IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

CHRISTOPHER W. STONEMAN,
Plaintiff,
vs. Case No. 4:21-cv-00061-SRB
NORFOLK IRON & METAL
and JAMES J. AJELLO,
Defendants.

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF NORFOLK IRON & METAL and NIM TRANSPORTATION, LLC, CORPORATION, Defendants, through its designated representative, JOSEPH W. SPENCER, a witness, taken on behalf of the Plaintiff, pursuant to Notice, on November 12, 2021, before

ELLEN L. STOCK

Registered Merit Reporter Certified in Missouri and Kansas.

EXHIBIT 3

2

APPEARANCES

For the Plaintiff:
MR. JAMES T. THOMPSON
EDELMAN & THOMPSON, LLC
3100 Broadway, Suite 1400
Kansas City, Missouri 64111
jthompson@etkclaw.com
(816) 561-3400

For the Defendants:
MR. MICHAEL B. LESTER
BROWN & JAMES, PC
2345 Grand Boulevard, Suite 2100
Kansas City, Missouri 64108
mlester@bjpc.com
(816) 472-0800

Also present:
Mr. Richard R. Shoemaker
Ms. Joey Patterson

STIPULATIONS

It was stipulated and agreed by and between counsel and the witness that there is no objection to the deposition officer administering a binding oath to the witness by videoconference.

3

TABLE OF CONTENTS

EXAMINATION
Questions By Mr. Thompson 5
Questions By Mr. Lester 88
Questions By Mr. Thompson 94
Questions By Mr. Lester 95

EXHIBITS
1 - Deposition notice 62
2 - Defendants' document production 67
4 - NIM Drivers Manual 83
5 - Training materials 20
7 - "Internal Emails," accidents reports, and other attachments 23

CERTIFICATE OF REPORTER 97
ERRATA SHEET 98
SIGNATURE PAGE 99

Reporter's Note: Electronic exhibits provided by counsel were made OCR searchable (PDF), downsampled to 600 dpi, digitally labeled if not previously labeled, flattened, archived as original exhibits, and provided electronically to all ordering counsel. Processing electronic exhibits can change the file size, resolution, and metadata of files originally provided.

4

TABLE OF CONTENTS (Continued)

(ph) indicates a phonetic spelling.
[sic] indicates the text is as stated.
Quoted text is as stated by the speaker.

5

(The deposition commenced at 11:43 a.m.)

THE VIDEOGRAPHER: We are now on the record. Today's date is 11 -- November 12, 2021, and the time is 11:43. This is the video-recorded deposition of Joseph Spencer in the matter of Christopher Stoneman versus NIM Transportation, LLC, Case No. is 4:21-cv-00061 in the United States District Court for the Western District of Missouri at Kansas City.

Will counsel please identify themselves and the parties they represent for the record.

MR. THOMPSON: James Thompson on behalf of the plaintiff, Christopher Stoneman.

MR. LESTER: Michael Lester on behalf of defendants, James Ajello and NIM Transportation, LLC, and nonparty Norfolk Iron & Metal is producing Joe Spencer as a corporate representative today.

THE VIDEOGRAPHER: And will the court reporter please swear in the witness.

JOSEPH W. SPENCER,

a witness, being first duly sworn, testified under oath as follows:

EXAMINATION

BY MR. THOMPSON:

Q. Mr. Spencer, good morning, my name's James

6

Thompson, and I have the privilege of representing Christopher Stoneman in this matter. Do you understand that you have been designated by Norfolk Iron & Metal to respond to various areas of inquiry for Norfolk Iron & Metal and NIM Transportation?

A. I do.

Q. Have you ever had your deposition taken before, sir?

A. I have not.

Q. Have you been present during any of the prior depositions today?

A. I was here for just the tail end of Jeff's and most of Joey's.

Q. Okay. Well, just for the record, I'll -- I'll go quickly over some of the guidelines.

Obviously, continue to give a full audible response rather than a nod of the head. You and I might know what your intention was in your response, but we need a clean record so the court reporter can take down your words. So if you'd continue to do that, I would appreciate that.

A. Yes, sir.

Q. Also, most importantly, if you don't understand a question I've asked you, let me know you don't understand it, it may be because it's just

7

an inarticulate question, I ask a lot of those, and I apologize up front for them, but I need to know that you don't understand a question so that I have an opportunity to rephrase it in a way that you will understand.

So if you don't understand a question or think you haven't heard a question correctly, or maybe the video feed catches and we miss part -- you miss part of the question, will you let me know?

A. I will.

Q. If you go ahead and answer the question, can I assume, and the folks on the jury here in Kansas City assume, that you understood the question and answered it truthfully and to the best of your recollection?

A. You can.

Q. And just to be fair to you, you understand that if -- when this case goes to trial, if your testimony were different at trial than it is today, I would have an opportunity and an obligation to point those differences out to a jury?

And I just don't want to be in a situation where you say, "Well, when you took my deposition on November 12, Mr. Thompson, I didn't really understand that question." So we need to make sure

8

that's all cleared up today. Fair?

A. Fair.

Q. Okay. Also, we won't keep you a great deal of time today, but if at any time you need to take a break, just let me know you need a break. If there's a question pending, you need to answer that question, and then we'll take a break immediately thereafter. Okay?

A. Okay.

Q. Also, as you can tell how this process goes, Mr. Lester may have some objections. He has an obligation to his client to object to things that he believes the question is not framed appropriately or is missing some of its elements. That's not telling you not to answer, that's saying for the court to look at, the judge to look at, at a later point in time and determine whether the question was appropriate or not. So when he -- after he's fully stated his objection, you can go ahead and answer. Do you understand that?

A. I do.

Q. That's a long-winded way of saying his objection is not telling you not to answer, it's putting something on the record he believes he needs to. Okay?

9

A. Okay.

Q. Mr. Spencer, could you go ahead and state your full name for the record, please.

A. It's Joseph William Spencer.

Q. And, Mr. Spencer, where do you currently live?

A. Emporia, Kansas.

Q. And what is your address in Emporia, Kansas?

A. For work or home?

Q. Home.

A. 2011 Belmont Drive.

Q. And are you currently employed?

A. I am.

Q. And where are you currently employed?

A. Norfolk Iron & Metal, Emporia, Kansas.

Q. And what is your current position with Norfolk Iron & Metal in Emporia, Kansas?

A. Safety and ISO coordinator.

Q. Can you tell me what your current job duties entail in terms of a generalized job description for safety and ISO coordinator?

A. The primary functions of my position are managing new hire and cross-training of employees in the Norfolk Iron & Metal facility, and training

10

within NIM Transportation, accident investigation, any safety duties related to both of those, and then managing the ISO quality system.

Q. And have those job duties -- or strike that.

Let me ask you this: When did you go to work for Norfolk Iron & Metal?

A. April of 2007.

Q. And can you just give me a thumbnail sketch of your -- your job duties and your job titles from April of 2007 until you became safety and ISO coordinator?

A. I came to Norfolk as a loader, which was a warehouse employee who loaded steel onto trucks or on trailers the drivers were going to take out. I went from that to most warehouse positions, ultimately ending as an assistant supervisor of a -- of a shift, and then moved into this position in, I believe, 2008, maybe 2009.

Q. Okay. From 2009 to today, have your duties as safety and ISO coordinator remained primary the same?

A. They have.

Q. So you understand that we're -- one of the things we're going to be talking about today is an

11

accident that took place back in 2018, July of 2018. If that accident had happened in 2012, your involvement would have likely been very similar; is that fair?

A. Yes.

MR. THOMPSON: And, Michael, what areas of inquiry is Mr. Spencer being designated today?

MR. LESTER: On the NIM -- on behalf of NIM Transportation, its topics, subject to the objections that we've agreed to limit any scope issues to for today, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 32, 42, 51, 52, 53, 58, 62, 63, 64, 71. And then there's -- on behalf of Norfolk Iron & Metal, I think two of those are identical. So he's cross-identified.

Q. (By Mr. Thompson) Okay. Mr. Spencer, can you give me some general understanding of your educational background, your formal educational background?

A. Some college; did not graduate.

Q. Okay. Did -- was there a particular field of study that you pursued in college?

A. General studies.

Q. Okay. Any vocational training or certificates that you have?

12

A. Not -- no. OSHA certificates related to the job that I'm in now that I've obtained here. Past that, no.

Q. Have you -- I assume you have OSHA 10 training?

A. OSHA 10, OSHA 30, some specialized training.

Q. What about training in -- with regards to the Federal Motor Carrier Safety Administration's regulations?

A. The training in the FMCSA regulations has been on the job.

Q. Do you currently have a CDL?

A. I do not.

Q. Have you ever had a CDL?

A. I have not.

Q. Have you ever gone to any Federal Motor Carrier Safety administration regulation seminars or topics?

In other words, I understand you -- you gain a body of knowledge simply by doing your job every day, and perhaps reviewing the Federal Motor Carrier Safety administration's regulations. Have you ever gone to any formalized training outside of Norfolk or NIM?

13

A. Not formal training that was specific to the FMCSA. There have been conferences and breakout sessions related to that occasionally along the way, most of my training came from the driver supervisor, the drivers, corporate representatives, on the job within NIM.

Q. Do you have a understanding of the training that was -- that Mr. Ajello received from NIM or Norfolk?

A. Mr. Ajello began his career with Norfolk Iron, NIM Transportation several years before I came to the company, and I cannot speak to what the training consisted of before -- before I was here.

Q. What training --

Let me ask you this: Are you aware of any training that Mr. Ajello received from 2009 when you -- and I think I'm right. Is that the right date for you becoming a safety and ISO coordinator?

A. I believe it was.

Q. Okay. So in 2 -- from 2009 on, would you be responsible for training drivers to the extent -- extent such training took place out of the Emporia facility?

A. Yes, sir.

Q. Okay. And that would be new hires as well

14

as existing hires?
A. I would have my part of that training, yes.
Q. Okay. With respect to new hires from 2009 on, what responsibilities would you have as it relates to training?
A. When a new driver starts with NIM Transportation, there are a series of steps the new driver goes through before they're allowed to work on their own, one of those steps is meeting with me where I cover the objectives of the safety and loss prevention program, typical types of accidents that -- that can happen, our policies, our procedures, our recommendations and rules of thumb to avoid those.
When I'm finished with the -- with my part of the new driver training, they spend some time with the driver supervisor, and he'll have a list similar to mine, but it will be more logistic. It would be here's how you handle a cash on delivery, here's how you use the -- the computer in the truck.
They spend a day on the warehouse floor to understand how the loads go together. They spend a self-paced amount of time going through a program offered by AdvanceOnline that we pay for for the

15

driver to receive specific training in different areas.
And when those things are accomplished, which that could be anywhere between two to three days to even a week or so, after that the driver starts with a driver trainer and typically spends ten days minimum on the road with the driver trainer.
Once the trainer, the supervisor -- driver supervisor and myself agree, then we sign the new trainee off, and we let him start driving on his own.
Q. Let's break that down if we can just a little bit. My understanding is kind of the first step is an interaction and meeting with you; is that correct?
A. Not always. That -- that is a part of the training the driver would go through, the new driver would go through before -- typically before going out with a driver trainer. As to who goes first between the driver supervisor or myself, it's -- it's scheduling.
Q. Okay. So in terms of interaction, the driver -- and this is not in any particular order -- is going to meet with the driver supervisor and is

16

going to meet with you?
A. Correct.
Q. Might meet with the driver supervisor first, might meet with you first, but those two components are going to take place, and then he's going to be -- he or she is going to be put out on the road with an experienced driver for a period of approximately ten days?
MR. LESTER: Object to form. That misstates his testimony.
Joe, you can answer.
Q. (By Mr. Thompson) Mr. Spencer, I don't want in any way to misstate your testimony. I'm just trying to get some clarification here.
There -- I'm trying to walk through the components of what a new hire would go through now. Right? Do you understand that?
A. I do.
Q. And they would meet with you, and you'd explain the expectations, you'd go over safety-related topics and issues with them. They would also meet with the -- the person who's going to be their driver supervisor; correct?
A. Correct.
Q. And after those two functions are

17

accomplished, they are going to be put on the road with an experienced driver to assist them in learning what they need to. That -- that person can also assess the safety of those drivers and basically sign off on them when they feel they are ready to be on their own.
The bottom line is there's a period of on the road, real-life, real-world driving experience for about ten days, maybe a little more, maybe a little less depending on the driver; right?
MR. LESTER: I'm just going to object to form. I think that still misstates his testimony and doesn't include everything he said.
But, Joe, you can -- you can answer.
A. I believe what Mr. Lester is referring to would be the amount of time the new driver spends training online through the modules that we have them go through.
Q. (By Mr. Thompson) Okay. And is that -- that's done before they go out for that ten-day period?
A. It is. With new drivers that have been coming in since 2009.
Q. Okay. So new drivers that are coming in since 2009, when -- when you're talking about the

18

modules, is that what you were referring to when you were saying kind of at their own pace, sometimes it takes two or three days, sometimes a week, but you're letting them work through at their own pace these modules so that they have time to make sure they can absorb the information?

A. That is correct.

Q. Okay. So we've got meeting with you, meeting with the driver supervisor, a self-paced extensive computer-based modular training, and then approximately ten days on the road?

A. Correct.

Q. And at that point -- and I'm sure that if there are any issues that arise during any of those portions, you may give some additional training or some additional counseling, but the bottom line is that's a generalized picture of what a new driver since 2009 would go through to get to the point where they can be on the road by themselves; fair?

A. That is fair.

Q. Okay. Now, do you know how drivers were -- strike that.

That is the format since 2009 when you took on your position; right?

A. Approximately, yes.

19

Q. Okay. Do you know -- and we know that Mr. Ajello's hire predates 2009; correct?

A. It does.

Q. So do you know what training he would have received?

A. When we adopted using AdvanceOnline to train each of the modules for new drivers, we had all existing drivers complete the course successfully, so we pulled Mr. Ajello off the road, brought him into the -- the office and had him complete each one of those sections also.

Q. And have you reviewed any documents in preparation for your testimony today?

A. I've spoke with Mr. Lester and I --

Q. I don't -- I don't mean to interrupt you. I don't want to know what you've talked to Mr. Lester about. I'm not entitled to know that. I'm just --

For instance, I'm about to go through some documents that have been produced. They appear to be training documents. Some of them appear to be perhaps screen captures of computer module training. Are you familiar with the documents that have been produced in this case that relate to training?

A. I have seen the documents that were

20

produced, and I absolutely cannot say which ones for sure. It was a very large file. There were a lot of documents, but I have looked through that, yes.

Q. Okay. Let's see if we can try to sort some things out. So there was a group of documents running from -- it looks like Bates stamped 740, 516 pages running through Bates Stamp 1254 that are in a category of documents produced called training documents. Are you familiar with those?

A. Not by that description, no.

Q. Okay. Let me put some up then. Okay.

MR. THOMPSON: Can we pull up Exhibit 5.

Q. (By Mr. Thompson) So, Mr. Spencer, this is the grouping I'm talking about, and obviously the first page of the exhibit doesn't give you any information. If we go to page 2. Are you familiar -- do you recognize this document?

A. I do.

Q. Where is that document out of?

A. That document is a part of a printed out -- it was screenshots from the AdvanceOnline training that were printed out back in '08, '09, 2010, in that general ballpark, approximately the time that all the drivers that were already here went through that training.

21

And these were printed out at that time, and they were found in the driver supervisor's office by myself, and we -- we provided these to Mr. Lester, and this is a part of that.

Q. Okay. What -- are you aware of any document that -- that substantiates that Mr. Ajello received this training?

A. My understanding is that each module's completion results in a certificate of completion.

Q. And have you reviewed any certificates that would substantiate Mr. Ajello going through any of this training?

A. I cannot say for sure whether I saw those recently. I would have seen those at the time that Jim took these -- these classes.

Q. Well, those are something that should be in his driver qualification file; correct?

A. Not -- not necessarily. I -- I don't know whether those are in Jim's DQ file or not.

MR. LESTER: James, just to short-circuit it and maybe make it easier, because I think Rich is more qualified to talk about the DQ file next. But the certificates for AdvanceOnline for Jim Ajello are Defendants 110 through Defendants 126 --

MR. THOMPSON: Right.

22

MR. LESTER: -- are his certificates of completion.
MR. THOMPSON: Yep.
Q. (By Mr. Thompson) Have you reviewed the DQ file of Mr. Ajello?
A. I have not reviewed all of the DQ file. I've reviewed parts of it.
Q. Do you -- when you talk to drivers, do you discuss with them the importance of space management?
A. We do.
Q. Explain to me, for a commercial motor vehicle operator, the importance of space management?
A. What I train -- what my part of the training for new drivers is going to focus on with space management is mostly referenced by the Kansas CDL manual. We talk about our internal guideline of 6 to 8 inches -- I'm sorry, wow. Six to eight seconds of following distance under normal conditions and up to 10 inches -- or 10 seconds in adverse weather conditions as our rule of thumb we like our drivers to go by.
We do also discuss flow of traffic, which is referenced in the Kansas CDL manual, as the safe

23

way to travel through urban and congested traffic. We discuss the difference between the two. We focus on knowing the lane that you're going to need to be in and how to make arrangements to get there safely.
Q. And with -- with respect to Mr. Ajello and this accident, there was a finding that he failed to follow company guidelines on space management; correct?
A. No, that isn't correct.
Q. That's not correct?
A. Right.
Q. Okay. Were you part of the investigation of this accident?
A. I was.
Q. Okay.
MR. THOMPSON: Let's pull up, if we can, we'll just jump around a little bit here, Exhibit 7. And go to page 2 of Exhibit 7.
Q. (By Mr. Thompson) Are you familiar with this document, Mr. Spencer?
A. That looks like an email that I would have sent to the transportation accident incident notification email distribution group in 2018 following the investigation into Jim's accident.
Q. It looks like what you're doing is you're

24

attaching the police report; right?
A. That looks like it has the police report and the internal investigation, both of those should be attached to that email.
Q. Okay. So if we go to page 3, that's the first page of the police report; right?
A. It looks like it, yes.
Q. And you understand the importance of proper accident investigation; right?
A. I do.
Q. When a NIM Transportation driver is involved in an accident, you want to make sure that -- you want to find out if there's any preventability issues there, if there's some counseling that the driver should get, that hopefully doesn't make it a reoccurrence occur. There's -- from the standpoint of proper safety management controls, under the Federal Motor Carrier Safety administration's regulations, you understand the importance of accident investigation; right?
MR. LESTER: Object to form.
You can answer, Joe.
A. The internal investigations are completed with the goal in mind of preventing recurrence. They are used as training tools.

25

Q. (By Mr. Thompson) You would agree --
A. I would -- I'm sorry, go ahead.
Q. No. I didn't mean to interrupt you, sir. I thought you may have been done with your answer. Go ahead.
A. No. That -- that's all.
Q. Oh, okay. My question is a little different. You'd agree that internal accident investigation and a preventability analysis is part of having proper safety management controls in place; right?
A. Could you rephrase and repeat the question?
Q. Sure. Do you have an understanding of what is meant by "safety management controls" under the Federal --
A. I do.
Q. -- Motor Carrier Safety regulations?
A. Yes, sir.
Q. What does that mean?
A. Has recognition and an attempt to keep an accident from occurring.
Q. Anything else that's encompassed in a company's safety management controls?
MR. LESTER: Object to form.

26

Joe, you can answer.
A. I do not know what you're looking for.
Q. (By Mr. Thompson) Okay. You understand that safety management controls is a word of art defined in the Federal Motor Carrier Safety Administration's regulations. Do you understand that?
A. Define "word of art."
Q. A word of art is, in this context, a specific word or words, "safety management controls," that have a specific definition within the Federal Motor Carrier Safety Administration's regulations. Do you have a familiarity with what that term means?
A. I do not.
Q. Okay. But from a practical standpoint, regardless of your understanding of the regs, you understand the importance of an internal investigation and a preventability analysis as a learning and teaching tool to try to prevent occurrences from occurring again; right?
A. I have always seen accident investigations -- I think the -- the key words you're using there that I'm going to kind of cling to are going to be a teaching tool, a way to prevent

27

it from happening again. There is a difference between what we're doing here and what an internal investigation would include.
In Mr. Ajello's case specifically, a relatively minor and noninjury accident, there was no cross-examination, there was no trip to the scene. There was what was seen as an opportunity to discuss our rule of thumb of a six- to eight-second following distance, that way we could discuss the accident with other drivers and hopefully take something away from it.
Q. How many feet per second does a commercial motor vehicle travel if it's going 60 miles an hour?
A. I couldn't give you that number, sir.
Q. How about 45 miles an hour?
MR. LESTER: Object to the form.
A. Can't give you the -- I'm not going to be able to give you a specific number of feet traveled by a vehicle.
Q. (By Mr. Thompson) But you understand for proper safe -- space management, at least the company, after being in business for a period of time, believes that a six- to eight-second following distance is appropriate; right?
A. A six- to eight-second following distance

28

is in some circumstances not just appropriate but expected.
Q. And -- and depending on the driving conditions, you may have to actually increase that following distance; right?
A. In adverse weather conditions, yes.
Q. Yeah.
A. When possible.
Q. And a following distance of six to eight seconds affords the driver an opportunity to respond to, for instance, vehicles entering their lane; right?
A. That's a -- that's a almost unanswerable question the way that it's being asked.
Q. What -- is there a -- what difficulty are you having with the question? I'll try to -- I'll try to address it and ask it in a different fashion.
A. I think it has a very narrow focus. The -- I guess I've got to draw the difference between whether we're talking about driving in between Emporia, Kansas, and Ottawa on I-35 at 2:00 o'clock on a Sunday afternoon where six to eight seconds is absolutely expected under normal conditions, ten seconds in adverse conditions.
In a rural highway, that's more than

29

possible. In urban downtown traffic in the middle of Kansas City, anyone who's ever driven that has got to understand that that's not a possibility in any way, shape, or form, and that a driver attempting to merge left and attempting to give a six- to eight-second following distance would become a hazard to the drivers behind him, and, therefore, no, that is not NIM Transportation's expectation of our driver.
Q. Was Mr. Ajello counseled on following distance and the company's policy after this accident?
A. There was a conversation with Jim.
MR. THOMPSON: If we can go to page 13 of Exhibit 7. Which is Defendants 1277.
Q. (By Mr. Thompson) Do you know who filled out this "Norfolk Iron & Metal Company Accident Invest -- Incident Investigation"?
A. Mr. Thompson, I confess the older I get, it is a little bit difficult to see. Can you --
Q. No problem.
A. -- (inaudible) the image a little bit.
Q. Yeah, we'll -- I have the same problem; so if the videographer could expand on it.
A. That -- that is the final investigation of

30

Jim's accident. This is the form that I would have been a part of filling out.
Q. Well, the verbiage or the -- the narrative that's in -- on the following page, 1278, is that -- did you fill that out?
A. Same thing. Can we expand it a little bit, please.
That is Jim, the driver that we're discussing, the driver supervisor, and myself. That would have been a probably -- I can't say for sure, but it probably would have been -- I probably would have been the one that typed that, I think.
Q. And your signature appears on the bottom of page 1278?
A. It should, yes.
Q. Safety coordinator director's signature, that's you; right?
A. Correct.
Q. And then Charlie Cheek, is he still employed by the company?
A. He is.
Q. And he was the manager for that facility?
A. A driver supervisor, yes, sir.
Q. Okay. And if we go back to 1277, "Indicate all of the following that contributed to

31

the accident or incident." Do you see that?
A. You've got to blow this thing up a little bit, guys.
MR. THOMPSON: We need to go -- bring it down -- there you go.
A. It appears that we checked "Failure to follow prescribed policies and procedures."
Q. (By Mr. Thompson) Right. And it -- it's -- and that's in the -- you have a list of things you could check off there; right?
A. There is.
Q. And you can even put "other." And you want this to be accurate, don't you?
A. Absolutely.
Q. You're not just making stuff up; right?
A. No.
Q. I mean, if something's going to be an effective teaching tool, it needs to be accurate, at least from the company's perspective of how preventability can be taught and hopefully learned from as a teaching tool; right?
A. If a incident involving one of our drivers had occurred that we felt that we could teach the other drivers from, this is the tool we would use to teach those drivers.

32

Q. Well, it's also a tool to counsel the driver that was involved in the actual accident; right?
A. That is not the case, no.
Q. No? So your intent here is not in any way, shape, or form to help Mr. Ajello perhaps become a safer driver, that's not important to you --
MR. LESTER: Object to form.
Q. (By Mr. Thompson) -- is that right?
MR. LESTER: Argumentative.
A. We believe that Mr. Ajello is an exceptionally safe driver with 30 years of experience over the road, more than a million miles.
Q. (By Mr. Thompson) Have you read Mr. Ajello's deposition?
A. I have.
Q. Did you find his description of how he deals with space management to be consistent with the Kansas commercial driver's license manual and the safety training that he was purportedly provided? Did you see --
MR. LESTER: Object to --
Q. (By Mr. Thompson) Did you see anything that seemed a little out of place in terms of his

33

understanding of -- of space management?
MR. LESTER: I object to form. It's vague and ambiguous. Calls for speculation.
Joe, you can answer if you know.
A. Mr. Ajello referred to how many feet per second he needed to be behind a -- another vehicle. Mr. Ajello also said that he was traveling at 45 miles an hour with his foot on the brake as he's preparing to go left on 610, and that he can see the vehicles in front of him.
He also says that he saw the driver approaching on his right-hand side. With his foot on the brake, intentionally not driving so slow as to become a hazard to the cars behind him, and leaving space in between himself and the cars in front of him, not the car in the next lane, because that's not what we trained Mr. Jim -- or Jim Ajello to do, I don't feel there is absolutely anything that I personally would have done differently.
Q. (By Mr. Thompson) My question -- I move to strike as nonresponsive. That wasn't my question, Mr. Spencer, although I appreciate you trying to provide an answer.
Mr. Ajello said that -- since the beginning of his driving, that he uses a rule with

34

regard to space management of 10 feet for every 10 miles an hour he's traveling. As -- as someone involved in the training of commercial motor vehicle drivers, do you think that is a safe understanding of space management?

MR. LESTER: Object to form.

A. It is a possibly simple explanation of that doesn't fit in all circumstances. I would suggest that the Kansas CDL manual, if looking at a vehicle approximately the same size as Jim, is at the speed that he was traveling, I believe it's 2 -- Section 2728, somewhere -- somewhere around the part where it talks about how safe it is to travel at the speed and the flow of traffic, it does give the example specifically that Jim cited.

Q. (By Mr. Thompson) Do you believe that that is a safe and good understanding of safe space management technique?

MR. LESTER: Object to form. Argumentative. Asked and answered.

Q. (By Mr. Thompson) Ten feet for every 10 miles an hour you're traveling?

MR. LESTER: Object to form. Asked and answered.

Joe, you can -- you can --

35

Q. (By Mr. Thompson) You can answer, Mr. Spencer.

MR. LESTER: You can answer again.

A. I feel like that given the circumstances Jim was in, his actions were safe. I -- I don't -- I don't know another way to answer your question, sir.

Q. (By Mr. Thompson) Sure. I -- and I'm not talking about Mr. Ajello on that day. So I'm not asking you to critique, as part of the answer to the question, his actions that day.

I'm asking you, as a commercial motor vehicle driver, do you believe his understanding of 10 feet for every 10 miles an hour he's traveling in terms of space management is a safe understanding of space management?

MR. LESTER: Object to form.

Q. (By Mr. Thompson) Just generally, do you believe that's a safe understanding of it?

MR. LESTER: Asked and answered.

Joe, you can answer again.

A. Again, I don't feel that's necessarily a fair question. It isn't only what Jim learned in high school, as he stated in his deposition, but it's also the six to eight that Norfolk's asking for

36

(inaudible) applicable.

It's also, the dozens of times that we've had drivers meetings over the last 15 years that I've been here, 13 in this position, excuse me, that urban driving, safe driving, checking mirrors, all of those things have been discussed.

So asking the question of is Jim's understanding of how far he should be away from other cars in a safe traveling distance based on this one number, from an interview that you had with him a few months ago, is not a fair question, because Jim has a much bigger understanding of how to drive a semi truck than that.

Q. (By Mr. Thompson) And, for instance, based on that high level of understanding and experience, he appreciated and knew that he was coming into a portion of the roadway that historically, almost on a daily basis, had heavy congestion at that time of day; correct?

MR. LESTER: Just going to object to form.

Joe, to the extent you -- you know what Mr. Ajello testified to, you can answer.

A. I believe that's what he said in his deposition.

Q. (By Mr. Thompson) Right. I mean, he

37

expect -- it wasn't new to him or a surprise to him that there was going to be slowing traffic, stopped traffic, or congested traffic at that juncture; right?

A. Correct.

Q. And that's what you -- you -- you were talking about, his -- his body of knowledge as a commercial motor vehicle operator, that's the type of thing that you use when you know there's a situation where you have congested traffic, where you can have people moving from lane to lane, you want to adjust your driving to address the safety concerns associated with that type of environment; right?

A. In the position that he was in, attempting to keep as much space in between him and the automobiles in front of him in his lane, without creating a hazard to the cars behind him, is exactly what should have been done.

Q. And why would slowing down any further create a hazard? He said he was going 45; right?

A. I believe that's what he said in his deposition.

Q. And he knows that there's congested and -- and potentially stopped traffic ahead of him; right?

A. I don't believe he said that, no.
Q. Oh, okay. You don't believe he said that.
A. Not that I remember.
Q. Okay. In any event, back on your form, you listed failure to follow prescribed policies and procedures as the item that -- that contributed to the accident; isn't that true?
A. That is what we listed, yes.
Q. And that's based on your professional understanding after what you believed was a thorough investigation of the accident; right?
MR. LESTER: Object to form. Argumentative.
You can answer, Joe.
A. Again, Mr. Thompson, it is a significantly different thing to do an internal accident investigation over a 5-mile-an-hour fender bender. There was no trip to the scene. There was no cross-examination. We used that opportunity to attempt to open a dialogue and discuss traveling distance with our drivers, yes, that's what we did.
Q. (By Mr. Thompson) And in this situation, you -- I mean, you felt you did as complete an investigation as you needed to to basically reach a conclusion of what contributed to the accident;

right?
MR. LESTER: Object to form.
You can answer.
A. I -- I think I have a couple of times. I'm not sure how -- how else you would like to hear the answer, sir, with no disrespect, but I -- I feel like you're asking the same thing over and over.
Q. (By Mr. Thompson) Well, I feel like you aren't answering the question, with no disrespect.
So my question is do you -- let's just walk through it. Do you take -- when you -- you have a preliminary investigation or preliminary report of an accident; right?
A. Yes, sir.
Q. And then there's a process where you collect information, necessary information to -- to get to a point where you can do a final accident -- a final accident, an incident investigation report; right?
A. That's right.
Q. Now, sometimes that accident may involve going to the scene, it may involve interview with numerous people. It may be more involved than your investigation here was; right?
A. Yes, sir.

Q. But the bottom line is regardless of how complex an investigation is, you don't get to a point where you attribute causation issues or what contributed to it unless you have obtained the information you feel you need to -- to reach that conclusion; right?
MR. LESTER: Object to form. Calls for speculation.
But you -- you can answer.
A. I'm -- I'm -- I'm going to try to word it a different way. We -- in dealing with a minor accident, we took what we could from that accident to create a training tool for the other drivers without -- admittedly without investing the time to go to the scene, without investing the time to -- a scene investigation would have probably been the -- I don't know, I'm trying to think of what else we would have done here.
You've got Jim, that we absolutely called in. We had a conversation with the guy that we have had working for us for a very long time, that we know does a good job and takes his job very seriously, and that was a key part of our investigation, the conversation with Jim.
At the end of the day, Jim felt very

strongly, how the events played out, that this was directly caused by Mr. Stoneman.
Q. (By Mr. Thompson) Well, that's not what the police thought, is it?
A. The police report did -- did come later.
Q. Well, but you --
A. -- I believe.
Q. You had the police report when you did this final accident report; right?
A. I believe that's right, yes.
Q. Yeah, and so the -- the police were on the scene, weren't they?
A. I believe so, yes.
Q. And -- well, you don't always have to take the word of law enforcement. That's certainly an important data point in terms of their interpretation of what caused the accident; right?
A. It is.
Q. I mean, you wanted the police report prior to completing your investigation; right?
A. We did.
Q. And you understand that there can be two sides to every story about how an accident occurs; right?
A. I would -- I would assume so, yes.

42

Q. Okay. Did you ever talk to Mr. Stoneman?
A. That, I did not, no.
Q. And you refer to a 5-mile-an-hour fender bender. Have you seen the damage to your vehicle?
A. I have.
Q. Do you think that's a 5-mile-an-hour impact?
A. I do.
Q. Okay. You have some other accidents that are 5-mile-an-hour impacts that look like that?
A. I think that the damage to Jim's truck, in my opinion, is consistent with slamming on your brakes when you're cut off, the way the truck lifts up, the damage to the -- the front of the hood, the radiator, it is absolutely consistent with a 5-mile-an-hour crash, yes.
Q. What other crashes have you investigated at 5 miles an hour?
MR. LESTER: Object to form.
A. I -- I can't think of a specific case right now to give you, but I can -- I can say that over the time that I've been doing the job that I'm in now, there have been many investigations for lots of different things.
Q. (By Mr. Thompson) Well, have your trucks

43

gotten in a lot of accidents since 2009?
A. Absolutely not.
Q. So I'm just trying to find out what your knowledge base, when you say that the damage to this vehicle looks like a 5-mile-an-hour collision, I'm just trying to find out where that knowledge base is. Do you understand?
A. I -- I do.
Q. And so I'm trying to find out -- I mean, I didn't think you guys crash every day. I'm not being facetious. I mean, how many 5-mile-an-hour crashes have you investigated and have a knowledge base as to what that particular type of vehicle would look like in a 5-mile-an-hour crash?
MR. LESTER: Object to form. Object to the preamble. The question's argumentative. It's outside the scope of his testimony as a corporate representative.
But, Joe, you can answer.
A. I -- I already have. I can't tell you a specific case that I can remember investigating a 5-mile-an-hour crash.
Q. (By Mr. Thompson) Okay. And I'm not, again, trying to be difficult, but I need to run this to ground. Do you have any experience in

44

accident reconstruction?
For instance, there's the Northwestern Traffic Institute at Northwestern University in Chicago. They teach accident reconstruction to law enforcement, to many people who go there for a week or two weeks or even a month. Do you have any such formalized training in accident reconstruction?
A. No, sir.
Q. Now, do you understand whether there were any modules or ECM modules on that truck that may have had information that would be relevant to your investigation?
A. I -- I can't say for sure.
Q. Fair. And when you say you can't say for sure there may be a few reasons, so I'm going to ask some follow-up.
Do you know if that truck had a module on it that would provide any data as to such things as vehicle speed, braking, acceleration, throttle, rpms, any of that?
A. The truck should have been equipped with PeopleNet, which was an electronic logs system at the time.
Q. Okay. And did you request any information from PeopleNet?

45

A. I did not.
Q. Okay. And you understand that PeopleNet, depending on the equipment on a particular vehicle, through GPS, may have some information with respect to vehicle speed? Are you aware of that?
MR. LESTER: James, I'm fine with you asking the question, and I'll let Joe answer it. But I'll just say Rich, who is coming up next, is the corporate representative who is going to be able to talk about these precise PeopleNet logs that were on board at the time and what they entailed, so --
MR. THOMPSON: Okay.
MR. LESTER: -- Joe can answer to his personal knowledge, but there will be a corporate rep on the topic when we're done.
A. Mr. Thompson, I -- I honestly don't know.
Q. (By Mr. Thompson) Okay. So as part of any accident investigation, not just this accident, but any other accident that you've investigated since 2009, have you ever used PeopleNet to provide some information or data that may shed light or provide additional data points in your investigation?
A. I believe that I've never requested information from PeopleNet myself, and if it ever

46

has been used, it was provided by the folks at corporate.
Q. Do you recall it ever being provided by the folks at corporate?
A. I can't say for sure. I don't know.
Q. Okay. Other than PeopleNet, are you aware of any modules through the engine manufacturer that would provide data points for an accident?
MR. LESTER: And I'm just going to -- same objection as earlier. Joe can obviously answer to his personal knowledge, but Rich is the corporate representative designated to testify to it.
A. I -- I don't know.
Q. (By Mr. Thompson) Okay. Have -- I just want to make sure I'm clear. Do you -- as you sit here, do you have any recollection of ever getting engine module data as part of an investigation you were doing for Norfolk Iron?
A. I -- I don't remember that, no.
MR. LESTER: And just to be -- well, I'll clear it up later, but that's fine.
Q. (By Mr. Thompson) So with respect to the information you had in investigating this accident, you had a statement from Mr. Ajello; right?
A. Correct.

47

Q. And -- and not only a written statement from Mr. Ajello, you had a -- a verbal conversation with him as well; correct?
A. That's right.
Q. And is it fair to say that his verbal conversation was pretty consistent with his written narrative?
A. I don't have the written narrative in front of me.
Q. Sure. Let's do that, in fairness to you. I think if we go to page 11 and 12.
MR. THOMPSON: So let's bring up, if we could, 11 and 12, and you may have to rotate them. And why don't you go to 12 first and maybe blow it up a little bit for the witness.
Q. (By Mr. Thompson) Mr. Spencer, are you familiar with this type of document?
A. The type of document, yes.
Q. And when is this used and what's it used for?
A. This is what we refer to as a driver's kit. This is for the driver to document the events of -- of an incident after they happen.
Q. And the handwriting on this particular document, do you believe that to be to Mr. -- be

48

Mr. Ajello's?
A. We're not anywhere close enough for me to be able to see that. We're going to need to go about twice that big.
(The videographer complied.)
A. I think so.
Q. (By Mr. Thompson) And it looks like it was filled out on the day of the accident, that would be consistent with policy; right?
A. Correct.
Q. And take a moment, if you can, and -- and read his narrative here.
(Reviews document.)
Q. (By Mr. Thompson) Is it your recollection that that narrative, not perhaps with every specific detail, but the general tenor of that narrative is consistent with his verbal discussions with you about the accident?
A. I believe so, to the best of my memory.
Q. So you had his version of events. You had the police report. You didn't have any data off the truck, you didn't have any data off the engine, and you never talked to Mr. Stoneman. Is that a --
MR. LESTER: I object --
Q. (By Mr. Thompson) Is that a --

49

MR. LESTER: Sorry.
Q. (By Mr. Thompson) -- fair assessment of the information you did and did not have?
MR. LESTER: I object to the form of the question. It's argumentative and it misstates the evidence.
A. To the best of my memory.
Q. (By Mr. Thompson) Were you part of a decision not to try to follow up and talk to Mr. Stoneman as part of your investigation?
A. I -- I was not a part of the decision to or to not talk to Mr. Stoneman.
Q. Would that have been someone else's decision?
A. I don't know.
Q. As part of a preventability analysis -- and strike that.
Let me ask you this: Does -- does NIM or Norfolk have a policy when a driver is involved -- a commercial motor vehicle driver is involved in an accident of conducting a preventability analysis of the accident?
A. Whenever an accident has occurred, we attempt to figure out the best that we can do to keep it from happening again.

50

Q. My question is just a little different.
Do you have a formal policy to conduct a preventability analysis as that analysis is described in the Federal Motor Carrier Safety Administration's regulations?
A. I can't answer that question.
Q. And in the narrative on page -- let's see, page 14 of Exhibit 7.
MR. THOMPSON: If you could bring that up.
Q. (By Mr. Thompson) It says "Jim states another vehicle cut in front of him and hit his brakes abruptly. Jim was unable to stop and rear-ended the other vehicle. Although Jim did not receive a citation, the report -- the police report lists Jim as driving too fast for the conditions as well as following too close to the vehicle he hit." Do you see that?
A. Yes, sir.
Q. Is that your verbiage, your narrative?
A. Possibly.
Q. Consistent with the -- with the conclusions that were reached here -- right? -- as to how the accident -- "How did the accident or incident occur? What is the root cause?" And that's the narrative that was put in that section;

51

right?
A. I don't understand what -- what you're specifically asking.
Q. Sure. I apologize. Poor question.
The -- what that narrative is answering is the question how did the accident or incident occur, and what is the root cause; correct?
A. That is what the question is asking, yes.
Q. And you signed off on that answer; right?
A. That's my signature at the bottom of the page; correct.
Q. And you wouldn't have signed it if you hadn't reviewed it; right?
A. I'm sure that I wouldn't have.
Q. Just so the record's clear, you may or may not have actually written that narrative, but you certainly would have read that narrative before signing off on it; right?
A. Correct.
Q. And then this gets to your point. "Accident reoccurrence prevention. What have we done to prevent this from happening again? What administrative or engineering controls were put in place?"
And the answer is "The following policy is

52

in place for NIM Transportation, and if followed, would have prevented this accident."
Then it says "Six to eight seconds following distance will be maintained under normal driving conditions. Under adverse driving conditions, ten seconds following distance will be maintained." Do you see that?
A. I do.
Q. And, again, you may have written that -- right? -- you just don't have a specific recollection?
A. Correct.
Q. But you would have read it prior to signing off on it; right?
A. Correct.
Q. And if you didn't agree with anything in this form, you could have requested it be changed or gotten follow-up; right?
A. That is also correct.
Q. And it says "Participating employees involved in the investigation." You have Mr. Ajello, Mr. Cheek, and yourself; right?
A. Yes.
MR. THOMPSON: We've been going, I think, about an hour. Why don't we take about a

53

five-minute break.
THE VIDEOGRAPHER: Time is 12:49, and we are going off the record. Stand by.
(A recess was taken.)
THE VIDEOGRAPHER: The time is now 12:59, and we are back on the record.
Q. (By Mr. Thompson) Mr. Spencer, I just want to touch -- go back and look at Exhibit 7 again and just try to get an understanding of the general time frame and the process and procedure that was gone through here rather than kind of the substantive conclusions.
So it looks -- if we look at Exhibit -- page 8 of Exhibit 7, there's what's called a "Preliminary Report of Driver Accident." Do you see that?
A. I do.
MR. LESTER: I think -- we're -- we're seeing the police report now, is that what we're supposed to see?
Q. (By Mr. Thompson) I'm sorry, page 9. So with the policies and procedures there at NIM and at Norfolk, if we're kind of walking through a chronology, an accident happens involving a NIM commercial motor vehicle driver. That driver has an

54

accident kit, which includes a number of things. And one of the things is, it allows the driver to fill out a narrative or description of how the accident happened. Right?
A. That is correct.
Q. And are they supposed to go through that process with the accident kit there at the scene?
A. They should complete the accident kit, which is the -- the term we use for the preliminary -- I'm sorry, not the preliminary report, but the witness statement which has the -- I think it was the last one that you had up that has the -- the picture the driver can -- can kind of draw where everybody was at, where he signs it, as soon as possible, that way they -- so it's fresh in their mind.
Q. Okay. So are they supposed to do that at the scene, or are they supposed to do it sometime that day, or is it just generically as soon as you can? How are they instructed?
A. As soon as possible.
Q. Okay. So maybe at the scene, maybe a little while later that day depending on circumstances?
A. That's really all we tell them, is just as

55

soon as possible.
Q. Okay. And then does that generate -- or strike that.
Are they all supposed to -- also supposed to call and report the accident immediately?
A. Drivers have been instructed to get ahold of their supervisor as soon as possible if an incident occurs.
Q. So that would mean a cell phone call from the scene; right?
A. Potentially, yes.
Q. Okay. And is that first notification from the driver what generates that preliminary report of driver accident?
A. That is correct.
Q. And if we go back to page 9 of Exhibit 7. Can you tell when this document was created? And -- and it tells us when this was actually filled out.
A. It's -- it's going to need to be blown up again. Apologize to whoever's having to do that for me.
(Videographer complied.)
A. It looks like 7/16 of 2018. And I'm looking at the -- the time stamp in the header on the right-hand side and the date of the accident on

56

the top line on the left.
Q. (By Mr. Thompson) When you say the time stamp or the date stamp, you're -- are you talking about what appears above "Preliminary Report of Driver Accident," in the upper right it has "James J. Ajello," and then "Ajello 07/16/2018"?
A. Yes. Date stamp --
Q. What does that --
A. -- is what I meant.
Q. What does that time stamp tell you?
A. That tells us when -- when the driver supervisor completed this report.
Q. Okay. So sometime on the 16th of July; right?
MR. LESTER: (Inaudible.)
A. Yes.
Q. (By Mr. Thompson) And --
MR. LESTER: (Inaudible) in the way, if that's true, Joe.
But could we show him the very bottom, the very last line of that page? I didn't know if that -- I don't know if that changes the answer or not.
A. Actually, I don't know why those two would be different. I -- I don't think I've ever seen

57

that before.
MR. LESTER: I just want to make sure we have a clear record. I'm sorry, James. The witness is back to yours.
MR. THOMPSON: Yeah, I'm not -- it's -- it's not a trick question or trying to -- I'm just trying to get the process.
Q. (By Mr. Thompson) So at the bottom of the page there's an audit -- it says "Audit stamp created 7/17/2018. Preliminary accident 1.4 preliminary report of driver accident reported by Charlie Cheek."
A. Correct.
Q. What -- what appears at the top of the document, based on your experience, would kind of indicate to you that it was filled out on the 16th, but there's also a -- a notation at the bottom that says audit stamp that was created on 7/17 of 28 -- 2018. Do you know what the audit stamp means?
A. I've never seen that. I've never noticed that on the form before. I don't know what that is.
Q. Okay. The form was probably filled out at least after 7:15 p.m. on the 16th because it includes the fact that -- it includes the fact that Mr. Ajello did go to Newman Hospital for a UA at

7:15; right?
A. I would -- I would assume that also.
Q. So this is -- this is kind of the starting point officially to start deciding what needs to be investigated?
A. Correct. That's the -- the preliminary report. That's what the driver supervisor completes and starts the process.
Q. And at this point you don't have the police report; right?
A. No. Correct.
Q. And -- but this also -- in fairness to you guys, this is a preliminary report of a driver accident, not the completion of your investigation; right?
A. That's correct.
Q. And then if we go to page 21, 22, 23, do those -- do you know who took those photographs?
A. I don't.
Q. Do you know when they were taken?
A. I do not.
Q. Do you know where they were taken?
A. I can see another NIM trailer beside that truck in the picture. I -- I don't see anything else that tells me for sure where.

Q. Did you review these photos?
A. I don't remember.
Q. Did you ever go and look at the truck yourself personally?
A. Possibly, and I don't remember.
Q. Do you have any reason to believe that these photos don't accurately reflect the condition of the truck after the accident?
A. I have no way of -- of knowing that.
Q. Do you believe you would have had the photos at the time you signed off on the investigation report?
A. That long ago, I can't say.
Q. All right. Let me jump back to training for a moment if we could.
MR. THOMPSON: And pull up Exhibit 5. And if we could, go to page 32 of Exhibit 5.
Q. (By Mr. Thompson) And this says "Driver Training Audit." So my question is, is this document --
MR. LESTER: Did -- James --
Q. (By Mr. Thompson) -- are these --
MR. LESTER: Sorry.
Q. (By Mr. Thompson) So if we go back to page 31, it looks like this is a sample of a -- is

this a test that a driver takes after completing, perhaps, one of the modules?
A. Can we blow it up, please?
Q. Sure.
A. I don't know.
Q. Are you familiar with this document?
A. I'm not -- I'm not seeing it anymore, it disappeared on me. It's gone again.
MR. LESTER: It's a finicky screen share here.
(Videographer clarification.)
A. Honestly, Mr. Thompson, I'm -- I'm inclined to believe that it's probably a -- a test at the end of one of the modules. I've seen those, but I don't -- I don't know for sure if this is one of them or not. It looks like it probably is.
Q. (By Mr. Thompson) Let's go, if we could, to page 54.
So these are how these were produced. Do you know -- for instance, this document, do you know where this document was found?
A. I don't understand the question.
Q. Well --
MR. LESTER: Joe, I'm going to help you answer for one second, and I think that will answer

James's questions.
MR. THOMPSON: Sure.
MR. LESTER: It's -- he's in the middle of the documents that were produced with this (indicating).
THE WITNESS: Right. Okay. Yeah.
A. Those were in the -- the three-ring binder that Mr. Lester just showed us. That was found in the driver supervisor's office, and those were printed out -- I -- I think it's time stamped at the bottom of several of the pages, but it was around the same time Jim would have taken those modules.
Q. (By Mr. Thompson) Yeah, for instance, page 58 is time stamped 12/30 of 2009?
A. That does sound right.
Q. But these documents aren't unique to Jim Ajello; right? They're -- so if we see highlighting on them, if we see writing on them, that's not Jim Ajello's highlighting or -- or handwriting; right?
A. I would not have any idea.
Q. These are -- all of the documents that were produced, were produced from a -- or all of these training documents came out of a three-ring binder in the driver supervisor's office; is that right?

A. Correct.
Q. Okay. So I'm going to go through quickly some of these topics in the deposition notice. Okay?
MR. THOMPSON: If we could pull up Exhibit 1.
Q. (By Mr. Thompson) Have you had an opportunity to review Exhibit 1, which is a deposition notice?
A. No, I haven't.
MR. THOMPSON: If we could go to page 3.
A. Oh, I'm sorry, yes, I have.
Q. (By Mr. Thompson) Okay. So you've been designated -- we're going to walk through these. On -- on this page, you have been designated to testify as to 6, 7, 8, 9, and 10.
So "A person or persons knowledgeable regarding the informational contents of any and all video, audio, electronic, or other media forms of training material provided to James Ajello at any time during his employment with you."
MR. LESTER: Obviously, James, as we march through these, subject to the objections that we've agreed to and limitations, but Joe -- Joe will answer your questions.

Q. (By Mr. Thompson) Are you aware of any training provided to Mr. Ajello that hasn't been produced in this case?
A. The only thing that I can definitively say for sure where Jim was trained would have been at the quarterly drivers meetings, which we did not have a list of the topics that were covered at those, but there's been quite a bit of group discussion over the years in those.
Q. So quarterly driving -- driver's meetings. They -- but the name, I assume they take place about every three months?
A. That -- usually, yes. That's the goal.
Q. Can you explain the format of those meetings?
A. I can. There has been a little bit of -- usually -- usually there's going to be some corporate representation. The guys from Nebraska are going to fly down, and we are going then -- they'll join us for the meeting. It is primarily a safety meeting.
We'll serve either breakfast or lunch to the drivers. We'll talk about anything that's happened over the last three months that we can learn from. There will be a group discussion, use

sometimes PowerPoint, sometimes video.
Q. And do you keep any record of what's covered in those meetings?
A. Not that we could find for this far back.
Q. Well, so what about in the last five years?
A. Not that I know of. You'll have topics (inaudible) --
Q. Do -- do you have record --
I didn't mean to interrupt you. I just -- do you have any documentation for any period prior to July of 2018 about any -- any topics covered in quarterly driver's meetings?
A. There isn't any documentation, no.
Q. How about any documentation of who attended those meetings.
A. That --
Q. Does the driver have to sign in?
A. That, I -- I'm going to have to defer to Rich. I don't know the answer to that, but I believe it's something he can address.
MR. THOMPSON: To short-circuit this, Michael, the documents that you've produced as -- that are either in the driver qualification file or that you've produced as training documents more

recently, is that the totality of what has -- what's available with respect to training for Mr. Ajello?
MR. LESTER: It's everything I have, and I believe it's everything pre-accident. I don't know if we've looked for what -- if there's new training in the last year. And I think our objection speaks to that.
But with respect to all pre-accident documentation of training of Jim Ajello, you have everything.
MR. THOMPSON: Okay.
MR. LESTER: To our -- to -- to defendant's best knowledge and belief.
Q. (By Mr. Thompson) And if we jump to 13, which is on page 4 of the exhibit. Actually, 12, 13, and 14. Take a moment, if you would, Mr. Spencer, and just look at those three paragraphs.
MR. LESTER: Just to be clear, as he reads them, there's an objection that we've agreed to limit this to -- we're providing Mr. Spencer to testify regarding Jim Ajello's training, instruction, and monitoring.
A. Okay. Mr. Thompson, what's the -- what's the question on -- on which one are we wanting to

start with here?

Q. (By Mr. Thompson) Sure.

MR. THOMPSON: And -- and, again, Michael, you might be able to short circuit this. With respect to documents that would cover any pre-accident training that -- to the extent such documents exist of Mr. Ajello, they've been produced; is that accurate?

MR. LESTER: Yes. I'll -- Joe, I'll -- I'll field this one.

Yes. To defendant's best knowledge and belief.

Q. (By Mr. Thompson) Mr. Spencer, between 2009 and 2018, what -- what policies or procedures were in place to provide refresher training to drivers like Mr. Ajello?

You've -- you've talked about quarterly driving -- driver's meetings, that would be one aspect of continuing education and training; is that fair?

A. It is.

Q. As I understand it, back in 2009, when you put in place the -- this modular training for new drivers in the future, and also brought in all existing drivers and ran them through that training,

was there -- has there -- strike that.

The training that Mr. Ajello was provided, would there be any training in the five years prior to the accident, 2013, involving computer modules? I think I -- if I have it here.

A. Not to the best of my memory.

Q. So we -- we can jump back maybe to Exhibit 2?

MR. LESTER: Are we supposed to be looking at the police report?

MR. THOMPSON: No. Exhibit -- I'm sorry, Exhibit 2. And I'm going to page 119 of Exhibit 2.

Q. (By Mr. Thompson) So this is what -- when you talk about AdvanceOnline Solutions Online Institute, and we've looked at that 500-and-some pages under training, which was Exhibit 5, much of that material is through AdvanceOnline Solutions; right?

A. Correct.

Q. And so if we look at when this, for instance, date of completion, this says 12/18/2009, and that kind of lines up -- and that training, for instance, is "Best practices for commercial motor vehicle drivers: Adverse conditions and emergency situations."

So we know that Mr. Ajello completed that module at or around December of 2009; right?

A. Correct.

Q. And then the -- the next page, 120 of Exhibit 2, there was a module "Best practices for CMV drivers: Changing lanes and passing," and that also was completed on or about December 18th of 2009.

The next page is 121, "Best practices for CMV drivers: Curves, turns, and downgrades." That also was completed on 12/18 of 2009.

MR. LESTER: Is there a question, James?

MR. THOMPSON: No. I'm just ...

Q. (By Mr. Thompson) You would agree with me -- right? -- that -- that that's when that certificate indicates it was completed, 12/18 of 2009; right?

A. I think that's what it says, yes.

Q. Do you know how these certificates are generated?

A. They were -- the online course gave the driver three attempts to pass the test after reviewing a module. So the driver would read. There were lab exercises, practice exercises.

When they were done, they would take the

test, and if they passed the test with a minimum of a 70 percent within three tries, then this became a printable form that I believe at the time we had the router dispatcher and transportation print out, collect, and -- and provide to either myself or the driver supervisor.

Q. And then it would be placed in the driver's file?

A. Yes.

Q. So basically the certificate was generated through the program itself. Once completed and the driver attained 70 percent, they're given three attempts to do it, once they attain it, if they attain it, this spits out a certificate; right?

A. That is correct.

Q. And so with respect to Mr. Ajello's -- if we go back to his certificates.

MR. THOMPSON: If we go back to page 119, we can blow these up. 119 should be the next page. I show 119 as certificate of completion for best practices. You should be at Defendants 112 -- one -- there. That's 119 that I have anyway.

Q. (By Mr. Thompson) So this first one, these are all in -- in a row as they were produced. So the first one, Mr. Ajello successfully completed

it on December 18, 2009, at 9:01 a.m.; is that right?
A. If that's what it says, yes.
Q. Okay. And then we go to the next one, and Mr. Ajello, 17 minutes later, completes the next module, "Best practices for CMV drivers: Changing lanes and passing"; right?
A. That's what's on the form that we're looking at.
Q. And then we have about another 17 minutes, Mr. Ajello completes "Best practices for CMV drivers: Curves, turns, and down grades"; right?
A. Yes.
Q. And then if we go to the next one, we see that another ten minutes later he completes "Best practices for CMV drivers: Pedestrians and passengers"; right?
A. Yes.
Q. And then another 12 minutes later, he completes "Best practices for CMV drivers: Right-of-way and intersections"?
A. Yes, sir.
Q. And these are all on the 18th of December, 2009; right?
A. Yes, sir.

Q. And if we go to page 124, "Best Practices for CMV drivers: Start up, back up, parking procedures." That actually in the -- that's completed at 10:08 a.m. on the 18th; right?
A. That is what it says, yes, sir.
Q. The next one is "Cargo securement for drivers." That's completed a little over a half hour later -- or about a half hour later at 10:41 a.m.; right?
A. That -- yes.
Q. And then 11 minutes later, he gets "Cargo securement for drivers: Metal coils."
MR. LESTER: Is there a question, James?
Q. (By Mr. Thompson) And I believe that's all of the AdvanceOnline training certificates that we have.
So if there were any other -- if there was any other online solutions training that Mr. Ajello obtained or received while at NIM or Norfolk --
MR. LESTER: What's the -- what's the last Bates number that you --
MR. THOMPSON: Should be -- what's that?
MR. LESTER: What's the last Bates number that you have?
MR. THOMPSON: The last page number? Let

me go back.
MR. LESTER: Yeah. What are we looking at? They go through 126. So I don't think you've looked at them all.
MR. THOMPSON: I think we've looked at all of the online training.
MR. LESTER: Oh, I'm sorry, I apologize. You broke out, so I missed that part of the question. I think I'm --
MR. THOMPSON: No problem. No problem.
Q. (By Mr. Thompson) We're -- we're talking about AdvanceOnline Solutions training. Do you believe that we've covered all of the certificates consistent with your testimony that since he was an existing driver, he was brought in and run through the same modules that a new driver would be done -- would be run through; right?
A. Can you repeat the question, please?
Q. Sure. Have we -- have we gone through all of the training that you believe he would have received by AdvanceOnline Solutions Online Institute at any time while employed at NIM?
A. Honestly, I -- I don't know. That seems -- that seems a little light, to be honest. I'm -- I'm working from memory from -- what has this

been? 12 years now. I -- I -- I can't say for sure.
Q. Did you see any topics with online -- or AdvanceOnline Solutions have covered specifically, at least in their title, space management?
A. Not in the title. Not from the ones that you just read, no.
Q. And if we look at -- at some of the information that's been produced as part of the training materials in Exhibit 5, there -- there is reference at least into those materials to space management; right?
A. Can you repeat the question again?
Q. Sure. In the documents that were produced, the documents that were produced as Exhibit 5, training materials, those doc -- which -- which are the documents -- the screenshots of the AdvanceOnline training modules, they do reference space management; correct?
A. I -- I -- I'm looking at a page that says "training materials" in front of me.
Q. Okay. Let's go to page 470.
MR. LESTER: I don't think he's trying to trick you. Just -- does that three-ring binder that we produced reference space management?

74

A. Does the three-ring binder reference space management? I don't -- I don't know the answer to that question, I really don't.
Q. (By Mr. Thompson) Well, I'm going to pull up what's been produced as page 470 of Exhibit 5. And it is the Bates stamped document Defendants 1208. And if you look at it, "Required Knowledge in Detail. Drivers must know 13 safe vehicle control topics." Do you see that?
A. Can we blow it up a little bit, please.
Q. Sure. Absolutely.
A. And can you repeat the question now that it's blown up?
Q. Sure. There's a reference on the page I just referenced to you of "space management"; right?
A. Yes, sir.
Q. Okay. Do you -- based on you being involved in this training, as you sit there today, do you recall any other AdvanceOnline training literature that specifically explains space management?
A. I do not.
Q. Okay. And you would -- I think your comment a few moments ago was the amount of online AdvanceOnline training that we see, if -- if that's

75

the extent of it, all done back in December of 2009, that seems a little light to you; right?
A. I'm not sure that you're wording it quite the way that I did. I -- I felt that there was more training than that for AdvanceOnline. We listed, it seemed like, six or seven different -- different certifications. I feel like probably ten to 12 was right. If you listed ten to 12, then I do apologize. I was focused more on trying to read the date as that was what the questions were at the time.
Q. Well, let's -- let's just walk through them so we're all on the same page.
So the first one I have that's been produced is Defendants 112. And that's page -- so we can count them together. That's -- page 119 is the first one, the second is 120, the third is 121, the fourth is 122, the fifth is 123. The sixth --
MR. LESTER: I don't think we're -- we're -- we're not seeing what you're seeing --
THE WITNESS: Yeah.
MR. LESTER: -- James, what you're looking at. We're still in Exhibit 5.
Q. (By Mr. Thompson) Okay. Let's go to Exhibit --

76

MR. LESTER: But if you want us to stipulate that the number of AdvanceOnline Solutions is the number of certificates we have, I'm sure -- I imagine that the issue is that there's other certificates in there that aren't from AdvanceOnline Solutions and that's the confusion.
MR. THOMPSON: Okay. Well -- well, let's clear up any confusion.
Q. (By Mr. Thompson) So AdvanceOnline Solutions, let's walk through them together, and then we'll also include the other ones.
So for AdvanceOnline Solutions we have page 119 of Exhibit 2. That's the first one. The second one is page 120. The third one is page 121. The fourth one is page 122. The fifth one is page 123. The sixth one is page 124. The seventh one is page 125. The eighth one is page 126. The ninth one -- well, that's it. There's eight of them for AdvanceOnline. Do you believe there may have been more AdvanceOnline modules?
A. No, I -- I don't. I think that's probably right.
Q. And then just to be fair, there's some additional certificates. So the -- the first additional certificate, we have to jump back to 117.

77

State of Alabama Department of Public Safety.
A. That is an AdvanceOnline course also.
Q. And this was also completed -- okay. So that's an AdvanceOnline, I see. So we are going to get clarity here.
So we should include page 117 as an AdvanceOnline training course; right?
A. Correct.
Q. And that one was completed the same day, in the same roughly two-hour, 2 1/2-hour period; right?
A. I don't remember the times that we were at on the last ones. I know that that -- typically that section, Alabama coil, took most drivers between two and four hours to complete.
Q. And it looks like he completed it in an hour and 27 minutes; right?
A. It -- it does appear so, yes.
Q. I mean, is that your understanding of that reference, Advance -- where it says "time online"?
A. Yes, that -- that's how I'm taking that too.
Q. And then the next page, 118. That's also the same date, the time stamp and the same time online, one hour 27 minutes and 42 seconds; right?

78

A. I don't see the difference between that form and the last one.
Q. Do you know what --
(Reporter clarification.)
(Zoom technical difficulties.)
(Discussion off the record.)
Q. (By Mr. Thompson) (Inaudible) -- looks like pages 117 and 118 are the same certificates; right?
MR. LESTER: Did -- was everybody having trouble hearing that?
THE WITNESS: Yes.
THE REPORTER: Yes.
MR. LESTER: James, could you maybe back out and come back in. You've been breaking up a lot the last few questions.
MR. THOMPSON: (No response.)
THE REPORTER: Now he's frozen for good.
MR. LESTER: All right. Let's go off the record then.
THE VIDEOGRAPHER: Okay. The time is 1:42. We're going off the record. Stand by.
(Discussion off the record.)
THE VIDEOGRAPHER: The time is 1:51 p.m., and we are back on the record.

79

Q. (By Mr. Thompson) Mr. Spencer, we're going to try to get you finished up here. I believe that we were talking about Exhibit 2. Page 117 and 118 appears to be the same certificate; is that fair?
A. They do. Yes, sir, they do appear that way to me too.
Q. And then I think at the end of -- if we jump to page 127 of Exhibit 2. Is this an AdvanceOnline program as well? It's done the same date, 12/18 of 2009. A little later in the morning at 11:39 a.m. Do you see that?
A. I do. That is a AdvanceOnline certificate also.
Q. Okay. And then the -- the same would be true of Exhibit 128 -- or page 128 of Exhibit 2; correct? "DOT/TSI driver guide to CDL requirements"?
A. Yes, sir.
Q. And that appears to have been undertaken the same day, December 18, 2009; right?
A. Yes, sir.
Q. And that's through AdvanceOnline as well, even though the certificate says U.S. Department of Transportation; right?

80

A. It is.
Q. And then if we go to page 130, same day, December 18, 2009, "DOT/TSI driver guide to driving CMVs." And the next one is 131 -- page 131 of Exhibit 2. "DOT/TSI driver's guy to drug and alcohol regulations," also conducted -- or -- or taken on December 18, 2009; right?
A. Correct.
Q. And then the next one is page 132, "DOT/TSI driver's guide to hours of service," also taken the same day, a little later in the afternoon; right?
A. Yes, sir.
Q. Exhibit [sic] 133, again AdvanceOnline, certificate says "U.S. Department of Transportation, Transportation Safety Institute Certificate," also completed on December 18, 2009; right?
A. It is, yes.
Q. Do you believe that with respect to the online training, we've now covered everything that Mr. Ajello received through those programs?
A. I would say that is most likely the case, yes.
Q. And so he did all that training on December 18th of 2009; correct?

81

A. It does look like it, yes.
Q. And that would be 9 1/2 years before the accident; right?
A. Correct, yes.
Q. The only other training that he would have received would have been these quarterly drivers' meetings where some training and safety issues would be discussed; is that fair?
A. That is fair, yes.
Q. Okay. And unfortunately we don't have any documentation of the topics covered or anything like that; right?
A. We don't have documentation. I have specific memories of several different topics that were discussed, but we don't have any --
Q. What -- what do you recall?
A. We've discussed maintaining space. We've discussed urban driving. We've discussed changing lanes. Any lessons learned from any accidents that would have happened in the quarter, and oftentimes corporate-wide, usually not from Emporia drivers. Video review of any accident. Any of the mirror usage. Staying with the flow of traffic. Using common sense. Off the top of my head.
Q. Okay. Do any of the trucks running out of

82

Emporia currently have dash cams?
A. They do.
Q. Was there a dash cam on the vehicle at the time of the July '18 accident?
A. Unfortunately, no.
Q. Or the July 16, 2018, accident?
A. I'm sorry, what was the last question?
Q. Yeah, I apologize. Was there -- just so -- I referenced a date that was unclear. We're talking about a July 16, 2018, accident, collision; right?
A. Correct.
Q. At the time of this collision, Mr. Ajello's vehicle was not equipped with a dash cam; is that correct?
A. That is correct.
Q. Are vehicles now equipped with dash cams?
A. Yes, sir.
Q. Do you recall when that change went into effect?
A. I would be giving you a -- an approximate guess. That would be pretty close. But I think Rich is going to be talking about that later. And he -- he will know for sure exactly when, I'm sure.
Q. Okay. Then if -- take a look at

83

Exhibit 1, going back to 16, 17, 18, and 19. These, again, are all different ways of asking about driver training and documentation provided to Mr. Ajello.
With -- take a look at 16 and 17 and 18. With respect to manuals, I'm going to ask that we pull up Exhibit 4. This is an 18-page document. Are you familiar with this document?
A. To an extent.
Q. Do you believe this document would have been provided to Mr. Ajello?
A. I believe so.
Q. Are there any prior versions of this document? This -- this exhibit has a last revised date of 11/10 of 2016. Do you see that?
A. I don't, but I do believe you. And I don't know about previous versions of it.
Q. It looks like this manual's dated 2013 with last revision of 11/10/2016.
MR. LESTER: Is there a question, James?
Q. (By Mr. Thompson) And just so we're clear, do you -- you -- you don't know of any prior versions -- or you're not aware of any prior versions of the manual prior to 2013; is that right?
A. Not that I'm aware of.
Q. Okay. Were you part of putting this

84

manual together?
A. I'm -- I'm go -- I'm going to give you a guess and say that for parts of it probably, but I absolutely couldn't swear to it.
Q. All right. Let's see. 32 -- I'm just running through these numbers. We've already talked about 42, which is "A person or persons knowledgeable regarding all policies and procedures regarding the memorialization of the accident scene and driver accident kits." Do you recall that discussion, Mr. Spencer?
A. I do.
Q. We've already covered 32, "A person or persons knowledgable regarding your policies and/or procedures with respect to the investigation and determination of preventable or nonpreventable accident collisions and property loss or damage involving drivers or equipment."
We've talked about that. You're not aware of any formal preventability policy or procedure with respect to investigations; true?
A. I apologize to the group. I've got quite a bit of noise happening right outside of the door. I'm having a hard time hearing you.
Q. Sure (inaudible) --

85

THE WITNESS: I don't know what the process is, but I'd like to tell these folks to quiet down a little bit so I can hear you better. Is that an okay thing to do?
MR. THOMPSON: Yeah. Absolutely.
MR. LESTER: Sure. Let's go off the record for one minute.
THE VIDEOGRAPHER: The time is 2:01, and we're going off the record. Stand by.
(A recess was taken.)
THE VIDEOGRAPHER: The time is 2:02, and we are back on the record.
Q. (By Mr. Thompson) Mr. Spencer, I'm just trying to clean up some of the things, make sure we cover the topics that you're designated for.
Topic No. 32 was "A person or persons knowledgeable regarding your policies or procedures with respect to investigation and determination of preventable or nonpreventable accidents and collisions." Do you recall that?
A. Yes.
Q. And we talked a little bit about that. And my understanding is there's no formal policy at Norfolk or NIM in conducting a preventability analysis; correct?

A. To the best of my knowledge.
Q. Let's go to 51, 52, and 53. Which is page 8 of Exhibit 1. "Person or persons knowledgeable regarding all agents, servants, or employees, attorneys, claims adjusters, experts, or other persons who were present at the scene of the accident at issue within seven days of the accident, including the date and time they were present." I think we've covered this implicitly. No one was sent to the accident scene; right?
A. Correct.
Q. So we obviously know that Mr. Ajello and Mr. Stoneman were at the accident scene. Mr. Stoneman's employer was at the accident scene, and the police were at the accident scene, but other than that, you're not aware of any persons who were there; fair?
MR. LESTER: Object to the form, misstates the evidence.
Joe, you can answer.
A. I don't know of anyone else that was at the accident scene myself.
Q. (By Mr. Thompson) 52, "Person or persons knowledgeable regarding the present custodian of all photographs of the scene taken within 14 days of the

accident." Do you know who has any pictures taken within 14 days?
A. I have no knowledge at all.
MR. THOMPSON: So, Michael, I assume that all such pictures have been produced; right?
MR. LESTER: Yes. That's -- we have looked for additional photographs. None exist that we have found.
Q. (By Mr. Thompson) And 53 is kind of duplicative, if you can believe that.
58. This is now page 8 of Exhibit 1.
MR. LESTER: I actually misspoke -- I think -- well, you can ask for Joe's answer, but I think Rich will also be talking about 58.
MR. THOMPSON: Okay.
Q. (By Mr. Thompson) On 58, "A person or persons knowledgeable regarding all written test certificates for James J. Ajello." Have -- are you aware of any written test certificates that we have not covered?
A. No.
MR. THOMPSON: 62, probably just quicker to ask you, Michael. All -- all such photos --
MR. LESTER: Same. Yep.
MR. THOMPSON: -- in their damage -- in --

the truck in its damaged condition have been produced; right?
MR. LESTER: Every photo that I'm aware of. And that -- NIM looked for photos. We haven't found any others than what's been produced.
Q. (By Mr. Thompson) 64, "A person or persons knowledgeable regarding all statements you have from any witness to the collision." Are you aware of any witnesses to the collision other than Mr. Stoneman and Mr. Ajello?
A. I am not.
Q. And 71 I think we've already covered.
MR. THOMPSON: So, Mr. Spencer, I don't have any further questions of you at this time.
MR. LESTER: I just have one quick one, I think. One quick area.

EXAMINATION

BY MR. LESTER:
Q. Do you recall having the testimony about whether or not you or Charlie or Jim obtained PeopleNet data in evaluating this accident?
A. I do.
Q. I'm just going to screen share what has been -- what we Bates labeled as Defendants 734. Can you tell me what this document is?

A. Try to blow it up a little here.
That is --
Q. I might be able to.
Can you tell me what that document is?
A. That is a -- it's an eLog violation report, like it says up top. It's from PeopleNet for Jim Ajello, 7/16/2018, that's Charlie's handwriting that lists "Could not do a" -- does it say "posttrip"?
Q. Yeah.
A. Yes.
Q. Can you read that?
A. "No posttrip inspections" was the violation on that day.
Q. Yeah. This is part of the accident investigation file; correct?
A. Correct.
Q. Would you agree with me that this is something that -- a piece of information that NIM Transportation had while it was investigating the accident?
A. Yes.
Q. And would it -- would you agree with me that it implies that a driver supervisor at the very least looked at Jim Ajello's driver's logs on the

day of the accident?
A. He would have had to, yes.
MR. THOMPSON: I would object, call -- calls for speculation. Lacks foundation.
Q. (By Mr. Lester) Let me ask this: What -- have you seen a form like this before?
A. I have.
Q. How does a form like this get generated and put into a file?
A. From PeopleNet. From the drive -- yeah. From PeopleNet, the driver supervisor would have gone into the logs to -- or into PeopleNet at least for sure to -- to pull the form.
Q. Okay. Could Mr. Cheek have pulled this form without looking at the PeopleNet information and data from the day of the accident?
A. I don't think so. I think Rich would know for sure, but I -- I think you are correct.
Q. In an accident investigation standpoint, did you have any policies or procedures regarding checking logs?
A. Not a policy in writing that I know of, no.
Q. What about just practices or procedures?
A. Usually, yes.

Q. All right. Would you agree, as the corporate rep for NIM Transportation, LLC, that the -- that the PeopleNet log from the day of the accident was reviewed as part of this accident investigation?
MR. THOMPSON: Objection. Leading. Lacks foundation.
A. Is it okay to answer?
Q. (By Mr. Lester) Yes, you can.
A. I would believe so.
Q. Okay. And this -- this form is part of the accident investigation file; correct?
A. I don't know --
MR. THOMPSON: Objection. Lack of foundation.
What was the Bates stamp on that, Michael?
MR. LESTER: That is 734.
THE REPORTER: Is that an exhibit that I'm going to need to attach?
MR. LESTER: Well, I have no idea. James, is 734 in any of the exhibits that you've already put on?
MR. THOMPSON: It -- well, I'm going to confirm that. See, 734 -- 737, just trying to find it here, sorry.

MR. LESTER: Yeah, if you marked the accident investigation file, it's in -- it's in what we've produced under that heading.
MR. THOMPSON: Yeah, your 734 -- I'm going to go back and let me -- we got to figure this out. Your 734 is part of the manual.
MR. LESTER: So I have -- let me see -- maybe -- for me, accident investigation starts on Defendants 700, and there's -- it's -- all the things that you marked from the emails have been produced. It's in between that and insurance in our original Bates production. Stop my share.
MR. THOMPSON: The accident investigation begins with Bates stamped --
MR. LESTER: Let's just go off the record while we -- while we work it out.
THE VIDEOGRAPHER: Time is 2:12, and we're going off the record. Stand by.
(Discussion off the record.)
(A recess was taken.)
THE VIDEOGRAPHER: Time is 2:13, and we're back on the record.
MR. LESTER: Can you pull up Defendants 716 for us so that Joe can see it?
Q. (By Mr. Lester) All right. Mr. Spencer,

I just asked you a number of questions about a document titled "eDriver Log Violation Report, Driver Detail." Do you see that document in front of you?
A. Yes, sir.
Q. I was using an old, outdated Bates stamp. It's correctly labeled Defendants 716. Do you see that?
A. Yes, sir.
Q. All right. All of the questions I asked you about the previous -- about the eDriver log violation report don't change regardless of what page number it is; correct?
A. That is correct.
Q. Do you know -- I don't know if this is going to be a "you" or "Rich" question. If you pull something like this, would it show all violations over an entire day?
A. I don't know that for sure. I would ask Rich.
Q. All right. I'll ask Rich about it.
MR. LESTER: I don't have any further questions.
MR. THOMPSON: I just have a few follow-up on that. If you could put that exhibit back up. So

94

if you can blow up the bottom of the exhibit.

EXAMINATION

BY MR. THOMPSON:

Q. It says "Note: Report data availability is limited to the eDriver log data retention preference set in PFM." Do you know what that means?

A. I don't.

Q. And it looks like the report was generated for Norfolk Iron & Metal Company on July 22nd of 2018 at 11:01 Greenwich Mountain Time, I guess. Do you see that?

A. I do. That's -- that's what I would take it to mean also.

Q. So it looks like it -- it -- have you -- have you ever interacted with the people at PeopleNet?

MR. LESTER: James, you're really quiet. Are you --

MR. THOMPSON: No. I'm not -- can you hear me now?

(Discussion off the record.)

Q. (By Mr. Thompson) Have you ever had interaction with PeopleNet directly?

A. I'm -- I'm thinking. No.

95

Q. Okay. Is interaction like this something that would have been done through corporate?

A. No. This would have been the driver supervisor.

Q. Okay.

MR. THOMPSON: No further questions.

MR. LESTER: Just real quick so -- to clean it up.

EXAMINATION

BY MR. LESTER:

Q. Joe, is this something that you could get on and run from your own computers, this report, or is that a "Rich" question?

A. That's a "Rich" question. My answer is -- would be I think so. At the driver supervisor level at the branch.

Q. As far as you know, it's not something that you actually have to reach out and communicate and contact PeopleNet to obtain; right?

A. I don't think so.

Q. Okay. Better -- question better asked for Rich?

A. Yes.

Q. Okay.

MR. LESTER: Then I'm all done.

96

James, anything else?

MR. THOMPSON: Nope. Let's take ten, be back at it.

MR. LESTER: We will read and sign.

THE VIDEOGRAPHER: Time is 2:17, and we're going off the record. Stand by.

(The deposition concluded at 2:17 p.m.)

97

CERTIFICATE OF REPORTER

I, Ellen L. Stock, a Certified Court Reporter of the State of Missouri, do hereby certify:

That prior to being examined, the witness was first duly sworn;

That said testimony was reported by me at the time and place hereinbefore stated and was thereafter reduced to typewriting under my direction;

That the foregoing transcript is a true record of the testimony given by said witness;

That I am not a relative or employee or attorney or counsel of any of the parties or a relative or employee of such attorney or counsel or financially interested in the action.

Witness my hand and seal this 22nd day of November, 2021.

Ellen L. Stock
Missouri Supreme Court
Certified Court Reporter

ERRATA SHEET

RE: Christopher W. Stoneman v. Norfolk Iron & Metal and James J. Ajello

PG/LN Correction and Reason for Change

_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________
_____ ___________________________________________

______________________

Joseph W. Spencer

ELS

SIGNATURE PAGE

RE: Christopher W. Stoneman v. Norfolk Iron & Metal and James J. Ajello

____ I certify that I have read my testimony and request that NO changes be made.

____ I certify that I have read my testimony and request that the above changes be made.

________________________

Joseph W. Spencer

Subscribed and sworn to before me this ____ day of ____________, 20____

______________________

Notary Public

State of _____________

County of _____________

My commission expires ____________

ELS

**A**

**a.m** 5:1 70:1 71:4,9 79:12
**able** 27:18 45:9 48:3 66:4 89:3
**abruptly** 50:12
**absolutely** 20:1 28:23 31:14 33:18 40:19 42:15 43:2 74:11 84:4 85:5
**absorb** 18:6
**acceleration** 44:19
**accident** 10:1 11:1,2 23:6,13,22,24 24:9 24:12,20 25:8,22 26:22 27:5,10 29:12 29:17 30:1 31:1 32:2 38:7,11,16,25 39:13,17,18,21 40:12,12 41:9,17,23 44:1,4,7 45:18,18 45:19 46:8,23 48:8 48:18 49:21,22,23 50:23,23 51:6,21 52:2 53:15,24 54:1 54:4,7,8 55:5,14,25 56:5 57:10,11 58:14 59:8 67:4 81:3,22 82:4,6,10 84:9,10 84:17 86:7,7,10,13 86:14,15,22 87:1 88:21 89:15,21 90:1 90:16,19 91:4,4,12 92:2,8,13
**accidents** 3:13 14:12 42:9 43:1 81:19 85:19
**accomplished** 15:3 17:1
**accurate** 31:13,18 66:8
**accurately** 59:7
**action** 97:17
**actions** 35:5,11
**actual** 32:2
**additional** 18:15,16 45:22 76:24,25 87:7
**address** 9:8 28:17 37:12 64:21
**adjust** 37:12
**adjusters** 86:5
**administering** 2:18
**administration** 12:18
**administration's** 12:9,23 24:19 26:6 26:12 50:5
**administrative** 51:23
**admittedly** 40:14
**adopted** 19:6
**Advance** 77:20
**AdvanceOnline** 14:25 19:6 20:21 21:23 67:14,17 71:15 72:12,21 73:4 73:18 74:19,25 75:5 76:2,5,9,12,19,20 77:2,4,7 79:10,13 79:23 80:14
**adverse** 22:22 28:6 28:24 52:5 67:24
**affords** 28:10
**afternoon** 28:22 80:11
**agents** 86:4
**ago** 36:11 59:13 74:24
**agree** 15:10 25:1,8 52:16 68:14 89:18 89:23 91:1
**agreed** 2:16 11:10 62:24 65:20
**ahead** 7:11 8:19 9:2 25:2,5 37:25
**ahold** 55:6
**Ajello** 1:9 5:15 13:8 13:10,16 19:9 21:6 21:11,23 22:5 23:5 29:10 32:6,12 33:5 33:7,17,24 35:9 36:22 46:24 47:2 52:22 56:6,6 57:25 61:17 62:20 63:2 65:2,9 66:7,16 67:2 68:1 69:25 70:5,11 71:18 80:21 83:3,10 86:12 87:18 88:10 89:7 98:3 99:3
**Ajello's** 19:2 27:4 32:16 48:1 61:19 65:22 69:16 82:14 89:25
**Alabama** 77:1,14
**alcohol** 80:6
**allowed** 14:9
**allows** 54:2
**ambiguous** 33:3
**amount** 14:24 17:16 74:24
**analysis** 25:9 26:19 49:16,21 50:3,3 85:25
**and/or** 84:14
**answer** 7:11 8:6,15 8:19,23 16:11 17:14 24:22 25:4 26:1 33:4,23 35:1,3,6,10 35:21 36:22 38:14 39:3,6 40:9 43:19 45:7,13 46:10 50:6 51:9,25 56:22 60:25 60:25 62:25 64:20 74:2 86:20 87:13 91:8 95:14
**answered** 7:14 34:20 34:24 35:20
**answering** 39:9 51:5
**anymore** 60:7
**anyway** 69:22
**apologize** 7:2 51:4 55:20 72:7 75:9 82:8 84:22
**appear** 19:20,21 77:18 79:6
**APPEARANCES** 2:1
**appears** 30:13 31:6 56:4 57:14 79:4,20
**applicable** 36:1
**appreciate** 6:21 33:22
**appreciated** 36:16
**approaching** 33:12
**appropriate** 8:18 27:24 28:1
**appropriately** 8:13
**approximate** 82:21
**approximately** 16:8 18:11,25 20:23 34:10
**April** 10:8,11
**archived** 3:21
**area** 88:16
**areas** 6:4 11:6 15:2
**argumentative** 32:11 34:20 38:13 43:16 49:5
**arrangements** 23:4
**art** 26:4,8,9
**asked** 6:24 28:14 34:20,23 35:20 93:1 93:10 95:21
**asking** 35:10,12,25 36:7 39:7 45:7 51:3 51:8 83:2
**aspect** 66:19
**assess** 17:4
**assessment** 49:2
**assist** 17:2
**assistant** 10:17
**associated** 37:13
**assume** 7:12,13 12:4 41:25 58:2 63:11 87:4
**attach** 91:19
**attached** 24:4
**attaching** 24:1
**attachments** 3:14
**attain** 69:13,14
**attained** 69:12
**attempt** 25:21 38:20 49:24

**attempting** 29:5,5 37:15
**attempts** 68:22 69:13
**attended** 64:16
**attorney** 97:15,16
**attorneys** 86:5
**attribute** 40:3
**audible** 6:16
**audio** 62:19
**audit** 57:9,9,18,19 59:19
**automobiles** 37:17
**availability** 94:4
**available** 65:2
**avoid** 14:15
**aware** 13:15 21:5 45:5 46:6 63:1 83:22,24 84:19 86:16 87:19 88:3,9

**B**

**B** 2:8
**back** 11:1 20:22 30:24 38:4 53:6,8 55:16 57:4 59:14,24 64:4 66:22 67:7 69:17,18 71:2 72:1 75:1 76:25 78:14,15 78:25 83:1 85:12 92:5,22 93:25 96:3
**background** 11:18,19
**ballpark** 20:23
**base** 43:4,6,13
**based** 36:9,15 38:9 57:15 74:17
**basically** 17:5 38:24 69:10
**basis** 36:18
**Bates** 20:6,7 71:21,23 74:6 88:24 91:16 92:12,14 93:6
**becoming** 13:18
**began** 13:10
**beginning** 33:25
**begins** 92:14
**behalf** 1:19 5:12,14 11:8,13
**belief** 65:13 66:12
**believe** 10:19 13:19 17:15 32:12 34:11 34:16 35:13,19 36:23 37:22 38:1,2 41:7,10,13 45:24 47:25 48:19 59:6,10 60:13 64:21 65:4 69:3 71:14 72:13,20 76:19 79:2 80:19 83:9,11,15 87:10 91:10
**believed** 38:10
**believes** 8:13,24 27:23
**Belmont** 9:12
**bender** 38:17 42:4
**best** 7:14 48:19 49:7 49:24 65:13 66:11 67:6,23 68:5,9 69:20 70:6,11,15,20 71:1 86:1
**better** 85:3 95:21,21
**big** 48:4
**bigger** 36:12
**binder** 61:7,24 73:24 74:1
**binding** 2:18
**bit** 15:14 23:17 29:20 29:22 30:7 31:3 47:15 63:8,16 74:10 84:23 85:3,22
**blow** 31:2 47:14 60:3 69:19 74:10 89:1 94:1
**blown** 55:19 74:13
**board** 45:11
**body** 12:21 37:7
**bottom** 17:7 18:16 30:13 40:1 51:10 56:20 57:8,17 61:11 94:1
**Boulevard** 2:9
**brake** 33:8,13
**brakes** 42:13 50:12
**braking** 44:19
**branch** 95:16
**break** 8:5,5,7 15:13 53:1
**breakfast** 63:22
**breaking** 78:15
**breakout** 13:2
**bring** 31:4 47:12 50:9
**Broadway** 2:4
**broke** 72:8
**brought** 19:10 66:24 72:15
**BROWN** 2:8
**business** 27:22

**C**

**call** 55:5,9 90:3
**called** 20:8 40:19 53:14
**calls** 33:3 40:7 90:4
**cam** 82:3,15
**cams** 82:1,17
**captures** 19:22
**car** 33:16
**career** 13:10
**Cargo** 71:6,11
**Carrier** 12:9,18,23 24:18 25:18 26:5,12 50:4
**cars** 33:14,15 36:9 37:18
**case** 1:7 5:7 7:18 19:24 27:4 32:4 42:20 43:21 63:3 80:22
**cash** 14:20
**catches** 7:8
**category** 20:8
**causation** 40:3
**cause** 50:24 51:7
**caused** 41:2,17
**CDL** 12:13,15 22:18 22:25 34:9 79:17
**cell** 55:9
**certainly** 41:15 51:17
**certificate** 3:16 21:9 68:16 69:10,14,20 76:25 79:4,13,24 80:15,16 97:1
**certificates** 11:25 12:1 21:10,23 22:1 68:19 69:17 71:15 72:13 76:3,5,24 78:8 87:18,19
**certifications** 75:7
**Certified** 1:24 97:3 97:25
**certify** 97:5 99:5,8
**change** 3:22 82:19 93:12 98:4
**changed** 52:17
**changes** 56:22 99:6,9
**changing** 68:6 70:6 81:18
**Charlie** 30:19 57:12 88:20
**Charlie's** 89:7
**check** 31:10
**checked** 31:6
**checking** 36:5 90:21
**Cheek** 30:19 52:22 57:12 90:14
**Chicago** 44:4
**Christopher** 1:5 5:6 5:13 6:2 98:2 99:2
**chronology** 53:24
**circuit** 66:4
**circumstances** 28:1 34:8 35:4 54:24
**citation** 50:14
**cited** 34:15
**City** 2:4,9 5:9 7:13 29:2
**claims** 86:5
**clarification** 16:14 60:11 78:4
**clarity** 77:5
**classes** 21:15

**clean** 6:19 85:14 95:8
**clear** 46:15,21 51:15 57:3 65:19 76:8 83:21
**cleared** 8:1
**client** 8:12
**cling** 26:24
**close** 48:2 50:16 82:22
**CMV** 68:6,10 70:6,11 70:16,20 71:2
**CMVs** 80:4
**coil** 77:14
**coils** 71:12
**collect** 39:16 69:5
**college** 11:20,22
**collision** 43:5 82:10 82:13 88:8,9
**collisions** 84:17 85:20
**come** 41:5 78:15
**coming** 17:23,24 36:17 45:8
**commenced** 5:1
**comment** 74:24
**commercial** 22:12 27:12 32:20 34:3 35:12 37:8 49:20 53:25 67:23
**commission** 99:24
**common** 81:24
**communicate** 95:18
**company** 13:12 23:7 27:22 29:17 30:20 94:10
**company's** 25:24 29:11 31:19
**complete** 19:8,11 38:23 54:8 77:15
**completed** 24:23 56:12 68:1,7,11,16 69:11,25 71:4,7 77:3,9,16 80:17
**completes** 58:7 70:5 70:11,15,20
**completing** 41:20
60:1
**completion** 21:9,9 22:2 58:14 67:21 69:20
**complex** 40:2
**complied** 48:5 55:22
**components** 16:5,16
**computer** 14:21 19:22 67:4
**computer-based** 18:10
**computers** 95:12
**concerns** 37:13
**concluded** 96:7
**conclusion** 38:25 40:6
**conclusions** 50:22 53:12
**condition** 59:7 88:1
**conditions** 22:21,22 28:4,6,24,24 50:15 52:5,6 67:24
**conduct** 50:2
**conducted** 80:6
**conducting** 49:21 85:24
**conferences** 13:2
**confess** 29:19
**confirm** 91:24
**confusion** 76:6,8
**congested** 23:1 37:3 37:10,24
**congestion** 36:19
**consisted** 13:13
**consistent** 32:19 42:12,15 47:6 48:9 48:17 50:21 72:14
**contact** 95:19
**contents** 3:1 4:1 62:18
**context** 26:9
**continue** 6:16,20
**Continued** 4:1
**continuing** 66:19
**contributed** 30:25
38:6,25 40:4
**control** 74:8
**controls** 24:18 25:10 25:15,24 26:4,11 51:23
**conversation** 29:13 40:20,24 47:2,6
**coordinator** 9:19,22 10:12,21 13:18 30:16
**corporate** 5:17 13:5 43:17 45:9,14 46:2 46:4,11 63:18 91:2 95:2
**corporate-wide** 81:21
**CORPORATION** 1:17
**correct** 15:16 16:2,23 16:24 18:7,12 19:2 21:17 23:8,9,10 30:18 36:19 37:5 46:25 47:3 48:10 51:7,11,19 52:12,15 52:19 54:5 55:15 57:13 58:6,11,16 62:1 67:19 68:3 69:15 73:19 77:8 79:17 80:8,25 81:4 82:12,15,16 85:25 86:11 89:16,17 90:18 91:12 93:13 93:14
**Correction** 98:4
**correctly** 7:7 93:7
**counsel** 2:17 3:20,22 5:10 32:1 97:15,16
**counseled** 29:10
**counseling** 18:16 24:15
**count** 75:16
**County** 99:23
**couple** 39:4
**course** 19:8 68:21 77:2,7
**court** 1:1 5:8,18 6:19 8:16 97:3,24,25
**cover** 14:11 66:5 85:15
**covered** 63:7 64:3,12 72:13 73:4 80:20 81:11 84:13 86:9 87:20 88:12
**crash** 42:16 43:10,14 43:22
**crashes** 42:17 43:12
**create** 37:21 40:13
**created** 55:17 57:10 57:18
**creating** 37:18
**critique** 35:10
**cross-examination** 27:6 38:19
**cross-identified** 11:15
**cross-training** 9:24
**current** 9:17,20
**currently** 9:5,13,15 12:13 82:1
**Curves** 68:10 70:12
**custodian** 86:24
**cut** 42:13 50:11

**D**

**daily** 36:18
**damage** 42:4,11,14 43:4 84:17 87:25
**damaged** 88:1
**dash** 82:1,3,14,17
**data** 41:16 44:18 45:21,22 46:8,17 48:21,22 88:21 90:16 94:4,5
**date** 5:3 13:18 55:25 56:3,7 67:21 75:10 77:24 79:11 82:9 83:14 86:8
**dated** 83:17
**day** 12:22 14:22 35:9 35:11 36:19 40:25

43:10 48:8 54:19,23 77:9 79:21 80:2,11 89:14 90:1,16 91:3 93:18 97:18 99:17
**days** 15:5,7 16:8 17:9 18:3,11 86:7,25 87:2
**deal** 8:4
**dealing** 40:11
**deals** 32:19
**December** 68:2,7 70:1,23 75:1 79:21 80:3,7,17,25
**deciding** 58:4
**decision** 49:9,11,14
**defendant's** 65:13 66:11
**defendants** 1:10,17 2:7 5:15 21:24,24 29:15 69:21 74:6 75:15 88:24 92:9,24 93:7
**Defendants'** 3:10
**defer** 64:19
**Define** 26:8
**defined** 26:5
**definition** 26:11
**definitively** 63:4
**delivery** 14:20
**Department** 77:1 79:24 80:15
**depending** 17:10 28:3 45:3 54:23
**deposition** 1:15 2:18 3:9 5:1,5 6:7 7:23 32:16 35:24 36:24 37:23 62:3,9 96:7
**depositions** 6:11
**described** 50:4
**description** 9:22 20:10 32:18 54:3
**designated** 1:17 6:3 11:7 46:12 62:14,15 85:15
**detail** 48:16 74:8 93:3
**determination** 84:16 85:18
**determine** 8:17
**dialogue** 38:20
**difference** 23:2 27:1 28:19 78:1
**differences** 7:21
**different** 7:19 15:1 25:8 28:17 38:16 40:11 42:24 50:1 56:25 75:6,6 81:14 83:2
**differently** 33:19
**difficult** 29:20 43:24
**difficulties** 78:5
**difficulty** 28:15
**digitally** 3:21
**direction** 97:11
**directly** 41:2 94:24
**director's** 30:16
**disappeared** 60:8
**discuss** 22:9,24 23:2 27:8,9 38:20
**discussed** 36:6 81:8 81:15,17,18,18
**discussing** 30:9
**discussion** 63:9,25 78:6,23 84:11 92:19 94:22
**discussions** 48:17
**dispatcher** 69:4
**disrespect** 39:6,9
**distance** 22:20 27:9 27:24,25 28:5,9 29:6,11 36:9 38:21 52:4,6
**distribution** 23:23
**District** 1:1,1 5:8,8
**DIVISION** 1:2
**doc** 73:16
**document** 3:10 20:17 20:19,20 21:6 23:20 47:17,18,22,25 48:13 55:17 57:15 59:20 60:6,20,21 74:6 83:6,7,9,13 88:25 89:4 93:2,3
**documentation** 64:11 64:14,15 65:9 81:11 81:13 83:3
**documents** 19:12,20 19:21,23,25 20:3,5 20:8,9 61:4,16,21 61:23 64:23,25 66:5 66:7 73:14,15,17
**doing** 12:21 23:25 27:2 42:22 46:18
**door** 84:23
**DOT/TSI** 79:17 80:3 80:5,10
**downgrades** 68:10
**downsampled** 3:20
**downtown** 29:1
**dozens** 36:2
**dpi** 3:21
**DQ** 21:19,22 22:5,6
**draw** 28:19 54:14
**drive** 9:12 36:13 90:10
**driven** 29:2
**driver** 13:4 14:7,9,17 14:18 15:1,5,6,7,9 15:18,18,20,21,24 15:25 16:3,7,23 17:2,10,16 18:9,17 21:2,17 24:11,15 28:10 29:4,9 30:8,9 30:23 32:2,7,13 33:11 35:13 47:22 49:19,20 53:15,25 53:25 54:2,13 55:13 55:14 56:5,11 57:11 58:7,13 59:18 60:1 61:9,24 64:18,24 68:22,23 69:6,12 72:15,16 79:17 80:3 83:2 84:10 89:24 90:11 93:3 95:3,15
**driver's** 32:20 47:21 63:10 64:13 66:18 69:8 80:5,10 89:25
**drivers** 3:11 10:15 13:5,21 17:4,22,24 18:21 19:7,8 20:24 22:8,16,23 27:10 29:7 31:22,24,25 34:4 36:3 38:21 40:13 55:6 63:6,23 66:16,24,25 67:24 68:6,10 70:6,12,16 70:20 71:2,7,12 74:8 77:14 81:21 84:18
**drivers'** 81:6
**driving** 15:11 17:8 28:3,20 33:13,25 36:5,5 37:12 50:15 52:5,5 63:10 66:18 80:3 81:18
**drug** 80:5
**duly** 5:21 97:7
**duplicative** 87:10
**duties** 9:21 10:2,4,10 10:21

E

**earlier** 46:10
**easier** 21:21
**ECM** 44:10
**EDELMAN** 2:3
**eDriver** 93:2,11 94:5
**education** 66:19
**educational** 11:18,18
**effect** 82:20
**effective** 31:18
**eight** 22:20 28:10,23 35:25 52:3 76:18
**eight-second** 27:8,23 27:25 29:6
**eighth** 76:17
**either** 63:22 64:24 69:5
**electronic** 3:20,22 44:22 62:19
**electronically** 3:22

**elements** 8:14
**Ellen** 1:22 97:3,23
**eLog** 89:5
**ELS** 98:25 99:25
**else's** 49:13
**email** 23:21,23 24:4
**emails** 3:13 92:10
**emergency** 67:24
**employed** 9:13,15 30:20 72:22
**employee** 10:14 97:14,16
**employees** 9:24 52:20 86:5
**employer** 86:14
**employment** 62:21
**Emporia** 9:7,8,16,18 13:22 28:21 81:21 82:1
**encompassed** 25:23
**enforcement** 41:15 44:5
**engine** 46:7,17 48:22
**engineering** 51:23
**entail** 9:21
**entailed** 45:11
**entering** 28:11
**entire** 93:18
**entitled** 19:17
**environment** 37:13
**equipment** 45:3 84:18
**equipped** 44:21 82:14,17
**ERRATA** 3:17 98:1
**evaluating** 88:21
**event** 38:4
**events** 41:1 47:22 48:20
**everybody** 54:14 78:10
**evidence** 49:6 86:19
**exactly** 37:18 82:24
**EXAMINATION** 3:2 5:23 88:17 94:2 95:9
**examined** 97:6
**example** 34:15
**exceptionally** 32:13
**excuse** 36:4
**exercises** 68:24,24
**exhibit** 20:12,15 23:17,18 29:15 50:8 53:8,13,14 55:16 59:16,17 62:6,8 65:15 67:8,11,12,12 67:16 68:5 73:10,16 74:5 75:23,25 76:13 79:3,9,16,16 80:5 80:14 83:1,6,13 86:3 87:11 91:18 93:25 94:1
**exhibits** 3:8,20,21,22 91:21
**exist** 66:7 87:7
**existing** 14:1 19:8 66:25 72:15
**expand** 29:24 30:6
**expect** 37:1
**expectation** 29:8
**expectations** 16:20
**expected** 28:2,23
**experience** 17:8 32:14 36:16 43:25 57:15
**experienced** 16:7 17:2
**experts** 86:5
**expires** 99:24
**explain** 16:20 22:12 63:14
**explains** 74:20
**explanation** 34:7
**extensive** 18:10
**extent** 13:21,22 36:21 66:6 75:1 83:8

**F**

**facetious** 43:11
**facility** 9:25 13:23 30:22
**fact** 57:24,24
**failed** 23:6
**failure** 31:6 38:5
**fair** 7:17 8:1,2 11:4 18:19,20 35:23 36:11 44:14 47:5 49:2 66:20 76:23 79:5 81:8,9 86:17
**fairness** 47:10 58:12
**familiar** 19:23 20:9 20:17 23:19 47:17 60:6 83:7
**familiarity** 26:13
**far** 36:8 64:4 95:17
**fashion** 28:17
**fast** 50:15
**Federal** 12:9,17,22 24:18 25:16 26:5,12 50:4
**feed** 7:8
**feel** 17:5 33:18 35:4 35:22 39:6,8 40:5 75:7
**feet** 27:12,18 33:5 34:1,21 35:14
**felt** 31:23 38:23 40:25 75:4
**fender** 38:17 42:3
**field** 11:21 66:10
**fifth** 75:18 76:15
**figure** 49:24 92:5
**file** 3:22 20:2 21:17 21:19,22 22:5,6 64:24 69:8 89:16 90:9 91:12 92:2
**files** 3:23
**fill** 30:5 54:3
**filled** 29:16 48:8 55:18 57:16,22
**filling** 30:2
**final** 29:25 39:17,18 41:9
**financially** 97:17
**find** 24:13 32:18 43:3 43:6,9 64:4 91:24
**finding** 23:6
**fine** 45:6 46:21
**finicky** 60:9
**finished** 14:16 79:2
**first** 5:21 15:14,20 16:4,4 20:15 24:6 47:14 55:12 69:23 69:25 75:14,17 76:13,24 97:7
**fit** 34:8
**five** 64:5 67:3
**five-minute** 53:1
**flattened** 3:21
**floor** 14:22
**flow** 22:24 34:14 81:23
**fly** 63:19
**FMCSA** 12:11 13:2
**focus** 22:16 23:2 28:18
**focused** 75:9
**folks** 7:12 46:1,4 85:2
**follow** 23:7 31:7 38:5 49:9
**follow-up** 44:16 52:18 93:24
**followed** 52:1
**following** 22:20 23:24 27:9,23,25 28:5,9 29:6,10 30:4 30:25 50:16 51:25 52:4,6
**follows** 5:22
**foot** 33:8,12
**foregoing** 97:12
**form** 16:9 17:12 24:21 25:25 27:16 29:4 30:1 32:6,9 33:2 34:6,19,23 35:17 36:20 38:4,12 39:2 40:7 42:19 43:15 49:4 52:17 57:21,22 69:3 70:8 78:2 86:18 90:6,8

90:13,15 91:11
**formal** 11:18 13:1 50:2 84:20 85:23
**formalized** 12:24 44:7
**format** 18:23 63:14
**forms** 62:19
**found** 21:2 60:21 61:8 87:8 88:5
**foundation** 90:4 91:7 91:15
**four** 77:15
**fourth** 75:18 76:15
**frame** 53:10
**framed** 8:13
**fresh** 54:15
**front** 7:2 33:10,16 37:17 42:14 47:9 50:11 73:21 93:3
**frozen** 78:18
**full** 6:16 9:3
**fully** 8:18
**functions** 9:23 16:25
**further** 37:20 88:14 93:22 95:6
**future** 66:24

**G**

**gain** 12:21
**general** 11:17,23 20:23 48:16 53:9
**generalized** 9:21 18:17
**generally** 35:18
**generate** 55:2
**generated** 68:20 69:10 90:8 94:9
**generates** 55:13
**generically** 54:19
**getting** 46:16
**give** 6:16 10:9 11:17 18:15 20:15 27:14 27:17,18 29:5 34:14 42:21 84:2
**given** 35:4 69:12
97:13
**giving** 82:21
**go** 6:15 7:11 8:19 9:2 10:6 14:23 15:18,19 16:16,20 17:18,20 18:18 19:19 20:16 22:23 23:18 24:5 25:2,5 29:14 30:24 31:4,5 33:9 40:15 44:5 47:11,14 48:3 53:8 54:6 55:16 57:25 58:17 59:3,17 59:24 60:17 62:2,11 69:17,18 70:4,14 71:1 72:1,3 73:22 75:24 78:19 80:2 84:2 85:6 86:2 92:5 92:15
**goal** 24:24 63:13
**goes** 7:18 8:11 14:9 15:20
**going** 10:15,25 14:24 15:19,25 16:1,5,6,6 16:22 17:1,11 21:11 22:16 23:3 26:24,25 27:13,17 31:17 36:20 37:2,21 39:22 40:10 44:15 45:9 46:9 48:3 52:24 53:3 55:19 60:24 62:2,14 63:17,19,19 64:19 67:12 74:4 77:4 78:22 79:2 82:23 83:1,5 84:2 85:9 88:23 91:19,23 92:4,18 93:16 96:6
**good** 5:25 34:17 40:22 78:18
**gotten** 43:1 52:18
**GPS** 45:4
**grades** 70:12
**graduate** 11:20
**Grand** 2:9
**great** 8:3
**Greenwich** 94:11
**ground** 43:25
**group** 20:5 23:23 63:8,25 84:22
**grouping** 20:14
**guess** 28:19 82:22 84:3 94:11
**guide** 79:17 80:3,10
**guideline** 22:18
**guidelines** 6:15 23:7
**guy** 40:20 80:5
**guys** 31:3 43:10 58:13 63:18

**H**

**half** 71:7,8
**hand** 97:18
**handle** 14:20
**handwriting** 47:24 61:19 89:8
**happen** 14:13 47:23
**happened** 11:2 54:4 63:24 81:20
**happening** 27:1 49:25 51:22 84:23
**happens** 53:24
**hard** 84:24
**hazard** 29:7 33:14 37:18,21
**he'll** 14:18
**head** 6:17 81:24
**header** 55:24
**heading** 92:3
**hear** 39:5 85:3 94:21
**heard** 7:7
**hearing** 78:11 84:24
**heavy** 36:18
**help** 32:6 60:24
**hereinbefore** 97:9
**high** 35:24 36:15
**highlighting** 61:17,19
**highway** 28:25
**hire** 9:24 16:16 19:2
**hires** 13:25 14:1,4
**historically** 36:18
**hit** 50:11,16
**home** 9:10,11
**honest** 72:24
**honestly** 45:16 60:12 72:23
**hood** 42:14
**hopefully** 24:16 27:10 31:20
**Hospital** 57:25
**hour** 27:13,15 33:8 34:2,22 35:14 42:18 52:25 71:8,8 77:17 77:25
**hours** 77:15 80:10

**I**

**I-35** 28:21
**idea** 61:20 91:20
**identical** 11:14
**identify** 5:10
**image** 29:22
**imagine** 76:4
**immediately** 8:7 55:5
**impact** 42:7
**impacts** 42:10
**implicitly** 86:9
**implies** 89:24
**importance** 22:9,13 24:8,20 26:18
**important** 32:7 41:16
**importantly** 6:23
**inarticulate** 7:1
**inaudible** 29:22 36:1 56:15,18 64:8 78:7 84:25
**inches** 22:19,21
**incident** 23:22 29:18 31:1,22 39:18 47:23 50:24 51:6 55:8
**inclined** 60:13
**include** 17:13 27:3 76:11 77:6
**includes** 54:1 57:24 57:24
**including** 86:8
**increase** 28:4

**indicate** 30:25 57:16
**indicates** 4:2,3 68:16
**indicating** 61:5
**information** 18:6 20:16 39:16,16 40:5 44:11,24 45:4,21,25 46:23 49:3 73:9 89:19 90:15
**informational** 62:18
**inquiry** 6:4 11:7
**inspections** 89:13
**instance** 19:19 28:11 36:14 44:2 60:20 61:13 67:21,23
**Institute** 44:3 67:15 72:21 80:16
**instructed** 54:20 55:6
**instruction** 65:23
**insurance** 92:11
**intent** 32:5
**intention** 6:18
**intentionally** 33:13
**interacted** 94:16
**interaction** 15:15,23 94:24 95:1
**interested** 97:17
**internal** 3:13 22:18 24:3,23 25:8 26:18 27:2 38:16
**interpretation** 41:17
**interrupt** 19:15 25:3 64:10
**intersections** 70:21
**interview** 36:10 39:22
**Invest** 29:18
**investigated** 42:17 43:12 45:19 58:5
**investigating** 43:21 46:23 89:20
**investigation** 10:1 23:12,24 24:3,9,20 25:9 26:19 27:3 29:18,25 38:11,17 38:24 39:12,18,24 40:2,16,24 41:20 44:12 45:18,23 46:17 49:10 52:21 58:14 59:12 84:15 85:18 89:16 90:19 91:5,12 92:2,8,13
**investigations** 24:23 26:23 42:23 84:21
**investing** 40:14,15
**involve** 39:21,22
**involved** 24:12 32:2 34:3 39:23 49:19,20 52:21 74:18
**involvement** 11:3
**involving** 31:22 53:24 67:4 84:18
**Iron** 1:8,16 5:16 6:4,5 9:16,18,25 10:7 11:13 13:11 29:17 46:18 94:10 98:2 99:2
**ISO** 9:19,22 10:3,12 10:21 13:18
**issue** 76:4 86:7
**issues** 11:11 16:21 18:14 24:14 40:3 81:7
**item** 38:6

**J**

**J** 1:9 56:6 87:18 98:3 99:3
**James** 1:9 2:3,8 5:12 5:15,25 21:20 45:6 56:5 57:3 59:21 62:20,22 68:12 71:13 75:22 78:14 83:19 87:18 91:20 94:18 96:1 98:3 99:3
**James's** 61:1
**Jeff's** 6:12
**Jim** 21:15,23 29:13 30:8 33:17,17 34:10 34:15 35:5,23 36:12 40:19,24,25 50:10 50:12,13,15 61:12 61:16,18 63:5 65:9 65:22 88:20 89:7,25
**Jim's** 21:19 23:24 30:1 36:7 42:11
**job** 9:20,21 10:4,10 10:10 12:2,12,21 13:5 40:22,22 42:22
**Joe** 5:17 16:11 17:14 24:22 26:1 33:4 34:25 35:21 36:21 38:14 43:19 45:7,13 46:10 56:19 60:24 62:24,24 66:9 86:20 92:24 95:11
**Joe's** 87:13
**Joey** 2:13
**Joey's** 6:13
**join** 63:20
**Joseph** 1:18 5:5,20 9:4 98:24 99:14
**jthompson@etkcla...** 2:5
**judge** 8:16
**July** 11:1 56:13 64:12 82:4,6,10 94:10
**jump** 23:17 59:14 65:14 67:7 76:25 79:9
**juncture** 37:3
**jury** 7:12,21

**K**

**Kansas** 1:25 2:4,9 5:9 7:13 9:7,9,16,18 22:17,25 28:21 29:2 32:20 34:9
**keep** 8:3 25:21 37:16 49:25 64:2
**key** 26:23 40:23
**kind** 15:14 18:2 26:24 53:11,23 54:13 57:15 58:3 67:22 87:9
**kit** 47:22 54:1,7,8
**kits** 84:10
**knew** 36:16
**know** 6:18,24 7:2,9 8:5 18:21 19:1,1,4 19:16,17 21:18 26:2 29:16 33:4 35:6 36:21 37:9 40:17,22 44:17 45:16 46:5,13 49:15 56:21,22,24 57:19,21 58:18,20 58:22 60:5,15,20,20 64:7,20 65:4 68:1 68:19 72:23 74:2,8 77:13 78:3 82:24 83:16,21 85:1 86:12 86:21 87:1 90:17,22 91:13 93:15,15,19 94:6 95:17
**knowing** 23:3 59:9
**knowledgable** 84:14
**knowledge** 12:21 37:7 43:4,6,12 45:14 46:11 65:13 66:11 74:7 86:1 87:3
**knowledgeable** 62:17 84:8 85:17 86:4,24 87:17 88:7
**knows** 37:24

**L**

**L** 1:22 97:3,23
**lab** 68:24
**labeled** 3:21,21 88:24 93:7
**Lack** 91:14
**Lacks** 90:4 91:6
**lane** 23:3 28:12 33:16 37:11,11,17
**lanes** 68:6 70:7 81:19
**large** 20:2
**law** 41:15 44:4
**Leading** 91:6
**learn** 63:25

**learned** 31:20 35:23 81:19
**learning** 17:3 26:20
**leaving** 33:15
**left** 29:5 33:9 56:1
**lessons** 81:19
**Lester** 2:8 3:4,6 5:14 5:14 8:11 11:8 16:9 17:11,15 19:14,17 21:4,20 22:1 24:21 25:25 27:16 32:9,11 32:23 33:2 34:6,19 34:23 35:3,17,20 36:20 38:12 39:2 40:7 42:19 43:15 45:6,13 46:9,20 48:24 49:1,4 53:18 56:15,18 57:2 59:21 59:23 60:9,24 61:3 61:8 62:22 65:3,12 65:19 66:9 67:9 68:12 71:13,20,23 72:2,7 73:23 75:19 75:22 76:1 78:10,14 78:19 83:19 85:6 86:18 87:6,12,24 88:3,15,18 90:5 91:9,17,20 92:1,7 92:15,23,25 93:22 94:18 95:7,10,25 96:4
**let's** 15:13 20:4 23:16 39:10 47:10,12 50:7 60:17 73:22 75:12 75:12,24 76:7,10 78:19 84:5 85:6 86:2 92:15 96:2
**letting** 18:4
**level** 36:15 95:15
**license** 32:20
**lifts** 42:13
**light** 45:21 72:24 75:2
**limit** 11:10 65:21
**limitations** 62:24
**limited** 94:5
**line** 17:7 18:16 40:1 56:1,21
**lines** 67:22
**list** 14:18 31:9 63:7
**listed** 38:5,8 75:5,8
**lists** 50:15 89:8
**literature** 74:20
**little** 15:14 17:9,10 23:17 25:7 29:20,22 30:6 31:2 32:25 47:15 50:1 54:23 63:16 71:7 72:24 74:10 75:2 79:11 80:11 85:3,22 89:1
**live** 9:6
**LLC** 1:16 2:3 5:6,16 91:2
**loaded** 10:14
**loader** 10:13
**loads** 14:23
**log** 91:3 93:2,11 94:5
**logistic** 14:19
**logs** 44:22 45:10 89:25 90:12,21
**long** 40:21 59:13
**long-winded** 8:22
**look** 8:16,16 42:10 43:14 53:8,13 59:3 65:17 67:20 73:8 74:7 81:1 82:25 83:4
**looked** 20:3 65:5 67:15 72:4,5 87:7 88:4 89:25
**looking** 26:2 34:9 55:24 67:9 70:9 72:2 73:20 75:22 90:15
**looks** 20:6 23:21,25 24:2,7 43:5 48:7 53:13 55:23 59:25 60:16 77:16 78:7 83:17 94:9,15
**loss** 14:11 84:17
**lot** 7:1 20:2 43:1 78:15
**lots** 42:23
**lunch** 63:22

**M**

**maintained** 52:4,7
**maintaining** 81:17
**making** 31:15
**management** 22:10 22:14,17 23:7 24:18 25:10,15,24 26:4,10 27:21 32:19 33:1 34:1,5,18 35:15,16 73:5,12,19,25 74:2 74:15,21
**manager** 30:22
**managing** 9:24 10:3
**manual** 3:11 22:18 22:25 32:20 34:9 83:23 84:1 92:6
**manual's** 83:17
**manuals** 83:5
**manufacturer** 46:7
**march** 62:22
**marked** 92:1,10
**material** 62:20 67:17
**materials** 3:12 73:10 73:11,16,21
**matter** 5:5 6:2
**mean** 19:15 25:3,20 31:17 36:25 38:23 41:19 43:9,11 55:9 64:10 77:19 94:14
**means** 26:14 57:19 94:7
**meant** 25:15 56:9
**media** 62:19
**meet** 15:25 16:1,3,4 16:19,22
**meeting** 14:10 15:15 18:8,9 63:20,21
**meetings** 36:3 63:6 63:10,15 64:3,13,16 66:18 81:7
**memorialization** 84:9
**memories** 81:14
**memory** 48:19 49:7 67:6 72:25
**merge** 29:5
**Merit** 1:24
**metadata** 3:23
**Metal** 1:8,16 5:16 6:4 6:5 9:16,18,25 10:7 11:14 29:17 71:12 94:10 98:2 99:2
**Michael** 2:8 5:14 11:6 64:23 66:3 87:4,23 91:16
**middle** 29:1 61:3
**miles** 27:13,15 32:14 33:8 34:2,22 35:14 42:18
**million** 32:14
**mind** 24:24 54:16
**mine** 14:19
**minimum** 15:7 69:1
**minor** 27:5 40:11
**minute** 85:7
**minutes** 70:5,10,15 70:19 71:11 77:17 77:25
**mirror** 81:22
**mirrors** 36:5
**missed** 72:8
**missing** 8:14
**Missouri** 1:1,24 2:4,9 5:8 97:4,24
**misspoke** 87:12
**misstate** 16:13
**misstates** 16:10 17:12 49:5 86:18
**mlester@bjpc.com** 2:10
**modular** 18:10 66:23
**module** 19:22 44:17 46:17 68:2,5,23 70:6
**module's** 21:8

**modules** 17:17 18:1,5 19:7 44:10,10 46:7 60:2,14 61:12 67:4 72:16 73:18 76:20
**moment** 48:11 59:15 65:16
**moments** 74:24
**monitoring** 65:23
**month** 44:6
**months** 36:11 63:12 63:24
**morning** 5:25 79:11
**motor** 12:9,17,22 22:12 24:18 25:18 26:5,12 27:13 34:3 35:12 37:8 49:20 50:4 53:25 67:23
**Mountain** 94:11
**move** 33:20
**moved** 10:18
**moving** 37:11

**N**

**name** 9:3 63:11
**name's** 5:25
**narrative** 30:3 47:7,8 48:12,15,16 50:7,19 50:25 51:5,16,17 54:3
**narrow** 28:18
**Nebraska** 63:18
**necessarily** 21:18 35:22
**necessary** 39:16
**need** 6:19 7:2,25 8:4 8:5,6 17:3 23:3 31:4 40:5 43:24 48:3 55:19 91:19
**needed** 33:6 38:24
**needs** 8:24 31:18 58:4
**never** 45:24 48:23 57:20,20
**new** 9:24 13:25 14:4 14:7,8,17 15:10,18 16:16 17:16,22,24 18:17 19:7 22:16 37:1 65:5 66:23 72:16
**Newman** 57:25
**NIM** 1:16 3:11 5:6,15 6:5 10:1 11:8,9 12:25 13:6,9,11 14:7 24:11 29:8 49:18 52:1 53:22,24 58:23 71:19 72:22 85:24 88:4 89:19 91:2
**ninth** 76:18
**nod** 6:17
**noise** 84:23
**noninjury** 27:5
**nonparty** 5:16
**nonpreventable** 84:16 85:19
**nonresponsive** 33:21
**Nope** 96:2
**Norfolk** 1:8,16 5:16 6:3,5 9:16,18,25 10:7,13 11:13 12:25 13:9,10 29:17 46:18 49:19 53:23 71:19 85:24 94:10 98:2 99:2
**Norfolk's** 35:25
**normal** 22:20 28:23 52:4
**Northwestern** 44:2,3
**Notary** 99:21
**notation** 57:17
**Note** 3:20 94:4
**notice** 1:19 3:9 62:3,9
**noticed** 57:20
**notification** 23:23 55:12
**November** 1:20 5:3 7:24 97:19
**number** 27:14,18 36:10 54:1 71:21,23 71:25 76:2,3 93:1 93:13
**numbers** 84:6
**numerous** 39:23

**O**

**o'clock** 28:22
**oath** 2:19 5:22
**object** 8:12 16:9 17:11 24:21 25:25 27:16 32:9,23 33:2 34:6,19,23 35:17 36:20 38:12 39:2 40:7 42:19 43:15,15 48:24 49:4 86:18 90:3
**objection** 2:17 8:19 8:23 46:10 65:6,20 91:6,14
**objections** 8:11 11:10 62:23
**objectives** 14:11
**obligation** 7:20 8:12
**obtain** 95:19
**obtained** 12:2 40:4 71:19 88:20
**obviously** 6:16 20:14 46:10 62:22 86:12
**occasionally** 13:3
**occur** 24:16 50:24 51:6
**occurred** 31:23 49:23
**occurrences** 26:21
**occurring** 25:22 26:21
**occurs** 41:23 55:8
**OCR** 3:20
**offered** 14:25
**office** 19:10 21:3 61:9 61:24
**officer** 2:18
**officially** 58:4
**oftentimes** 81:20
**Oh** 25:7 38:2 62:12 72:7
**okay** 6:14 8:3,8,9,25 9:1 10:20 11:16,21 11:24 13:20,25 14:4 15:23 17:19,24 18:8 18:21 19:1 20:4,11 20:11 21:5 23:12,15 24:5 25:7 26:3,16 30:24 38:2,4 42:1,9 43:23 44:24 45:2,12 45:17 46:6,14 54:17 54:22 55:2,12 56:13 57:22 61:6 62:2,4 62:13 65:11,24 70:4 73:22 74:17,23 75:24 76:7 77:3 78:21 79:15 81:10 81:25 82:25 83:25 85:4 87:15 90:14 91:8,11 95:1,5,21 95:24
**old** 93:6
**older** 29:19
**once** 15:9 69:11,13
**ones** 20:1 73:6 76:11 77:13
**online** 17:17 67:14 68:21 71:18 72:6,21 73:3 74:24 77:20,25 80:20
**open** 38:20
**operator** 22:13 37:8
**opinion** 42:12
**opportunity** 7:4,20 27:7 28:10 38:19 62:8
**order** 15:24
**ordering** 3:22
**original** 3:21 92:12
**originally** 3:23
**OSHA** 12:1,4,6,6
**Ottawa** 28:21
**outdated** 93:6
**outside** 12:24 43:17 84:23

**P**

**p.m** 57:23 78:24 96:7

**pace** 18:2,4
**page** 3:18 20:15,16 23:18 24:5,6 29:14 30:4,14 47:11 50:7 50:8 51:11 53:14,21 55:16 56:21 57:9 58:17 59:17,25 60:18 61:14 62:11 62:15 65:15 67:12 68:4,9 69:18,19 71:1,25 73:20,22 74:5,14 75:13,15,16 76:13,14,14,15,16 76:16,17,17 77:6,23 79:3,9,16 80:2,4,9 86:3 87:11 93:13 99:1
**pages** 20:7 61:11 67:16 78:8
**paragraphs** 65:18
**parking** 71:2
**part** 7:8,9 14:2,16 15:17 20:20 21:4 22:15 23:12 25:9 30:2 34:12 35:10 40:23 45:17 46:17 49:8,10,11,16 72:8 73:9 83:25 89:15 91:4,11 92:6
**Participating** 52:20
**particular** 11:21 15:24 43:13 45:3 47:24
**parties** 5:11 97:15
**parts** 22:7 84:3
**pass** 68:22
**passed** 69:1
**passengers** 70:17
**passing** 68:6 70:7
**Patterson** 2:13
**pay** 14:25
**PC** 2:8
**PDF** 3:20
**Pedestrians** 70:16
**pending** 8:6
**people** 37:11 39:23 44:5 94:16
**PeopleNet** 44:22,25 45:2,10,20,25 46:6 88:21 89:6 90:10,11 90:12,15 91:3 94:17 94:24 95:19
**percent** 69:2,12
**period** 16:7 17:7,21 27:22 64:11 77:10
**person** 16:22 17:3 62:17 84:7,13 85:16 86:3,23 87:16 88:6
**personal** 45:14 46:11
**personally** 33:19 59:4
**persons** 62:17 84:7 84:14 85:16 86:3,6 86:16,23 87:17 88:7
**perspective** 31:19
**PFM** 94:6
**PG/LN** 98:4
**ph** 4:2
**phone** 55:9
**phonetic** 4:2
**photo** 88:3
**photographs** 58:18 86:25 87:7
**photos** 59:1,7,11 87:23 88:4
**picture** 18:17 54:13 58:24
**pictures** 87:1,5
**piece** 89:19
**place** 11:1 13:22 16:5 25:11 32:25 51:24 52:1 63:11 66:15,23 97:9
**placed** 69:7
**plaintiff** 1:6,19 2:2 5:13
**played** 41:1
**please** 5:10,19 9:3 30:7 60:3 72:18 74:10
**point** 7:21 8:17 18:13 18:18 39:17 40:3 41:16 51:20 58:4,9
**points** 45:22 46:8
**police** 24:1,2,6 41:4,5 41:8,11,19 48:21 50:14 53:19 58:10 67:10 86:15
**policies** 14:13 31:7 38:5 53:22 66:14 84:8,14 85:17 90:20
**policy** 29:11 48:9 49:19 50:2 51:25 84:20 85:23 90:22
**Poor** 51:4
**portion** 36:17
**portions** 18:15
**position** 9:17,23 10:18 18:24 36:4 37:15
**positions** 10:16
**possibility** 29:3
**possible** 28:8 29:1 54:15,21 55:1,7
**possibly** 34:7 50:20 59:5
**posttrip** 89:9,13
**potentially** 37:25 55:11
**PowerPoint** 64:1
**practical** 26:16
**practice** 68:24
**practices** 67:23 68:5 68:9 69:21 70:6,11 70:16,20 71:1 90:24
**pre-accident** 65:4,8 66:6
**preamble** 43:16
**precise** 45:10
**predates** 19:2
**preference** 94:6
**preliminary** 39:12,12 53:15 54:10,10 55:13 56:4 57:10,11 58:6,13
**preparation** 19:13
**preparing** 33:9
**prescribed** 31:7 38:5
**present** 2:12 6:10 86:6,8,24
**pretty** 47:6 82:22
**prevent** 26:20,25 51:22
**preventability** 24:14 25:9 26:19 31:20 49:16,21 50:3 84:20 85:24
**preventable** 84:16 85:19
**prevented** 52:2
**preventing** 24:24
**prevention** 14:12 51:21
**previous** 83:16 93:11
**previously** 3:21
**primarily** 63:20
**primary** 9:23 10:22
**print** 69:4
**printable** 69:3
**printed** 20:20,22 21:1 61:10
**prior** 6:11 41:19 52:13 64:11 67:3 83:12,21,22,23 97:6
**privilege** 6:1
**probably** 30:10,11,11 40:16 57:22 60:13 60:16 75:7 76:21 84:3 87:22
**problem** 29:21,23 72:10,10
**procedure** 53:10 84:20
**procedures** 14:14 31:7 38:6 53:22 66:14 71:3 84:8,15 85:17 90:20,24
**process** 8:10 39:15 53:10 54:7 57:7 58:8 85:2

**Processing** 3:22
**produced** 19:20,24 20:1,8 60:19 61:4 61:22,22 63:3 64:23 64:25 66:8 69:24 73:9,15,15,25 74:5 75:15 87:5 88:2,5 92:3,11
**producing** 5:16
**production** 3:10 92:12
**professional** 38:9
**program** 14:12,24 69:11 79:10
**programs** 80:21
**proper** 24:9,17 25:10 27:21
**property** 84:17
**provide** 33:23 44:18 45:20,22 46:8 66:15 69:5
**provided** 3:20,22,23 21:3 32:22 46:1,3 62:20 63:2 67:2 83:3,10
**providing** 65:21
**Public** 77:1 99:21
**pull** 20:12 23:16 59:16 62:5 74:4 83:6 90:13 92:23 93:16
**pulled** 19:9 90:14
**purportedly** 32:21
**pursuant** 1:19
**pursued** 11:22
**put** 16:6 17:1 20:11 31:12 50:25 51:23 66:23 90:9 91:22 93:25
**putting** 8:24 83:25

**Q**

**qualification** 21:17 64:24
**qualified** 21:22
**quality** 10:3
**quarter** 81:20
**quarterly** 63:6,10 64:13 66:17 81:6
**question** 6:24 7:1,3,6 7:7,9,11,13,25 8:6,7 8:13,17 25:7,13 28:14,16 33:20,22 35:6,11,23 36:7,11 39:9,10 45:7 49:5 50:1,6 51:4,6,8 57:6 59:19 60:22 65:25 68:12 71:13 72:9,18 73:13 74:3,12 82:7 83:19 93:16 95:13 95:14,21
**question's** 43:16
**questions** 3:3,4,5,6 61:1 62:25 75:10 78:16 88:14 93:1,10 93:23 95:6
**quick** 88:15,16 95:7
**quicker** 87:22
**quickly** 6:15 62:2
**quiet** 85:3 94:18
**quite** 63:8 75:3 84:22
**Quoted** 4:4

**R**

**R** 2:13
**radiator** 42:15
**ran** 66:25
**reach** 38:24 40:5 95:18
**reached** 50:22
**read** 32:15 48:12 51:17 52:13 68:23 73:7 75:9 89:12 96:4 99:5,8
**reads** 65:19
**ready** 17:6
**real** 95:7
**real-life** 17:8
**real-world** 17:8
**really** 7:24 54:25 74:3 94:18
**rear-ended** 50:13
**reason** 59:6 98:4
**reasons** 44:15
**recall** 46:3 74:19 81:16 82:19 84:10 85:20 88:19
**receive** 15:1 50:14
**received** 13:8,16 19:5 21:7 71:19 72:21 80:21 81:6
**recess** 53:4 85:10 92:20
**recognition** 25:21
**recognize** 20:17
**recollection** 7:15 46:16 48:14 52:11
**recommendations** 14:14
**reconstruction** 44:1 44:4,7
**record** 5:3,11 6:14,19 8:24 9:3 53:3,6 57:3 64:2,9 78:6,20,22 78:23,25 85:7,9,12 92:15,18,19,22 94:22 96:6 97:13
**record's** 51:15
**recurrence** 24:24
**reduced** 97:10
**refer** 42:3 47:21
**reference** 73:11,18 73:25 74:1,14 77:20
**referenced** 22:17,25 74:15 82:9
**referred** 33:5
**referring** 17:15 18:1
**reflect** 59:7
**refresher** 66:15
**regard** 34:1
**regarding** 62:18 65:22 84:8,9,14 85:17 86:4,24 87:17 88:7 90:20
**regardless** 26:17 40:1 93:12
**regards** 12:8
**Registered** 1:24
**regs** 26:17
**regulation** 12:18
**regulations** 12:10,11 12:23 24:19 25:18 26:6,13 50:5 80:6
**relate** 19:24
**related** 10:2 12:1 13:3
**relates** 14:6
**relative** 97:14,16
**relatively** 27:5
**relevant** 44:11
**remained** 10:21
**remember** 38:3 43:21 46:19 59:2,5 77:12
**reoccurrence** 24:16 51:21
**rep** 45:15 91:2
**repeat** 25:12 72:18 73:13 74:12
**rephrase** 7:4 25:12
**report** 24:1,2,6 39:13 39:18 41:5,8,9,19 48:21 50:14,14 53:15,19 54:11 55:5 55:13 56:4,12 57:11 58:7,10,13 59:12 67:10 89:6 93:2,12 94:4,9 95:12
**reported** 57:11 97:8
**reporter** 1:24 3:16 5:19 6:19 78:4,13 78:18 91:18 97:1,4 97:25
**Reporter's** 3:20
**reports** 3:13
**represent** 5:11
**representation** 63:18
**representative** 1:18 5:17 43:18 45:9 46:12
**representatives** 13:5

**representing** 6:1
**request** 44:24 99:6,9
**requested** 45:24 52:17
**Required** 74:7
**requirements** 79:18
**resolution** 3:23
**respect** 14:4 23:5 45:4 46:22 65:2,8 66:5 69:16 80:19 83:5 84:15,21 85:18
**respond** 6:4 28:11
**response** 6:17,18 78:17
**responsibilities** 14:5
**responsible** 13:21
**results** 21:9
**retention** 94:5
**review** 59:1 62:8 81:22
**reviewed** 19:12 21:10 22:4,6,7 51:13 91:4
**reviewing** 12:22 68:23
**Reviews** 48:13
**revised** 83:13
**revision** 83:18
**Rich** 21:21 45:8 46:11 64:20 82:23 87:14 90:17 93:16 93:20,21 95:13,14 95:22
**Richard** 2:13
**right** 13:17,17 16:17 17:10 18:24 21:25 23:11 24:1,6,9,20 25:11 26:21 27:24 28:5,12 30:17 31:8 31:10,15,21 32:3,10 36:25 37:4,14,21,25 38:11 39:1,13,19,20 39:24 40:6 41:9,10 41:17,20,24 42:21 46:24 47:4 48:9 50:22 51:1,9,13,18 52:10,14,18,22 54:4 55:10 56:5,14 58:1 58:10,15 59:14 61:6 61:15,17,19,25 67:18 68:2,15,17 69:14 70:2,7,12,17 70:24 71:4,9 72:17 73:12 74:15 75:2,8 76:22 77:7,11,17,25 78:9,19 79:21,25 80:7,12,17 81:3,12 82:11 83:23 84:5,23 86:10 87:5 88:2 91:1 92:25 93:10,21 95:19
**right-hand** 33:12 55:25
**Right-of-way** 70:21
**road** 15:7 16:7 17:1,8 18:11,19 19:9 32:14
**roadway** 36:17
**root** 50:24 51:7
**rotate** 47:13
**roughly** 77:10
**router** 69:4
**row** 69:24
**rpms** 44:20
**rule** 22:22 27:8 33:25
**rules** 14:14
**run** 43:24 72:15,17 95:12
**running** 20:6,7 81:25 84:6
**rural** 28:25

**S**

**safe** 22:25 27:21 32:13 34:4,13,17,17 35:5,15,19 36:5,9 74:8
**safely** 23:4
**safer** 32:7
**safety** 9:19,22 10:2 10:11,21 12:9,18,23 13:18 14:11 17:4 24:17,19 25:10,15 25:18,24 26:4,5,10 26:12 30:16 32:21 37:12 50:4 63:21 77:1 80:16 81:7
**safety-related** 16:21
**sample** 59:25
**saw** 21:13 33:11
**saying** 8:15,22 18:2
**says** 33:11 50:10 52:3 52:20 57:9,18 59:18 67:21 68:18 70:3 71:5 73:20 77:20 79:24 80:15 89:6 94:4
**scene** 27:7 38:18 39:22 40:15,16 41:12 54:7,18,22 55:10 84:9 86:6,10 86:13,14,15,22,25
**scheduling** 15:22
**school** 35:24
**scope** 11:10 43:17
**screen** 19:22 60:9 88:23
**screenshots** 20:21 73:17
**seal** 97:18
**searchable** 3:20
**second** 27:12 33:6 60:25 75:17 76:14
**seconds** 22:20,21 28:10,23,24 52:3,6 77:25
**section** 34:12 50:25 77:14
**sections** 19:11
**securement** 71:6,12
**see** 20:4 29:20 31:1 32:22,24 33:9 48:3 50:7,17 52:7 53:15 53:20 58:23,24 61:17,18 70:14 73:3 74:9,25 77:4 78:1 79:12 83:14 84:5 91:24 92:7,24 93:3 93:7 94:12
**seeing** 53:19 60:7 75:20,20
**seen** 19:25 21:14 26:22 27:7 42:4 56:25 57:20 60:14 90:6
**self-paced** 14:24 18:9
**semi** 36:13
**seminars** 12:18
**sense** 81:24
**sent** 23:22 86:10
**series** 14:8
**seriously** 40:23
**servants** 86:4
**serve** 63:22
**service** 80:10
**sessions** 13:3
**set** 94:6
**seven** 75:6 86:7
**seventh** 76:16
**shape** 29:4 32:6
**share** 60:9 88:23 92:12
**shed** 45:21
**SHEET** 3:17 98:1
**shift** 10:18
**Shoemaker** 2:13
**short** 66:4
**short-circuit** 21:20 64:22
**show** 56:20 69:20 93:17
**showed** 61:8
**sic** 4:3 80:14
**side** 33:12 55:25
**sides** 41:23
**sign** 15:10 17:5 64:18 96:4
**signature** 3:18 30:13 30:16 51:10 99:1
**signed** 51:9,12 59:11
**significantly** 38:15
**signing** 51:18 52:14

**signs** 54:14
**similar** 11:3 14:19
**simple** 34:7
**simply** 12:21
**sir** 6:8,22 13:24 25:3 25:19 27:14 30:23 35:7 39:6,14,25 44:8 50:18 70:22,25 71:5 74:16 79:6,19 79:22 80:13 82:18 93:5,9
**sit** 46:15 74:18
**situation** 7:22 37:10 38:22
**situations** 67:25
**six** 22:19 28:9,22 35:25 52:3 75:6
**six-** 27:8,23,25 29:6
**sixth** 75:18 76:16
**size** 3:23 34:10
**sketch** 10:10
**slamming** 42:12
**slow** 33:13
**slowing** 37:2,20
**solutions** 67:14,17 71:18 72:12,21 73:4 76:2,6,10,12
**something's** 31:17
**soon** 54:15,19,21 55:1,7
**sorry** 22:19 25:2 49:1 53:21 54:10 57:3 59:23 62:12 67:11 72:7 82:7 91:25
**sort** 20:4
**sound** 61:15
**space** 22:9,13,17 23:7 27:21 32:19 33:1,15 34:1,5,17 35:15,16 37:16 73:5,11,19,25 74:1,15,20 81:17
**speak** 13:12
**speaker** 4:4
**speaks** 65:6
**specialized** 12:6
**specific** 13:1 15:1 26:10,11 27:18 42:20 43:21 48:15 52:10 81:14
**specifically** 27:4 34:15 51:3 73:4 74:20
**speculation** 33:3 40:8 90:4
**speed** 34:11,14 44:19 45:5
**spelling** 4:2
**Spencer** 1:18 5:5,17 5:20,25 9:2,4,5 11:7 11:16 16:12 20:13 23:20 33:22 35:2 47:16 53:7 65:17,21 66:13 79:1 84:11 85:13 88:13 92:25 98:24 99:14
**spend** 14:17,22,23
**spends** 15:6 17:16
**spits** 69:14
**spoke** 19:14
**stamp** 20:7 55:24 56:3,3,7,10 57:9,18 57:19 77:24 91:16 93:6
**stamped** 20:6 61:10 61:14 74:6 92:14
**Stand** 53:3 78:22 85:9 92:18 96:6
**standpoint** 24:17 26:16 90:19
**start** 15:11 58:4 66:1 71:2
**starting** 58:3
**starts** 14:7 15:6 58:8 92:8
**state** 9:2 77:1 97:4 99:22
**stated** 4:3,4 8:19 35:24 97:9
**statement** 46:24 47:1 54:11
**statements** 88:7
**states** 1:1 5:7 50:10
**Staying** 81:23
**steel** 10:14
**step** 15:15
**steps** 14:8,10
**stipulate** 76:2
**stipulated** 2:16
**STIPULATIONS** 2:15
**Stock** 1:22 97:3,23
**Stoneman** 1:5 5:6,13 6:2 41:2 42:1 48:23 49:10,12 86:13 88:10 98:2 99:2
**Stoneman's** 86:14
**stop** 50:12 92:12
**stopped** 37:2,25
**story** 41:23
**strike** 10:4 18:22 33:21 49:17 55:3 67:1
**strongly** 41:1
**studies** 11:23
**study** 11:22
**stuff** 31:15
**subject** 11:9 62:23
**Subscribed** 99:16
**substantiate** 21:11
**substantiates** 21:6
**substantive** 53:12
**successfully** 19:9 69:25
**suggest** 34:9
**Suite** 2:4,9
**Sunday** 28:22
**supervisor** 10:17 13:4 14:18 15:9,10 15:21,25 16:3,23 18:9 30:9,23 55:7 56:12 58:7 69:6 89:24 90:11 95:4,15
**supervisor's** 21:2 61:9,24
**supposed** 53:20 54:6 54:17,18 55:4,4 67:9
**Supreme** 97:24
**sure** 7:25 18:5,13 20:2 21:13 24:12 25:14 30:10 35:8 39:5 44:13,15 46:5 46:15 47:10 51:4,14 57:2 58:25 60:4,15 61:2 63:5 66:2 72:19 73:2,14 74:11 74:14 75:3 76:3 82:24,24 84:25 85:6 85:14 90:13,18 93:19
**surprise** 37:1
**swear** 5:19 84:4
**sworn** 5:21 97:7 99:16
**system** 10:3 44:22

**T**

**T** 2:3
**TABLE** 3:1 4:1
**tail** 6:12
**take** 6:20 8:5,7 10:15 16:5 27:10 39:11 41:14 48:11 52:25 63:11 65:16 68:25 82:25 83:4 94:13 96:2
**taken** 1:18 6:7 53:4 58:20,22 61:12 80:7 80:11 85:10 86:25 87:1 92:20
**takes** 18:3 40:22 60:1
**talk** 21:22 22:8,18 42:1 45:10 49:9,12 63:23 67:14
**talked** 19:16 48:23 66:17 84:6,19 85:22
**talking** 10:25 17:25 20:14 28:20 35:9 37:7 56:3 72:11 79:3 82:10,23 87:14

**talks** 34:13
**taught** 31:20
**teach** 31:23,25 44:4
**teaching** 26:20,25 31:18,21
**technical** 78:5
**technique** 34:18
**tell** 8:10 9:20 43:20 54:25 55:17 56:10 85:2 88:25 89:4
**telling** 8:15,23
**tells** 55:18 56:11 58:25
**ten** 15:7 16:8 17:9 18:11 28:24 34:21 52:6 70:15 75:7,8 96:2
**ten-day** 17:20
**tenor** 48:16
**term** 26:14 54:9
**terms** 9:21 15:23 32:25 35:15 41:16
**test** 60:1,13 68:22 69:1,1 87:17,19
**testified** 5:21 36:22
**testify** 46:12 62:16 65:22
**testimony** 7:19 16:10 16:13 17:12 19:13 43:17 72:14 88:19 97:8,13 99:5,8
**text** 4:3,4
**thing** 30:6 31:2 37:9 38:16 39:7 63:4 85:4
**things** 8:12 10:25 15:3 20:5 31:10 36:6 42:24 44:18 54:1,2 85:14 92:10
**think** 7:7 11:14 13:17 17:12 21:21 26:23 28:18 30:12 34:4 39:4 40:17 42:6,11 42:20 43:10 47:11 48:6 52:24 53:18 54:12 56:25 60:25 61:10 65:6 67:5 68:18 72:3,5,9 73:23 74:23 75:19 76:21 79:8 82:22 86:9 87:13,14 88:12 88:16 90:17,17,18 95:15,20
**thinking** 94:25
**third** 75:17 76:14
**Thompson** 2:3,3 3:3 3:5 5:12,12,24 6:1 7:24 11:6,16 16:12 17:19 20:12,13 21:25 22:3,4 23:16 23:19 25:1 26:3 27:20 29:14,16,19 31:4,8 32:10,15,24 33:20 34:16,21 35:1 35:8,18 36:14,25 38:15,22 39:8 41:3 42:25 43:23 45:12 45:16,17 46:14,22 47:12,16 48:7,14,25 49:2,8 50:9,10 52:24 53:7,21 56:2 56:17 57:5,8 59:16 59:18,22,24 60:12 60:17 61:2,13 62:5 62:7,11,13 63:1 64:22 65:11,14,24 66:2,3,13 67:11,13 68:13,14 69:18,23 71:14,22,25 72:5,10 72:11 74:4 75:24 76:7,9 78:7,17 79:1 83:20 85:5,13 86:23 87:4,9,15,16,22,25 88:6,13 90:3 91:6 91:14,23 92:4,13 93:24 94:3,20,23 95:6 96:2
**thorough** 38:10
**thought** 25:4 41:4
**three** 15:4 18:3 63:12 63:24 65:17 68:22 69:2,12
**three-ring** 61:7,23 73:24 74:1
**throttle** 44:19
**thumb** 14:14 22:22 27:8
**thumbnail** 10:9
**time** 5:4 8:4,4,17 14:17,24 17:16 18:5 20:24 21:1,14 27:23 36:19 40:14,15,21 42:22 44:23 45:11 53:2,5,10 55:24 56:2,10 59:11 61:10 61:12,14 62:21 69:3 72:22 75:11 77:20 77:24,24 78:21,24 82:4,13 84:24 85:8 85:11 86:8 88:14 92:17,21 94:11 96:5 97:9
**times** 36:2 39:4 77:12
**title** 73:5,6
**titled** 93:2
**titles** 10:11
**today** 5:17 6:11 7:19 8:1,4 10:20,25 11:7 11:11 19:13 74:18
**Today's** 5:3
**tool** 26:20,25 31:18 31:21,24 32:1 40:13
**tools** 24:25
**top** 56:1 57:14 81:24 89:6
**topic** 45:15 85:16
**topics** 11:9 12:19 16:21 62:3 63:7 64:7,12 73:3 74:9 81:11,14 85:15
**totality** 65:1
**touch** 53:8
**traffic** 22:24 23:1 29:1 34:14 37:2,3,3 37:10,25 44:3 81:23
**trailer** 58:23
**trailers** 10:15
**train** 19:7 22:15
**trained** 33:17 63:5
**trainee** 15:11
**trainer** 15:6,8,9,20
**training** 3:12 9:25 11:24 12:5,7,8,11 12:24 13:1,4,8,13 13:14,16,21,22 14:2 14:6,17 15:1,18 17:17 18:10,15 19:4 19:21,22,24 20:8,22 20:25 21:7,12 22:16 24:25 32:21 34:3 40:13 44:7 59:14,19 61:23 62:20 63:2 64:25 65:2,5,9,22 66:6,15,19,23,25 67:2,3,16,22 71:15 71:18 72:6,12,20 73:10,16,18,21 74:18,19,25 75:5 77:7 80:20,24 81:5 81:7 83:3
**transcript** 97:12
**transportation** 1:16 5:6,15 6:5 10:1 11:9 13:11 14:8 23:22 24:11 52:1 69:4 79:25 80:15,16 89:20 91:2
**Transportation's** 29:8
**travel** 23:1 27:13 34:13
**traveled** 27:18
**traveling** 33:7 34:2 34:11,22 35:14 36:9 38:20
**trial** 7:18,19
**trick** 57:6 73:24
**tries** 69:2
**trip** 27:6 38:18
**trouble** 78:11

**truck** 14:21 36:13 42:11,13 44:10,17 44:21 48:22 58:24 59:3,8 88:1
**trucks** 10:14 42:25 81:25
**true** 38:7 56:19 79:16 84:21 97:12
**truthfully** 7:14
**try** 20:4 26:20 28:16 28:17 40:10 49:9 53:9 79:2 89:1
**trying** 16:14,15 33:23 40:17 43:3,6,9,24 57:6,7 73:23 75:9 85:14 91:24
**turns** 68:10 70:12
**twice** 48:4
**two** 11:14 15:4 16:4 16:25 18:3 23:2 41:22 44:6 56:24 77:15
**two-hour** 77:10
**type** 37:8,13 43:13 47:17,18
**typed** 30:12
**types** 14:12
**typewriting** 97:10
**typical** 14:12
**typically** 15:6,19 77:13

**U**

**U.S** 79:24 80:15
**UA** 57:25
**ultimately** 10:17
**unable** 50:12
**unanswerable** 28:13
**unclear** 82:9
**understand** 6:3,24,25 7:3,5,6,17,25 8:20 10:24 12:20 14:23 16:17 24:8,19 26:3 26:6,18 27:20 29:3 41:22 43:7 44:9 45:2 51:2 60:22 66:22
**understanding** 11:17 13:7 15:14 21:8 25:14 26:17 33:1 34:4,17 35:13,15,19 36:8,12,15 38:10 53:9 77:19 85:23
**understood** 7:13
**undertaken** 79:20
**unfortunately** 81:10 82:5
**unique** 61:16
**United** 1:1 5:7
**University** 44:3
**upper** 56:5
**urban** 23:1 29:1 36:5 81:18
**usage** 81:23
**use** 14:21 31:24 37:9 54:9 63:25
**uses** 33:25
**usually** 63:13,17,17 81:21 90:25

**V**

**v** 98:2 99:2
**vague** 33:2
**various** 6:4
**vehicle** 22:13 27:13 27:19 33:6 34:3,10 35:13 37:8 42:4 43:5,13 44:19 45:3 45:5 49:20 50:11,13 50:16 53:25 67:24 74:8 82:3,14
**vehicles** 28:11 33:10 82:17
**verbal** 47:2,5 48:17
**verbiage** 30:3 50:19
**version** 48:20
**versions** 83:12,16,22 83:23
**versus** 5:6
**video** 7:8 62:19 64:1 81:22
**video-recorded** 1:15 5:4
**videoconference** 1:15 2:19
**videographer** 5:2,18 29:24 48:5 53:2,5 55:22 60:11 78:21 78:24 85:8,11 92:17 92:21 96:5
**violation** 89:5,14 93:2,12
**violations** 93:17
**vocational** 11:24
**vs** 1:7

**W**

**W** 1:5,18 5:20 98:2 98:24 99:2,14
**walk** 16:15 39:11 62:14 75:12 76:10
**walking** 53:23
**want** 7:22 16:13 19:16 24:12,13 31:13 37:12 46:15 53:8 57:2 76:1
**wanted** 41:19
**wanting** 65:25
**warehouse** 10:14,16 14:22
**wasn't** 33:21 37:1
**way** 7:4 8:22 13:3 16:13 23:1 26:25 27:9 28:14 29:4 32:6 35:6 40:11 42:13 54:15 56:18 59:9 75:4 79:7
**ways** 83:2
**we'll** 8:7 23:17 29:23 63:22,23 76:11
**we're** 10:24,25 27:2 28:20 30:8 45:15 48:2,3 53:18,18,19 53:23 62:14 65:21 70:8 72:11,11 75:13 75:19,20,20,23 78:22 79:1 82:9 83:20 85:9 92:17,21 96:5
**we've** 11:10 18:8 36:2 52:24 62:23 65:5,20 67:15 72:5,13 80:20 81:17,17,18 84:6,13 84:19 86:9 88:12 92:3
**weather** 22:22 28:6
**week** 15:5 18:3 44:5
**weeks** 44:6
**went** 10:16 20:25 82:19
**weren't** 41:12
**Western** 1:1,2 5:8
**whoever's** 55:20
**William** 9:4
**witness** 1:18 2:17,19 5:19,21 47:15 54:11 57:3 61:6 75:21 78:12 85:1 88:8 97:6,13,18
**witnesses** 88:9
**word** 26:4,8,9,10 40:10 41:15
**wording** 75:3
**words** 6:20 12:20 26:10,23
**work** 9:10 10:7 14:9 18:4 92:16
**working** 40:21 72:25
**wouldn't** 51:12,14
**wow** 22:19
**writing** 61:18 90:22
**written** 47:1,6,8 51:16 52:9 87:17,19

**X**

**Y**

**yeah** 28:7 29:23 41:11 57:5 61:6,13 72:2 75:21 82:8

85:5 89:10,15 90:10 92:1,4
**year** 65:6
**years** 13:11 32:13 36:3 63:9 64:6 67:3 73:1 81:2
**Yep** 22:3 87:24

**Z**

**Zoom** 78:5

**0**

**07/16/2018** 56:6
**08** 20:22
**09** 20:22

**1**

**1** 3:9 62:6,8 83:1 86:3 87:11
**1.4** 57:10
**1/2** 81:2
**1/2-hour** 77:10
**1:42** 78:22
**1:51** 78:24
**10** 11:11 12:4,6 22:21 22:21 34:1,2,22 35:14,14 62:16
**10:08** 71:4
**10:41** 71:9
**11** 5:3 47:11,13 71:11
**11/10** 83:14
**11/10/2016** 83:18
**11:01** 94:11
**11:39** 79:12
**11:43** 5:1,4
**110** 21:24
**112** 69:21 75:15
**117** 76:25 77:6 78:8 79:3
**118** 77:23 78:8 79:4
**119** 67:12 69:18,19 69:20,22 75:16 76:13
**12** 1:20 5:3 7:24 11:11 47:11,13,14 65:15 70:19 73:1 75:7,8
**12/18** 68:11,16 79:11
**12/18/2009** 67:21
**12/30** 61:14
**12:49** 53:2
**12:59** 53:5
**120** 68:4 75:17 76:14
**1208** 74:7
**121** 68:9 75:17 76:14
**122** 75:18 76:15
**123** 75:18 76:16
**124** 71:1 76:16
**125** 76:17
**1254** 20:7
**126** 21:24 72:3 76:17
**127** 79:9
**1277** 29:15 30:24
**1278** 30:4,14
**128** 79:16,16
**13** 11:11 29:14 36:4 65:14,16 74:8
**130** 80:2
**131** 80:4,4
**132** 80:9
**133** 80:14
**14** 11:11 50:8 65:16 86:25 87:2
**1400** 2:4
**15** 11:11 36:3
**16** 11:12 82:6,10 83:1 83:4
**16th** 56:13 57:16,23
**17** 11:12 70:5,10 83:1 83:4
**18** 11:12 70:1 79:21 80:3,7,17 82:4 83:1 83:4
**18-page** 83:6
**18th** 68:7 70:23 71:4 80:25
**19** 11:12 83:1

**2**

**2** 3:10 13:20 20:16 23:18 34:11 67:8,12 67:12 68:5 76:13 77:10 79:3,9,16 80:5
**2:00** 28:22
**2:01** 85:8
**2:02** 85:11
**2:12** 92:17
**2:13** 92:21
**2:17** 96:5,7
**20** 3:12 99:17
**2007** 10:8,11
**2008** 10:19
**2009** 10:19,20 13:16 13:20 14:4 17:23,25 18:18,23 19:2 43:1 45:20 61:14 66:14 66:22 68:2,8,11,17 70:1,24 75:1 79:11 79:21 80:3,7,17,25
**2010** 20:23
**2011** 9:12
**2012** 11:2
**2013** 67:4 83:17,23
**2016** 83:14
**2018** 11:1,1 23:23 55:23 57:19 64:12 66:14 82:6,10 94:11
**2021** 1:20 5:3 97:19
**21** 58:17
**2100** 2:9
**22** 58:17
**22nd** 94:10 97:18
**23** 3:13 58:17
**2345** 2:9
**27** 77:17,25
**2728** 34:12
**28** 57:18

**3**

**3** 24:5 62:11
**30** 12:6 32:13
**31** 59:25
**3100** 2:4
**32** 11:12 59:17 84:5 84:13 85:16

**4**

**4** 3:11 65:15 83:6
**4:21-cv-00061** 5:7
**4:21-cv-00061-SRB** 1:7
**42** 11:12 77:25 84:7
**45** 27:15 33:8 37:21
**470** 73:22 74:5
**472-0800** 2:10

**5**

**5** 3:3,12 20:12 42:18 59:16,17 67:16 73:10,16 74:5 75:23
**5-mile-an-hour** 38:17 42:3,6,10,16 43:5 43:11,14,22
**500-and-some** 67:15
**51** 11:12 86:2
**516** 20:6
**52** 11:12 86:2,23
**53** 11:12 86:2 87:9
**54** 60:18
**561-3400** 2:5
**58** 11:12 61:14 87:11 87:14,16

**6**

**6** 11:11 22:19 62:16
**60** 27:13
**600** 3:21
**610** 33:9
**62** 3:9 11:12 87:22
**63** 11:12
**64** 11:12 88:6
**64108** 2:9
**64111** 2:4
**67** 3:10

**7**

**7** 3:13 11:11 23:17,18 29:15 50:8 53:8,14 55:16 62:16
**7/16** 55:23
**7/16/2018** 89:7

**7/17** 57:18
**7/17/2018** 57:10
**7:15** 57:23 58:1
**70** 69:2,12
**700** 92:9
**71** 11:13 88:12
**716** 92:24 93:7
**734** 88:24 91:17,21 91:24 92:4,6
**737** 91:24
**740** 20:6

**8**

**8** 11:11 22:19 53:14 62:16 86:3 87:11
**816** 2:5,10
**83** 3:11
**88** 3:4

**9**

**9** 11:11 53:21 55:16 62:16 81:2
**9:01** 70:1
**94** 3:5
**95** 3:6
**97** 3:16
**98** 3:17
**99** 3:18