James J. Ajello - July 16, 2021

Christopher W. Stoneman vs Norfolk Iron & Metal, et al.

Page 1 to 109



Cornerstone
Court Reporting Company LLC

Quality transcripts. On time.

**(913) 825-2510**

8700 Monrovia, Suite 310

Lenexa, Kansas 66215-3500

Fax (913) 825-2530

www.cornerstonekc.net

office@cornerstonekc.net

**Plaintiff's**

**Exh A**

## Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF MISSOURI
2                  WESTERN DIVISION
3
4    CHRISTOPHER W. STONEMAN,
5              Plaintiff,
6    vs.            Case No. 4:21-cv-00061-SRB
7    NORFOLK IRON & METAL
8    and JAMES J. AJELLO,
9              Defendants.
10
11
12
13
14
15
16       VIDEO-RECORDED DEPOSITION OF JAMES J. AJELLO, a
17   Defendant, taken on behalf of the Plaintiff,
18   pursuant to Notice, on July 16, 2021, at the offices
19   of BROWN & JAMES, PC, 2345 Grand Boulevard, Suite
20   2100, Kansas City, Missouri  64108, before
21
22            ELLEN L. STOCK
23
24   Registered Merit Reporter Certified in Missouri and
25   Kansas.
```

## Page 2

```
                     APPEARANCES
1
2    For the Plaintiff:
3      MR. JAMES T. THOMPSON
       EDELMAN & THOMPSON, LLC
4      3100 Broadway, Suite 1400
       Kansas City, Missouri  64111
5      jthompson@etkclaw.com
       (816) 561-3400
6
7    For the Defendants:
8      MR. MICHAEL B. LESTER
       BROWN & JAMES, PC
9      2345 Grand Boulevard, Suite 2100
       Kansas City, Missouri  64108
10     mlester@bjpc.com
       (816) 472-0800
11
12   Videographer:
13     MR. BRIAN CAIN
       TELE-BUSINESS COMMUNICATIONS, INC.
14     415 Southeast Douglas Street, Suite A
       Lee's Summit, Missouri  64063
15
16   Also Present:
17     Ms. Christy Bingham
18
19
20
21
22
23
24
25
```

## Page 3

```
1                TABLE OF CONTENTS
2    EXAMINATION
3    Questions By Mr. Thompson              4
4    Questions By Mr. Lester             105
5
6    EXHIBITS
7    14 - "Driver Qualification"           14
8    16 - "Accident Investigation" file    32
9    19 - Answers to frist interrogatories 13
10
11   CERTIFICATE OF REPORTER              107
12   ERRATA SHEET                         108
13   SIGNATURE PAGE                       109
14
```

```
15   Reporter's Note:  Electronic exhibits provided
     by counsel were made OCR searchable (PDF),
16   downsampled to 600 dpi, digitally labeled if
     not previously labeled, flattened, archived as
17   original exhibits, and provided electronically
     to all ordering counsel.  Processing electronic
18   exhibits can change the file size, resolution,
     and metadata of files originally provided.
19   (ph) indicates a phonetic spelling.
20   [sic] indicates the text is as stated.
21   Quoted text is as stated by the speaker.
22
23
24
25
```

## Page 4

```
1         (The deposition commenced at 2:30 p.m.)
2         THE VIDEOGRAPHER:  We are on the record.
3    The time now is 2:30 p.m., July 16th, 2021.  This
4    begins the deposition of Mr. James Ajello in a case
5    styled Christopher Stoneman versus Norfolk Iron &
6    Metal and James Ajello.  The United States District
7    Court for the Western District of Missouri at Kansas
8    City.  Case No. 4:21-CV00061-SRB.
9         Counsel please identify themselves.
10        MR. THOMPSON:  James Thompson on behalf of
11   the plaintiff, Christopher Stoneman.
12        MR. LESTER:  Michael Lester on behalf of
13   defendants.
14        THE VIDEOGRAPHER:  Please swear the
15   witness.
16        JAMES J. AJELLO,
17   a Defendant, being first duly sworn, testified under
18   oath as follows:
19             EXAMINATION
20   BY MR. THOMPSON:
21        Q.  Mr. Ajello, good afternoon.  We had an
22   opportunity to briefly introduce ourselves before we
23   got going today.  My name is James Thompson, and I
24   have the privilege of representing Christopher
25   Stoneman in a case that has been filed against you
```

1 (Pages 1 to 4)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                        www.cornerstonekc.net
Case 4:21-cv-00061-SRB   Document 102-1   Filed 05/23/22   Page 2 of 51

## Page 5

1  and against Norfolk Iron & Metal in the -- in the
2  United States District Court for the Western
3  District of Missouri.  Do you understand you're here
4  to give sworn testimony in that case?
5      A.  Yes.
6      Q.  Mr. Ajello, have you ever given a
7  deposition before?
8      A.  I have not.
9      Q.  Well, contrary to popular belief, it's a
10  painless process.  We'll try to get you out of here
11  as soon as we can today.  We appreciate your time on
12  a Friday afternoon coming down to visit with us.
13          There are -- excuse me, there are a few
14  guidelines or ground rules that hopefully make it
15  easier for you, make it easier for Ellen and make it
16  easier for Brian, the videographer; so I'm going to
17  go over some of those now.  Okay?
18      A.  Yes.
19      Q.  First and foremost, there's a tendency for
20  you to -- to know how my question's going to end
21  very often before it ends, and human nature is to
22  start to answer that question as if we were in
23  normal conversation.  That makes it very hard for
24  the court reporter, as skilled as she is, to take us
25  both down at the same time.

## Page 6

1          So try to make sure my question is
2  completely finished before you go ahead and start to
3  answer the question.  I will try to make sure that
4  you're completely answered with your question before
5  I follow up with another question.  Okay?
6      A.  Yes.
7      Q.  This isn't going to be under the hot
8  bright light and rapid-fire questions; so we're
9  going to take our time today and -- and try to be as
10  efficient as possible.
11          Also, it's extremely important that you
12  understand my questions.  If you don't understand my
13  questions, it's not your fault, it's my fault, I've
14  asked a poor question, and I do that on occasion.  I
15  just need to know that you don't understand my
16  question so I have an opportunity to rephrase it in
17  a way that you will understand.
18          So if you don't understand a question, or
19  you don't believe you've heard the entire question,
20  will you let me know that?
21      A.  Of course.
22      Q.  If you go ahead and answer the question,
23  can I assume, and the folks on the jury assume, that
24  you answered it truthfully and to the best of your
25  recollection today?

## Page 7

1      A.  Of course.
2      Q.  Also, as we -- you heard us banter a bit
3  beforehand, sometimes attorneys object to questions.
4  If Mr. Lester is misguided and believes that my
5  question is objectionable, he has a right and an
6  obligation to you as -- as his client to state that
7  objection.
8          But the objection's not to tell you not to
9  answer the question, it's putting something on the
10  record that he believes the judge needs to look at
11  at a later point in time and make a determination as
12  to whether or not the question is appropriate in its
13  form or not.
14          So please let Mr. Lester state his
15  objection fully for the record.  Once he's finished,
16  you can go ahead and answer that question.  Okay?
17      A.  Okay.
18      Q.  And the exception to that would be is if
19  he instructs you not to answer, and I'll leave that
20  up to the two of you on how to proceed with that on
21  that score.  Okay?
22      A.  Okay.
23      Q.  Also, if at any time -- I will tell you,
24  as important as Ellen is, you're the most important
25  person in the room here today because you've taken

## Page 8

1  your time to come and visit with us on these -- on
2  these issues; so if at any time you need to take a
3  break, just let me know you need to take a break,
4  and I will certainly afford you that courtesy.  I'm
5  not going to ask you why you need to take a break,
6  you just have to let me know.  Okay?
7      A.  I appreciate that.  Thank you.
8      Q.  If -- the only exception -- there's always
9  an exception to a rule.  The only exception is if a
10  question's pending, you need to go ahead and answer
11  that question, and then we'll immediately take the
12  break.  Okay?
13      A.  I understand that, yes.
14      Q.  All right.  Can you go ahead and state
15  your full name for the record, please?
16      A.  James Joseph Ajello.
17      Q.  And, Mr. Ajello, where do you live?
18  What's your address?
19      A.  2318 Arrowhead Drive, Emporia, Kansas
20  66801.
21      Q.  And who do you live with at that address?
22      A.  My wife.
23      Q.  And what is her name?
24      A.  Teresa, without the H.
25      Q.  Okay.  And are you currently employed,

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                www.cornerstonekc.net

Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 3 of 51

## Page 9

1  sir?
2  A.  Yes, I am.
3  Q.  And where are you currently employed?
4  A.  I am employed with NIM Transportation in
5  Emporia, Kansas.
6  Q.  And what type of business is NIM
7  Transportation?
8  A.  NIM Transportation is a transportation
9  division, I would guess, of Norfolk Iron & Metal.
10  Q.  And when you say the "transportation
11  division," kind of -- what does that mean?  What --
12  A.  It's a separate company.
13  Q.  Okay.  And you transport product for
14  Norfolk Iron & Metal primarily?
15  A.  That's correct, yes.
16  Q.  I assume that you don't transport product
17  for anyone else other than Norfolk Iron & Metal; is
18  that fair?
19  A.  That is very correct.
20  Q.  And what type of business is Norfolk Iron
21  & Metal in?
22  A.  They're a metal service company, which
23  they're pretty much like a middleman for the steel
24  distribution business.  We'll have company --
25  different companies call in orders, and they'll fill

## Page 10

1  the orders and load them on the trailers in specific
2  routes to be delivered.
3  Q.  So they're not involved in the actual
4  manufacture of steel products; is that fair?
5  A.  Absolutely not.
6  Q.  Okay.
7  A.  They do have some processing.
8  Q.  But there's no furnaces sitting around the
9  plant?
10  A.  Heavens, no.
11  Q.  And how long have you worked for NIM
12  Transportation?
13  A.  My next anniversary will be 20 years.
14  Q.  Have you enjoyed it?
15  A.  Most of the time.
16  Q.  Have you reviewed any documents in
17  preparation for your testimony here today?
18  A.  I've only seen the things that were
19  discovered.  As far as anything else, no.
20  Q.  Well, let -- let me try to -- let's try to
21  figure out, when you -- you use the things that were
22  discovered, let me try to find out a little bit by
23  what you mean by that.  All right?
24  A.  Okay.
25  Q.  Did you look at the police report?  Have

## Page 11

1  you reviewed the police report?
2  A.  I saw the -- yes, I did.
3  Q.  Okay.
4  A.  Yes.
5  Q.  There's some -- there is a document that
6  appears, anyway, to be some handwritten -- it's a
7  handwritten form that may have been filled out by
8  you at the time of the accident.  Have you looked at
9  that document?
10  A.  I possibly have.  If it was part of the
11  accident kit, then it was filled out by me at the
12  scene.
13  Q.  Okay.  And NIM Transportation has an
14  accident kit; right?
15  A.  That's correct.
16  Q.  And that's something that you keep in the
17  cab?
18  A.  Absolutely.
19  Q.  And if in -- in the unfortunate occurrence
20  that there's an accident, you're instructed to fill
21  that out; fair?
22  A.  With any kind of incident.
23  Q.  Okay.  Any other documents that you recall
24  filling out?  Or, I'm sorry, any other documents you
25  recall reviewing in preparation for your testimony

## Page 12

1  here today?
2  A.  I know there was -- my driver's
3  qualification file was there, but I didn't really go
4  through it all.  It seemed to be quite thick.
5  Q.  Yeah, your driver qualification file, as
6  it was produced in this case, and I think there's
7  some things that are actually even beyond the scope
8  of a -- of an actual driver qualification file, but
9  it was 700-and-some pages as it's produced.  You
10  didn't go through each and every page, did you, sir?
11  A.  Heavens, no, I -- I really didn't review
12  anything in there.
13  Q.  Okay.  Anything else you recall reviewing
14  in preparation for your testimony?  Did you look at
15  any photographs?
16  A.  I did see a few that -- that were
17  submitted by I believe your side.
18  Q.  What -- what were those photos of, if you
19  remember?  Were they, for instance, of the roadway,
20  the vehicles involved?
21  A.  Primarily, it was just my vehicle.
22  Q.  Okay.
23  MR. LESTER:  Just --
24  A.  I don't remember any --
25  MR. LESTER:  -- to clarify, it was the

3 (Pages 9 to 12)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                              www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 4 of 51

## Page 13

1  deposition exhibits.
2  MR. THOMPSON: Okay.
3  THE WITNESS: I apologize.
4  MR. LESTER: No, I --
5  MR. THOMPSON: No, it's not your --
6  Mr. Lester's just trying to expedite things here so
7  there's a little clarity.
8  Q. (By Mr. Thompson) Anything else other
9  than the photographs you've just described and
10  Mr. Lester has given us guidance on, the handwritten
11  material in the accident kit, the police report that
12  you would have reviewed particularly to prepare for
13  this deposition?
14  A. Offhand, I can't think of -- couldn't have
15  been very much more.
16  Q. Okay. Did you review your
17  interrogatories?
18  Interrogatories are written questions that
19  we submitted and were answered by you.
20  A. Gosh, I'm not sure. I might have.
21  Q. I think those -- we have those as
22  Exhibit 19.
23  MR. THOMPSON: Brian, can we show those?
24  A. It looks familiar.
25  MR. THOMPSON: Well, maybe because I'm not

## Page 14

1  connected. Can we go off the record for a minute?
2  THE VIDEOGRAPHER: Going off the record.
3  The time now is 2:40 p.m.
4  (Discussion off the record.)
5  THE VIDEOGRAPHER: We are back on the
6  record, 2:45 p.m.
7  MR. THOMPSON: Can we pull up -- let's
8  see -- on Exhibit 14, page 120.
9  Q. (By Mr. Thompson) Mr. Ajello, as part of
10  your driver qualification file, we were provided
11  your -- what appears to be your initial application
12  back in 2001 to Norfolk Iron & Metal, Emporia
13  Division. Do you recall applying for that position
14  at that time?
15  A. Yes.
16  Q. And the application is approximately -- it
17  is, let's see here -- four pages, and your signature
18  appears on page 1 --
19  MR. THOMPSON: 123, Brian.
20  Q. (By Mr. Thompson) And it -- there's
21  basically, above your signature, "To be read and
22  signed by the applicant." Do you see that?
23  A. Yes.
24  Q. And you make a certification or
25  attestation there that effectively the matters that

## Page 15

1  you filled out in this application are true and
2  accurate and are filled out by you --
3  A. Yes.
4  Q. -- do you see that?
5  And my question's a pretty simple one.
6  There's some various experience, qualifications,
7  commercial driver's license information, prior
8  employers on this application. You would have
9  filled out this application truthfully and
10  accurately; is that fair?
11  A. I would believe so.
12  Q. And if we're trying to walk back through
13  your employment history prior to NIM Transportation,
14  this would be a good source to get some additional
15  information; fair?
16  A. I would think so, yes.
17  Q. It looks like immediately prior to working
18  at NIM, you were working at K&B Transportation based
19  out of Sioux Falls, Iowa; is that fair?
20  A. That's fair to say.
21  Q. And my understanding from reading your
22  file is the reason you applied to -- to Norfolk or
23  NIM Transportation is because the job with K&B had
24  changed somewhat such that you were left out of town
25  on some days; is that fair?

## Page 16

1  A. From -- leave Monday and come back on
2  Friday, yes.
3  Q. And you obviously -- that -- from a
4  quality of life standpoint, that isn't what you
5  wanted; fair?
6  A. Absolutely. That's -- that's correct.
7  That's not what I wanted.
8  Q. And so you were -- the only reason you
9  left K&B was because you were looking for a job that
10  was more conducive to the quality of life that you
11  were seeking?
12  A. To the quality of life that I had prior to
13  the change in the business structure.
14  Q. Okay. And then prior to K&B you worked at
15  PBX?
16  A. That's correct also.
17  Q. And it looks like you worked there from
18  '89 to '98; is that fair?
19  A. That would be fair, because it's -- it was
20  the same job, but IBP, which is Iowa Beef
21  Processors, PBX is the transportation arm of that
22  just like NIM Transportation is to -- to Norfolk
23  Iron & Metal, and they decided to get rid of their
24  own power and contacted K&B to take over that
25  business, that part of the business, and I hired on

4 (Pages 13 to 16)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 5 of 51

Page 17

1    with them.
2        Q.  Okay.  And fair to say that, basically
3    from September of '89 to the present day, you've
4    been operating as a commercial motor vehicle
5    operator?
6        A.  Yes.
7        Q.  Lot of miles, I assume, in those years?
8        A.  Not very many really.  I was not an
9    over-the-road truck driver.
10       Q.  Do you have over a million miles in your
11   career?
12       A.  Oh, I'm certain of that.
13       Q.  And I assume you've seen many, many things
14   on the road occur; right?
15       A.  Yes, sir.
16       Q.  Okay.  Do you consider yourself an
17   extremely safe commercial motor vehicle operator?
18       A.  I do.
19       Q.  Okay.  And it looks like, from your file,
20   that's something that you take pride in; fair?
21       A.  I hope everybody does, yes.
22       Q.  Let's talk a little bit about the training
23   that you received as a commercial motor vehicle
24   operator.  Have you ever -- have you ever had Smith
25   training?

Page 18

1        A.  Smith training?
2        Q.  The Smith system?
3        A.  I'm not sure what that is.
4        Q.  Okay.  Have you ever had any training
5    modules or train -- written materials through
6    J.J. Keller?
7        A.  Sure.
8        Q.  What do you recall -- let me ask you
9    this -- let's kind of go backwards from NIM
10   Transportation.
11          Did you receive any training from NIM
12   Transportation that's directed towards commercial
13   motor vehicle operators?
14       A.  Towards safety, yes.
15       Q.  What -- and what training do you recall?
16   Just generally describe it if you could.
17          And the reason I'm asking that is
18   sometimes trucking companies, they may have videos
19   that they have their drivers watch, sometimes
20   they'll have their drivers actually log onto
21   computer modules and walk through a training program
22   that asks -- then the driver takes a test on those
23   modules and just check their retention of the
24   information, that sort of thing.
25          I'm trying to get an understanding of,

Page 19

1    what methodology and what systems were used at NIM
2    to provide you training in the realm of commercial
3    motor vehicle operation?
4        A.  I see.  Yes, we had to -- we had to
5    certify online with interactive programs for --
6    gosh, there were a number of things.  Must have been
7    seven or eight different things.
8        Q.  Seven or eight different modules?
9        A.  Yes.
10       Q.  And do you -- was that through the
11   Department of Transportation?
12       A.  Offhand I cannot remember where it
13   originated.
14       Q.  Was it a system where you sat down at a
15   computer and kind of moved through various screens
16   and information, and then had to -- then you were
17   tested on that?
18       A.  That's correct, yeah.  What I remember.
19       Q.  And then hopefully, if you successfully
20   completed that module, you got a certificate that
21   says you successfully completed; fair?
22       A.  That's -- that's correct.
23       Q.  Can you think of any other information you
24   received while at NIM in terms of training for --
25   from a safety standpoint as a commercial motor

Page 20

1    vehicle operator?
2        A.  I imagine we just go -- a quick overview
3    on the basic rules of the law and -- and the dos and
4    don'ts as far as what the type of material we were
5    hauling.  And, of course, I trained on proper way to
6    tie equipment -- or the proper use of equipment and
7    tying down the material --
8        Q.  Okay.
9           (Overlapping speakers.)
10       A.  -- (inaudible.)
11       Q.  (By Mr. Thompson)  Tie -- tie down is
12   obviously pretty important in the realm of work you
13   work in?
14       A.  It makes a big difference, yes.
15       Q.  Do you have any endorsements on your CDL?
16       A.  I used to have them all, but I got rid of
17   the hazmat a number years ago.
18       Q.  I assume with NIM you've never needed a
19   hazmat endorsement?
20       A.  No.
21       Q.  Okay.  Who's Charlie Cheek?
22       A.  He was, once upon a time, our driver
23   supervisor.
24       Q.  And what types of things would he do?
25          I don't know what a -- every company's

5 (Pages 17 to 20)

CORNERSTONE COURT REPORTING COMPANY, LLC
(913) 825-2510                                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 6 of 51

## Page 21

1  driver supervisor's a little different; so what were
2  his responsibilities to the extent you know?
3      A.  Just let us know what's going on and -- I
4  really don't know.  Probably watching the logs and
5  making sure we're updated on any new policies.
6      Q.  Do you know what "Aim high in the
7  steering" means?
8      A.  I've never heard that term.
9      Q.  Okay.  How about "Get the big picture"?
10      A.  I don't know what that pertains to.
11      Q.  How about "Keep your eyes moving"?
12      A.  That would just make sense, keeping a --
13  surveying what's going on around you.
14      Q.  And how do you -- what's your practice in
15  terms of surveying what's going on around you?
16      A.  I try to manage my lane and manage what's
17  going on in traffic so I can be a defensive driver
18  that I am to be ready for any situation.
19      Q.  Kind of as they say in a lot of driver
20  training, "Expect the unexpected"?
21      A.  Pretty much.
22      Q.  And I assume over the million-plus miles
23  that you've driven, you've seen four-wheelers time
24  and time again jump into space that you're managing;
25  right?

## Page 22

1      A.  That's usually the major cause of
2  accidents with commercial vehicles.
3      Q.  And you understand that as soon as your
4  space management becomes compromised when something
5  like that happens, you need to move back so that
6  your space is, again, in a -- in line with safe
7  practice; right?
8      A.  Do it in a safe manner, yes.
9      Q.  Okay.  And in terms of -- in terms of
10  vehicles compromising your -- the space that you are
11  managing -- and I think we both know what we're
12  talking about there -- you -- you have a distance
13  you're trying to maintain between you and the
14  vehicle in front of you in your lane; right?
15      A.  A reasonable safe distance.
16      Q.  Okay.  What is a reasonable safe distance?
17  How do you calculate that?
18      A.  What I've always learned from day one from
19  driver's training in high school, they try to
20  maintain 10 feet for every 10 miles per hour.
21      Q.  So if you're going 60 miles an hour, you
22  would maintain 60 feet in front of you?
23      A.  Try to, yes, or more.  Hopefully more.
24      Q.  The truck that you were driving on the day
25  of -- of this unfortunate collision on July 16th of

## Page 23

1  2018, was that truck governored?
2      A.  Yes.
3      Q.  And what was it governored at?
4      A.  They're governed to 70 miles an hour.
5      Q.  Okay.  And there was a time when they were
6  governored to 65; right?
7      A.  I don't know.  I don't remember that, no.
8      Q.  I saw a memorandum in the DQ file that
9  seemed to indicate that at one point they were at
10  65, and they were moving them to 70, but if you have
11  a safety violation, they would take your governor
12  back down?
13      A.  That sounds familiar.
14      Q.  Does that sound a little familiar?
15      A.  Yes, that does --
16      Q.  Have --
17      A.  -- sound familiar.
18      Q.  Have -- have you ever been in a situ- --
19      Since the governors were set at 70, have
20  you ever been in a situation where Mr. Cheek or
21  anyone else have said, "Hey, Mr. Ajello, we're going
22  to -- we're going to reduce -- we've -- we've caught
23  you on some safety violations, we're going to reduce
24  you back down to 65"?
25      A.  I -- I don't recall that.

## Page 24

1      Q.  Okay.  In any event, your understanding at
2  the time of this collision was that the -- the truck
3  that you were driving --
4      And let me ask you this:  What type of
5  vehicle were you driving?
6      A.  A 2017 Freightliner Conventional.
7      Q.  And had that been your truck for a while?
8      A.  Since brand new at that time.
9      Q.  I'm sorry?
10      A.  Since brand new at that time.
11      Q.  All right.  So you were pretty familiar
12  with that truck?
13      A.  Yes.
14      Q.  You'd had that truck at the time for one
15  or two years?
16      A.  At least a year.
17      Q.  Okay.  Back in 2018, how many miles a year
18  were you putting on that truck?
19      A.  Oh, it varies because the routes vary a
20  little bit as far as around the city; so it could be
21  70 to 80,000.
22      Q.  Okay.  So certainly not putting on the
23  kind of miles that a true over-the-road truck driver
24  puts on; right?
25      A.  That's correct.  I'm a local driver.

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                    www.cornerstonekc.net

Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 7 of 51

## Page 25

1      Q.   How were your logs kept in July of 2018?
2      A.   I believe we were on the PeopleNet system.
3      Q.   Okay.  And by that time, is it your
4  understanding that the Federal Motor Carrier Safety
5  Administration was requiring electronic logs?
6      A.   I'm not sure if that came into effect yet,
7  but it possibly could have.
8      Q.   Whether it did or it didn't, the company
9  was into electronic logs by then, is that your best
10  recollection?
11      A.   Yes, quite a few years prior to that.
12      Q.   Okay.  Does -- to your knowledge, does
13  the -- does NIM Transportation ever counsel drivers
14  based on PeopleNet data?
15      A.   If there is some violations, I imagine so.
16      Q.   Okay.  Have you ever had an
17  hour-of-service violation brought to your attention
18  by the company?
19      A.   I can't -- I can't recall any, but if
20  there is, it'd probably be in my driver's file, and
21  you'd probably pull up a document, maybe we can go
22  through that, and --
23      Q.   Okay.
24      A.   -- we can walk through it.
25      Q.   In any event, doing what you did on a

## Page 26

1  daily basis, it would be kind of hard to get an
2  hour-of-service violation, wouldn't it?
3      A.   Yeah, unless there was a -- a improper
4  logout or something the day before.
5      Q.   I mean, you -- you weren't, for the most
6  part, operating in a manner that is more likely to
7  cause an HOS violation; right?
8      A.   Oh, yes, you're right.  You're correct.
9      Q.   I mean, as a -- as basically a local
10  operator?
11      A.   That's correct.  Yeah, if I work more than
12  11, 12 hours a day, that's a pretty long day.
13      Q.   What's your understanding of how many
14  hours back in 2018 you could work?
15      A.   Well, 14 hours total, including all
16  on-duty and driving, just as it is today.
17      Q.   And in 2018, do you believe there was an
18  hour-of-service requirement within those 14 hours
19  for driving hours?
20      A.   It'd be 11 hours driving.
21      Q.   Okay.  Do you appreciate and understand
22  that PeopleNet system can -- can track your -- from
23  a GPS stand -- strike that.
24          Do you understand that the PeopleNet
25  system can track your miles per hour --

## Page 27

1      A.   Yes.
2      Q.   -- of operation by GPS tracking?
3      A.   Yes.
4      Q.   Okay.  Do you have any information -- or
5  have you ever seen the PeopleNet data for the day of
6  this accident?
7      A.   I have not.
8      Q.   Okay.  You would expect that it -- that it
9  existed at some point in time; right?
10      A.   I imagine federal law states that all
11  companies are required to keep log information for
12  six months.  I don't think that has changed any.
13      Q.   Are you aware that, in September of 2018,
14  we requested that the company maintain and preserve
15  that log information?
16      A.   I have no knowledge of that.
17      Q.   Did -- and so no one's ever told you that?
18      A.   No.
19      Q.   No -- no one within the company; fair?
20      A.   That's fair.
21      Q.   Did you ever get back into that
22  Freightliner?
23      A.   Yes.  After it was repaired and it came
24  back, it was still my assigned vehicle.
25      Q.   Okay.  While it was being repaired, did

## Page 28

1  you have another vehicle to operate?
2      A.   Yes, of course.
3      Q.   Okay.  How long did you -- were you in
4  that other vehicle before you got your Freightliner
5  back?
6      A.   I don't recall the exact length of time,
7  but I would imagine two weeks maybe.  I believe it
8  was transported up to Nebraska to be repaired.
9      Q.   Is it fair to say that your vehicle was
10  towed from the scene of this collision?
11      A.   It had to be because my radiator sprung a
12  leak.
13      Q.   Okay.  Did you have a dash cam in that
14  vehicle?
15      A.   No.
16      Q.   To your knowledge does NIM Transportation
17  have dash cams in any of the vehicles?
18      A.   They do now, but not at that time.
19      Q.   Okay.  Do you recall approximately when
20  they put them in?
21      A.   It's been less than a year.
22      Q.   Okay.  And are those forward- and
23  rear-facing cams?
24      A.   Yes, they are.
25      Q.   Okay.  Do you have the option to turn off

7 (Pages 25 to 28)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**                    **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 8 of 51

## Page 29

1  the rear-facing camera?
2      A.  Absolutely not.
3      Q.  You would be interested to know that
4  Warner Transportation gives their drivers that
5  option.
6      A.  I have no idea, but I would never want to
7  work for Warner.
8      Q.  Gotcha.  So with -- with respect to that
9  dash cam, in terms of how it operates now, it's
10  obviously recording you and it's recording the road
11  in front of you?
12      A.  Yes.
13      Q.  Okay.  But on July 16th of 2018, the
14  vehicle you were operating had no such surveillance
15  on it; right?
16      A.  Fleet-wide, there was no such things.
17      Q.  How many units does NIM Transportation
18  operate?
19      A.  I don't really know how many they have,
20  but I believe just in the Emporia division there's
21  32.
22      Q.  Okay.
23      A.  I would guess.
24      Q.  And we won't hold you to a specific
25  number, I'm just trying to get an estimate.

## Page 30

1      A.  Thank you.
2      Q.  And are all -- to your -- again, to your
3  understanding, are all of those approximately --
4  maybe more, maybe less -- 32 units operated on a
5  local driving basis?
6      A.  Some of them are used for a little longer,
7  some of them are out overnight --
8      Q.  Okay.
9      A.  -- occasionally.  And some are sent out of
10  town occasionally --
11      Q.  Okay.
12      A.  -- as far as to a different location,
13  whether it's Norfolk, Nebraska, or Greeley,
14  Colorado, or -- or over in Iowa.
15      Q.  Generally, would they be locally driven?
16      A.  Yes.
17      Q.  Okay.  Would your days always start out
18  out of Emporia, Kansas?
19      A.  Yes.
20      Q.  Okay.  Were you -- were you working a
21  particular route on a regular basis back in 2006 --
22  July of 2016?
23      A.  Yes, a mechanic.
24      MR. LESTER:  I'm sorry, 2018?
25      MR. THOMPSON:  2018, I'm sorry.  Thanks

## Page 31

1  for correcting me.  Anytime you need to do that,
2  feel free, just jump in.
3      MR. LESTER:  If you want to ask him a
4  bunch of questions for 2016, that's fine with me, I
5  just think we might have to rework some of it later.
6      MR. THOMPSON:  Right.  I gotcha.
7      Q.  (By Mr. Thompson)  In -- in July of
8  2018 -- and I can't remember now if I asked --
9      In July of 2018 you didn't have any video
10  surveillance on the vehicle; right?
11      A.  That's correct.
12      Q.  I can't remember if I used "2016" for that
13  question too, so I just want to make sure we're all
14  on the same page.
15      A.  Yes.
16      Q.  In any event, let's talk about what was
17  your normal route in July of 2018.
18      A.  As it is today, I'm the -- the city route
19  guy.  I have the -- the shortest route in the whole
20  industry.
21      Q.  Is that -- does that come with seniority?
22      A.  Well, I hope so, but it probably comes
23  with the experience I have --
24      Q.  Okay.
25      A.  -- with the city, since I've been

## Page 32

1  delivering the Kansas City area for well over a
2  decade.
3      Q.  Okay.  Do you folks bid for routes?
4      A.  No.
5      Q.  Okay.  So has this been your route for
6  approximately 10 years?
7      A.  At least.
8      Q.  Okay.  Tell me a little bit about where
9  your customers are on that route.  And I know it
10  probably depends day to day, but who are some of
11  your customers?
12      A.  One I see pretty much every day would be,
13  like, Kansas City Steel Supply on the Missouri side.
14  And another one I'm regularly going to is -- this is
15  terrible.  I feel like I'm under pressure, but --
16      Q.  We won't tell them if you can't remember
17  their name.
18      A.  KCI and Nail by the Foot, these are all
19  relatively regular -- very regular customers.
20      Q.  In terms of -- if we could go to
21  Exhibit 16.  One of the things produced was the
22  "Accident Investigation" file.  Is that -- have you
23  reviewed that file?
24      A.  I don't think so.
25      Q.  Okay.  Anytime I show you a document,

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**                    **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 9 of 51

1  please take your time.  Brian will help you go
2  through at your pace because you're looking at it on
3  a screen.  I want to make sure you have the time you
4  need to digest it and look it over so you're
5  comfortable answering questions about it.  All
6  right?
7      A.  Okay.  Thank you.
8      Q.  So there's a document in here titled
9  "Preliminary Report of Driver Accident."  And if we
10  go to the -- first let me ask you -- let's flip
11  through the whole document.
12         And it appears to be two pages.  Are you
13  familiar with this form or this document?
14      A.  I am as of today.
15      Q.  Okay.  Is this a document you reviewed in
16  preparation for your testimony today?
17      A.  I think I just saw this prior to coming in
18  here.
19      Q.  Okay.  Did you have -- do you recall
20  having any loads still on your -- your vehicle at
21  the time of this collision?
22      A.  I believe I had a little bit of steel
23  left.  I think I had one or two stops left on my
24  trailer.
25      Q.  And what type of trailer were you

1  operating that day?
2      A.  A flatbed.
3      Q.  Okay.
4      A.  That's all we have are flatbed trailers.
5      Q.  And this isn't a "gotcha" moment, or
6  anything like that, but when we look at this form on
7  page 1 of the form, and we go down to "Load and
8  Trip," and I just may be interpreting this
9  incorrectly.  Okay?  It says that -- it indicates
10  you're empty at this point in time.
11      A.  I see that, yes.
12         THE VIDEOGRAPHER:  I'm sorry, James, what
13  page are you on?
14         MR. THOMPSON:  I'm on page 1 towards the
15  bottom of the page.  Mr. Ajello, I think, is on
16  board with me under "Load and Trip," almost --
17         THE VIDEOGRAPHER:  I gotcha.
18         MR. THOMPSON:  If you want to pull that up
19  a little more for him.
20      Q.  (By Mr. Thompson)  "Load and trip."  It
21  indicates, anyway, on this form that you're empty.
22  Is it possible you were empty?
23      A.  I don't believe that's correct.  I did not
24  fill --
25      Q.  Okay.

1      A.  I did not fill this form out.
2      Q.  Fair.  Very fair.
3         It says "Stops made:  Six."  I assume the
4  number of stops on your city route in Kansas City
5  would fluctuate from day to day?
6      A.  Sure.  It could be two, or it could be
7  eight.
8      Q.  Okay.  And it says "Stops remaining:
9  Zero"?
10      A.  I see that.
11      Q.  Okay.  In any event, your belief is you
12  still had steel on the truck and at least, would it
13  be fair, one customer left to deliver to?
14      A.  That would be fair to say.  That's just
15  what I recollect.
16      Q.  Okay.  And we won't hold it against you if
17  some other record proves that to be wrong.
18         Your recollection, as you sit here today,
19  is that you had some steel left on the vehicle, and
20  you were -- you had perhaps one stop left to make --
21      A.  That's my --
22      Q.  -- is that your best recollection?
23      A.  Yes, that's what I remember.
24      Q.  Do you recall your last stop before this
25  collision?

1      A.  No, not a specific customer, no.
2      Q.  Okay.  Do you recall any of the customers
3  that day?
4      A.  I can't say that I do.
5      Q.  Okay.  What would be the best record of
6  the customers you had seen that day?
7         Are there -- are there bills of lading?
8  Sales tickets?  Things that a customer might sign
9  either electronically or paper-wise?  Something that
10  would help us and help you put together your route
11  that day.
12      A.  There should be a paper trail of the
13  invoices of the day, which the customer would sign,
14  and I'd give them one copy.
15      Q.  And would those be both date and time
16  stamped?
17      A.  Absolute -- or not time but date stamped.
18      Q.  Okay.  But of course the GPS on the
19  PeopleNet would provide when you were at a
20  particular location; right?
21      A.  That's correct.  Yes, it would be -- all
22  the logging information would be on there.
23      Q.  And I've seen many, many PeopleNet
24  printouts, and they actually -- you can tell when a
25  truck stops because obviously the GPS coordinates

CORNERSTONE COURT REPORTING COMPANY, LLC
(913) 825-2510                          www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 10 of 51

## Page 37

1  remain static for a period of time, and then the
2  truck starts on again.  Are you aware of that
3  capability?
4      A.  I've never seen a readout, but I'm sure it
5  knows when I start the truck, turn the truck off,
6  idle time.  I'm sure it has all the parameters in
7  there.
8      Q.  In terms of the PeopleNet module, do you
9  have a module in your cab?
10     A.  At that time, I believe so.  It was on the
11  back -- back wall of the cab.
12     Q.  Okay.  Did you -- how would you receive
13  any dispatch information during the day?
14     A.  Well, that was several years ago.  I
15  imagine it was an email capability.
16     Q.  Okay.  And how would that come in to the
17  cab?
18     A.  I believe just give us a prompt.
19     Q.  Okay.  And you'd have a screen?
20     A.  Yes, there's a screen.
21     Q.  And do you know what system provided you
22  that information?
23     A.  I can't offhand, no.
24     Q.  That was separate from PeopleNet?
25     A.  I'm not sure.  I do not know.

## Page 38

1      Q.  Okay.  Currently, what system is available
2  for you to -- for them to communicate -- dispatch to
3  communicate with you during your day?
4      A.  Today, right now, the system we have is a
5  Samsara.  It's a tablet in -- at-based.
6      Q.  Okay.  Is that an at-base and a tablet
7  that you also use for customers when they sign for
8  their deliveries?
9      A.  Not at this time.
10     Q.  Okay.
11     A.  That hasn't been turned on yet as far as I
12  know.
13     Q.  Okay.
14     A.  I think that's something they're looking
15  to in the future but has not come around yet.
16     Q.  If you look at the next -- the second page
17  of Exhibit 16, there's a description of the
18  accident, or "Accident Description and Damage."  Do
19  you see that?
20     A.  Yes, I do.
21     Q.  And just by your knowledge, do you know
22  who would have filled this form out?
23     A.  I would imagine it would be Charlie Cheek
24  at that time was the driver supervisor.
25     Q.  Okay.

## Page 39

1      A.  But I really don't know.
2      Q.  Do you remember talking to Charlie that
3  day about the incident, about the accident?
4      A.  I'm sure I met with him, but I don't
5  recall what was exactly talked about.
6      Q.  Take a moment and read that description if
7  you would, because I'm going to ask you if it's
8  accurate or if there's anything you'd like to add to
9  it for it to be more accurate.
10     A.  It's pretty much just a general overview
11  of what did happen.  There's a lot of -- lot of
12  details not on this.
13     Q.  Okay.  Is it incorrect in any way?
14     A.  As an overview, that's -- that's correct.
15     Q.  I'm sorry?
16     A.  As an overview of what happened, that is
17  correct.
18     Q.  Okay.  Now, this says "Jim was in the very
19  left lane of traffic."  Is that the lane you recall
20  traveling in?
21     A.  Absolutely.
22     Q.  How long had you been in that lane?
23     A.  Prior to the incident, probably just over
24  a mile.
25     Q.  When -- do you recall when you got on

## Page 40

1  I-70?
2      A.  I don't remember exactly, but knowing my
3  route, I would say it was either off of Blue Ridge
4  Cutoff or off of 435 and came westbound on I-70.
5      Q.  Okay.  Out by the stadium?
6      A.  Yes.
7      Q.  Generally in that general area?
8      A.  That's fair to say, yes.
9      Q.  Okay.  So from that point until the
10  collision site, had you been in the left lane?
11     A.  No.
12     Q.  Okay.
13     A.  Oh, I'm sorry, till -- yes, I was -- for
14  the mile prior to coming to the loop.
15     Q.  And -- and I -- my question's just a
16  little different; so I want to make sure we're not
17  kind of confusing it.
18     A.  It was just a little confusing because my
19  mind was somewhere else.
20     Q.  No -- no problem, always take your time.
21  What I'm trying to find out -- I kind of
22  asked you two things; so I'm going to just start
23  from scratch.
24     A.  Thank you.
25     Q.  From the time you got on at either 435 or

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 11 of 51

Page 41

1    Blue Ridge, somewhere in the vicinity of the
2    stadium, till the point where the collision
3    occurred, were you always in the left-hand lane?
4        A.  I was not always in the left-hand lane.
5        Q.  Okay.  You know there's the Jackson curve
6    there, are you familiar with that?
7        A.  Oh, yes.
8        Q.  And the Benton curve?
9        A.  Of course.
10       Q.  Okay.  Using those as -- let's talk about
11   the Benton curve first.
12       A.  Okay.
13       Q.  Were you already in the left-hand lane
14   when you went through the Benton curve?
15       A.  Upon approach, I was not.
16       Q.  Okay.
17       A.  I was in the middle lane.
18       Q.  Okay.  As you came out of the Benton
19   curve, did you get into the left-hand lane?
20       A.  Yes.  The way the Benton curve is set up,
21   initially it's a 55-mile-an-hour zone.  From the --
22   from the Jackson curve to where it's 55, and it's
23   reduced with a suggested speed limit of 45.  And as
24   you enter the curve, it's a hard -- hard part of the
25   curve, then it starts gradually reducing the radius.

Page 42

1    And at that time it comes back to 55, and the lane
2    restriction for commercial trucks, and the left lane
3    is ended.
4            And prior to that, I always watch the lane
5    next to me, the left lane, just to make sure that I
6    have clear access and a safe access to that lane
7    when I'm coming out of the curve.
8        Q.  Okay.  So your belief is you wouldn't have
9    gotten into the left-hand lane until you were coming
10   out of the Benton curve because there's a commercial
11   motor vehicle restriction on the left-hand lane up
12   to that point; right?
13       A.  And I would have not merged till that
14   sign.  And that's where I always merge is right at
15   that sign.
16       Q.  Okay.  So by the time you were into the
17   Jackson curve, you were in the left-hand lane; is
18   that right?
19       A.  I guess that -- well, is Jackson curve
20   east or west of the Benton curve?
21       Q.  Jackson curve is -- you're right -- west
22   of -- by the time you were -- the Benton curve is
23   the second curve coming out of the stadium; right?
24       A.  That -- that's my recollection, yes.
25       Q.  Okay.  So the Jackson curve -- all through

Page 43

1    the Jackson curve you're in the middle lane?
2        A.  Yes.
3        Q.  You get to the Benton curve, its speed --
4    suggested speed reduction to 45 at that point?
5        A.  Yes.
6        Q.  And then it -- as you come out of the
7    Benton curve, the speed limit kicks up for a period
8    to 55?
9        A.  As you come through the -- the initial,
10   sharper part of the Benton curve, yes.
11       Q.  Okay.
12       A.  But it curves in -- with a reduced radius.
13       Q.  And as you came out of the Benton curve,
14   you passed the sign lifting the commercial motor
15   vehicle restriction, and at that point your practice
16   always was moving into the left-hand lane?
17       A.  Yes, if it is safe to do so, absolutely.
18       Q.  Sure.  And why would you do that?
19       A.  Because once I enter the downtown loop, I
20   need to be in that lane, because I'll need to move
21   over one more lane to proceed on -- on the -- on the
22   south loop there to go westbound on I-70.
23       Q.  Okay.  Do you believe it was your
24   intention that day to proceed westbound on I-70?
25       A.  Yes.

Page 44

1        Q.  To go to Kansas City, Kansas?
2        A.  I could be either Kansas City, Kansas, off
3    of 635 -- I thought about this a few times -- and it
4    was either that or going down to the West Bottoms.
5        Q.  Okay.  And as you sit here today, you
6    can't tell us one way or the other where you were
7    headed --
8        A.  No.
9        Q.  -- right?
10       A.  That's correct.
11       Q.  If you were headed home, you also would
12   have been proceeding in the same manner; right?  You
13   would have been taking 35 south?
14       A.  That particular day, if I was coming off
15   of where I thought I was coming back on from, I
16   would have taken 435 south to Johnson County.  I
17   would have not entered downtown.
18       Q.  Okay.  I think I understand what you're
19   saying.  You believe you got on around 435 or Blue
20   Ridge, but even if it was Blue Ridge, you were in
21   the area of 435; so that if you were proceeding home
22   at that point, back down to Emporia, you -- you
23   would have transitioned onto 435 southbound around
24   the southeast corner of the city and hit 35
25   eventually west of -- west of Johnson County; right?

11 (Pages 41 to 44)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB      Document 102-1      Filed 05/23/22      Page 12 of 51

Page 45

1    A.   In the southern Johnson County, yes.  On
2  that particular day, I did not pull double trailers;
3  so there would be no reason to go westbound through
4  downtown if I was empty.
5    **Q.   Okay.  Some days you would pull a double?**
6    A.   Most days.
7    **Q.   Okay.**
8    A.   That is my primary job.
9    **Q.   Okay.**
10    A.   And the only time that I do not pull
11  doubles is if the person that I pulled the
12  trailer -- the other trailer to is off for one
13  reason or another.
14    **Q.   What do you mean the person -- the other
15  person you pull the trailer to?**
16    A.   I pull two trailers up on the turnpike.  I
17  leave one loaded trailer at a staging area just west
18  of downtown on the Kansas side for him to pick up.
19  And when we're all done, his empty from the previous
20  trip is there that I hook back up and take back to
21  Emporia on the turnpike.
22    **Q.   So let me see if I -- I can understand
23  this.  I think I'm -- I'm learning.**
24    **So your normal day is you pull a double up
25  to a staging area west of Kansas City, Missouri, in**

Page 46

1  **Kansas, and you drop one of those trailers for a
2  local driver here to pick up, make deliveries, and
3  go on his way.**
4    **That local driver would have an empty from
5  the day before that they would leave at the staging
6  area.  And when you got done with your deliveries
7  and are heading back to Emporia, you'd pick up that
8  double, and you'd head back home?**
9    A.   That's correct.
10    **Q.   Okay.  And at the time of this accident
11  you only had one trailer on; right?**
12    A.   That is correct.
13    **Q.   Okay.  How long -- what's the length of
14  the trailer you had on your truck that day at the
15  time of the collision?**
16    A.   The trailers I pull are 50 feet long.
17    **Q.   Okay.  So when you do a double, you're --
18  you didn't have a double that day?**
19    A.   I would never pull one in the city
20  anyways; but, yes, I did not pull doubles that day.
21    **Q.   When you pull doubles, how long are the
22  doubles?**
23    A.   Just in excess of 120 feet.
24    **Q.   Okay.  Basically you're pulling two
25  100-foot trailers and then the hitch between them?**

Page 47

1    A.   Two 50-foot trailers and --
2    **Q.   I'm sorry.**
3    A.   -- and the -- and the converter between
4  them, yes.
5    **Q.   And the converter between them.  Sorry.  I
6  don't mean -- I was getting ahead -- I was making
7  you -- you out like you're taking a freight train
8  down the road.**
9    A.   Sounds like Australia.
10    **Q.   Right, it is like.**
11    **And explain to me again the reason --
12  You -- you don't believe you brought a
13  double up that day?**
14    A.   That's correct.
15    **Q.   Would you still have had a double to take
16  back that day?**
17    A.   No.
18    **Q.   Okay.  If you didn't bring up a double,
19  would it always be the fact that you wouldn't take a
20  double back?**
21    A.   That's correct, because I wouldn't have
22  the converter.
23    **Q.   Okay.  There were no converters at the
24  staging area?**
25    A.   We don't leave that equipment there, no.

Page 48

1    **Q.   Okay.**
2    A.   Except for in between when I get there and
3  go back home in the afternoon.
4    **Q.   Gotcha.**
5    A.   That's the only time there's a converter
6  there.
7    **Q.   Is there a -- a customer that you think
8  you would have been going to see at the time of the
9  collision?  Is there a customer that makes sense?**
10    A.   Well, the only ones that would make sense
11  would -- it would not have been in the Fairfax
12  District because I would have taken the -- 70 on the
13  north side to go to Fairfax; so I'm assuming that
14  would be either in the West Bottoms or Metro Meadows
15  on Metropolitan Avenue.  That's off of 635.  That
16  would be my best guess.
17    **Q.   How long were you at the accident scene
18  after the collision?**
19    A.   Hour and 45 minutes, maybe closer to two
20  hours.
21    **Q.   Was Mr. Stoneman's truck removed prior to
22  you leaving?**
23    A.   No.
24    **Q.   Was his truck still there when you left?**
25    A.   Yes.

12 (Pages 45 to 48)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**                                    **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 13 of 51

## Page 49

1      **Q. Okay. Was your tractor and trailer towed?**
2      A. It had to be, yes. Can't leave the
3 equipment on the side of the road.
4      **Q. Right. My question was -- sometimes**
5 **another tractor will come and pull the trailer --**
6      A. I see.
7      **Q. -- so that -- so that the customer can get**
8 **its product. And I'm trying to find -- I should**
9 **have just asked you that.**
10      **Did -- did anyone else come and get that**
11 **trailer to take the product to the customer?**
12      A. I did. I -- they -- I was towed --
13 eventually the tow truck showed up, and they towed
14 me over on the Kansas side to their tow lot, and I
15 waited there till another tow truck came up and
16 brought a replacement tractor.
17      **Q. Okay. So a replacement tractor was towed**
18 **up from Emporia?**
19      A. Yes, sir.
20      **Q. Okay. That probably took a little bit of**
21 **time.**
22      A. A little bit of time, sir.
23      **Q. Did you have any discussions with**
24 **Mr. Stoneman at the -- at the accident location?**
25      A. Nothing in depth, no.

## Page 50

1      **Q. Okay. Do you recall anything the two of**
2 **you talked about?**
3      A. Just we made sure -- we both kept asking
4 each other that we -- if we were okay, and that's
5 all that mattered.
6      **Q. Okay. And what did -- what do you recall**
7 **Mr. Stoneman telling you?**
8      A. That he was fine.
9      **Q. Okay. And did he seem fine to you?**
10      A. Yes.
11      **Q. Did you witness any activity by**
12 **Mr. Stoneman after the accident, after the**
13 **collision?**
14      A. Yes, I observed him for quite some time
15 while I was waiting on the tow truck.
16      **Q. Okay. And what did you observe?**
17      A. He was underneath the back of his truck
18 trying to reattach a -- the -- the light bar that
19 his taillights are attached to with a nylon strap.
20      **Q. How long after the accident do you recall**
21 **him being under his truck doing that?**
22      A. Had been at least -- he -- he was probably
23 under there for probably 45 minutes from the time
24 that I first observed him. The tow truck showed up,
25 we hooked it all up. As I climbed into the tow

## Page 51

1 truck to leave, he was still underneath his
2 vehicle --
3      **Q. Okay.**
4      A. -- with the -- trying to secure that
5 taillight bar.
6      **Q. Do you recall seeing anyone else from his**
7 **company -- anyone else from his company arriving at**
8 **the scene?**
9      A. There was nobody else there. That's what
10 I was wondering why they couldn't drive 20 minutes
11 to come help the guy out.
12      **Q. Okay. So in terms of how long he was**
13 **under there, you think he was under there for 45**
14 **minutes?**
15      A. I'm guessing that. That would be my
16 estimate.
17      **Q. Okay. Did you see specifically anything**
18 **he was doing, anything he was trying to maneuver?**
19      A. Yeah, he was wrestling around with a -- a
20 metal light bar, which was just some lighter pieces
21 of steel fabricated and bolted to the back of his
22 frame that his taillights were mounted on. And he
23 had a -- I don't know how long of a nylon strap,
24 maybe 10, 12 feet long, it was probably a 2-inch
25 strap I would guess. And he had it wound up around

## Page 52

1 up there and trying to maneuver it into place.
2      **Q. Did you ever see him come back out from**
3 **under the truck?**
4      A. No.
5      **Q. Okay. So once he headed underneath the**
6 **truck, you were able to see him trying to remove --**
7 **or trying to maneuver this lighter piece of metal**
8 **light bar using a -- a nylon strap, but you never**
9 **saw him kind of crawl back out and get up and do**
10 **anything?**
11      A. No. But I didn't sit there and observe
12 him for every second, but every time I looked, he
13 was still under there.
14      **Q. Okay. Obviously, like you just said, you**
15 **weren't looking at him every moment?**
16      A. That's correct.
17      **Q. Okay. But the best you can recall is he**
18 **was in underneath there trying to reattach the light**
19 **bar for about -- at least for the 45 minutes from**
20 **the time you first saw him underneath there until**
21 **you were leaving in the tow truck?**
22      A. That's what I recollect, yes.
23      **Q. Okay. And were you in your cab the entire**
24 **time you were observing him?**
25      A. Yes, I was.

13 (Pages 49 to 52)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510         www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 14 of 51

## Page 53

1  Q. Okay. Now, you had a camera with you that
2  day?
3  A. There was a -- digital disposable --
4  disposable digital camera that came with the
5  accident kit at that time, and -- so I did have one,
6  yes.
7  Q. Did you take any pictures?
8  A. I took pictures, yes.
9  Q. And did you take any pictures of -- or
10 what do you recall taking pictures of?
11 A. Just the general scene and the vehicles.
12 Q. Okay. Did you take any pictures of -- for
13 the 45 minutes that you observed Mr. Stoneman
14 underneath his truck?
15 A. No.
16 Q. Okay. Why not?
17 A. I didn't feel any need to.
18 Q. Okay. Didn't think there was really any
19 significance to it?
20 A. No, because there -- it was a low-speed
21 incident.
22 Q. Okay. How fast do you think you were
23 going when you hit him?
24 A. Gosh, that's a good question. If I was to
25 guess, probably 15, 20 miles an hour. Probably a --

## Page 54

1  a 5-mile-an-hour impact is what I would have
2  guessed.
3  Q. So you think the impact on your vehicle
4  was approximately -- at the time of impact, you were
5  going about 5 miles an hour?
6  A. I was going probably a 5-mile-an-hour
7  differential speed.
8  Q. Oh, differential with his speed?
9  A. Yes.
10 Q. Was he still moving at the time of the
11 accident?
12 A. I think he was either still moving or just
13 close to a stop.
14 Q. Now, in some of your descriptions of this,
15 you've indicated that he was stopped.
16 A. I think that's probably what I wrote down
17 on the report.
18 Q. Right. And that was right at the time of
19 the incident; right?
20 A. It was pretty nerve-racking moment.
21 Q. Okay. But you would agree with me that
22 your -- some things, for instance, where you were --
23    If we had asked you right after the
24 accident where you were headed that day, I assume
25 you could have told us --

## Page 55

1  A. Oh, I'm sure.
2  Q. -- where you were headed?
3  A. Yes, I'm sure.
4  Q. If we had asked you where you had come
5  from immediately before the accident, you could have
6  told us; right?
7  A. I would imagine so.
8  Q. If we were -- if we could time travel back
9  there and jump up on your cab and say, "Mr. Ajello,
10 we're here to investigate the accident, where was
11 your last stop?" you'd be able to tell us; right?
12 A. I would think so.
13 Q. "And, Mr. Ajello, where were you going?"
14 You'd be able to tell us that as well; right?
15 A. I would hope so.
16 Q. Right. And my point is we're now three
17 years out; right?
18 A. That's correct.
19 Q. But the description you gave at the time
20 of this accident was that he was stopped; correct?
21 A. That's what is written in the report.
22 Q. And you don't -- you don't -- you wouldn't
23 have intentionally misstated anything back when you
24 provided that information, would you?
25 A. I wouldn't intentionally, but I might have

## Page 56

1  hastily just wrote that down to fill the report out.
2  Q. Was there a reason you had to hastily fill
3  the report out?
4  A. It was pretty nerve-racking.
5  Q. Okay. Why was it nerve-racking?
6  A. It was an accident.
7  Q. Sure. You're -- you're a very experienced
8  commercial motor vehicle operator; right?
9  A. I would like to think so.
10 Q. And your understanding was no one was hurt
11 in the accident; right?
12 A. That's correct.
13 Q. And you were sitting there waiting for a
14 tow truck to come; right?
15 A. Yes.
16 Q. And you couldn't speed up the tow truck
17 any more than whatever time it took them; right?
18 A. I have no control over that.
19 Q. That's the point. Out of your control;
20 right?
21 A. I do not make the call, and I don't know
22 what the -- how busy they were; so I was never
23 informed on how long it was going to take.
24 Q. Okay. Are you -- is there any requirement
25 that you fill out your accident kit report within

14 (Pages 53 to 56)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                      www.cornerstonekc.net
Case 4:21-cv-00061-SRB      Document 102-1      Filed 05/23/22      Page 15 of 51

## Page 57

1  five minutes of the accident or anything like that?
2      A.  I'm not certain, but it's probably
3  required to fill it out as soon as possible.
4      Q.  Okay.  You're not aware of any written
5  documentation or training you've received that says
6  fill it out within five minutes?
7      A.  I don't recall at this time.
8      Q.  Okay.  In any event, you had a bit of time
9  there by yourself to -- to consider things; right?
10      A.  Before writing the report?
11      Q.  Right.
12      A.  Probably a few minutes, yes.
13          MR. LESTER:  We're coming up -- would
14  this -- we've been going for a little over an hour,
15  is this a good break point or --
16          MR. THOMPSON:  Sure, we can take a break.
17          MR. LESTER:  Stretch our legs.
18          MR. THOMPSON:  Take five minutes --
19          MR. LESTER:  That would be fine.
20          MR. THOMPSON:  -- would that work?
21          THE VIDEOGRAPHER:  Going off the record.
22  Time now is 3:34 p.m.
23          (Discussion off the record.)
24          THE VIDEOGRAPHER:  We are back on the
25  record.  The time now is 3:39 p.m.

## Page 58

1          MR. THOMPSON:  If we could, Brian, could
2  you bring up on Exhibit 16, page -- page 4.
3      Q.  (By Mr. Thompson)  Mr. Ajello, are you
4  familiar with the document, page 4 of Exhibit 16?
5      A.  I am.
6      Q.  And it appears this is a two-page document
7  that goes on to page 5 of Exhibit 16; correct?
8      A.  That's correct.
9      Q.  And on that second page, we see your name
10  and your signature and the date of 7/16/18; right?
11      A.  Yes.
12      Q.  Is this a document that is found in the
13  accident kit that would have been in the cab?
14      A.  Yes, it is.
15      Q.  Okay.  What is in that accident kit?
16  Obviously there's this document.  You've
17  already indicated there's a camera.  What else is in
18  the accident kit?
19      A.  Just other -- a couple other forms for
20  documentation.  One -- been a while since I've seen
21  that; so I can't exactly remember what's in there.
22      Q.  I'm glad it's been a while.
23          You think there's a couple other forms?
24      A.  I think there were a couple other items in
25  there.

## Page 59

1      Q.  Do you recall filling anything else out?
2      A.  I don't have any recollection of that.
3      Q.  Would -- after the collision, would you
4  have, very shortly thereafter, contacted dispatch or
5  Mr. Cheek?
6      A.  Absolutely.
7      Q.  Okay.  Did you call on a cell phone?
8      A.  Yes.
9      Q.  Was it your cell phone?
10      A.  Yes.
11      Q.  Is that a cell phone you own as opposed to
12  a company cell phone?
13      A.  That's correct, it's my personal cell
14  phone.
15      Q.  Okay.  And what is the number of that
16  phone?
17      A.  It's (620) 343-0411.
18      Q.  And who's the -- who was the service
19  provider for that number back in July of 2018?
20      A.  It would have been Verizon.
21      Q.  Okay.  Do you get paper bills, or do you
22  get electronic bills?
23      A.  I'd have to ask my wife.
24      Q.  Okay.  And I guess the better question is
25  back in July of '18, would you have gotten -- or

## Page 60

1  August of '18, would you have gotten the paper bill
2  or electronic bill?  You don't know?
3      A.  I -- I -- I have no idea.  I don't take
4  care of the bills.
5      Q.  That's okay.  You have to ask your better
6  half; right?
7      A.  The boss.
8      Q.  The boss.
9          Would the first call you made have been to
10  Mr. Cheek?
11      A.  I believe I would have dialed 911.
12      Q.  Okay.  After dialing 911, would the next
13  call have been to Mr. Cheek?
14      A.  Of course, yes.
15      Q.  Do you recall any other calls you would
16  have made while still at the scene before you left
17  with the tow truck?
18      A.  I might have called my wife, I don't know.
19      Q.  Okay.  Maybe tell her it's going to be a
20  little later today?
21      A.  Just tell her that maybe there was an
22  incident.  I don't remember if I did call anybody
23  else or not.
24      Q.  As you sit here today, other than calling
25  911, and other than calling Mr. Cheek, are there any

15 (Pages 57 to 60)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**                    **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 16 of 51

## Page 61

1 other calls that you feel pretty strongly you made?
2 A. I don't recall any.
3 Q. Okay. When you -- immediately after the
4 impact, did you get out of the cab?
5 A. Yes, we both did.
6 Q. Okay. So he got out of his cab, you got
7 out of your cab, and what was the first thing you
8 said to him?
9 A. "Are you okay?"
10 Q. And what was his response?
11 A. He's fine, and he asked me if I was okay.
12 Q. And what'd you tell him?
13 A. I'm fine.
14 Q. Okay. Any other communication you
15 remember having with him as you guys got out of the
16 truck?
17 A. Not really, no.
18 Q. Okay. Did he then get back in his truck?
19 A. I believe so.
20 Q. And you got back in your cab?
21 A. That's correct.
22 Q. Was that the end of any face-to-face
23 communication and contact with you?
24 A. No.
25 Q. Okay. Tell me what happened then -- next

## Page 62

1 that led to additional face-to-face contact and
2 communication?
3 A. Well, after that face-to-face initially in
4 the left lane after the impact, we both pulled over
5 to the far right shoulder, and we both got out and
6 inspected each other's vehicles and made our
7 documentations and our pictures.
8 Q. Okay. So you guys get back in your cab,
9 and he gets in his cab. Before you moved your
10 vehicle, did you call 911?
11 A. I don't remember if it was before or after
12 we moved.
13 Q. Do you know if you called 911 even before
14 you got out of your cab the first time?
15 A. I don't remember.
16 Q. Okay. In any event, you both decide to
17 move your vehicles off to the right-hand side?
18 A. Yes, because it was just a minor incident.
19 Q. Okay.
20 A. There were no injuries.
21 Q. And did he move his vehicle first? I
22 would assume he had to.
23 A. Possibly. He was 10 feet or so ahead of
24 me, 12 feet ahead of me by the time when we stopped.
25 Q. At the time you hit him, do you know if

## Page 63

1 there were any vehicles in front of him?
2 A. I have no idea.
3 Q. Okay. May have been, may not have been?
4 A. My -- when he changed lanes in front of me
5 before he slammed on his brakes, he took away all of
6 my vision of what was going on in front of me
7 because he was maybe 12, maybe 15 feet in front of
8 me when he merged over.
9 Q. Okay. How much distance had you been
10 maintaining prior to him coming into your lane?
11 A. Prior to him changing lanes, I was four,
12 five vehicle lengths behind some cars.
13 Q. Okay. What was -- when he merged over
14 into the left-hand lane, your lane -- what was the
15 speed limit?
16 A. Forty-five.
17 Q. Okay. And so basically, based on your --
18 kind of your formula, you would have at least
19 been -- you -- you probably would have been around
20 45 or 50 feet behind the vehicles in front of you?
21 A. That's correct.
22 Q. Okay. And he came over into that space?
23 A. Yes.
24 Q. Obviously, vehicles don't just, as they
25 used to, I guess, in Star Trek, move from one spot

## Page 64

1 to the next. There's movement when a vehicle moves
2 into your lane; right?
3 A. That's true.
4 Q. I mean, they don't come over instantly,
5 and they don't --
6 A. No.
7 Q. -- they don't move and get dropped into
8 the space, there's a merging; right?
9 A. Absolutely.
10 Q. I'm not trying to be facetious, I'm just
11 trying to explain the process and see if you agree
12 with me.
13 A. I understand.
14 Q. So I assume at the time he began his merge
15 into your lane, you were looking forward?
16 A. That's correct.
17 Q. Okay. And so you saw him as he began to
18 make that move?
19 A. He made a quick move. The -- the curve is
20 slightly downhill and to the right, so it was a
21 pretty quick merge, because he's already -- you
22 know, it's a shorter merge for him because it's a
23 right-hand curve; so it happened very quickly.
24 Q. I understand. But the point is you're
25 looking ahead, and you're seeing his vehicle start

16 (Pages 61 to 64)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 17 of 51

Page 65

1 to come into your lane. And I assume, as an
2 experienced commercial operator, you're going, This
3 guy's going to come over; right?
4     A. I didn't know he was coming over till he
5 was moving into the lane.
6     Q. Right. As he starts to merge into your
7 lane, as his vehicle starts to break the plane into
8 your lane, you're an experienced commercial motor
9 vehicle operator, you understand that he's going to
10 be coming into your lane; right? You're not happy
11 about it, but you understand that's what about -- is
12 about to occur?
13     A. I see him moving over.
14     Q. And you know that he is now in -- in your
15 mind, infringed on your 45 or 50 feet of space
16 management; right?
17     A. He merged in front of me about 12 to
18 15 feet maximum, and at that time I was still
19 decelerating with my engine brake on, I was already
20 downshifted one gear, and I had my foot on the
21 brake. I was already slowing down for the
22 conditions that were happening ahead of me.
23     Q. Because you understood that -- that
24 traffic was slowing and congested in front of you;
25 right?

Page 66

1     A. It always is there.
2     Q. Right. So you knew, when you come around
3 that curve, you've got to be -- even though the
4 speed limit is 45, you've got to be slowing?
5     A. Yes, absolutely.
6     Q. Okay. And when he started his merge, do
7 you believe you were going 45?
8     A. I think when he merged over, I was quite a
9 bit under the speed limit, as was the traffic ahead
10 of me.
11     Q. So he didn't block your view of the
12 traffic ahead of you knowing that -- allow --
13 allowing you to know that at least the traffic in
14 front of you, as it very often does there, was
15 slowing down; right?
16     A. I was slowing down with the traffic ahead
17 of me, and I had a clear view. And like I said, it
18 was a -- right-hand curve. As soon as he started
19 merging, I lost -- before he even got all the way
20 into my -- in the left lane, I lost all the field of
21 vision, what was going on ahead of me.
22     Q. So now you were in a situation where you
23 were basically blind to traffic in front of you;
24 right?
25     A. He blinded my view of traffic, yes.

Page 67

1     Q. So you knew that immediately you need to
2 really start slowing down because you had no vision
3 of what was going on in front of you?
4     A. I was -- I was really slowing down.
5     Q. Okay.
6     A. I just could not stop as fast as he could.
7     Q. And my -- understand, sir. My questions
8 are a little bit different; so try to listen to the
9 question.
10     Your -- you realized that traffic is
11 congested there not only because you can see it,
12 this is before he merges, but it's -- from your
13 experience of years of making that same maneuver day
14 after day, you know that that's a bottleneck; right?
15     A. I'm well versed with it.
16     Q. And you know that even though it says you
17 can go 45, that doesn't mean it's okay to go 45;
18 right?
19     A. Absolutely.
20     Q. And so even before he comes into your lane
21 and blinds your view of traffic in front of you, you
22 know you've got a situation where traffic's
23 congested and may actually come to a stop; right?
24     A. Yes, and I had plenty of time -- a safe
25 distance behind the vehicle I was following, I had

Page 68

1 more than enough time to react to any situation that
2 was going to happen.
3     Q. Do you recall what vehicle was in front of
4 you?
5     A. Just some generic, you know, jelly bean
6 cars.
7     Q. Okay. I -- it would have been amazing if
8 you could have identified it. I'm not -- I'm not
9 berating you or criticizing you for not, I'm just
10 trying to find out can you tell -- you're not going
11 to be able to say, "Yes, it was a Chevrolet Impala
12 that was red"; right?
13     A. That's correct, yeah, I wouldn't be able
14 to make that distinction.
15     Q. So in any event --
16     And you've been trained as a commercial
17 motor vehicle operator, in terms of whether it's fog
18 or it's other circumstances, smoke, anything --
19 vehicles blinding you; once you've lost your view of
20 traffic, and you're effectively blinded, you know
21 you've got to get your vehicle slowed down very
22 fast; right?
23     A. Absolutely.
24     Q. And so as he moves into your lane, you
25 appreciate and understand that he's going to blind

17 (Pages 65 to 68)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510              www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 18 of 51

Page 69

1  you just because of his proximity to you and his
2  size; right?
3      A.  It happened so quick, I knew it was
4  happening.
5      Q.  And so from the very moment he is try --
6  he is starting to move into your lane, you're
7  already slowing down, and the urgency of slowing
8  down becomes even greater; right?
9      A.  And I press my brake a lot harder.
10     Q.  As soon as you saw that he was starting to
11 make that move?
12     A.  Absolutely.
13     Q.  Do you remember what gear you were in when
14 he started to come over?
15     A.  I would have been in ninth gear.
16     Q.  Okay.  You would agree with me that, in
17 congested traffic, it is very common to have people
18 who very often -- as we talked about before --
19 four-wheelers that are lane jumpers; right?
20     A.  It's a -- just a fact of life.
21     Q.  It's a fact of life as a commercial motor
22 vehicle operator that when you get into congested
23 traffic, you have people killing your space
24 management; right?
25     A.  It's true whether I'm in a car or a truck.

Page 70

1  Any vehicle.
2      Q.  And that's a -- that's something you knew
3  back on July 16, 2018; right?
4      A.  Something I've known since driver's ed in
5  high school.
6      Q.  And I bet you've come through that very
7  location before and had vehicles jump in front of
8  you?
9      A.  Pretty much every day.  I'm prepared for
10 it all.
11     Q.  How long after he got fully in your lane
12 did the impact occur?
13     A.  Maybe two seconds at the most.
14     Q.  Now, if we go back and look at Exhibit 16,
15 going back to page 4.  Is everything on page 4 of
16 Exhibit 6 -- 16, that first page of this
17 "Accident/Incident Data" form, filled out in your
18 handwriting?
19     A.  Oh, yes.  Yes, it is.
20     Q.  And it all would have been filled out at
21 the scene of this collision; correct?
22     A.  That's correct.
23     Q.  Would it have been filled out -- I assume,
24 but I shouldn't assume anything -- would it have
25 been filled out after you moved your vehicle from

Page 71

1  the point of impact over to the right-hand side of
2  the road?
3      A.  It would be safe to say that, yes.
4      Q.  Okay.  In terms of the time period, the 45
5  minutes -- or strike that.
6          Let me ask you this:  We were talking
7  about how long he was underneath his truck trying to
8  mess with the light bar, but I never asked you how
9  long from the time the collision occurred until you
10 were in the tow truck getting towed away.  How much
11 time occurred?
12     A.  Gosh, it would be probably hour and 45
13 minutes to two hours.
14     Q.  (By Mr. Thompson)  Okay.  Do you know when
15 in the hour and 45 minutes to two hours you filled
16 out pages 4 and 5 of Exhibit 16?
17     A.  I would guess within the first 10, 15
18 minutes.
19     Q.  Okay.  Would it have been before or after
20 you talked to Mr. Cheek?
21     A.  That's a good question.
22     Q.  Sometimes I ask a good question.
23         MR. LESTER:  You've got one.
24     A.  I -- I don't recall.
25     Q.  (By Mr. Thompson)  Okay.  Do you know how

Page 72

1  long it took you to fill out pages 4 and 5 of
2  Exhibit 16?
3      A.  Probably three or four minutes.
4      Q.  You understood that it was important
5  information that the company was requiring you fill
6  out; right?
7      A.  I would think so.
8      Q.  That it was going to be the initial,
9  basically, report of the incident; right?
10     A.  Yes, but I never -- didn't really think of
11 it on those terms.  Just there's a limited space, so
12 I just quickly wrote down the basics.
13     Q.  Do you consider yourself to be a
14 relatively calm person?
15     A.  I like to think so, yes.
16     Q.  I mean, it sounds like over the years
17 you've probably dealt with some fairly difficult --
18 whether it be weather, bad road conditions, bad
19 traffic conditions, circumstances that can be fairly
20 stressful.  Is that fair?
21     A.  Living in the Midwest, coming to Kansas
22 City every day.
23     Q.  I know.  Sometimes we're driving on ice
24 rinks.
25     A.  It's amazing.

18 (Pages 69 to 72)

CORNERSTONE COURT REPORTING COMPANY, LLC
(913) 825-2510                                            www.cornerstonekc.net
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 19 of 51

## Page 73

1  Q. But the point is you -- you -- you believe
2  you handle yourself pretty well under pressure?
3  A. I know how to adjust for the situation,
4  yes.
5  Q. You don't panic?
6  A. I hope not, no.
7  Q. Okay. In your description on page 5 of
8  Exhibit 16, can you go ahead and read into the
9  record -- you have -- you don't have bad
10  handwriting, but I don't want to be missing
11  anything. So --
12  A. Pretty bad.
13  Q. -- why don't -- why don't you go ahead and
14  read what you have written here in the description
15  which states "Explain in your own words what
16  happened."
17  A. What I have written down at that time,
18  looks like "Driving with the flow of traffic
19  westbound I-70 at the 670 split in the southeast
20  corner of the downtown loop. I am in lane 3
21  following at a safe distance. Vehicle 2 comes
22  around me and dives in front of me and blocks my
23  vision as traffic is slowing, and I think he
24  overreacts and slams on his brakes and comes to a
25  stop, and I am not -- as I just did little enough --

## Page 74

1  and I did not as I just" -- I must have -- it looks
2  like I said "I just did little enough room after his
3  lane change." Maybe it should say "didn't have."
4  But -- and it says "All this happened in just a few
5  seconds' time."
6  My handwriting's terrible.
7  Q. I don't think it's so bad.
8  MR. LESTER: Mine's worse.
9  Q. (By Mr. Thompson) And then there's
10  some -- there's your name that's handwritten and
11  then your signature. And then we have to kind of
12  turn the document. I don't know if we can just --
13  if Brian can be just the master here and -- and turn
14  that around, but if he can't, can you read -- is
15  that also your handwriting the -- the writing that's
16  kind of perpendicular to the rest of the writing?
17  A. It looks like my scribble, yes.
18  Q. Okay. Can you tell us what that says?
19  A. I'll be guessing. It says something --
20  maybe "I believe only a few feet from getting
21  stopped."
22  Q. Okay. And is that your belief today, that
23  you were only a few feet from getting stopped?
24  A. Or less maybe.
25  Q. Okay. So if you just -- if you just had

## Page 75

1  two or three more feet, you would have been stopped?
2  A. If I would have been speeding like him or
3  go -- driving slower, this would have never
4  happened.
5  Q. Okay. The -- the point being if you
6  had -- if -- if the situation had given you just a
7  few more feet, maybe 5 or 10 feet, you would have
8  been stopped; right?
9  A. I'm thinking probably another 6 inches,
10  and that would have probably been avoided.
11  Q. Okay. If you had another 6 inches to deal
12  with, this accident never would have happened?
13  A. It's a possibility.
14  Q. If you had another few feet, we can pretty
15  much --
16  A. Yes.
17  (Overlapping speakers.)
18  Q. -- stand that it wouldn't have happened?
19  A. I agree.
20  Q. When he came into your lane, do you have
21  any estimate of how fast he was traveling?
22  A. When he started to come -- when he
23  overtook me, he was obviously going a little faster
24  than I was, but then he -- he -- he changed his
25  speed up, pretty much matched my speed, then just

## Page 76

1  came right over and slammed on his brakes.
2  That's -- that's all that happened.
3  Q. So when he was -- when he was coming over,
4  he was going about your speed?
5  A. I would -- yeah, I would estimate that.
6  Q. And then when he was fully in your lane,
7  he then slams on his brakes?
8  A. That's correct.
9  Q. Okay. And we've been this -- through this
10  before, and I understand you believe this may not
11  have been accurate, but anyway, at the time you said
12  he had come to a stop when you hit him; right?
13  A. That's what I had written at that time,
14  yes.
15  Q. Okay. That may be accurate, it may not be
16  accurate; is that fair?
17  A. On that point, yes.
18  Q. Okay. And your best estimate of how fast
19  your vehicle was traveling when you hit him is what?
20  A. Well, if he was stopped, it probably
21  wasn't more than 5 miles an hour at the impact. So
22  I'm thinking probably a 5-mile-an-hour differential
23  in -- in speed.
24  I was thinking -- after recollecting on
25  this, or rethinking about this, I imagine he was

19 (Pages 73 to 76)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**                    **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 20 of 51

## Page 77

1   still rolling maybe 10 miles an hour, and I might
2   have been doing 15 at the time of impact.  Some --
3   just a 5-mile-an-hour differential, but it was a
4   very low speed.
5       Q.  And I asked you this before, but your view
6   was blinded.  You don't know if traffic was stopped
7   in front of him or not; right?
8       A.  That's correct.
9       Q.  I mean, traffic in front of him may have
10  been completely stopped, but because you didn't have
11  a view of that, you don't know; right?
12      A.  That's correct.  But traffic was slowing
13  in the right lane.
14      Q.  And sometimes you've seen traffic just
15  moving slowly through there at a -- at a choke
16  point, and sometimes you've seen it stopped; right?
17      A.  That's correct.  Some -- some -- sometimes
18  somebody overreacts.
19      Q.  Or sometimes the congestion is just such,
20  and there's enough traffic that the safe thing to do
21  is to stop and pause for a moment; right?
22      A.  If possible, if that's what it takes.
23      Q.  When you got out of your truck, were --
24  for the first time after the accident, do you recall
25  seeing any traffic in front of him?

## Page 78

1      A.  I don't recall any traffic ahead of him.
2      Q.  One way or the other?
3         Do you know if it was there or it wasn't
4  there, or you don't --
5      A.  I don't recall seeing any traffic.  I
6  don't know one way or the other.
7      Q.  Okay.
8      A.  I know that traffic was flowing in the
9  right lane next to us.
10      Q.  And we're talking about -- it -- I mean,
11  by the time you get out of your trucks, a little bit
12  of time has passed; right?
13      A.  Yeah, a few seconds, yeah.  The situation
14  could change in a flash.
15      Q.  So you think you were out of your truck
16  within just a few seconds?
17      A.  Absolutely.
18      Q.  Okay.  Is that the first rear-end
19  collision you've ever had?
20      A.  That I can remember, yes.
21      Q.  Okay.  In a commercial motor vehicle?
22      A.  Or in any vehicle.
23      Q.  Okay.  Prior to him coming in your lane,
24  did you ever see him?
25      A.  Not until he was overtaking me, I did not

## Page 79

1   see him.
2      Q.  Okay.
3      A.  The volume of traffic there, I'm not
4  worried about what's past me, I'm worried about
5  what's going on right ahead of me.
6      Q.  Okay.  So at that point your focus -- let
7  me ask you this:  Do you have kind of a general
8  procedure -- some commercial motor vehicle operators
9  have kind of a general procedure of how they work
10  their mirrors.
11        Do you have kind of a custom and practice
12  on how you work your mirrors just when you're
13  driving down the road?
14      A.  Yes, I -- I keep an eye on both mirrors so
15  I know I'm managing my lane and know what people are
16  doing around me.
17      Q.  Okay.  So on that truck, how many mirrors
18  did that truck have?
19      A.  It has two large mirrors and one spot --
20  spot mirror on the doors and spot mirrors on each
21  side on the hood.
22      Q.  All right.  So it has -- it has a total of
23  six mirrors; right?
24      A.  That's correct.
25      Q.  And when you're checking your mirrors, are

## Page 80

1   you checking all six mirrors?
2      A.  I'm checking at least four:  The two on
3  the hood and the two large mirrors on the side.
4      Q.  And the two on the hood give you a view of
5  vehicles that are in close proximity down on your --
6  for instance, down on your right side; right?
7      A.  On both sides.  It helps eliminate the
8  blind spot.
9      Q.  Right.  They're -- have you ever heard
10  them referred to as blind spot mirrors?
11      A.  I think so.
12      Q.  Kind of makes sense that they would be
13  called that because that's exactly what they
14  address; right?
15      A.  That's correct.
16      Q.  Okay.  And then, of course, your larger
17  mirrors on -- on each side of the vehicle give you a
18  little broader view of the lanes next to you; right?
19      A.  Yes.  Without any distortion or
20  magnification or -- yes.
21      Q.  The round, or circular mirrors, there's a
22  little bit of distortion in those; right?
23      A.  Yes.
24      Q.  Objects may appear closer than they are;
25  right?

20 (Pages 77 to 80)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**        **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB   Document 102-1   Filed 05/23/22   Page 21 of 51

## Page 81

1  A. That's true.
2  Q. Okay. And when you're in the left-hand
3  lane, the focus on your left-hand mirror really
4  isn't as important as your right-hand mirror; is it?
5  A. That's correct.
6  Q. Because there's no lane there to keep
7  track of; right?
8  A. Only the lane edge to make sure you're
9  still on the road.
10  Q. Exactly. And you can also check that lane
11  edge by looking forward; right?
12  A. That's true. You have your -- your points
13  on your hood that you're used to using.
14  Q. Okay. When you saw Mr. Stoneman
15  overtaking you, is that when you first realized that
16  he was going to come over?
17  A. I didn't realize he was going to come over
18  until he made the move.
19  Q. Okay --
20  A. I didn't expect a -- I don't expect a lot
21  of people to do that. There's cars that do that all
22  day long, but I didn't expect another commercial
23  vehicle to do that.
24  Q. So you're doing about 45, or even less
25  than 45, because you're not blinded yet because he's

## Page 82

1  not in front of you. You know you have to slow down
2  because traffic is congested right there; so you are
3  braking as he -- and you're downshifting as he
4  starts to come over; right? You're already doing
5  those things.
6  A. Yeah. I've already downshifted, my engine
7  brake's on, my foot on the brake, and I'm keeping a
8  safe distance to the vehicles ahead of me.
9  Q. Okay. And as -- I think you've already
10  indicated this, but as he starts to come over, and
11  you realize he's coming over, the urgency of slowing
12  even further and faster and being harder on your
13  brake comes into your mind; right?
14  A. Yes, I'm applying them a little firmer.
15  It's on a little downhill, so it takes a second
16  to -- to get the bite on the brake shoes.
17  Q. But you don't -- it's not a situation --
18  we're in a situation where you're not having to
19  move -- physically move your foot to the brake,
20  because your foot's already there; right?
21  A. It's already there.
22  Q. So your ability to ply -- apply additional
23  pressure to the brake is immediate; right?
24  A. And as it was.
25  Q. Once you guys got out of your vehicles,

## Page 83

1  you moved them, and I think you said you -- you all
2  did some paperwork, you thought you did your
3  paperwork and took your pictures when you were over
4  on the right-hand side. Did you have any more
5  face-to-face communication and interaction?
6  A. Just a little bit. We didn't talk about
7  the weather, or anything like that. We made sure we
8  were both fine. We checked out his vehicle, he
9  checked out my vehicle. There was no damage to his,
10  and my hood was broken and cracked both my
11  windshields, and I had a leaking radiator.
12  Q. Was the light bar he was working on
13  damaged that occurred in this accident?
14  A. There wasn't any damage, it -- it -- for
15  some reason it -- they must have had some small mild
16  steel bolts holding it onto the frame, and it
17  just -- it tapped it and broke the bolts. It looked
18  like there was no damage to the light bar.
19  Q. Okay. Is it -- based on your
20  understanding of the circumstances -- I'm not
21  suggesting it was major structural damage, or
22  anything like that, it wasn't even a very heavy
23  piece of a -- of steel; right? I mean, it --
24  it's --
25  MR. LESTER: Objection. Calls for

## Page 84

1  speculation.
2  MR. THOMPSON: I'll withdraw the question.
3  Q. (By Mr. Thompson) Let me ask you this:
4  My point is, is it your understanding or did you
5  appreciate that whatever had occurred, the bolt
6  breaking or whatever, occurred in the accident?
7  A. I would speculate so.
8  Q. Okay.
9  A. I don't remember -- I wouldn't think he
10  would be driving down the road dragging it.
11  Q. I agree. I just wanted to make sure that
12  we were talking about the same thing.
13  A. But I wouldn't know for sure because I
14  never got to see that part of his truck until after
15  the accident.
16  Q. Okay.
17  A. Because he was so close, all I saw was the
18  back of his rollback.
19  Q. By the time -- and I -- and how --
20  Do you have an estimate of how close he
21  was once he was fully in your lane?
22  A. Twelve, maybe 15 feet.
23  Q. Okay. And your best estimate based on
24  where kind of the -- your very good knowledge of the
25  road is from the Benton curve -- out of the Benton

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**                    **www.cornerstonekc.net**

Page 85

1  curve, but not before the CMV restriction is lifted,
2  you got into the left-hand lane and remained in the
3  left-hand lane until you struck Mr. Stoneman from
4  the rear; right?
5      A.  I was in that left-hand lane as soon as
6  the restriction was lifted for -- it had to have
7  been a mile or a little bit better before the
8  incident happened, yes.
9      Q.  So would you have been traveling at about
10 55 miles an hour at that time?
11     A.  I would have probably been around 45,
12 accelerating to 55 coming out of the curve.
13     Q.  Because the curve has a suggested --
14 quote/unquote, suggested 45 MPH; right?
15     A.  And it's a good thing it's there.
16     Q.  And you take it seriously and operate at
17 that speed?
18     A.  Absolutely.  Don't want the load to shift.
19     Q.  So you're -- you then accelerate to 55 or
20 thereabouts because that's what the speed limit is
21 coming out of the curve, and then the speed limit
22 changes to 45; is that right?
23     A.  That's correct.
24     Q.  And you would have slowed down to 45?
25     A.  I would have been near or at 45 at that

Page 86

1  sign.
2      Q.  At the sign that goes to 45?
3      A.  Yes.  That's the law.
4      Q.  Okay.  Have you ever gotten a speeding
5  ticket?
6      A.  I imagine I have.
7      Q.  Okay.  Do you recall ever getting a
8  speeding ticket?
9      A.  Oh, I'm sure -- you know, I've been
10 driving for a lot of years.  I know I've gotten
11 speeding tickets.  I'm sure in my driver's file,
12 they probably have the documentation of something.
13         So if you have a specific one -- incident
14 or speed or whatever, you want to refer to, pull it
15 out and refresh me, I'll give you every detail about
16 it.
17     Q.  All right.
18     A.  I'll walk you right through it.
19     Q.  I'm just asking you, as you sit here
20 today, do you recall any?  Do any come to mind?
21     A.  I remember once I was north of Salina in a
22 70-mile-an-hour zone.  I believe I got a ticket for
23 71 or '2 miles an hour.
24     Q.  That's a harsh trooper.
25     A.  And I was following traffic.

Page 87

1      Q.  Maybe he just wanted to expect -- inspect
2  the vehicle.
3      A.  He did that.
4      Q.  Fair to say, while you consider yourself a
5  safe driver, you don't always travel within the
6  speed limit; fair?
7      A.  I generally go at the -- I try to go with
8  the flow of traffic when possible or when my truck
9  is able to.  But generally it's not always the case
10 around Kansas City.
11         Yes, I -- I try to be the safest driver
12 possible.
13     Q.  Okay.
14     A.  It's not always -- I'm not watching my
15 speedometer every second of the day, but my truck
16 only goes so fast.  I'm aware of situations around
17 the city or any given route, I know how to react to
18 things.
19     Q.  Right.
20     A.  And I know what to expect.
21     Q.  And -- and what Mr. Stoneman did that day
22 is nothing that you hadn't seen before; right?
23     A.  I haven't seen a commercial vehicle do
24 that.
25     Q.  You've never seen a commercial vehicle

Page 88

1  come over into a lane?
2      A.  Not in front of me and slam on the brakes.
3      Q.  So that was a first?
4      A.  That was a first.
5      Q.  As he was coming over, you understood he
6  was a commercial vehicle; right?
7      A.  He wasn't a private vehicle.
8      Q.  Right.  It was a commercial vehicle;
9  right?
10     A.  I believe so.  I believe they're for hire.
11     Q.  Okay.  Do you have any military service,
12 sir?
13     A.  I spent a little time in the U.S. Army
14 when I was a teenager.
15     Q.  All right.  Honorably discharged?
16     A.  Honorable under general conditions, or
17 general under honorable.
18     Q.  How long did you serve?
19     A.  Just under two years.
20     Q.  What was your MOS?
21     A.  96 Bravo.
22     Q.  How long have you had a CDL?
23     A.  Since the mid-'80s.
24     Q.  Did you pass your -- did you pass your CDL
25 on the first time?

22 (Pages 85 to 88)

CORNERSTONE COURT REPORTING COMPANY, LLC
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 23 of 51

## Page 89

1    A. Yes.
2    **Q. Have you told me anything specifically**
3  **that you recall Mr. Stoneman saying? Anything that**
4  **you can specifically say -- for instance, you recall**
5  **him saying, "I'm fine, I'm -- I'm okay," something**
6  **to that effect. Anything else you can say, "I know**
7  **he said that"?**
8    A. No, because that was the only main
9  concern. There was no other reason we would be
10  discussing anything else.
11    **Q. I mean, other than that, it was just**
12  **property damage, and that can get taken care of;**
13  **right?**
14    A. Basically nobody was hurt, nothing --
15  nothing on his vehicle was damaged, and he was fine.
16  I didn't even realize his taillight bar
17  was off the truck until I saw him underneath the
18  truck trying to put it back up.
19    **Q. Did you go through any weigh stations that**
20  **day?**
21    A. I don't believe I would have that day.
22    **Q. Did you fill up with any fuel anywhere?**
23    A. Only at the yard, we had a bulk tank.
24    **Q. With respect to your -- how are you**
25  **compensated? Hours? By the hour? By mile? Are**

## Page 90

1  **you salaried? That's what I'm trying to find out.**
2    A. I see. We're a performance-based, so it
3  would be mileage and drops. The only time I would
4  be paid by the hour, if it was extensive detention
5  time, which is pretty much nonexistent.
6    **Q. Mileages and draws?**
7    A. Drops.
8    **Q. Drops?**
9    A. I'm sorry, I mumble. I'm getting old.
10    **Q. That's okay.**
11    So do you get paid more -- are the drops
12  calculated by the weight that you're dropping? The
13  amount of steel you're dropping? The number of
14  drops? How is it?
15    A. Just the number of drops.
16    **Q. Okay. So what is the average number of**
17  **drops in -- on your route in Kansas City?**
18    A. Probably like that day, six.
19    **Q. Okay. Is six a good day or a bad day?**
20  **And by that I mean from a compensation standpoint.**
21    A. Oh, personally, I don't worry about the
22  compensation because I'm not in that big of a need
23  for money. I'm not a paycheck-to-paycheck person.
24    **Q. Right.**
25    A. So six is more than adequate.

## Page 91

1    **Q. And you have your wife taking care of the**
2  **bills?**
3    A. Thank goodness.
4    **Q. So are there times you have 10 drops?**
5    A. It's happened in the past, yes.
6    **Q. That would be a big day?**
7    A. That would be a real big day, yes.
8    **Q. Okay. Six is a -- does it sound about**
9  **average?**
10    A. Yeah. It makes for a nice 10-hour day.
11  Hopefully no more.
12    **Q. What is Kansas City to Emporia, about two**
13  **hours?**
14    A. 114 miles, hour and 40, 45 minutes to the
15  staging area.
16    **Q. Okay.**
17    A. On the turnpike.
18    **Q. Okay. Where is the staging area --**
19    A. It's --
20    **Q. -- as best you can describe it?**
21    A. It's between 58th Street and 78th Street.
22  It's on both sides of I-70. There -- used to be the
23  old vehicle inspection station. And the other side
24  would be a truck parking area, which now is -- since
25  they redid them both, they're both truck parking

## Page 92

1  areas and staging areas as the official --
2    **Q. Have you ever heard the expression "high**
3  **eye lead time"?**
4    A. I'm sorry, could you repeat that?
5    **Q. "High eye lead time."**
6    A. I'm not sure what that means.
7    THE REPORTER: Is it an eye like your eye?
8    MR. THOMPSON: Like eye, like an eyeball.
9    **Q. (By Mr. Thompson) Were you ever counseled**
10  **for this accident?**
11    A. I was talked to and said that I could
12  probably do a little bit better and use my common
13  sense and -- and it was pretty much about it.
14    I -- they know that I do everything I can
15  for -- for safety. And -- and like I told them,
16  there was -- there was nothing I could do. I was
17  driving in a safe manner before this incident
18  happened.
19    **Q. Are you aware that the police report**
20  **indicated that you were following too close and**
21  **traveling too fast?**
22    A. I read that, and I don't know why that's
23  there. He wasn't there, he didn't witness the
24  situation or the accident.
25    **Q. If we go to page 16 of Exhibit --**

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**    **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 24 of 51

Page 93

1  Exhibit 16. So page 16 of 16. You indicated
2  previously you were maintaining -- until
3  Mr. Stoneman took it away from you, you were
4  maintaining about 45 to 50 feet in front of you. Do
5  you recall that testimony?
6      A. Yes.
7      Q. Okay. And you were traveling about
8  45 miles an hour and slowing; right?
9      A. I was probably a lot slower than 45 before
10 he turned in front of me.
11     Q. What the company counseled you, at least
12 by this document, do you see "Accident Recurrence --
13 Recurrence Prevention" under this form?
14     MR. LESTER: You can read the whole page.
15     Q. (By Mr. Thompson) Yeah. Sure. Take your
16 time, read the whole page.
17     A. Okay. I've read it.
18     Q. Is it frustrating, as a commercial motor
19 vehicle operator, to you that when you leave too
20 much distance in front of you -- between you and the
21 car in front of you, you invite a lane jumper?
22     A. Doesn't bother me at all.
23     Q. Okay. So you don't get up tight or -- I
24 mean by that, I mean physical distance up tight to
25 the vehicle in front of you to prevent that from

Page 94

1  occurring, that's not your practice?
2      A. That's not my practice.
3      Q. Okay. Do you see where it says "Accident
4  Recurrence Prevention," do you see that on the form?
5      A. I believe I read that, yes.
6      Q. And it says "The following policy is in
7  place at NIM Transportation and if followed would
8  have prevented this accident. Six to eight seconds
9  following distance will be maintained under normal
10 driving conditions. Under adverse driving
11 conditions, 10 seconds following distance will be
12 maintained." Do you see that?
13     A. I do see that. You know, that's fair.
14 They want us to use common sense in the --
15     Under some conditions that's possible.
16 Around Kansas City, the type of traffic there is,
17 and the volume, it's impossible to have six to eight
18 seconds following distance, especially around the
19 city.
20     If I tried to maintain the six to eight
21 second distance between me and the vehicle ahead of
22 me, I'd probably be doing 30 miles an hour or less.
23 That would be a bigger hazard than being less than
24 eight or six seconds.
25     Q. I appreciate that, Mr. Ajello, my

Page 95

1  question's just a little different. Did you have an
2  opportunity to read that?
3      A. Yes, I -- I do read that.
4      Q. And were you familiar with that policy
5  that the company had?
6      A. I must have been.
7      Q. And will you -- would you agree and --
8  agree with me that you weren't following that policy
9  that day?
10     And I understand you have a reason for
11 that, but you weren't following that policy that
12 day, were you?
13     A. I was using common sense and keeping a
14 safe distance behind the vehicle ahead of me.
15     Q. I appreciate that's your explanation, but
16 my question's a little different.
17     You weren't following that policy that day
18 at the time of the accident, were you?
19     A. I believe this is probably just a general
20 guideline. But six to eight seconds, I was probably
21 five, six seconds behind the vehicle ahead of me at
22 that time.
23     Q. So you think having 45 to 50 feet of
24 distance, it would take you five to six seconds to
25 cover that at 35 miles an hour?

Page 96

1      A. Well, I'm sure it would take less time
2  than that.
3      Q. So you weren't maintaining that type of
4  distance, were you?
5      A. To the letter, no. Not to the letter of
6  this.
7      Q. And we understand, based on your testimony
8  here today, that you didn't need a lot more distance
9  to have kept this accident from happening because
10 you almost got stopped; right?
11     A. I almost got stopped. I did my best.
12     Q. Have you ever reviewed your phone records
13 for the day of that accident?
14     A. I've never reviewed any phone records
15 ever.
16     Q. What time did you start out that day, do
17 you recall?
18     A. I don't totally recall, but I imagine
19 being a single trailer, if the load was done on
20 time, I probably would have started around 5:00 in
21 the morning.
22     Q. Would that have been when you got to the
23 yard in Emporia?
24     A. Yes, that would probably have been the
25 time that I got to the yard.

24 (Pages 93 to 96)

CORNERSTONE COURT REPORTING COMPANY, LLC
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 25 of 51

Page 97

1    Q.  You do your pretrip?
2    A.  Pretrip inspections, yes.
3    Q.  Takes about 15 minutes?
4    A.  Pretty much.
5    Q.  And then you would have headed out?
6    A.  I would have tied down my load, made sure
7  it was secured properly.
8    Q.  And you do that separate from a precheck,
9  pretrip?
10    A.  Some of it I can do at the same time.
11    Q.  Okay.
12    A.  Because I'm walking around the vehicle.
13    Q.  When do you believe you left the yard or
14  most likely would have left the yard hauling one
15  trailer?
16    A.  It could have been anywhere from 20 to 45
17  minutes later.  I -- I don't recall.
18    Q.  Do you load your own trailers?
19    A.  No.
20    Q.  Okay.  You understand under the Federal
21  Motor Carrier Safety Administration regulations you
22  are responsible for the securement of your load
23  though; right?
24    A.  That's correct.
25    Q.  And that's why you take securement

Page 98

1  extremely seriously when you're carrying steel?
2    A.  Carrying anything.
3    Q.  Okay.  Do you have any estimate of what
4  your truck weighed at the time of the accident?
5    A.  Just -- I'd be guessing.  The truck and
6  trailer weighs 14 tons empty.  I might have had five
7  or more tons left on the trailer.
8    Q.  So if -- if you were empty -- and I
9  understand you believe you had one more -- you had
10  a -- still had a little steel.  But if you were
11  empty, the truck and trailer -- the tare weight of
12  the tuck and -- truck and tailor -- truck and -- the
13  tare, T-A-R-E, weight of the truck and trailer --
14    MR. LESTER:  Do you want to restart --
15    Q.  (By Mr. Thompson)  -- would have been --
16  that's a tongue twister.
17    MR. LESTER:  Do you want to start this
18  question over.
19    Q.  (By Mr. Thompson)  I'm going to start it
20  all over.  But it's a tongue twister.  It's better
21  than Sally sells seashells by the seashore.
22    In any event, the tare weight of the truck
23  and trailer that day, if empty, would have been
24  approximately 14 tons or 28,000 pounds?
25    A.  That's correct.  Maybe just slightly more.

Page 99

1    Q.  Okay.  And you think you may have had how
2  much more steel on there?
3    A.  I would -- if -- just guessing, I would
4  say maybe 5 to 10,000 pounds.
5    Q.  Okay.  So probably the maximum you're
6  rolling with at the time of the accident is 35,
7  38,000 pounds?
8    A.  Quick math, probably so.
9    Q.  Okay.  May have been less?
10    A.  Or more.
11    Q.  What time would you normally go to bed?
12    A.  My habit of going to bed, usually around
13  7:00 o'clock.
14    Q.  Okay.  And get up at what time?
15    A.  If I'm pulling doubles, 2:15, 2:30.
16    Q.  Well, I hope you have tomorrow off.
17    A.  I don't work weekends.
18    Q.  Good man.
19    A.  Actually, I had yesterday and today off.
20    Q.  All right.
21    You were -- you did a -- an alcohol test
22  after this accident; right?
23    A.  Absolutely.
24    Q.  Okay.  And obviously that was negative?
25    A.  Yes.

Page 100

1    Q.  Okay.  Do you have an understanding as to
2  whether a -- a drug or alcohol test was mandatory
3  under the Federal Motor Carrier Safety
4  Administration regulations based on the nature of
5  this accident?
6    A.  Yes, it's -- it's required under any type
7  of accident.
8    Q.  Why weren't you drug tested?
9    A.  I was drug tested.
10    Q.  Were you drug tested and alcohol tested?
11    A.  Drug, alcohol, yes.
12    Q.  Okay.  What's your understanding of how
13  quickly after an accident like this you need to be
14  tested?
15    A.  I have no idea.
16    Q.  Okay.  You -- you were tested back down in
17  Emporia; correct?
18    A.  I would -- yes.  That's a safe assumption,
19  yes.
20    Q.  If the records show that it was around
21  7:00 something in the evening, would you have any
22  reason to disagree with that?
23    A.  I wouldn't know, but -- no, I wouldn't be
24  able to disagree or agree.
25    Q.  Okay.  Mr. Cheek told you where to go for

25 (Pages 97 to 100)

CORNERSTONE COURT REPORTING COMPANY, LLC
(913) 825-2510                                      www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 26 of 51

## Page 101

1 that testing?

2    A. It's always the same place. The hospital.

3    Q. Because you also, as a commercial motor

4 vehicle operator, are subject to random drug and

5 alcohol testing; right?

6    A. That's correct.

7    Q. As part of an employer's program?

8    A. Every -- yes. Every employer.

9    Q. In other words, you're not singled out?

10    A. I hope not.

11    Q. No.

12    A. If they are, they're looking for a

13 negative.

14    Q. Other than the Department of

15 Transportation training modules that you recall, do

16 you recall receiving any other specific training

17 from NIM?

18    A. We -- we have a -- quarterly safety

19 meetings. People come down from Nebraska, the

20 corporate guys for transportation, and we review a

21 lot of things. If there's new requirements, we go

22 over them there and do tie-down procedures or

23 something new they want to try, we learn about it

24 there.

25      And we review the last three months as far

## Page 102

1 as safety, maintenance, and our scores nationwide.

2 And periodically we'll receive flyers -- or I should

3 say -- flyers. I guess you call them, flyers, I

4 don't know --

5    Q. Okay.

6    A. -- of -- of any changes or anything new or

7 anything for safety or any route changes or what to

8 watch for in certain areas on certain routes.

9    Q. Do you recall any training as it relates

10 to space management?

11    A. As far as -- I don't recall.

12    Q. You understand what we've talked about

13 today as space management, as a commercial motor

14 vehicle operator, you understand that; right?

15    A. As a driver I do, if anything.

16    Q. You understand that that's an extremely

17 important skill to have?

18    A. For everybody, yes.

19    Q. Okay. And you understand what the company

20 was counseling you on was effectively a space

21 management violation; right?

22      MR. LESTER: Object to form.

23    Q. (By Mr. Thompson) That's -- that's the

24 type of violation they were counseling you on. I

25 understand you disagree with it.

## Page 103

1      MR. LESTER: Same objections.

2    A. I -- I don't totally disagree with space

3 management, but I think sometimes it's not -- you're

4 not able to realize or obtain the six to eight

5 seconds. They want us to use common sense.

6    Q. (By Mr. Thompson) And my question's a

7 little bit different. It's just that the counseling

8 you received after this accident was specifically

9 directed at space management. That's a space

10 management policy, the six to eight seconds; right?

11    A. I imagine that's probably what was talked

12 about, but I don't recall exactly what was said.

13    Q. Okay. I assume that there's nothing

14 mechanical about your truck that you believe didn't

15 operate correctly that day that caused or

16 contributed to cause this accident?

17      I'm just asking to try to cover my bases.

18 You're not saying the brakes didn't work, they

19 weren't properly adjusted, anything like that?

20    A. There were no defects.

21    Q. Okay. Is there anything, as you look at

22 this, that you can think of you wish you had done

23 differently that day to have avoided this accident?

24    A. I wish I would have stayed home.

25    Q. Okay. Other than the PeopleNet system,

## Page 104

1 were there any other either communications or

2 tracking or monitoring systems on that vehicle that

3 day?

4    A. Not that I'm aware of.

5    Q. Okay. Do you know if there was ever a

6 download done on the ECM module on that truck after

7 the accident?

8    A. I have no information on that. I have no

9 idea.

10    Q. Do you -- do you know that there is such a

11 module on that truck?

12    A. I would imagine so.

13    Q. What type of engine does that truck have,

14 a Detroit diesel?

15    A. Detroit.

16      MR. THOMPSON: Why don't we take a few

17 minutes, I think I'm just about done. Take five.

18      THE VIDEOGRAPHER: Going off the record.

19 Time now is 4:33 p.m.

20      (A recess was taken.)

21      THE VIDEOGRAPHER: We are back on the

22 record. The time now is 4:38 p.m.

23      MR. THOMPSON: Mr. Ajello, I have no

24 further questions for you today. I appreciate your

25 patience with me. I appreciate you coming up here.

26 (Pages 101 to 104)

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**      **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 27 of 51

## Page 105

1 I wish you safe travels back and a good weekend.
2 　　　　THE WITNESS:  Thank you very much.  Same
3 to you.
4 　　　　MR. THOMPSON:  Take care.
5 　　　　　EXAMINATION
6 BY MR. LESTER:
7 　　Q.  Mr. Ajello, I've got two -- three
8 questions.  You understand that you -- that you --
9 it is your recollection that you took a drug test on
10 the day of the accident; correct?
11 　　A.  That's correct.
12 　　Q.  And if Defendant's 715 is an email saying
13 that the result of your drug test was negative, that
14 comports with your recollection?
15 　　A.  Yeah, because it would have been after I
16 went back to Emporia.
17 　　Q.  And then my other question:  Going to the
18 scene of the accident, you talked earlier about how
19 you lost vision of the traffic ahead at a certain
20 point in time; correct?
21 　　A.  That's correct.
22 　　Q.  Before you lost vision, was the traffic
23 ahead stopped?
24 　　A.  No.  We were flowing.
25 　　Q.  Okay.

## Page 106

1 　　　　MR. LESTER:  No other questions.
2 　　　　THE VIDEOGRAPHER:  Concludes the
3 deposition.  The time now is 4:39 p.m.
4 　　　　THE REPORTER:  Read and sign?
5 　　　　MR. LESTER:  Read and sign.
6 　　　　THE REPORTER:  And do you want a copy of
7 this?
8 　　　　MR. LESTER:  I would like an eTranscript,
9 PDF emailed.
10 　　　　(The deposition concluded at 4:39 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 107

1 　　　　CERTIFICATE OF REPORTER
2
3 　　　　I, Ellen L. Stock, a Certified Court
4 Reporter of the State of Missouri, do hereby
5 certify:
6 　　　　That prior to being examined, the witness
7 was first duly sworn;
8 　　　　That said testimony was reported by me at
9 the time and place hereinbefore stated and was
10 thereafter reduced to typewriting under my
11 direction;
12 　　　　That the foregoing transcript is a true
13 record of the testimony given by said witness;
14 　　　　That I am not a relative or employee or
15 attorney or counsel of any of the parties or a
16 relative or employee of such attorney or counsel or
17 financially interested in the action.
18 　　　　Witness my hand and seal this 23rd day of
19 July, 2021.
20
21
22
23 　　　　Ellen L. Stock
24 　　　　Missouri Supreme Court
25 　　　　Certified Court Reporter

## Page 108

1 　　　　ERRATA SHEET
2 RE:  Christopher W. Stoneman v. Norfolk Iron & Metal
3 and James J. Ajello
4 PG/LN　　Correction and Reason for Change
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22
23 　　　　_____
24 　　　　James J. Ajello
25 ELS

CORNERSTONE COURT REPORTING COMPANY, LLC
(913) 825-2510　　　　　　　　　　　www.cornerstonekc.net
Case 4:21-cv-00061-SRB　　Document 102-1　　Filed 05/23/22　　Page 28 of 51

Page 109

```
 1              SIGNATURE PAGE
 2    RE:  Christopher W. Stoneman v. Norfolk Iron & Metal
 3    and James J. Ajello
 4
 5    _____ I certify that I have read my testimony and
 6        request that NO changes be made.
 7
 8    _____ I certify that I have read my testimony and
 9        request that the above changes be made.
10
11
12
13        _____
14            James J. Ajello
15
16            Subscribed and sworn to before me this
17    _____ day of _____, 20_____
18
19
20        _____
21            Notary Public
22            State of _____
23            County of _____
24            My commission expires _____
25    ELS
```

28 (Page 109)

**A**

ability
  82:22
able 52:6
  55:11,14
  68:11,13
  87:9
  100:24
  103:4
Absolute
  36:17
absolutely
  10:5 11:18
  16:6 29:2
  39:21
  43:17 59:6
  64:9 66:5
  67:19
  68:23
  69:12
  78:17
  85:18
  99:23
accelerate
  85:19
accelera...
  85:12
access 42:6
  42:6
accident 3:8
  11:8,11,14
  11:20
  13:11 27:6
  32:22 33:9
  38:18,18
  39:3 46:10
  48:17
  49:24
  50:12,20
  53:5 54:11
  54:24 55:5
  55:10,20
  56:6,11,25
  57:1 58:13
  58:15,18
  75:12
  77:24
  83:13 84:6
  84:15

92:10,24
93:12 94:3
94:8 95:18
96:9,13
98:4 99:6
99:22
100:5,7,13
103:8,16
103:23
104:7
105:10,18
Accident...
  70:17
accidents
  22:2
accurate
  15:2 39:8
  39:9 76:11
  76:15,16
accurately
  15:10
action
  107:17
activity
  50:11
actual 10:3
  12:8
add 39:8
additional
  15:14 62:1
  82:22
address 8:18
  8:21 80:14
adequate
  90:25
adjust 73:3
adjusted
  103:19
Administ...
  25:5 97:21
  100:4
adverse
  94:10
afford 8:4
afternoon
  4:21 5:12
  48:3
ago 20:17
  37:14

agree 54:21
  64:11
  69:16
  75:19
  84:11 95:7
  95:8
  100:24
ahead 6:2,22
  7:16 8:10
  8:14 47:6
  62:23,24
  64:25
  65:22 66:9
  66:12,16
  66:21 73:8
  73:13 78:1
  79:5 82:8
  94:21
  95:14,21
  105:19,23
Aim 21:6
Ajello 1:8
  1:16 4:4,6
  4:16,21
  5:6 8:16
  8:17 14:9
  23:21
  34:15 55:9
  55:13 58:3
  94:25
  104:23
  105:7
  108:3,24
  109:3,14
alcohol
  99:21
  100:2,10
  100:11
  101:5
allow 66:12
allowing
  66:13
amazing 68:7
  72:25
amount 90:13
anniversary
  10:13
answer 5:22
  6:3,22 7:9

7:16,19
8:10
answered 6:4
  6:24 13:19
answering
  33:5
Answers 3:9
anybody
  60:22
Anytime 31:1
  32:25
anyway 11:6
  34:21
  76:11
anyways
  46:20
apologize
  13:3
appear 80:24
APPEARANCES
  2:1
appears 11:6
  14:11,18
  33:12 58:6
applicant
  14:22
application
  14:11,16
  15:1,8,9
applied
  15:22
apply 82:22
applying
  14:13
  82:14
appreciate
  5:11 8:7
  26:21
  68:25 84:5
  94:25
  95:15
  104:24,25
approach
  41:15
appropriate
  7:12
approxim...
  14:16
  28:19 30:3

32:6 54:4
98:24
archived
  3:16
area 32:1
  40:7 44:21
  45:17,25
  46:6 47:24
  91:15,18
  91:24
areas 92:1,1
  102:8
arm 16:21
Army 88:13
arriving
  51:7
Arrowhead
  8:19
asked 6:14
  31:8 40:22
  49:9 54:23
  55:4 61:11
  71:8 77:5
asking 18:17
  50:3 86:19
  103:17
asks 18:22
assigned
  27:24
assume 6:23
  6:23 9:16
  17:7,13
  20:18
  21:22 35:3
  54:24
  62:22
  64:14 65:1
  70:23,24
  103:13
assuming
  48:13
assumption
  100:18
at-base 38:6
at-based
  38:5
attached
  50:19
attention

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 30 of 51

25:17
**attestation**
14:25
**attorney**
107:15,16
**attorneys**
7:3
**August** 60:1
**Australia**
47:9
**available**
38:1
**Avenue** 48:15
**average**
90:16 91:9
**avoided**
75:10
103:23
**aware** 27:13
37:2 57:4
87:16
92:19
104:4

**B**

**B** 2:8
**back** 14:5,12
15:12 16:1
22:5 23:12
23:24
24:17
26:14
27:21,24
28:5 30:21
37:11,11
42:1 44:15
44:22
45:20,20
46:7,8
47:16,20
48:3 50:17
51:21 52:2
52:9 55:8
55:23
57:24
59:19,25
61:18,20
62:8 70:3
70:14,15

84:18
89:18
100:16
104:21
105:1,16
**backwards**
18:9
**bad** 72:18,18
73:9,12
74:7 90:19
**banter** 7:2
**bar** 50:18
51:5,20
52:8,19
71:8 83:12
83:18
89:16
**based** 15:18
25:14
63:17
83:19
84:23 96:7
100:4
**bases** 103:17
**basic** 20:3
**basically**
14:21 17:2
26:9 46:24
63:17
66:23 72:9
89:14
**basics** 72:12
**basis** 26:1
30:5,21
**bean** 68:5
**bed** 99:11,12
**Beef** 16:20
**began** 64:14
64:17
**begins** 4:4
**behalf** 1:17
4:10,12
**belief** 5:9
35:11 42:8
74:22
**believe** 6:19
12:17
15:11 25:2
26:17 28:7

29:20
33:22
34:23
37:10,18
43:23
44:19
47:12
60:11
61:19 66:7
73:1 74:20
76:10
86:22
88:10,10
89:21 94:5
95:19
97:13 98:9
103:14
**believes** 7:4
7:10
**Benton** 41:8
41:11,14
41:18,20
42:10,20
42:22 43:3
43:7,10,13
84:25,25
**berating**
68:9
**best** 6:24
25:9 35:22
36:5 48:16
52:17
76:18
84:23
91:20
96:11
**bet** 70:6
**better** 59:24
60:5 85:7
92:12
98:20
**beyond** 12:7
**bid** 32:3
**big** 20:14
21:9 90:22
91:6,7
**bigger** 94:23
**bill** 60:1,2
**bills** 36:7

59:21,22
60:4 91:2
**Bingham** 2:17
**bit** 7:2
10:22
17:22
24:20 32:8
33:22
49:20,22
57:8 66:9
67:8 78:11
80:22 83:6
85:7 92:12
103:7
**bite** 82:16
**blind** 66:23
68:25 80:8
80:10
**blinded**
66:25
68:20 77:6
81:25
**blinding**
68:19
**blinds** 67:21
**block** 66:11
**blocks** 73:22
**Blue** 40:3
41:1 44:19
44:20
**board** 34:16
**bolt** 84:5
**bolted** 51:21
**bolts** 83:16
83:17
**boss** 60:7,8
**bother** 93:22
**bottleneck**
67:14
**bottom** 34:15
**Bottoms** 44:4
48:14
**Boulevard**
1:19 2:9
**brake** 65:19
65:21 69:9
82:7,13,16
82:19,23
**brake's** 82:7

**brakes** 63:5
73:24 76:1
76:7 88:2
103:18
**braking** 82:3
**brand** 24:8
24:10
**Bravo** 88:21
**break** 8:3,3
8:5,12
57:15,16
65:7
**breaking**
84:6
**Brian** 2:13
5:16 13:23
14:19 33:1
58:1 74:13
**briefly** 4:22
**bright** 6:8
**bring** 47:18
58:2
**broader**
80:18
**Broadway** 2:4
**broke** 83:17
**broken** 83:10
**brought**
25:17
47:12
49:16
**BROWN** 1:19
2:8
**bulk** 89:23
**bunch** 31:4
**business** 9:6
9:20,24
16:13,25
16:25
**busy** 56:22

**C**

**cab** 11:17
37:9,11,17
52:23 55:9
58:13 61:4
61:6,7,20
62:8,9,14
**CAIN** 2:13

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 31 of 51

22:17
**calculated**
  90:12
**call** 9:25
  56:21  59:7
  60:9,13,22
  62:10
  102:3
**called** 60:18
  62:13
  80:13
**calling**
  60:24,25
**calls** 60:15
  61:1  83:25
**calm** 72:14
**cam** 28:13
  29:9
**camera** 29:1
  53:1,4
  58:17
**cams** 28:17
  28:23
**capability**
  37:3,15
**car** 69:25
  93:21
**care** 60:4
  89:12  91:1
  105:4
**career** 17:11
**Carrier** 25:4
  97:21
  100:3
**carrying**
  98:1,2
**cars** 63:12
  68:6  81:21
**case** 1:6  4:4
  4:8,25  5:4
  12:6  87:9
**caught** 23:22
**cause** 22:1
  26:7
  103:16
**caused**
  103:15
**CDL** 20:15
  88:22,24

**cell** 59:7,9
  59:11,12
  59:13
**certain**
  17:12  57:2
  102:8,8
  105:19
**certainly**
  8:4  24:22
**certificate**
  3:11  19:20
  107:1
**certific...**
  14:24
**Certified**
  1:24  107:3
  107:25
**certify** 19:5
  107:5
  109:5,8
**change** 3:17
  16:13  74:3
  78:14
  108:4
**changed**
  15:24
  27:12  63:4
  75:24
**changes**
  85:22
  102:6,7
  109:6,9
**changing**
  63:11
**Charlie**
  20:21
  38:23  39:2
**check** 18:23
  81:10
**checked** 83:8
  83:9
**checking**
  79:25  80:1
  80:2
**Cheek** 20:21
  23:20
  38:23  59:5
  60:10,13
  60:25

71:20
  100:25
**Chevrolet**
  68:11
**choke** 77:15
**Christopher**
  1:4  4:5,11
  4:24  108:2
  109:2
**Christy** 2:17
**circular**
  80:21
**circumst...**
  68:18
  72:19
  83:20
**city** 1:20
  2:4,9  4:8
  4:20
  31:18,25
  32:1,13
  35:4,4
  44:1,2,24
  45:25
  46:19
  72:22
  87:10,17
  90:17
  91:12
  94:16,19
**clarify**
  12:25
**clarity** 13:7
**clear** 42:6
  66:17
**client** 7:6
**climbed**
  50:25
**close** 54:13
  80:5  84:17
  84:20
  92:20
**closer** 48:19
  80:24
**CMV** 85:1
**collision**
  22:25  24:2
  28:10
  33:21

35:25
  40:10  41:2
  46:15  48:9
  48:18
  50:13  59:3
  70:21  71:9
  78:19
**Colorado**
  30:14
**come** 8:1
  16:1  31:21
  37:16
  38:15  43:6
  43:9  49:5
  49:10
  51:11  52:2
  55:4  56:14
  64:4  65:1
  65:3  66:2
  67:23
  69:14  70:6
  75:22
  76:12
  81:16,17
  82:4,10
  86:20  88:1
  101:19
**comes** 31:22
  42:1  67:20
  73:21,24
  82:13
**comfortable**
  33:5
**coming** 5:12
  33:17
  40:14  42:7
  42:9,23
  44:14,15
  57:13
  63:10  65:4
  65:10
  72:21  76:3
  78:23
  82:11
  85:12,21
  88:5
  104:25
**commenced**
  4:1

**commercial**
  15:7  17:4
  17:17,23
  18:12  19:2
  19:25  22:2
  42:2,10
  43:14  56:8
  65:2,8
  68:16
  69:21
  78:21  79:8
  81:22
  87:23,25
  88:6,8
  93:18
  101:3
  102:13
**commission**
  109:24
**common** 69:17
  92:12
  94:14
  95:13
  103:5
**communicate**
  38:2,3
**communic...**
  61:14,23
  62:2  83:5
**communic...**
  2:13  104:1
**companies**
  9:25  18:18
  27:11
**company** 9:12
  9:22,24
  25:8,18
  27:14,19
  51:7,7
  59:12  72:5
  93:11  95:5
  102:19
**company's**
  20:25
**compensated**
  89:25
**compensa...**
  90:20,22
**completed**

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**                    **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 32 of 51

completely
  6:2, 4
  77:10
comports
  105:14
compromised
  22:4
compromi...
  22:10
computer
  18:21
  19:15
concern 89:9
concluded
  106:10
Concludes
  106:2
conditions
  65:22
  72:18, 19
  88:16
  94:10, 11
  94:15
conducive
  16:10
confusing
  40:17, 18
congested
  65:24
  67:11, 23
  69:17, 22
  82:2
congestion
  77:19
connected
  14:1
consider
  17:16 57:9
  72:13 87:4
contact
  61:23 62:1
contacted
  16:24 59:4
CONTENTS 3:1
contrary 5:9
contributed
  103:16
control
  56:18, 19

Conventi...
  24:6
conversa...
  5:23
converter
  47:3, 5, 22
  48:5
converters
  47:23
coordinates
  36:25
copy 36:14
  106:6
corner 44:24
  73:20
corporate
  101:20
correct 9:15
  9:19 11:15
  16:6, 16
  19:18, 22
  24:25 26:8
  26:11
  31:11
  34:23
  36:21
  39:14, 17
  44:10 46:9
  46:12
  47:14, 21
  52:16
  55:18, 20
  56:12 58:7
  58:8 59:13
  61:21
  63:21
  64:16
  68:13
  70:21, 22
  76:8 77:8
  77:12, 17
  79:24
  80:15 81:5
  85:23
  97:24
  98:25
  100:17
  101:6
  105:10, 11

105:20, 21
correcting
  31:1
Correction
  108:4
correctly
  103:15
counsel 3:15
  3:17 4:9
  25:13
  107:15, 16
counseled
  92:9 93:11
counseling
  102:20, 24
  103:7, 8
County 44:16
  44:25 45:1
  109:23
couple 58:19
  58:23, 24
course 6:21
  7:1 20:5
  28:2 36:18
  41:9 60:14
  80:16
court 1:1
  4:7 5:2, 24
  107:3, 24
  107:25
courtesy 8:4
cover 95:25
  103:17
cracked
  83:10
crawl 52:9
criticizing
  68:9
currently
  8:25 9:3
  38:1
curve 41:5, 8
  41:11, 14
  41:19, 20
  41:22, 24
  41:25 42:7
  42:10, 17
  42:19, 20
  42:21, 22

42:23, 25
  43:1, 3, 7
  43:10, 13
  64:19, 23
  66:3, 18
  84:25 85:1
  85:12, 13
  85:21
curves 43:12
custom 79:11
customer
  35:13 36:1
  36:8, 13
  48:7, 9
  49:7, 11
customers
  32:9, 11, 19
  36:2, 6
  38:7
Cutoff 40:4

────────
        D
────────
daily 26:1
damage 38:18
  83:9, 14, 18
  83:21
  89:12
damaged
  83:13
  89:15
dash 28:13
  28:17 29:9
data 25:14
  27:5 70:17
date 36:15
  36:17
  58:10
day 17:3
  22:18, 24
  26:4, 12, 12
  27:5 32:10
  32:10, 12
  34:1 35:5
  35:5 36:3
  36:6, 11, 13
  37:13 38:3
  39:3 43:24
  44:14 45:2
  45:24 46:5

46:14, 18
  46:20
  47:13, 16
  53:2 54:24
  67:13, 14
  70:9 72:22
  81:22
  87:15, 21
  89:20, 21
  90:18, 19
  90:19 91:6
  91:7, 10
  95:9, 12, 17
  96:13, 16
  98:23
  103:15, 23
  104:3
  105:10
  107:18
  109:17
days 15:25
  30:17 45:5
  45:6
deal 75:11
dealt 72:17
decade 32:2
decelera...
  65:19
decide 62:16
decided
  16:23
defects
  103:20
Defendant
  1:17 4:17
Defendant's
  105:12
defendants
  1:9 2:7
  4:13
defensive
  21:17
deliver
  35:13
delivered
  10:2
deliveries
  38:8 46:2
  46:6

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 33 of 51

delivering
  32:1
Department
  19:11
  101:14
depends
  32:10
deposition
  1:16 4:1,4
  5:7 13:1
  13:13
  106:3,10
depth 49:25
describe
  18:16
  91:20
described
  13:9
description
  38:17,18
  39:6 55:19
  73:7,14
descript...
  54:14
detail 86:15
details
  39:12
detention
  90:4
determin...
  7:11
Detroit
  104:14,15
dialed 60:11
dialing
  60:12
diesel
  104:14
difference
  20:14
different
  9:25 19:7
  19:8 21:1
  30:12
  40:16 67:8
  95:1,16
  103:7
differen...
  54:7,8

76:22 77:3
differently
  103:23
difficult
  72:17
digest 33:4
digital 53:3
  53:4
digitally
  3:15
directed
  18:12
  103:9
direction
  107:11
disagree
  100:22,24
  102:25
  103:2
discharged
  88:15
discovered
  10:19,22
discussing
  89:10
Discussion
  14:4 57:23
discussions
  49:23
dispatch
  37:13 38:2
  59:4
disposable
  53:3,4
distance
  22:12,15
  22:16 63:9
  67:25
  73:21 82:8
  93:20,24
  94:9,11,18
  94:21
  95:14,24
  96:4,8
distinction
  68:14
distortion
  80:19,22
distribu...

9:24
District 1:1
  1:1 4:6,7
  5:2,3
  48:12
dives 73:22
division 1:2
  9:9,11
  14:13
  29:20
document
  11:5,9
  25:21
  32:25 33:8
  33:11,13
  33:15 58:4
  58:6,12,16
  74:12
  93:12
document...
  57:5 58:20
  86:12
document...
  62:7
documents
  10:16
  11:23,24
doing 25:25
  50:21
  51:18 77:2
  79:16
  81:24 82:4
  94:22
don'ts 20:4
doors 79:20
dos 20:3
double 45:2
  45:5,24
  46:8,17,18
  47:13,15
  47:18,20
doubles
  45:11
  46:20,21
  46:22
  99:15
Douglas 2:14
downhill
  64:20

82:15
download
  104:6
downsampled
  3:15
downshifted
  65:20 82:6
downshif...
  82:3
downtown
  43:19
  44:17 45:4
  45:18
  73:20
dpi 3:15
DQ 23:8
dragging
  84:10
draws 90:6
drive 8:19
  51:10
driven 21:23
  30:15
driver 3:7
  12:5,8
  14:10 17:9
  18:22
  20:22 21:1
  21:17,19
  24:23,25
  33:9 38:24
  46:2,4
  87:5,11
  102:15
driver's
  12:2 15:7
  22:19
  25:20 70:4
  86:11
drivers
  18:19,20
  25:13 29:4
driving
  22:24 24:3
  24:5 26:16
  26:19,20
  30:5 72:23
  73:18 75:3
  79:13

84:10
  86:10
  92:17
  94:10,10
drop 46:1
dropped 64:7
dropping
  90:12,13
drops 90:3,7
  90:8,11,14
  90:15,17
  91:4
drug 100:2,8
  100:9,10
  100:11
  101:4
  105:9,13
duly 4:17
  107:7

_____

**E**

earlier
  105:18
easier 5:15
  5:15,16
east 42:20
ECM 104:6
ed 70:4
EDELMAN 2:3
edge 81:8,11
effect 25:6
  89:6
effectively
  14:25
  68:20
  102:20
efficient
  6:10
eight 19:7,8
  35:7 94:8
  94:17,20
  94:24
  95:20
  103:4,10
either 36:9
  40:3,25
  44:2,4
  48:14
  54:12

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 34 of 51

104:1
electronic
  3:14,17
  25:5,9
  59:22 60:2
electron...
  3:16 36:9
eliminate
  80:7
Ellen 1:22
  5:15 7:24
  107:3,23
ELS 108:25
  109:25
email 37:15
  105:12
emailed
  106:9
employed
  8:25 9:3,4
employee
  107:14,16
employer
  101:8
employer's
  101:7
employers
  15:8
employment
  15:13
Emporia 8:19
  9:5 14:12
  29:20
  30:18
  44:22
  45:21 46:7
  49:18
  91:12
  96:23
  100:17
  105:16
empty 34:10
  34:21,22
  45:4,19
  46:4 98:6
  98:8,11,23
ended 42:3
endorsement
  20:19

endorsem...
  20:15
ends 5:21
engine 65:19
  82:6
  104:13
enjoyed
  10:14
enter 41:24
  43:19
entered
  44:17
entire 6:19
  52:23
equipment
  20:6,6
  47:25 49:3
ERRATA 3:12
  108:1
especially
  94:18
estimate
  29:25
  51:16
  75:21 76:5
  76:18
  84:20,23
  98:3
eTranscript
  106:8
evening
  100:21
event 24:1
  25:25
  31:16
  35:11 57:8
  62:16
  68:15
  98:22
eventually
  44:25
  49:13
everybody
  17:21
  102:18
exact 28:6
exactly 39:5
  40:2 58:21
  80:13

81:10
  103:12
EXAMINATION
  3:2 4:19
  105:5
examined
  107:6
exception
  7:18 8:8,9
  8:9
excess 46:23
excuse 5:13
Exhibit
  13:22 14:8
  32:21
  38:17 58:2
  58:4,7
  70:14,16
  71:16 72:2
  73:8 92:25
  93:1
exhibits 3:6
  3:14,16,17
  13:1
existed 27:9
expect 21:20
  27:8 81:20
  81:20,22
  87:1,20
expedite
  13:6
experience
  15:6 31:23
  67:13
experienced
  56:7 65:2
  65:8
expires
  109:24
explain
  47:11
  64:11
  73:15
explanation
  95:15
expression
  92:2
extensive
  90:4

extent 21:2
extremely
  6:11 17:17
  98:1
  102:16
eye 79:14
  92:3,5,7,7
  92:8
eyeball 92:8
eyes 21:11

**F**

fabricated
  51:21
face-to-...
  61:22 62:1
  62:3 83:5
facetious
  64:10
fact 47:19
  69:20,21
fair 9:18
  10:4 11:21
  15:10,15
  15:19,20
  15:25 16:5
  16:18,19
  17:2,20
  19:21
  27:19,20
  28:9 35:2
  35:2,13,14
  40:8 72:20
  76:16 87:4
  87:6 94:13
Fairfax
  48:11,13
fairly 72:17
  72:19
Falls 15:19
familiar
  13:24
  23:13,14
  23:17
  24:11
  33:13 41:6
  58:4 95:4
far 10:19
  20:4 24:20

30:12
  38:11 62:5
  101:25
  102:11
fast 53:22
  67:6 68:22
  75:21
  76:18
  87:16
  92:21
faster 75:23
  82:12
fault 6:13
  6:13
federal 25:4
  27:10
  97:20
  100:3
feel 31:2
  32:15
  53:17 61:1
feet 22:20
  22:22
  46:16,23
  51:24
  62:23,24
  63:7,20
  65:15,18
  74:20,23
  75:1,7,7
  75:14
  84:22 93:4
  95:23
field 66:20
figure 10:21
file 3:8,17
  12:3,5,8
  14:10
  15:22
  17:19 23:8
  25:20
  32:22,23
  86:11
filed 4:25
files 3:18
fill 9:25
  11:20
  34:24 35:1
  56:1,2,25

CORNERSTONE COURT REPORTING COMPANY, LLC
(913) 825-2510                               www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 35 of 51

57:3,6
72:1,5
89:22
**filled** 11:7
11:11 15:1
15:2,9
38:22
70:17,20
70:23,25
71:15
**filling**
11:24 59:1
**financially**
107:17
**find** 10:22
40:21 49:8
68:10 90:1
**fine** 31:4
50:8,9
57:19
61:11,13
83:8 89:5
89:15
**finished** 6:2
7:15
**firmer** 82:14
**first** 4:17
5:19 33:10
41:11
50:24
52:20 60:9
61:7 62:14
62:21
70:16
71:17
77:24
78:18
81:15 88:3
88:4,25
107:7
**five** 57:1,6
57:18
63:12
95:21,24
98:6
104:17
**flash** 78:14
**flatbed** 34:2
34:4

**flattened**
3:16
**Fleet-wide**
29:16
**flip** 33:10
**flow** 73:18
87:8
**flowing** 78:8
105:24
**fluctuate**
35:5
**flyers** 102:2
102:3,3
**focus** 79:6
81:3
**fog** 68:17
**folks** 6:23
32:3
**follow** 6:5
**followed**
94:7
**following**
67:25
73:21
86:25
92:20 94:6
94:9,11,18
95:8,11,17
**follows** 4:18
**foot** 32:18
65:20 82:7
82:19
**foot's** 82:20
**foregoing**
107:12
**foremost**
5:19
**form** 7:13
11:7 33:13
34:6,7,21
35:1 38:22
70:17
93:13 94:4
102:22
**forms** 58:19
58:23
**formula**
63:18
**Forty-five**

63:16
**forward**
64:15
81:11
**forward-**
28:22
**found** 58:12
**four** 14:17
63:11 72:3
80:2
**four-whe...**
21:23
69:19
**frame** 51:22
83:16
**free** 31:2
**freight** 47:7
**Freightl...**
24:6 27:22
28:4
**Friday** 5:12
16:2
**frist** 3:9
**front** 22:14
22:22
29:11 63:1
63:4,6,7
63:20
65:17,24
66:14,23
67:3,21
68:3 70:7
73:22 77:7
77:9,25
82:1 88:2
93:4,10,20
93:21,25
**frustrating**
93:18
**fuel** 89:22
**full** 8:15
**fully** 7:15
70:11 76:6
84:21
**furnaces**
10:8
**further**
82:1
104:24

**future** 38:15

---
**G**
---

**gear** 65:20
69:13,15
**general**
39:10 40:7
53:11 79:7
79:9 88:16
88:17
95:19
**generally**
18:16
30:15 40:7
87:7,9
**generic** 68:5
**getting** 47:6
71:10
74:20,23
86:7 90:9
**give** 5:4
36:14
37:18 80:4
80:17
86:15
**given** 5:6
13:10 75:6
87:17
107:13
**gives** 29:4
**glad** 58:22
**go** 5:17 6:2
6:22 7:16
8:10,14
12:3,10
14:1 18:9
20:2 25:21
32:20 33:1
33:10 34:7
43:22 44:1
45:3 46:3
48:3,13
67:17,17
70:14 73:8
73:13 75:3
87:7,7
89:19
92:25
99:11

100:25
101:21
**goes** 58:7
86:2 87:16
**going** 4:23
5:16,20
6:7,9 8:5
14:2 21:3
21:13,15
21:17
22:21
23:21,22
23:23
32:14 39:7
40:22 44:4
48:8 53:23
54:5,6
55:13
56:23
57:14,21
60:19 63:6
65:2,3,9
66:7,21
67:3 68:2
68:10,25
70:15 72:8
75:23 76:4
79:5 81:16
81:17
98:19
99:12
104:18
105:17
**good** 4:21
15:14
53:24
57:15
71:21,22
84:24
85:15
90:19
99:18
105:1
**goodness**
91:3
**gosh** 13:20
19:6 53:24
71:12
**gotcha** 29:8

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 36 of 51

31:6 34:5
34:17 48:4
**gotten** 42:9
59:25 60:1
86:4,10
**governed**
23:4,6
**governor**
23:11
**governored**
23:1,3
**governors**
23:19
**GPS** 26:23
27:2 36:18
36:25
**gradually**
41:25
**Grand** 1:19
2:9
**greater** 69:8
**Greeley**
30:13
**ground** 5:14
**guess** 9:9
29:23
42:19
48:16
51:25
53:25
59:24
63:25
71:17
102:3
**guessed** 54:2
**guessing**
51:15
74:19 98:5
99:3
**guidance**
13:10
**guideline**
95:20
**guidelines**
5:14
**guy** 31:19
51:11
**guy's** 65:3
**guys** 61:15

62:8 82:25
101:20

_____
**H**

**H** 8:24
**habit** 99:12
**half** 60:6
**hand** 107:18
**handle** 73:2
**handwriting**
70:18
73:10
74:15
**handwrit...**
74:6
**handwritten**
11:6,7
13:10
74:10
**happen** 39:11
68:2
**happened**
39:16
61:25
64:23 69:3
73:16 74:4
75:4,12,18
76:2 85:8
91:5 92:18
**happening**
65:22 69:4
96:9
**happens** 22:5
**happy** 65:10
**hard** 5:23
26:1 41:24
41:24
**harder** 69:9
82:12
**harsh** 86:24
**hastily** 56:1
56:2
**hauling** 20:5
97:14
**hazard** 94:23
**hazmat** 20:17
20:19
**head** 46:8
**headed** 44:7

44:11 52:5
54:24 55:2
97:5
**heading** 46:7
**heard** 6:19
7:2 21:8
80:9 92:2
**Heavens**
10:10
12:11
**heavy** 83:22
**help** 33:1
36:10,10
51:11
**helps** 80:7
**hereinbe...**
107:9
**Hey** 23:21
**high** 21:6
22:19 70:5
92:2,5
**hire** 88:10
**hired** 16:25
**history**
15:13
**hit** 44:24
53:23
62:25
76:12,19
**hitch** 46:25
**hold** 29:24
35:16
**holding**
83:16
**home** 44:11
44:21 46:8
48:3
103:24
**honorable**
88:16,17
**Honorably**
88:15
**hood** 79:21
80:3,4
81:13
83:10
**hook** 45:20
**hooked** 50:25
**hope** 17:21

31:22
55:15 73:6
99:16
101:10
**hopefully**
5:14 19:19
22:23
91:11
**HOS** 26:7
**hospital**
101:2
**hot** 6:7
**hour** 22:20
22:21 23:4
26:25
48:19
53:25 54:5
57:14
71:12,15
76:21 77:1
85:10
86:23
89:25 90:4
91:14 93:8
94:22
95:25
**hour-of-...**
25:17 26:2
26:18
**hours** 26:12
26:14,15
26:18,19
26:20
48:20
71:13,15
89:25
91:13
**human** 5:21
**hurt** 56:10
89:14

_____
**I**

**I-70** 40:1,4
43:22,24
73:19
91:22
**IBP** 16:20
**ice** 72:23
**idea** 29:6

60:3 63:2
100:15
104:9
**identified**
68:8
**identify** 4:9
**idle** 37:6
**imagine** 20:2
25:15
27:10 28:7
37:15
38:23 55:7
76:25 86:6
96:18
103:11
104:12
**immediate**
82:23
**immediately**
8:11 15:17
55:5 61:3
67:1
**impact** 54:1
54:3,4
61:4 62:4
70:12 71:1
76:21 77:2
**Impala** 68:11
**important**
6:11 7:24
7:24 20:12
72:4 81:4
102:17
**impossible**
94:17
**improper**
26:3
**inaudible**
20:10
**inches** 75:9
75:11
**incident**
11:22 39:3
39:23
53:21
54:19
60:22
62:18 72:9
85:8 86:13

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                                www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 37 of 51

| | | | | |
|---|---|---|---|---|
| 92:17 | 89:4 | **J** | **Kansas** 1:20 | 8:3,6  12:2 |
| **including** | **instantly** | **J** 1:8,16 | 1:25  2:4,9 | 20:25  21:2 |
| 26:15 | 64:4 | 4:16  108:3 | 4:7  8:19 | 21:3,4,6 |
| **incorrect** | **instructed** | 108:24 | 9:5  30:18 | 21:10 |
| 39:13 | 11:20 | 109:3,14 | 32:1,13 | 22:11  23:7 |
| **incorrectly** | **instructs** | **J.J** 18:6 | 35:4  44:1 | 29:3,19 |
| 34:9 | 7:19 | **Jackson** 41:5 | 44:1,2,2 | 32:9  37:21 |
| **indicate** | **intention** | 41:22 | 45:18,25 | 37:25 |
| 23:9 | 43:24 | 42:17,19 | 46:1  49:14 | 38:12,21 |
| **indicated** | **intentio...** | 42:21,25 | 72:21 | 39:1  41:5 |
| 54:15 | 55:23,25 | 43:1 | 87:10 | 51:23 |
| 58:17 | **interaction** | **James** 1:8,16 | 90:17 | 56:21  60:2 |
| 82:10 | 83:5 | 1:19  2:3,8 | 91:12 | 60:18 |
| 92:20  93:1 | **interactive** | 4:4,6,10 | 94:16 | 62:13,25 |
| **indicates** | 19:5 | 4:16,23 | **KCI** 32:18 | 64:22  65:4 |
| 3:19,20 | **interested** | 8:16  34:12 | **keep** 11:16 | 65:14 |
| 34:9,21 | 29:3 | 108:3,24 | 21:11 | 66:13 |
| **industry** | 107:17 | 109:3,14 | 27:11 | 67:14,16 |
| 31:20 | **interpre...** | **jelly** 68:5 | 79:14  81:6 | 67:22  68:5 |
| **information** | 34:8 | **Jim** 39:18 | **keeping** | 68:20 |
| 15:7,15 | **interrog...** | **job** 15:23 | 21:12  82:7 | 71:14,25 |
| 18:24 | 3:9  13:17 | 16:9,20 | 95:13 | 72:23  73:3 |
| 19:16,23 | 13:18 | 45:8 | **Keller** 18:6 | 74:12  77:6 |
| 27:4,11,15 | **introduce** | **Johnson** | **kept** 25:1 | 77:11  78:3 |
| 36:22 | 4:22 | 44:16,25 | 50:3  96:9 | 78:6,8 |
| 37:13,22 | **investigate** | 45:1 | **kicks** 43:7 | 79:15,15 |
| 55:24  72:5 | 55:10 | **Joseph** 8:16 | **killing** | 82:1  84:13 |
| 104:8 | **Investig...** | **jthompso...** | 69:23 | 86:9,10 |
| **informed** | 3:8  32:22 | 2:5 | **kind** 9:11 | 87:17,20 |
| 56:23 | **invite** 93:21 | **judge** 7:10 | 11:22  18:9 | 89:6  92:14 |
| **infringed** | **invoices** | **July** 1:18 | 19:15 | 92:22 |
| 65:15 | 36:13 | 4:3  22:25 | 21:19 | 94:13 |
| **initial** | **involved** | 25:1  29:13 | 24:23  26:1 | 100:23 |
| 14:11  43:9 | 10:3  12:20 | 30:22  31:7 | 40:17,21 | 102:4 |
| 72:8 | **Iowa** 15:19 | 31:9,17 | 52:9  63:18 | 104:5,10 |
| **initially** | 16:20 | 59:19,25 | 74:11,16 | **knowing** 40:2 |
| 41:21  62:3 | 30:14 | 70:3 | 79:7,9,11 | 66:12 |
| **injuries** | **Iron** 1:7  4:5 | 107:19 | 80:12 | **knowledge** |
| 62:20 | 5:1  9:9,14 | **jump** 21:24 | 84:24 | 25:12 |
| **inspect** 87:1 | 9:17,20 | 31:2  55:9 | **kit** 11:11,14 | 27:16 |
| **inspected** | 14:12 | 70:7 | 13:11  53:5 | 28:16 |
| 62:6 | 16:23 | **jumper** 93:21 | 56:25 | 38:21 |
| **inspection** | 108:2 | **jumpers** | 58:13,15 | 84:24 |
| 91:23 | 109:2 | 69:19 | 58:18 | **known** 70:4 |
| **inspections** | **issues** 8:2 | **jury** 6:23 | **knew** 66:2 | **knows** 37:5 |
| 97:2 | **it'd** 25:20 | | 67:1  69:3 | |
| **instance** | 26:20 | **K** | 70:2 | **L** |
| 12:19 | **items** 58:24 | **K&B** 15:18,23 | **know** 5:20 | **L** 1:22  107:3 |
| 54:22  80:6 | | 16:9,14,24 | 6:15,20 | 107:23 |

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 38 of 51

labeled 3:15
3:16
lading 36:7
lane 21:16
22:14
39:19,19
39:22
40:10 41:3
41:4,13,17
41:19 42:1
42:2,4,5,6
42:9,11,17
43:1,16,20
43:21 62:4
63:10,14
63:14 64:2
64:15 65:1
65:5,7,8
65:10
66:20
67:20
68:24 69:6
69:19
70:11
73:20 74:3
75:20 76:6
77:13 78:9
78:23
79:15 81:3
81:6,8,10
84:21 85:2
85:3,5
88:1 93:21
lanes 63:4
63:11
80:18
large 79:19
80:3
larger 80:16
law 20:3
27:10 86:3
lead 92:3,5
leak 28:12
leaking
83:11
learn 101:23
learned
22:18
learning

45:23
leave 7:19
16:1 45:17
46:5 47:25
49:2 51:1
93:19
leaving
48:22
52:21
led 62:1
Lee's 2:14
left 15:24
16:9 33:23
33:23
35:13,19
35:20
39:19
40:10 42:2
42:5 48:24
60:16 62:4
66:20
97:13,14
98:7
left-hand
41:3,4,13
41:19 42:9
42:11,17
43:16
63:14 81:2
81:3 85:2
85:3,5
legs 57:17
length 28:6
46:13
lengths
63:12
Lester 2:8
3:4 4:12
4:12 7:4
7:14 12:23
12:25 13:4
13:10
30:24 31:3
57:13,17
57:19
71:23 74:8
83:25
93:14
98:14,17

102:22
103:1
105:6
106:1,5,8
Lester's
13:6
let's 10:20
14:7,17
17:22 18:9
31:16
33:10
41:10
letter 96:5
96:5
license 15:7
life 16:4,10
16:12
69:20,21
lifted 85:1
85:6
lifting
43:14
light 6:8
50:18
51:20 52:8
52:18 71:8
83:12,18
lighter
51:20 52:7
limit 41:23
43:7 63:15
66:4,9
85:20,21
87:6
limited
72:11
line 22:6
listen 67:8
little 10:22
13:7 17:22
21:1 23:14
24:20 30:6
32:8 33:22
34:19
40:16,18
49:20,22
57:14
60:20 67:8
73:25 74:2

75:23
78:11
80:18,22
82:14,15
83:6 85:7
88:13
92:12 95:1
95:16
98:10
103:7
live 8:17,21
Living 72:21
LLC 2:3
load 10:1
34:7,16,20
85:18
96:19 97:6
97:18,22
loaded 45:17
loads 33:20
local 24:25
26:9 30:5
46:2,4
locally
30:15
location
30:12
36:20
49:24 70:7
log 18:20
27:11,15
logging
36:22
logout 26:4
logs 21:4
25:1,5,9
long 10:11
26:12 28:3
39:22
46:13,16
46:21
48:17
50:20
51:12,23
51:24
56:23
70:11 71:7
71:9 72:1
81:22

88:18,22
longer 30:6
look 7:10
10:25
12:14 33:4
34:6 38:16
70:14
103:21
looked 11:8
52:12
83:17
looking 16:9
33:2 38:14
52:15
64:15,25
81:11
101:12
looks 13:24
15:17
16:17
17:19
73:18 74:1
74:17
loop 40:14
43:19,22
73:20
lost 66:19
66:20
68:19
105:19,22
lot 17:7
21:19
39:11,11
49:14 69:9
81:20
86:10 93:9
96:8
101:21
low 77:4
low-speed
53:20

---
**M**
---
magnific...
80:20
main 89:8
maintain
22:13,20
22:22

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                          www.cornerstonekc.net
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 39 of 51

27:14
94:20
**maintained**
94:9,12
**maintaining**
63:10 93:2
93:4 96:3
**maintenance**
102:1
**major** 22:1
83:21
**making** 21:5
47:6 67:13
**man** 99:18
**manage** 21:16
21:16
**management**
22:4 65:16
69:24
102:10,13
102:21
103:3,9,10
**managing**
21:24
22:11
79:15
**mandatory**
100:2
**maneuver**
51:18 52:1
52:7 67:13
**manner** 22:8
26:6 44:12
92:17
**manufacture**
10:4
**master** 74:13
**matched**
75:25
**material**
13:11 20:4
20:7
**materials**
18:5
**math** 99:8
**mattered**
50:5
**matters**
14:25

**maximum**
65:18 99:5
**Meadows**
48:14
**mean** 9:11
10:23 26:5
26:9 45:14
47:6 64:4
67:17
72:16 77:9
78:10
83:23
89:11
90:20
93:24,24
**means** 21:7
92:6
**mechanic**
30:23
**mechanical**
103:14
**meetings**
101:19
**memorandum**
23:8
**merge** 42:14
64:14,21
64:22 65:6
66:6
**merged** 42:13
63:8,13
65:17 66:8
**merges** 67:12
**merging** 64:8
66:19
**Merit** 1:24
**mess** 71:8
**met** 39:4
**metadata**
3:18
**metal** 1:7
4:6 5:1
9:9,14,17
9:21,22
14:12
16:23
51:20 52:7
108:2
109:2

**methodology**
19:1
**Metro** 48:14
**Metropol...**
48:15
**Michael** 2:8
4:12
**mid-'80s**
88:23
**middle** 41:17
43:1
**middleman**
9:23
**Midwest**
72:21
**mild** 83:15
**mile** 39:24
40:14 85:7
89:25
**mileage** 90:3
**Mileages**
90:6
**miles** 17:7
17:10
21:22
22:20,21
23:4 24:17
24:23
26:25
53:25 54:5
76:21 77:1
85:10
86:23
91:14 93:8
94:22
95:25
**military**
88:11
**million**
17:10
**million-...**
21:22
**mind** 40:19
65:15
82:13
86:20
**Mine's** 74:8
**minor** 62:18
**minute** 14:1

**minutes**
48:19
50:23
51:10,14
52:19
53:13 57:1
57:6,12,18
71:5,13,15
71:18 72:3
91:14 97:3
97:17
104:17
**mirror** 79:20
81:3,4
**mirrors**
79:10,12
79:14,17
79:19,20
79:23,25
80:1,3,10
80:17,21
**misguided**
7:4
**missing**
73:10
**Missouri** 1:1
1:20,24
2:4,9,14
4:7 5:3
32:13
45:25
107:4,24
**misstated**
55:23
**mlester@...**
2:10
**module** 19:20
37:8,9
104:6,11
**modules** 18:5
18:21,23
19:8
101:15
**moment** 34:5
39:6 52:15
54:20 69:5
77:21
**Monday** 16:1
**money** 90:23

**monitoring**
104:2
**months** 27:12
101:25
**morning**
96:21
**MOS** 88:20
**motor** 17:4
17:17,23
18:13 19:3
19:25 25:4
42:11
43:14 56:8
65:8 68:17
69:21
78:21 79:8
93:18
97:21
100:3
101:3
102:13
**mounted**
51:22
**move** 22:5
43:20
62:17,21
63:25 64:7
64:18,19
69:6,11
81:18
82:19,19
**moved** 19:15
62:9,12
70:25 83:1
**movement**
64:1
**moves** 64:1
68:24
**moving** 21:11
23:10
43:16
54:10,12
65:5,13
77:15
**MPH** 85:14
**mumble** 90:9

─────────
**N**
─────────
**Nail** 32:18

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510**     **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 40 of 51

**name** 4:23
8:15,23
32:17 58:9
74:10
**nationwide**
102:1
**nature** 5:21
100:4
**near** 85:25
**Nebraska**
28:8 30:13
101:19
**need** 6:15
8:2,3,5,10
22:5 31:1
33:4 43:20
43:20
53:17 67:1
90:22 96:8
100:13
**needed** 20:18
**needs** 7:10
**negative**
99:24
101:13
105:13
**nerve-ra...**
54:20 56:4
56:5
**never** 20:18
21:8 29:6
37:4 46:19
52:8 56:22
71:8 72:10
75:3,12
84:14
87:25
96:14
**new** 21:5
24:8,10
101:21,23
102:6
**nice** 91:10
**NIM** 9:4,6,8
10:11
11:13
15:13,18
15:23
16:22 18:9

18:11 19:1
19:24
20:18
25:13
28:16
29:17 94:7
101:17
**ninth** 69:15
**nonexistent**
90:5
**Norfolk** 1:7
4:5 5:1
9:9,14,17
9:20 14:12
15:22
16:22
30:13
108:2
109:2
**normal** 5:23
31:17
45:24 94:9
**normally**
99:11
**north** 48:13
86:21
**Notary**
109:21
**Note** 3:14
**Notice** 1:18
**number** 19:6
20:17
29:25 35:4
59:15,19
90:13,15
90:16
**nylon** 50:19
51:23 52:8

_____

**O**

**o'clock**
99:13
**oath** 4:18
**object** 7:3
102:22
**objection**
7:7,15
83:25
**objection's**

7:8
**objectio...**
7:5
**objections**
103:1
**Objects**
80:24
**obligation**
7:6
**observe**
50:16
52:11
**observed**
50:14,24
53:13
**observing**
52:24
**obtain** 103:4
**obviously**
16:3 20:12
29:10
36:25
52:14
58:16
63:24
75:23
99:24
**occasion**
6:14
28:3,13,19
**occasion...**
30:9,10
**occur** 17:14
65:12
70:12
**occurred**
41:3 71:9
71:11
83:13 84:5
84:6
**occurrence**
11:19
**occurring**
94:1
**OCR** 3:15
**offhand**
13:14
19:12
37:23
**offices** 1:18

**official**
92:1
**Oh** 17:12
24:19 26:8
40:13 41:7
54:8 55:1
70:19 86:9
90:21
**okay** 5:17
6:5 7:16
7:17,21,22
8:6,12,25
9:13 10:6
10:24 11:3
11:13,23
12:13,22
13:2,16
16:14 17:2
17:16,19
18:4 20:8
20:21 21:9
22:9,16
23:5 24:1
24:17,22
25:3,12,16
25:23
26:21 27:4
27:8,25
28:3,13,19
29:13,22
30:8,11,17
30:20
31:24 32:3
32:5,8,25
33:7,15,19
34:3,9,25
35:8,11,16
36:2,5,18
37:12,16
37:19 38:1
38:6,10,13
38:25
39:13,18
40:5,9,12
41:5,10,12
41:16,18
42:8,16,25
43:11,23

44:5,18
45:5,7,9
46:10,13
46:17,24
47:18,23
48:1 49:1
49:17,20
50:1,4,6,9
50:16 51:3
51:12,17
52:5,14,17
52:23 53:1
53:12,16
53:18,22
54:21 56:5
56:24 57:4
57:8 58:15
59:7,15,21
59:24 60:5
60:12,19
61:3,6,9
61:11,14
61:18,25
62:8,16,19
63:3,9,13
63:17,22
64:17 66:6
67:5,17
68:7 69:16
71:4,14,19
71:25 73:7
74:18,22
74:25 75:5
75:11 76:9
76:15,18
78:7,16,21
78:23 79:2
79:6,17
80:16 81:2
81:14,19
82:9 83:19
84:8,16,23
86:4,7
87:13
88:11 89:5
90:10,16
90:19 91:8
91:16,18
93:7,17,23

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 41 of 51

94:3 97:11
97:20 98:3
99:1,5,9
99:14,24
100:1,12
100:16,25
102:5,19
103:13,21
103:25
104:5
105:25
**old** 90:9
91:23
**on-duty**
26:16
**once** 7:15
20:22
43:19 52:5
68:19
82:25
84:21
86:21
**one's** 27:17
**ones** 48:10
**online** 19:5
**operate** 28:1
29:18
85:16
103:15
**operated**
30:4
**operates**
29:9
**operating**
17:4 26:6
29:14 34:1
**operation**
19:3 27:2
**operator**
17:5,17,24
20:1 26:10
56:8 65:2
65:9 68:17
69:22
93:19
101:4
102:14
**operators**
18:13 79:8

**opportunity**
4:22 6:16
95:2
**opposed**
59:11
**option** 28:25
29:5
**ordering**
3:17
**orders** 9:25
10:1
**original**
3:16
**originally**
3:18
**originated**
19:13
**other's** 62:6
**over-the...**
17:9 24:23
**Overlapping**
20:9 75:17
**overnight**
30:7
**overreacts**
73:24
77:18
**overtaking**
78:25
81:15
**overtook**
75:23
**overview**
20:2 39:10
39:14,16

---
**P**
---
**p.m** 4:1,3
14:3,6
57:22,25
104:19,22
106:3,10
**pace** 33:2
**page** 3:13
12:10 14:8
14:8,18
31:14 34:7
34:13,14
34:15

38:16 58:2
58:2,4,7,9
70:15,15
70:16 73:7
92:25 93:1
93:14,16
109:1
**pages** 12:9
14:17
33:12
71:16 72:1
**paid** 90:4,11
**painless**
5:10
**panic** 73:5
**paper** 36:12
59:21 60:1
**paper-wise**
36:9
**paperwork**
83:2,3
**parameters**
37:6
**parking**
91:24,25
**part** 11:10
14:9 16:25
26:6 41:24
43:10
84:14
101:7
**particular**
30:21
36:20
44:14 45:2
**particul...**
13:12
**parties**
107:15
**pass** 88:24
88:24
**passed** 43:14
78:12
**patience**
104:25
**pause** 77:21
**paycheck...**
90:23
**PBX** 16:15,21

**PC** 1:19 2:8
**PDF** 3:15
106:9
**pending** 8:10
**people** 69:17
69:23
79:15
81:21
101:19
**PeopleNet**
25:2,14
26:22,24
27:5 36:19
36:23 37:8
37:24
103:25
**performa...**
90:2
**period** 37:1
43:7 71:4
**periodic...**
102:2
**perpendi...**
74:16
**person** 7:25
45:11,14
45:15
72:14
90:23
**personal**
59:13
**personally**
90:21
**pertains**
21:10
**PG/LN** 108:4
**ph** 3:19
**phone** 59:7,9
59:11,12
59:14,16
96:12,14
**phonetic**
3:19
**photographs**
12:15 13:9
**photos** 12:18
**physical**
93:24
**physically**

82:19
**pick** 45:18
46:2,7
**picture** 21:9
**pictures**
53:7,8,9
53:10,12
62:7 83:3
**piece** 52:7
83:23
**pieces** 51:20
**place** 52:1
94:7 101:2
107:9
**plaintiff**
1:5,17 2:2
4:11
**plane** 65:7
**plant** 10:9
**please** 4:9
4:14 7:14
8:15 33:1
**plenty** 67:24
**ply** 82:22
**point** 7:11
23:9 27:9
34:10 40:9
41:2 42:12
43:4,15
44:22
55:16
56:19
57:15
64:24 71:1
73:1 75:5
76:17
77:16 79:6
84:4
105:20
**points** 81:12
**police** 10:25
11:1 13:11
92:19
**policies**
21:5
**policy** 94:6
95:4,8,11
95:17
103:10

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 42 of 51

poor 6:14
popular 5:9
position
  14:13
  54:20 56:4
possibility
  75:13
possible
  6:10 34:22
  57:3 77:22
  87:8,12
  94:15
possibly
  11:10 25:7
  62:23
pounds 98:24
  99:4,7
power 16:24
practice
  21:14 22:7
  43:15
  79:11 94:1
  94:2
precheck
  97:8
Preliminary
  33:9
preparation
  10:17
  11:25
  12:14
  33:16
prepare
  13:12
prepared
  70:9
present 2:16
  17:3
preserve
  27:14
press 69:9
pressure
  32:15 73:2
  82:23
pretrip 97:1
  97:2,9
pretty 9:23
  15:5 20:12
  21:21
  24:11

26:12
32:12
39:10
54:20 56:4
61:1 64:21
70:9 73:2
73:12
75:14,25
90:5 92:13
97:4
prevent
  93:25
prevented
  94:8
Prevention
  93:13 94:4
previous
  45:19
previously
  3:16 93:2
pride 17:20
primarily
  9:14 12:21
primary 45:8
printouts
  36:24
prior 15:7
  15:13,17
  16:12,14
  25:11
  33:17
  39:23
  40:14 42:4
  48:21
  63:10,11
  78:23
  107:6
private 88:7
privilege
  4:24
probably
  21:4 25:20
  25:21
  31:22
  32:10
  39:23
  49:20
  50:22,23
  51:24

53:25,25
54:6,16
57:2,12
63:19
71:12 72:3
72:17 75:9
75:10
76:20,22
85:11
86:12
90:18
92:12 93:9
94:22
95:19,20
96:20,24
99:5,8
103:11
problem
  40:20
procedure
  79:8,9
procedures
  101:22
proceed 7:20
  43:21,24
proceeding
  44:12,21
process 5:10
  64:11
processing
  3:17 10:7
Processors
  16:21
produced
  12:6,9
  32:21
product 9:13
  9:16 49:8
  49:11
products
  10:4
program
  18:21
  101:7
programs
  19:5
prompt 37:18
proper 20:5
  20:6

properly
  97:7
  103:19
property
  89:12
proves 35:17
provide 19:2
  36:19
provided
  3:14,16,18
  14:10
  37:21
  55:24
provider
  59:19
proximity
  69:1 80:5
Public
  109:21
pull 14:7
  25:21
  34:18 45:2
  45:5,10,15
  45:16,24
  46:16,19
  46:20,21
  49:5 86:14
pulled 45:11
  62:4
pulling
  46:24
  99:15
pursuant
  1:18
put 28:20
  36:10
  89:18
puts 24:24
putting 7:9
  24:18,22
_____
     Q
qualific...
  3:7 12:3,5
  12:8 14:10
qualific...
  15:6
quality 16:4
  16:10,12

quarterly
  101:18
question
  5:22 6:1,3
  6:4,5,14
  6:16,18,19
  6:22 7:5,9
  7:12,16
  8:11 31:13
  49:4 53:24
  59:24 67:9
  71:21,22
  84:2 98:18
  105:17
question's
  5:20 8:10
  15:5 40:15
  95:1,16
  103:6
questions
  3:3,4 6:8
  6:12,13
  7:3 13:18
  31:4 33:5
  67:7
  104:24
  105:8
  106:1
quick 20:2
  64:19,21
  69:3 99:8
quickly
  64:23
  72:12
  100:13
quite 12:4
  25:11
  50:14 66:8
quote/un...
  85:14
Quoted 3:21
_____
     R
radiator
  28:11
  83:11
radius 41:25
  43:12
random 101:4

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 43 of 51

rapid-fire
  6:8
react 68:1
  87:17
read 14:21
  39:6 73:8
  73:14
  74:14
  92:22
  93:14,16
  93:17 94:5
  95:2,3
  106:4,5
  109:5,8
reading
  15:21
readout 37:4
ready 21:18
real 91:7
realize
  81:17
  82:11
  89:16
  103:4
realized
  67:10
  81:15
really 12:3
  12:11 17:8
  21:4 29:19
  39:1 53:18
  61:17 67:2
  67:4 72:10
  81:3
realm 19:2
  20:12
rear 85:4
rear-end
  78:18
rear-facing
  28:23 29:1
reason 15:22
  16:8 18:17
  45:3,13
  47:11 56:2
  83:15 89:9
  95:10
  100:22
  108:4

reasonable
  22:15,16
reattach
  50:18
  52:18
recall 11:23
  11:25
  12:13
  14:13 18:8
  18:15
  23:25
  25:19 28:6
  28:19
  33:19
  35:24 36:2
  39:5,19,25
  50:1,6,20
  51:6 52:17
  53:10 57:7
  59:1 60:15
  61:2 68:3
  71:24
  77:24 78:1
  78:5 86:7
  86:20 89:3
  89:4 93:5
  96:17,18
  97:17
  101:15,16
  102:9,11
  103:12
receive
  18:11
  37:12
  102:2
received
  17:23
  19:24 57:5
  103:8
receiving
  101:16
recess
  104:20
recollect
  35:15
  52:22
recollec...
  76:24
recollec...

6:25 25:10
  35:18,22
  42:24 59:2
  105:9,14
record 4:2
  7:10,15
  8:15 14:1
  14:2,4,6
  35:17 36:5
  57:21,23
  57:25 73:9
  104:18,22
  107:13
recording
  29:10,10
records
  96:12,14
  100:20
Recurrence
  93:12,13
  94:4
red 68:12
redid 91:25
reduce 23:22
  23:23
reduced
  41:23
  43:12
  107:10
reducing
  41:25
reduction
  43:4
refer 86:14
referred
  80:10
refresh
  86:15
Registered
  1:24
regular
  30:21
  32:19,19
regularly
  32:14
regulations
  97:21
  100:4
relates

102:9
relative
  107:14,16
relatively
  32:19
  72:14
remain 37:1
remained
  85:2
remaining
  35:8
remember
  12:19,24
  19:12,18
  23:7 31:8
  31:12
  32:16
  35:23 39:2
  40:2 58:21
  60:22
  61:15
  62:11,15
  69:13
  78:20 84:9
  86:21
remove 52:6
removed
  48:21
repaired
  27:23,25
  28:8
repeat 92:4
rephrase
  6:16
replacement
  49:16,17
report 10:25
  11:1 13:11
  33:9 54:17
  55:21 56:1
  56:3,25
  57:10 72:9
  92:19
reported
  107:8
reporter
  1:24 3:11
  5:24 92:7
  106:4,6

107:1,4,25
Reporter's
  3:14
represen...
  4:24
request
  109:6,9
requested
  27:14
required
  27:11 57:3
  100:6
requirement
  26:18
  56:24
requirem...
  101:21
requiring
  25:5 72:5
resolution
  3:17
respect 29:8
  89:24
response
  61:10
responsi...
  21:2
responsible
  97:22
rest 74:16
restart
  98:14
restriction
  42:2,11
  43:15 85:1
  85:6
result
  105:13
retention
  18:23
rethinking
  76:25
review 12:11
  13:16
  101:20,25
reviewed
  10:16 11:1
  13:12
  32:23

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 44 of 51

33:15
96:12,14
**reviewing**
11:25
12:13
**rework** 31:5
**rid** 16:23
20:16
**Ridge** 40:3
41:1 44:20
44:20
**right** 7:5
8:14 10:23
11:14
17:14
21:25 22:7
22:14 23:6
24:11,24
26:7,8
27:9 29:15
31:6,10
33:6 36:20
38:4 42:12
42:14,18
42:21,23
44:9,12,25
46:11
47:10 49:4
54:18,18
54:19,23
55:6,11,14
55:16,17
56:8,11,14
56:17,20
57:9,11
58:10 60:6
62:5 64:2
64:8,20
65:3,6,10
65:16,25
66:2,15,24
67:14,18
67:23
68:12,22
69:2,8,19
69:24 70:3
72:6,9
75:8 76:1
76:12 77:7

77:11,13
77:16,21
78:9,12
79:5,22,23
80:6,6,9
80:14,18
80:22,25
81:7,11
82:2,4,13
82:20,23
83:23 85:4
85:14,22
86:17,18
87:19,22
88:6,8,9
88:15
89:13
90:24 93:8
96:10
97:23
99:20,22
101:5
102:14,21
103:10
**right-hand**
62:17
64:23
66:18 71:1
81:4 83:4
**rinks** 72:24
**road** 17:14
29:10 47:8
49:3 71:2
72:18
79:13 81:9
84:10,25
**roadway**
12:19
**rollback**
84:18
**rolling** 77:1
99:6
**room** 7:25
74:2
**round** 80:21
**route** 30:21
31:17,18
31:19 32:5
32:9 35:4

36:10 40:3
87:17
90:17
102:7
**routes** 10:2
24:19 32:3
102:8
**rule** 8:9
**rules** 5:14
20:3

---

**S**

**safe** 17:17
22:6,8,15
22:16 42:6
43:17
67:24 71:3
73:21
77:20 82:8
87:5 92:17
95:14
100:18
105:1
**safest** 87:11
**safety** 18:14
19:25
23:11,23
25:4 92:15
97:21
100:3
101:18
102:1,7
**salaried**
90:1
**Sales** 36:8
**Salina** 86:21
**Sally** 98:21
**Samsara** 38:5
**sat** 19:14
**saw** 11:2
23:8 33:17
52:9,20
64:17
69:10
81:14
84:17
89:17
**saying** 44:19
89:3,5

103:18
105:12
**says** 19:21
34:9 35:3
35:8 39:18
57:5 67:16
74:4,18,19
94:3,6
**scene** 11:12
28:10
48:17 51:8
53:11
60:16
70:21
105:18
**school** 22:19
70:5
**scope** 12:7
**score** 7:21
**scores** 102:1
**scratch**
40:23
**screen** 33:3
37:19,20
**screens**
19:15
**scribble**
74:17
**seal** 107:18
**searchable**
3:15
**seashells**
98:21
**seashore**
98:21
**second** 38:16
42:23
52:12 58:9
82:15
87:15
94:21
**seconds**
70:13
78:13,16
94:8,11,18
94:24
95:20,21
95:24
103:5,10

**seconds'**
74:5
**secure** 51:4
**secured** 97:7
**securement**
97:22,25
**see** 12:16
14:8,17,22
15:4 19:4
32:12
34:11
35:10
38:19
45:22 48:8
49:6 51:17
52:2,6
58:9 64:11
65:13
67:11
78:24 79:1
84:14 90:2
93:12 94:3
94:4,12,13
**seeing** 51:6
64:25
77:25 78:5
**seeking**
16:11
**seen** 10:18
17:13
21:23 27:5
36:6,23
37:4 58:20
77:14,16
87:22,23
87:25
**sells** 98:21
**seniority**
31:21
**sense** 21:12
48:9,10
80:12
92:13
94:14
95:13
103:5
**sent** 30:9
**separate**
9:12 37:24

**CORNERSTONE COURT REPORTING COMPANY, LLC**
**(913) 825-2510** **www.cornerstonekc.net**
Case 4:21-cv-00061-SRB Document 102-1 Filed 05/23/22 Page 45 of 51

97:8
September
  17:3 27:13
seriously
  85:16 98:1
serve 88:18
service 9:22
  59:18
  88:11
set 23:19
  41:20
seven 19:7, 8
sharper
  43:10
SHEET 3:12
  108:1
shift 85:18
shoes 82:16
shorter
  64:22
shortest
  31:19
shortly 59:4
shoulder
  62:5
show 13:23
  32:25
  100:20
showed 49:13
  50:24
sic 3:20
side 12:17
  32:13
  45:18
  48:13 49:3
  49:14
  62:17 71:1
  79:21 80:3
  80:6, 17
  83:4 91:23
sides 80:7
  91:22
sign 36:8, 13
  38:7 42:14
  42:15
  43:14 86:1
  86:2 106:4
  106:5
signature

3:13 14:17
14:21
58:10
74:11
109:1
signed 14:22
signific...
  53:19
simple 15:5
single 96:19
singled
  101:9
Sioux 15:19
sir 9:1
  12:10
  17:15
  49:19, 22
  67:7 88:12
sit 35:18
  44:5 52:11
  60:24
  86:19
site 40:10
sitting 10:8
  56:13
situ- 23:18
situation
  21:18
  23:20
  66:22
  67:22 68:1
  73:3 75:6
  78:13
  82:17, 18
  92:24
situations
  87:16
six 27:12
  35:3 79:23
  80:1 90:18
  90:19, 25
  91:8 94:8
  94:17, 20
  94:24
  95:20, 21
  95:24
  103:4, 10
size 3:17
  69:2

skill 102:17
skilled 5:24
slam 88:2
slammed 63:5
  76:1
slams 73:24
  76:7
slightly
  64:20
  98:25
slow 82:1
slowed 68:21
  85:24
slower 75:3
  93:9
slowing
  65:21, 24
  66:4, 15, 16
  67:2, 4
  69:7, 7
  73:23
  77:12
  82:11 93:8
slowly 77:15
small 83:15
Smith 17:24
  18:1, 2
smoke 68:18
somebody
  77:18
somewhat
  15:24
soon 5:11
  22:3 57:3
  66:18
  69:10 85:5
sorry 11:24
  24:9 30:24
  30:25
  34:12
  39:15
  40:13 47:2
  47:5 90:9
  92:4
sort 18:24
sound 23:14
  23:17 91:8
sounds 23:13
  47:9 72:16

source 15:14
south 43:22
  44:13, 16
southbound
  44:23
southeast
  2:14 44:24
  73:19
southern
  45:1
space 21:24
  22:4, 6, 10
  63:22 64:8
  65:15
  69:23
  72:11
  102:10, 13
  102:20
  103:2, 9, 9
speaker 3:21
speakers
  20:9 75:17
specific
  10:1 29:24
  36:1 86:13
  101:16
specific...
  51:17 89:2
  89:4
speculate
  84:7
speculation
  84:1
speed 41:23
  43:3, 4, 7
  54:7, 8
  56:16
  63:15 66:4
  66:9 75:25
  75:25 76:4
  76:23 77:4
  85:17, 20
  85:21
  86:14 87:6
speeding
  75:2 86:4
  86:8, 11
speedometer
  87:15

spelling
  3:19
spent 88:13
split 73:19
spot 63:25
  79:19, 20
  79:20 80:8
  80:10
sprung 28:11
stadium 40:5
  41:2 42:23
staging
  45:17, 25
  46:5 47:24
  91:15, 18
  92:1
stamped
  36:16, 17
stand 26:23
  75:18
standpoint
  16:4 19:25
  90:20
Star 63:25
start 5:22
  6:2 30:17
  37:5 40:22
  64:25 67:2
  96:16
  98:17, 19
started 66:6
  66:18
  69:14
  75:22
  96:20
starting
  69:6, 10
starts 37:2
  41:25 65:6
  65:7 82:4
  82:10
state 7:6, 14
  11:4 107:4
  109:22
stated 3:20
  3:21 107:9
states 1:1
  4:6 5:2
  27:10

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510              www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 46 of 51

73:15
static 37:1
station
  91:23
stations
  89:19
stayed
  103:24
steel 9:23
  10:4 32:13
  33:22
  35:12,19
  51:21
  83:16,23
  90:13 98:1
  98:10 99:2
steering
  21:7
Stock 1:22
  107:3,23
Stoneman 1:4
  4:5,11,25
  49:24 50:7
  50:12
  53:13
  81:14 85:3
  87:21 89:3
  93:3 108:2
  109:2
Stoneman's
  48:21
stop 35:20
  35:24
  54:13
  55:11 67:6
  67:23
  73:25
  76:12
  77:21
stopped
  54:15
  55:20
  62:24
  74:21,23
  75:1,8
  76:20 77:6
  77:10,16
  96:10,11
  105:23

stops 33:23
  35:3,4,8
  36:25
strap 50:19
  51:23,25
  52:8
Street 2:14
  91:21,21
stressful
  72:20
Stretch
  57:17
strike 26:23
  71:5
strongly
  61:1
struck 85:3
structural
  83:21
structure
  16:13
styled 4:5
subject
  101:4
submitted
  12:17
  13:19
Subscribed
  109:16
successf...
  19:19,21
suggested
  41:23 43:4
  85:13,14
suggesting
  83:21
Suite 1:19
  2:4,9,14
Summit 2:14
supervisor
  20:23
  38:24
supervis...
  21:1
Supply 32:13
Supreme
  107:24
sure 6:1,3
  13:20 18:3

18:7 21:5
25:6 31:13
33:3 35:6
37:4,6,25
39:4 40:16
42:5 43:18
50:3 55:1
55:3 56:7
57:16 81:8
83:7 84:11
84:13 86:9
86:11 92:6
93:15 96:1
97:6
surveill...
  29:14
  31:10
surveying
  21:13,15
swear 4:14
sworn 4:17
  5:4 107:7
  109:16
system 18:2
  19:14 25:2
  26:22,25
  37:21 38:1
  38:4
  103:25
systems 19:1
  104:2

_____
     T
_____
T 2:3
T-A-R-E
  98:13
TABLE 3:1
tablet 38:5
  38:6
taillight
  51:5 89:16
taillights
  50:19
  51:22
tailor 98:12
take 5:24
  6:9 8:2,3
  8:5,11
  16:24

17:20
23:11 33:1
39:6 40:20
45:20
47:15,19
49:11 53:7
53:9,12
56:23
57:16,18
60:3 85:16
93:15
95:24 96:1
97:25
104:16,17
105:4
taken 1:17
  7:25 44:16
  48:12
  89:12
  104:20
takes 18:22
  77:22
  82:15 97:3
talk 17:22
  31:16
  41:10 83:6
talked 39:5
  50:2 69:18
  71:20
  92:11
  102:12
  103:11
  105:18
talking
  22:12 39:2
  71:6 78:10
  84:12
tank 89:23
tapped 83:17
tare 98:11
  98:13,22
teenager
  88:14
TELE-BUS...
  2:13
tell 7:8,23
  32:8,16
  36:24 44:6
  55:11,14

60:19,21
61:12,25
68:10
74:18
telling 50:7
tendency
  5:19
Teresa 8:24
term 21:8
terms 19:24
  21:15 22:9
  22:9 29:9
  32:20 37:8
  51:12
  68:17 71:4
  72:11
terrible
  32:15 74:6
test 18:22
  99:21
  100:2
  105:9,13
tested 19:17
  100:8,9,10
  100:10,14
  100:16
testified
  4:17
testimony
  5:4 10:17
  11:25
  12:14
  33:16 93:5
  96:7 107:8
  107:13
  109:5,8
testing
  101:1,5
text 3:20,21
Thank 8:7
  30:1 33:7
  40:24 91:3
  105:2
Thanks 30:25
thereabouts
  85:20
thick 12:4
thing 18:24
  61:7 77:20

CORNERSTONE COURT REPORTING COMPANY, LLC
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 47 of 51

84:12
85:15
**things** 10:18
10:21 12:7
13:6 17:13
19:6,7
20:24
29:16
32:21 36:8
40:22
54:22 57:9
82:5 87:18
101:21
**think** 12:6
13:14,21
15:16
19:23
22:11
27:12 31:5
32:24
33:17,23
34:15
38:14
44:18
45:23 48:7
51:13
53:18,22
54:3,12,16
55:12 56:9
58:23,24
66:8 72:7
72:10,15
73:23 74:7
78:15
80:11 82:9
83:1 84:9
95:23 99:1
103:3,22
104:17
**thinking**
75:9 76:22
76:24
**Thompson** 2:3
2:3 3:3
4:10,10,20
4:23 13:2
13:5,8,23
13:25 14:7
14:9,19,20

20:11
30:25 31:6
31:7 34:14
34:18,20
57:16,18
57:20 58:1
58:3 71:14
71:25 74:9
84:2,3
92:8,9
93:15
98:15,19
102:23
103:6
104:16,23
105:4
**thought** 44:3
44:15 83:2
**three** 55:16
72:3 75:1
101:25
105:7
**ticket** 86:5
86:8,22
**tickets** 36:8
86:11
**tie** 20:6,11
20:11
**tie-down**
101:22
**tied** 97:6
**tight** 93:23
93:24
**till** 40:13
41:2 42:13
49:15 65:4
**time** 4:3
5:11,25
6:9 7:11
7:23 8:1,2
10:15 11:8
14:3,14
20:22
21:23,24
23:5 24:2
24:8,10,14
25:3 27:9
28:6,18
33:1,3,21

34:10
36:15,17
37:1,6,10
38:9,24
40:20,25
42:1,16,22
45:10
46:10,15
48:5,8
49:21,22
50:14,23
52:12,20
52:24 53:5
54:4,10,18
55:8,19
56:17 57:7
57:8,22,25
62:14,24
62:25
64:14
65:18
67:24 68:1
71:4,9,11
73:17 74:5
76:11,13
77:2,24
78:11,12
84:19
85:10
88:13,25
90:3,5
92:3,5
93:16
95:18,22
96:1,16,20
96:25
97:10 98:4
99:6,11,14
104:19,22
105:20
106:3
107:9
**times** 44:3
91:4
**titled** 33:8
**today** 4:23
5:11 6:9
6:25 7:25
10:17 12:1

26:16
31:18
33:14,16
35:18 38:4
44:5 60:20
60:24
74:22
86:20 96:8
99:19
102:13
104:24
**told** 27:17
54:25 55:6
89:2 92:15
100:25
**tomorrow**
99:16
**tongue** 98:16
98:20
**tons** 98:6,7
98:24
**total** 26:15
79:22
**totally**
96:18
103:2
**tow** 49:13,14
49:15
50:15,24
50:25
52:21
56:14,16
60:17
71:10
**towed** 28:10
49:1,12,13
49:17
71:10
**town** 15:24
30:10
**track** 26:22
26:25 81:7
**tracking**
27:2 104:2
**tractor** 49:1
49:5,16,17
**traffic**
21:17
39:19

65:24 66:9
66:12,13
66:16,23
66:25
67:10,21
68:20
69:17,23
72:19
73:18,23
77:6,9,12
77:14,20
77:25 78:1
78:5,8
79:3 82:2
86:25 87:8
94:16
105:19,22
**traffic's**
67:22
**trail** 36:12
**trailer**
33:24,25
45:12,12
45:15,17
46:11,14
49:1,5,11
96:19
97:15 98:6
98:7,11,13
98:23
**trailers**
10:1 34:4
45:2,16
46:1,16,25
47:1 97:18
**train** 18:5
47:7
**trained** 20:5
68:16
**training**
17:22,25
18:1,4,11
18:15,21
19:2,24
21:20
22:19 57:5
101:15,16
102:9
**transcript**

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 48 of 51

107:12
transiti...
  44:23
transport
  9:13,16
transpor...
  9:4,7,8,8
  9:10 10:12
  11:13
  15:13,18
  15:23
  16:21,22
  18:10,12
  19:11
  25:13
  28:16 29:4
  29:17 94:7
  101:15,20
transported
  28:8
travel 55:8
  87:5
traveling
  39:20
  75:21
  76:19 85:9
  92:21 93:7
travels
  105:1
Trek 63:25
tried 94:20
trip 34:8,16
  34:20
  45:20
trooper
  86:24
truck 17:9
  22:24 23:1
  24:2,7,12
  24:14,18
  24:23
  35:12
  36:25 37:2
  37:5,5
  46:14
  48:21,24
  49:13,15
  50:15,17
  50:21,24

51:1 52:3
52:6,21
53:14
56:14,16
60:17
61:16,18
69:25 71:7
71:10
77:23
78:15
79:17,18
84:14 87:8
87:15
89:17,18
91:24,25
98:4,5,11
98:12,12
98:13,22
103:14
104:6,11
104:13
trucking
  18:18
trucks 42:2
  78:11
true 15:1
  24:23 64:3
  69:25 81:1
  81:12
  107:12
truthfully
  6:24 15:9
try 5:10 6:1
  6:3,9
  10:20,20
  10:22
  21:16
  22:19,23
  67:8 69:5
  87:7,11
  101:23
  103:17
trying 13:6
  15:12
  18:25
  22:13
  29:25
  40:21 49:8
  50:18 51:4

51:18 52:1
52:6,7,18
64:10,11
68:10 71:7
89:18 90:1
tuck 98:12
turn 28:25
  37:5 74:12
  74:13
turned 38:11
  93:10
turnpike
  45:16,21
  91:17
Twelve 84:22
twister
  98:16,20
two 7:20
  24:15 28:7
  33:12,23
  35:6 40:22
  45:16
  46:24 47:1
  48:19 50:1
  70:13
  71:13,15
  75:1 79:19
  80:2,3,4
  88:19
  91:12
  105:7
two-page
  58:6
tying 20:7
type 9:6,20
  20:4 24:4
  33:25
  94:16 96:3
  100:6
  102:24
  104:13
types 20:24
typewriting
  107:10
———————
U
U.S 88:13
underneath
  50:17 51:1

52:5,18,20
53:14 71:7
89:17
understand
  5:3 6:12
  6:12,15,17
  6:18 8:13
  22:3 26:21
  26:24
  44:18
  45:22
  64:13,24
  65:9,11
  67:7 68:25
  76:10
  95:10 96:7
  97:20 98:9
  102:12,14
  102:16,19
  102:25
  105:8
understa...
  15:21
  18:25 24:1
  25:4 26:13
  30:3 56:10
  83:20 84:4
  100:1,12
understood
  65:23 72:4
  88:5
unexpected
  21:20
unfortunate
  11:19
  22:25
United 1:1
  4:6 5:2
units 29:17
  30:4
updated 21:5
urgency 69:7
  82:11
use 10:21
  20:6 38:7
  92:12
  94:14
  103:5
usually 22:1

99:12
———————
V
v 108:2
  109:2
varies 24:19
various 15:6
  19:15
vary 24:19
vehicle
  12:21 17:4
  17:17,23
  18:13 19:3
  20:1 22:14
  24:5 27:24
  28:1,4,9
  28:14
  29:14
  31:10
  33:20
  35:19
  42:11
  43:15 51:2
  54:3 56:8
  62:10,21
  63:12 64:1
  64:25 65:7
  65:9 67:25
  68:3,17,21
  69:22 70:1
  70:25
  73:21
  76:19
  78:21,22
  79:8 80:17
  81:23 83:8
  83:9 87:2
  87:23,25
  88:6,7,8
  89:15
  91:23
  93:19,25
  94:21
  95:14,21
  97:12
  101:4
  102:14
  104:2
vehicles

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                    www.cornerstonekc.net
Case 4:21-cv-00061-SRB    Document 102-1    Filed 05/23/22    Page 49 of 51

28:17
53:11 62:6
62:17 63:1
63:20,24
68:19 70:7
80:5 82:8
82:25
Verizon
59:20
versed 67:15
versus 4:5
vicinity
41:1
video 31:9
VIDEO-RE...
1:16
videogra...
2:12 4:2
4:14 5:16
14:2,5
34:12,17
57:21,24
104:18,21
106:2
videos 18:18
view 66:11
66:17,25
67:21
68:19 77:5
77:11 80:4
80:18
violation
23:11
25:17 26:2
26:7
102:21,24
violations
23:23
25:15
vision 63:6
66:21 67:2
73:23
105:19,22
visit 5:12
8:1
volume 79:3
94:17
vs 1:6

**W**
W 1:4 108:2
109:2
waited 49:15
waiting
50:15
56:13
walk 15:12
18:21
25:24
86:18
walking
97:12
wall 37:11
want 29:6
31:3,13
33:3 34:18
40:16
73:10
85:18
86:14
94:14
98:14,17
101:23
103:5
106:6
wanted 16:5
16:7 84:11
87:1
Warner 29:4
29:7
wasn't 76:21
78:3 83:14
83:22 88:7
92:23
watch 18:19
42:4 102:8
watching
21:4 87:14
way 6:17
20:5 39:13
41:20 44:6
46:3 66:19
78:2,6
we'll 5:10
8:11 9:24
102:2
we're 6:8
15:12 21:5

22:11
23:21,22
23:23
31:13
40:16
45:19
55:10,16
57:13
72:23
78:10
82:18 90:2
we've 23:22
23:22
57:14 76:9
102:12
weather
72:18 83:7
weekend
105:1
weekends
99:17
weeks 28:7
weigh 89:19
weighed 98:4
weighs 98:6
weight 90:12
98:11,13
98:22
went 41:14
105:16
weren't 26:5
52:15 95:8
95:11,17
96:3 100:8
103:19
west 42:20
42:21 44:4
44:25,25
45:17,25
48:14
westbound
40:4 43:22
43:24 45:3
73:19
Western 1:1
1:2 4:7
5:2
what'd 61:12
wife 8:22

59:23
60:18 91:1
windshields
83:11
wish 103:22
103:24
105:1
withdraw
84:2
witness 4:15
13:3 50:11
92:23
105:2
107:6,13
107:18
wondering
51:10
words 73:15
101:9
work 20:12
20:13
26:11,14
29:7 57:20
79:9,12
99:17
103:18
worked 10:11
16:14,17
working
15:17,18
30:20
83:12
worried 79:4
79:4
worry 90:21
worse 74:8
wouldn't
26:2 42:8
47:19,21
55:22,25
68:13
75:18 84:9
84:13
100:23,23
wound 51:25
wrestling
51:19
writing
57:10

74:15,16
written
13:18 18:5
55:21 57:4
73:14,17
76:13
wrong 35:17
wrote 54:16
56:1 72:12

**X**

**Y**
yard 89:23
96:23,25
97:13,14
yeah 12:5
19:18 26:3
26:11
51:19
68:13 76:5
78:13,13
82:6 91:10
93:15
105:15
year 24:16
24:17
28:21
years 10:13
17:7 20:17
24:15
25:11 32:6
37:14
55:17
67:13
72:16
86:10
88:19
yesterday
99:19

**Z**
Zero 35:9
zone 41:21
86:22

**0**

**1**

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510          www.cornerstonekc.net
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 50 of 51

**1** 14:18  34:7
  34:14
**10** 22:20,20
  32:6  51:24
  62:23
  71:17  75:7
  77:1  91:4
  94:11
**10-hour**
  91:10
**10,000** 99:4
**100-foot**
  46:25
**105** 3:4
**107** 3:11
**108** 3:12
**109** 3:13
**11** 26:12,20
**114** 91:14
**12** 26:12
  51:24
  62:24  63:7
  65:17
**120** 14:8
  46:23
**123** 14:19
**133** 3:9
**14** 3:7,7
  14:8  26:15
  26:18  98:6
  98:24
**1400** 2:4
**15** 53:25
  63:7  65:18
  71:17  77:2
  84:22  97:3
**16** 1:18  3:8
  32:21
  38:17  58:2
  58:4,7
  70:3,14,16
  71:16  72:2
  73:8  92:25
  93:1,1,1
**16th** 4:3
  22:25
  29:13
**18** 59:25
  60:1

**19** 3:9  13:22
—————
**2**
—————
**2** 73:21
  86:23
**2-inch** 51:24
**2:15** 99:15
**2:30** 4:1,3
  99:15
**2:40** 14:3
**2:45** 14:6
**20** 10:13
  51:10
  53:25
  97:16
  109:17
**2001** 14:12
**2006** 30:21
**2016** 30:22
  31:4,12
**2017** 24:6
**2018** 23:1
  24:17  25:1
  26:14,17
  27:13
  29:13
  30:24,25
  31:8,9,17
  59:19  70:3
**2021** 1:18
  4:3  107:19
**2100** 1:20
  2:9
**2318** 8:19
**2345** 1:19
  2:9
**23rd** 107:18
**28,000** 98:24
—————
**3**
—————
**3** 73:20
**3:34** 57:22
**3:39** 57:25
**30** 94:22
**31** 100 2:4
**32** 3:8  29:21
  30:4
**343-0411**
  59:17

**35** 44:13,24
  95:25  99:6
**38,000** 99:7
—————
**4**
—————
**4** 3:3  58:2,4
  70:15,15
  71:16  72:1
**4:21-cv-...**
  1:6
**4:21-CV0...**
  4:8
**4:33** 104:19
**4:38** 104:22
**4:39** 106:3
  106:10
**40** 91:14
**415** 2:14
**435** 40:4,25
  44:16,19
  44:21,23
**45** 41:23
  43:4  48:19
  50:23
  51:13
  52:19
  53:13
  63:20
  65:15  66:4
  66:7  67:17
  67:17  71:4
  71:12,15
  81:24,25
  85:11,14
  85:22,24
  85:25  86:2
  91:14  93:4
  93:8,9
  95:23
  97:16
**472-0800**
  2:10
—————
**5**
—————
**5** 54:5  58:7
  71:16  72:1
  73:7  75:7
  76:21  99:4
**5-mile-a...**

**54** :1,6
  76:22  77:3
**5:00** 96:20
**50** 46:16
  63:20
  65:15  93:4
  95:23
**50-foot** 47:1
**55** 41:22
  42:1  43:8
  85:10,12
  85:19
**55-mile-...**
  41:21
**561-3400** 2:5
**58th** 91:21
—————
**6**
—————
**6** 70:16  75:9
  75:11
**60** 22:21,22
**600** 3:15
**620** 59:17
**635** 44:3
  48:15
**6406** 3 2:14
**6410** 8 1:20
  2:9
**6411** 1 2:4
**65** 23:6,10
  23:24
**6680** 1 8:20
**670** 73:19
—————
**7**
—————
**7/16/18**
  58:10
**7:00** 99:13
  100:21
**70** 23:4,10
  23:19
  24:21
  48:12
**70-mile-...**
  86:22
**700-and-...**
  12:9
**71** 86:23
**715** 105:12

**78th** 91:21
—————
**8**
—————
**80,000** 24:21
**816** 2:5,10
**89** 16:18
  17:3
—————
**9**
—————
**911** 60:11,12
  60:25
  62:10,13
**96** 88:21
**98** 16:18

**CORNERSTONE COURT REPORTING COMPANY, LLC**
(913) 825-2510                                              www.cornerstonekc.net
Case 4:21-cv-00061-SRB     Document 102-1     Filed 05/23/22     Page 51 of 51