IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MISSOURI

AT KANSAS CITY

CHRISTOPHER STONEMAN,          )
                               )
                Plaintiff,     )
                               )
  v.                           ) Case No.
                               ) 4:21-CV-00061-SRB
                               )
NIM TRANSPORTATION, LLC,       )
and JAMES J. AJELLO,           )
                               )
                Defendants.    )
_____)


REMOTE VIDEO DEPOSITION OF STEVEN R. GRABOFF, M.D.

Taken on Behalf of Defendants

Wednesday, October 27, 2021

**Plaintiff's**

**Exh E**

exhibitsticker.com

**Page 2**

INDEX OF EXAMINATION
STEVEN R. GRABOFF, M.D.                    PAGE
Examination by Mr. Lester. . . . . . . . . .    6
Examination by Mr. Thompson. . . . . . . . . .  126

oOo

INDEX OF EXHIBITS

EXHIBITS                                  PAGE

No. 1 -  Notice of Deposition Duces Tecum,
         10/15/21 . . . . . . . . . . . . . .   35
No. 2 -  Dr. Graboff's CV, fee schedule, and
         testimonial history. . . . . . . . .   37
No. 3 -  Dr. Graboff's billing statement,
         10/19/21 . . . . . . . . . . . . . .   40
No. 4 -  Medical records, chart notes,
         handwritten notes, 6/10, 6/11/21 . . . 43
No. 5 -  Dr. Graboff's Medical Legal Report,
         6/14/21. . . . . . . . . . . . . . .   48
No. 6 -  Dr. Graboff's complete medical file. . 129

oOo

(Marked exhibits attached to original and
copies of transcript)

oOo

**Page 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
AT KANSAS CITY

CHRISTOPHER STONEMAN,      )
                           )
          Plaintiff,       )
                           )
    v.                     ) Case No.
                           ) 4:21-CV-00061-SRB
                           )
NIM TRANSPORTATION, LLC,   )
and JAMES J. AJELLO,       )
                           )
          Defendants.      )
_____)

REMOTE VIDEO DEPOSITION OF STEVEN R.
GRABOFF, M.D., produced, sworn and examined on
October 27, 2021, between the hours of 11:27 a.m. and
2:35 p.m. of that day, before Connie McCarthy, CCR,
RMR, CRR.

**Page 4**

A P P E A R A N C E S

For the Plaintiff:
     JAMES THOMPSON, ESQ.
     Edelman & Thompson
     3100 Broadway
     Suite 1400
     Kansas City, Missouri 64111
     (816) 561-3400
     jthompson@etkclaw.com

For the Defendants:
     MICHAEL B. LESTER, ESQ.
     Brown & James, P.C.
     2345 Grand Boulevard
     Suite 2100
     Kansas City, Missouri 64108
     (816) 472-0800
     mlester@bjpc.com

     Videographer:  MICHAEL DENNIS

Reported By:
Connie McCarthy, RMR, CRR
MO CCR #1435

**Page 5**

Wednesday, October 27, 2021            11:27 a.m.

VIDEOGRAPHER:  We're now going on the
record.  Today's date is October 27th, 2021.  The
time is 11:27 Central Standard Time.  This is the
videotaped deposition of Dr. Steven R. Graboff in the
case of Christopher Stoneman versus Norfolk Iron and
Metal, et al., Case No. 4:21-CV-00061-SRB in the
United States District Court for the Western District
of Missouri.

Would counsel please state their appearance
for the record?

MR. THOMPSON:  James Thompson on behalf of
the plaintiff, Christopher Stoneman.

MR. LESTER:  Michael Lester on behalf of
defendants.

VIDEOGRAPHER:  Would the court reporter
please swear in the witness, with stipulation.

COURT REPORTER:  The attorneys
participating in this deposition acknowledge that I
am not physically present in the deposition room and
that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of
an oath administered in person, I will administer the
oath remotely.

**6**

1       The parties and their counsel consent to
2   this arrangement and waive any objections to this
3   manner of reporting.
4       Please indicate your agreement by stating
5   your name and your agreement on the record.
6       MR. THOMPSON:  James Thompson on behalf of
7   the plaintiffs.  We agree with that format.
8       MR. LESTER:  Michael Lester on behalf of
9   defendants.  We also agree.
10
11          STEVEN R. GRABOFF, M.D.,
12   called as a witness by the defendants, having
13      been duly sworn, testified as follows:
14
15              EXAMINATION
16   BY MR. LESTER:
17   Q.  Good morning, Doctor.  Could you please
18   state your name for the record?
19   A.  I'm Dr. Steven Graboff.
20   Q.  And --
21       MR. THOMPSON:  I don't mean to interrupt
22   you, but just for the record, the plaintiffs
23   incorporate, rather than a lengthy objection, we
24   incorporate the objections filed to the notice for
25   Dr. Graboff's deposition for the reasons set forth in

**7**

1   our pleading.
2       MR. LESTER:  Okay.
3   BY MR. LESTER:
4   Q.  Dr. Graboff, could you please state just
5   where you're physically located right now?
6   A.  I am located in Gardnerville, Nevada.
7   Q.  And what's the address?
8   A.  521 Mottsville Lane, Gardnerville, Nevada
9   89460.
10   Q.  Is that your home address?
11   A.  Yes.
12   Q.  Is anybody else in the room with you
13   currently?
14   A.  Nope.
15   Q.  I think you've done more depositions than I
16   have, so I'm not going to waste any time going over
17   the... (unintelligible).
18       COURT REPORTER:  Mr. Lester, I think you
19   froze.
20       VIDEOGRAPHER:  We're now going off --
21   BY MR. LESTER:
22   Q.  ... and I'm happy to repeat or rephrase the
23   question.
24   A.  Yeah, you froze at the beginning of your
25   statement, so we didn't hear any of it.

**8**

1   Q.  Well, that's funny because that's what my
2   statement was about.
3       So we're taking this deposition over Zoom.
4   That's going to lead to some communication issues as
5   we go.  I would just ask that any time you don't
6   understand a question, whether because I asked a bad
7   question or because a technology failure, please let
8   me know and I'm happy to restate or rephrase.  Okay?
9   A.  Sure.
10   Q.  You understand that you're here today
11   because you've been identified as a retained expert
12   on behalf of Christopher Stoneman, correct?
13   A.  Correct.
14   Q.  What did you do to prepare for this
15   deposition?
16   A.  I reviewed the materials that I was sent to
17   review on the case initially.  I reviewed my file and
18   my report.
19   Q.  What documents do you believe are in your
20   file?
21   A.  So these are all of the documents.  They're
22   all on these CDs here, which I'm sure Mr. Thompson
23   has.  But the documents that are in my file, I have
24   outlined every single document, starting with my
25   report of June 14, 2021.  So they're all listed

**9**

1   there.  Every document, every radiologic study,
2   everything's itemized there.  The only thing that's
3   not listed there is some radiologic studies I
4   received -- or maybe they are listed there.  Let's
5   see.  Yeah, they're listed there.  Everything is
6   listed on that report.
7   Q.  Okay.  Is it fair to say that when you say
8   your file, what you are talking about is the medical
9   records and radiology scans that you reviewed in this
10   case?
11   A.  No.  My file contains more than just that.
12   Q.  Okay.  What are the non-medical records
13   that you have in your file?
14   A.  There's some correspondence in my file.
15   There is some handwritten notes that I took when I
16   was reviewing the file or the case.  There's some
17   dictated notes which were incorporated into the
18   report, but nevertheless they're separate documents
19   in the file.
20   Q.  Okay.  Have you ever spoken to
21   Mr. Stoneman?
22   A.  No.
23   Q.  Have you ever performed any type of medical
24   examination of Mr. Stoneman?
25   A.  No.

**10**

1    Q.   Did you ever talk to any of his doctors or
2 providers?
3    A.   No.
4    Q.   Did you ever look at any photographs of the
5 accident scene?
6    A.   No.
7    Q.   If Mr. Stoneman was in a line-up, could you
8 pick him out?
9    A.   No.
10    Q.   The last entry in your testimonial history
11 is the April 9th, 2021 deposition in the Debra Straws
12 lawsuit.  As I'm sure you recall, I took that
13 deposition.  Or maybe you do, maybe you don't, but
14 that was me.  Have you given any other depositions
15 since April?
16    A.   No.
17    Q.   Is it fair to say that all of the testimony
18 you gave me in the Debra Straws case about your
19 qualifications, background, experience, work history,
20 is still going to be true and up-to-date?
21    A.   Yes.
22    Q.   All right.  I'm going to run through some
23 of it quickly, but since we did all that just a
24 couple months ago, I'm going to try to speed it along
25 and not dwell too long.  But if at any point in time

**11**

1 I get anything wrong, obviously, please let me know,
2 okay?
3    A.   Yes.
4    Q.   Fair to say that in the last 20 years, you
5 have not performed any type of research or put forth
6 any peer-reviewed medical articles or research either
7 individually or as part of a group?
8    A.   Correct.
9    Q.   When was the last time you performed
10 surgery?
11    A.   December 2004.
12    Q.   So as of today, it's been approximately 16
13 years since the last time you performed any type of
14 surgery?
15    A.   Correct.
16    Q.   When was the last time you saw a patient?
17    A.   December 2017.
18    Q.   That's when you essentially retired your
19 clinic?
20    A.   January of 2018 is retirement date, so
21 yeah, correct.
22    Q.   So as of today, it's been approximately
23 four years since the last time you saw a patient?
24    A.   Correct.
25    Q.   My understanding from the last deposition

**12**

1 was for the last few years when you were working in
2 the clinic before retirement, about 40 percent of
3 your work was medical legal work; is that correct?
4    A.   Correct.
5    Q.   And that in total in your career, you have
6 a gross revenue of over $10 million from your time
7 spent as a medical legal expert?
8    A.   Was that my entire career?
9    Q.   Yeah.
10    A.   Correct.
11    Q.   Where did you first go to medical school?
12    A.   University Autonoma de Guadalajara, Mexico.
13    Q.   Why didn't... (unintelligible).
14    COURT REPORTER:  You've frozen again,
15 Mr. Lester.
16    THE WITNESS:  I think the question was why
17 did I not go to an American medical school?
18    MR. LESTER:  Correct.  Just -- is that --
19 can everybody hear me again?
20    MR. THOMPSON:  Why don't you repeat the
21 question, Michael, because --
22    MR. LESTER:  Yeah, no problem.  I just
23 wanted to make sure Connie -- wanted to make sure I
24 was back.
25 //

**13**

1 BY MR. LESTER:
2    Q.   Why didn't you go to an American medical
3 school originally?
4    A.   The question is:  Why did I not go to an
5 American medical school originally?
6    Q.   Sorry.  Let me just rephrase.  I'll start
7 over.
8    A.   You keep breaking up.
9    Q.   Yeah, I don't know why.  My internet's
10 usually been good.  I guess it's the storms in the
11 area.
12    So could you repeat, what's the first
13 medical school you went to?
14    A.   The first one was University Autonoma de
15 Guadalajara, Mexico.
16    Q.   And what years were you there?
17    A.   I was there from 1974 through the first
18 three months of 1978.
19    Q.   Why did you go there instead of an American
20 medical school?
21    A.   I applied here in the States and I was not
22 accepted, and I wanted to be a medical doctor, so I
23 decided to take whatever path I needed to get to my
24 destination, which was to become a doctor.
25    Q.   Fair to say I think 10 American medical

**14**

1 schools rejected you before you went to that school
2 in Mexico?
3     A. Yes.
4     Q. When you ultimately graduated from medical
5 school, did you become board-certified in any field?
6     A. When I graduated from the University of
7 California, Irvine School of Medicine, I did a
8 residency in orthopedic surgery and became
9 board-certified as an orthopedic surgeon.
10     Q. Okay. And just walk me through just -- I
11 know it already, but walk me through a little bit
12 what your practice was like and what field -- what
13 your general clientele was?
14     A. I clinically practiced orthopedic surgery
15 from 1985 through 2017, end of 2017, even though I
16 stopped doing surgery after 20 years in 2005. My
17 practice consisted of seeing general orthopedic
18 surgical patients. I was also on emergency backup
19 call as an orthopedic surgeon for about five hospital
20 emergency rooms in the area. At the time, I was
21 living in Southern California where my practice was.
22 And I did general orthopedics, I did trauma, I saw
23 and treated all kinds of orthopedic surgical
24 problems. I had an office-based practice where I saw
25 patients, I did surgery during the week, I did spine,

**15**

1 trauma, reconstructive surgery, joint replacement
2 surgery, pediatric orthopedics, fracture care, nerve
3 tendon repairs, hand, foot, ankle. Pretty much every
4 aspect of orthopedic surgery.
5     Q. Have you ever been board-certified in any
6 field other than orthopedic surgery?
7     A. I eventually became -- the answer is yes.
8 I eventually became board-certified as a forensic
9 physician. But other than that, no.
10     Q. We'll talk about that here in a second.
11 With respect to your orthopedic surgery board
12 certifications, have you ever attempted to recertify?
13     A. Yes.
14     Q. Did you ever have any issues or fail to
15 recertify?
16     A. So, two questions there. Let's see. First
17 question -- I forgot what the first question was.
18 But yes, I did recertify.
19       Second part of your question, did I ever
20 have any trouble recertifying? At one point, I did,
21 yes.
22     Q. And what was that issue?
23     A. So I recertified after the first 10 years
24 with no problem. And then 20 years later when I was
25 recertifying for the second time, I didn't pass the

**16**

1 exam on the first two attempts. It took the third
2 attempt to pass for recertification.
3     Q. So is that in roughly 2007?
4     A. Correct.
5     Q. And that would have been three years after
6 you stopped performing surgeries; is that fair?
7     A. Well, I stopped in 2005. 2007. That would
8 be two.
9     Q. Okay. Are you currently certified by any
10 medical board?
11     A. No.
12     Q. Why not?
13     A. Well, I retired in 2018, and I didn't feel
14 that there was a need to continue my board
15 certification at that time. I wasn't on hospital
16 staff anyplace and I didn't need to spend the money
17 for recertification. And it just didn't have any
18 purpose any further.
19     Q. How long has your board certification been
20 expired?
21     A. I let it lapse in 2018. It was up for
22 renewal in 2018. I'd just retired, so I didn't renew
23 it.
24     Q. You talked... (unintelligible).
25       COURT REPORTER: You're frozen.

**17**

1 BY MR. LESTER:
2     Q. You talked about the other board
3 certification... institute?
4     A. I'm sorry, you froze up there.
5     Q. I'm going to quit out and rejoin and see if
6 that helps. I'll be right back.
7       VIDEOGRAPHER: We're now going off the
8 record. The time is 11:42.
9       (Recess)
10       VIDEOGRAPHER: We're now going back on the
11 record. The time is 11:43.
12 BY MR. LESTER:
13     Q. Dr. Graboff, we just took a break to see if
14 I could get my internet sorted out.
15       But I wanted to move over to your other
16 certifications that we were discussing right before
17 the break. It's my understanding that you are
18 certified through the American College of Forensic
19 Examiners Institute and the American Board of
20 Forensic Medicine; is that true?
21     A. Correct.
22     Q. And those are two sister companies. The
23 American College of Forensic Medicine operates sort
24 of under the umbrella of the American College of
25 Forensic Examiners, correct?

18

1    A.   Correct.
2    Q.   And both of those entities were founded by
3 Robert O'Block, I believe we discussed last time?
4    A.   Yes.
5    Q.   You would have no reason to dispute that
6 O'Block's personal background and history was in
7 criminal justice, correct?
8    A.   I think that's correct.
9    Q.   And you would have no reason to dispute
10 that the American College of Forensic Examiners was
11 originally founded as a handwriting certification
12 course because Mr. O'Block was rejected from other
13 handwriting certification courses?
14        MR. THOMPSON:  Objection.  Asking this
15 witness to guess and speculate.  Lacks foundation.
16        MR. LESTER:  I'm asking if he has any
17 reason to dispute that background.
18 BY MR. LESTER:
19    Q.   If you have personal knowledge otherwise,
20 please feel free to tell me.
21        MR. THOMPSON:  Well, first of all, that's
22 an inappropriate question, asking him to -- where you
23 state a fact about unrelated issues, and then ask him
24 to comment thereupon in the sense of he doesn't have
25 any information to dispute it.  It lacks foundation,

19

1 and it's objectionable for that reason.
2 BY MR. LESTER:
3    Q.   Okay.  You can answer, Doctor.
4    A.   I don't know the answer to that question.
5    Q.   I believe we discussed last time that
6 Mr. O'Block is currently dead, and you believe there
7 was some issue surrounding that.  Do you recall that
8 testimony or that conversation?
9    A.   I think I know that he died, yes.
10    Q.   Do you know any facts about his death?
11    A.   I do not.
12    Q.   Do you have any reason to dispute that it
13 was a murder/suicide with his girlfriend who was 40
14 years younger than him?
15        MR. THOMPSON:  Objection.  You know, what
16 is this?  Just a game of salacious crap that you
17 throw out here, Michael?  It's not going to continue.
18 And we can -- it's completely tangential.  This
19 witness lacks foundation to respond to it.  And the
20 line of questioning, aside from being completely
21 inappropriate, lacks foundation.
22 BY MR. LESTER:
23    Q.   Okay, you can answer, Doctor.
24    A.   I don't know the answer to that.
25    Q.   All right.  So you've stated in the very

20

1 first sentence of your report that you're certified
2 by the American Board of Forensic Medicine and the
3 American Board of Forensic Examiners.  So I'm just
4 trying to understand what your knowledge is about how
5 they certify people and what their certification
6 process is.  What did you personally have to do to be
7 certified by those two boards?
8    A.   So when I joined those boards and when I
9 joined that college, the medical director at the time
10 was a very well-known forensic pathologist named
11 Dr. Cyril Wecht.  His last name is spelled W-e-c-h-t.
12 The name may be familiar to some people.  He was
13 involved with the O.J. Simpson trial.  He was
14 involved in looking into the JFK assassination, and
15 other things.  He was the medical director at the
16 time and set the standards for which physicians could
17 be certified by the American College of Forensic
18 Examiners as being board-certified by them in
19 medicine as well as forensic examination.  And what
20 he required of me was that I submit to him -- I
21 believe it was 10 full cases -- that were redacted
22 for personal information about the person involved --
23 but full cases of my file, my analysis, my opinions,
24 my testimony, whether it be in depo, depo and trial,
25 or just trial, and he and the medical board at the

21

1 time reviewed my 10 submissions and felt that I had
2 met their requirements for forensic analysis,
3 scientific assessment, objective assessment of the
4 facts as they were, and that I was qualified to be
5 certified by them to present a case to a trier of
6 fact.
7    Q.   Do you know that he personally looked at
8 the 10 submissions?
9    A.   It would only be assumptions on my part
10 that he was in charge.  He ran the board.  And I
11 assume that the board is the one that looked at my
12 submission material.
13    Q.   Do you have personal knowledge that anybody
14 actually looked at your submission materials and went
15 through and reviewed them?  Was there a process where
16 they called you to discuss anything?  Was there --
17 did you get called for a hearing where you had to
18 defend any of your opinions?
19        MR. THOMPSON:  I would object to the extent
20 it's compound question.  And we've now listed three
21 questions, and apparently attempting to roll them
22 into one.  So objectionable as compound.
23        THE WITNESS:  So I don't know the answer to
24 any of those questions.  I do know no one called me
25 at the time except to advise me of my acceptance into

22

1  the college, if I remember right. It's been awhile,
2  but yeah.
3  BY MR. LESTER:
4      Q.  So as you sit here today, you cannot
5  testify for certain that anybody actually looked at,
6  reviewed, or evaluated your submissions; is that
7  fair?
8      A.  That would be fair, sure.
9      Q.  How much did you pay for the
10 certifications?
11     A.  It was a pretty standard fee for even the
12 American Board of Orthopedic Surgery and other
13 organizations I belonged to.  They charged -- I
14 believe they charged about $950 at the time, which
15 was pretty standard.
16     Q.  And have you ever had to re-pay or
17 recertify?
18     A.  I did have to -- I did have to document
19 continuing medical education credits with them over
20 the course of a few years at one point.  And I did
21 have to re-up with them, recertify with them.  It did
22 not require anything except an additional update of
23 my information, which at the time hadn't changed.  My
24 clinical practice, my address, what I was doing.  And
25 I opted to become a lifetime member.  So I paid a

23

1  lifetime fee at the time.
2      Q.  How much was that fee?
3      A.  I think it was somewhere around -- these
4  are my best estimates: it's been a long time -- I
5  think it was about $1500.
6      Q.  Have you ever seen any articles or ever
7  been forwarded any information from other people in
8  your industry calling Robert O'Block the emperor of
9  junk science?
10     A.  No.
11     Q.  Any articles or have you seen or been
12 forwarded any information that says that these two
13 boards are certification mills?
14         MR. THOMPSON:  Well, I would object to the
15 question.  Lacks foundation.  No foundation.  Unless
16 you want to put in front of this witness where that
17 statement came from, the article that you're
18 referring to, etc.  It lacks foundation for this
19 witness to respond.  It's an improper question.
20 BY MR. LESTER:
21     Q.  That's fine.  Have you ever seen any
22 articles or been forwarded any information indicating
23 that the two boards we've been discussing are simply
24 certification mills?
25     A.  No.

24

1      Q.  Have you seen any articles discussing the
2  fact that they allowed a cat to be certified as an
3  American -- as a member of the American Board of
4  Forensic Medicine?
5      A.  No.
6          MR. THOMPSON:  Same objection.  Lacks
7  foundation.  Misstates the facts.
8  BY MR. LESTER:
9      Q.  Have you ever received any training through
10 either of those two boards?
11     A.  I have.
12     Q.  What did that entail?
13     A.  They were online courses that I took as
14 part of my CME credits with them in various areas of
15 forensic assessment, report-writing, analysis of
16 data.
17     Q.  Do you still have access to any of those?
18     A.  Any of those what?  Courses?
19     Q.  The courses and tests that -- yeah.  Sorry.
20 The courses and training that you received.
21     A.  I don't know.  I haven't tried to go back
22 and look and see if they're still available or not.
23 That would have been back somewhere around 2011.  Ten
24 years ago.
25     Q.  Okay.  Did you ever complete any

25

1  fellowships as part of your medical training?
2      A.  No.
3      Q.  Did you ever hold a medical license in
4  Missouri?
5      A.  No.
6      Q.  Have you ever practiced medicine or seen
7  patients in Missouri?
8      A.  No.
9      Q.  It's my understanding, based on our last
10 deposition, that you've had 10 cases for medical
11 malpractice filed against you?
12     A.  Yes.
13     Q.  Two of those you needed to settle out of
14 court, correct?
15     A.  Correct.
16     Q.  Did either of those involve a spine issue?
17     A.  No.
18     Q.  Of the 10 medical malpractice cases, did
19 any involve a spinal issue?
20     A.  No.
21     Q.  In 2007, a grievance was filed against you
22 with the American Association of Orthopedic Surgeons,
23 correct?
24     A.  Yes.
25     Q.  The allegation in the grievance was that

26

1 you prepared a report without all the necessary
2 facts, correct?
3     MR. THOMPSON: Objection. Misstates the
4 record.
5 BY MR. LESTER:
6     Q. You can answer.
7     A. That's incorrect.
8     Q. Okay. What do you believe the allegation
9 against you was?
10     A. I don't recall what they specifically were.
11 There was a number of them. I think there was five
12 or seven or six allegations. I'd rather not guess as
13 to what they were.
14     Q. Okay. Would you agree with me that the
15 grievance arose out of a report that you prepared
16 that someone took issue with you not having all the
17 facts at the time the report was prepared?
18     A. No, I would not agree with you.
19     Q. Okay. What do you -- in your own words,
20 what did the grievance arise out of?
21     A. The grievance arose, or arised, out of a
22 lawyer in Philadelphia misrepresenting a document I
23 sent to him as a complete report which he used to
24 settle a medical malpractice case, when in fact the
25 document that I sent to him before he whited out the

27

1 words "draft report" was just a preliminary
2 assessment.
3     Q. So what was wrong with what I said earlier?
4 What would you disagree with?
5     A. What did you say earlier?
6     Q. I'll just move on.
7     So you would agree with me that the
8 grievance arose out of the allegation that you
9 prepared a report without having access to all of the
10 relevant medical records; is that fair?
11     MR. THOMPSON: Objection. Misstates his
12 testimony; misstates the record. Don't rephrase what
13 he just told you. He answered it and he explained
14 it. And let's move on.
15 BY MR. LESTER:
16     Q. You prepared a draft report, correct?
17     A. Correct.
18     Q. At the time of the draft report, you did
19 not have all relevant medical records, correct?
20     MR. THOMPSON: Objection. Misstates the
21 record.
22 BY MR. LESTER:
23     Q. You didn't, right? I mean, you changed
24 your testimony when you got other medical records,
25 correct?

28

1     MR. THOMPSON: Objection. Misstates the
2 record.
3     THE WITNESS: It -- that's -- your last
4 statement is incorrect.
5 BY MR. LESTER:
6     Q. All right. I used the word "testimony".
7     In 20 -- around 2007 in this case, you
8 prepared a draft report, correct?
9     A. Correct.
10     Q. Later, upon review of additional medical
11 records, you would have changed the opinions offered
12 in the report, correct?
13     A. I can't answer the question the way you
14 asked it. It's not accurate.
15     Q. Okay. Why is it not accurate?
16     A. That's for you to figure out. Not me to
17 tell you.
18     Q. Do you agree with me that you did not have
19 all the relevant medical records at the time you
20 drafted the 2007 draft report? And I understand it's
21 a draft report that you --
22     MR. THOMPSON: Objection.
23     MR. LESTER: -- or anything like that?
24     MR. THOMPSON: Objection. I didn't mean to
25 step on top of what you were saying, Mike.

29

1     Objection. It's been asked and answered,
2 and it misstates the record and assumes facts that
3 were not present in that case.
4 BY MR. LESTER:
5     Q. You can answer.
6     A. At the time I drafted the draft preliminary
7 report, I had the relevant records at the time I
8 needed to draft that draft report. There was
9 additional materials I needed to complete the report.
10     Q. And those additional materials changed your
11 opinion or would have changed your opinion in that
12 case?
13     A. Ultimately, I came to find out that, yes,
14 if I had those additional materials, I would have had
15 a different opinion.
16     Q. Okay. The AAOS ultimately found that you
17 had violated your ethical obligations as a medical
18 legal expert; is that correct?
19     MR. THOMPSON: Objection. Misstates the
20 record.
21     THE WITNESS: That's something that they
22 have claimed, and that has been disputed by me in a
23 lawsuit against them, which they lost.
24 BY MR. LESTER:
25     Q. Well, the -- I will incorporate your

30

1 lawsuit into this question. But originally, the AAOS
2 found that you had violated their ethical
3 obligations; is that fair?
4     A.  Correct.
5     Q.  You appealed that finding, correct?
6     A.  Correct.
7     Q.  Through the AAOS, internally, correct?
8     A.  Correct.
9     Q.  And ultimately that finding was upheld by
10 the AAOS's internal procedures; is that fair?
11    A.  Correct.
12    Q.  Subsequently, you then filed a lawsuit in
13 civil court disputing that; is that fair?
14    A.  Correct.
15    Q.  At any point in time, has the AAOS's
16 finding that you had committed and -- violated your
17 ethical obligations under their standards ever been
18 overturned or changed or modified?
19    A.  It's only been shown that what they
20 published about me was false and fraudulent. But
21 nothing was overturned on their end.
22    Q.  They ultimately suspended you for two
23 years, correct?
24    A.  Correct.
25    Q.  And at that time, you then withdrew from

31

1 the AAOS; is that correct?
2     A.  At that time. At the end of the
3 administrative hearing, I withdrew.
4     Q.  We went through some of the AAOS ethical
5 standards, and I'm not going to go through all that
6 now. But you agreed with me at Miss Straw's
7 deposition that you would agree that when an
8 orthopedic surgeon offers their testimony, the final
9 report or final testimony, sworn testimony in a case,
10 they should have sought out and reviewed all
11 pertinent medical records and applicable legal
12 documents, including prior depositions. Do you still
13 agree with that?
14    A.  I agree with everything except for the
15 prior depositions portion. I don't remember my
16 testimony about what that meant. So I would agree
17 with everything up to prior depositions, because my
18 opinions are really based on the medical facts, the
19 medical evidence, and not on deposition testimony.
20 So I don't know how that came into your question.
21    Q.  Sure. Well, let me just show you, I guess.
22 This is -- I'm going to share my screen, hopefully.
23 This is what will be marked as -- can you see? AAOS
24 Standards of Professionalism?
25    A.  I see it.

32

1     Q.  We looked at A.6. I'm just going to read
2 it.
3     A.  I'm sorry to interrupt. Can you back one
4 page, please?
5     Q.  Yep.
6     A.  So you're showing me the one that was
7 amended May 2010.
8     Q.  I understand. We went through all this in
9 Straw, so I'm not trying to beat a dead horse here.
10    A.  I just want to make sure the record's
11 clear, what you're about to show me was not in effect
12 at the time of my grievance.
13    Q.  Yeah, I understand.
14        A.6.  An orthopedic surgeon who provides
15 oral or written medical testimony or expert medical
16 opinions shall seek and review all pertinent medical
17 records and applicable legal documents including
18 relevant prior depositions before rendering any
19 statement or opinion on the medical or surgical
20 management of the patient.
21        Did I read that correctly?
22    A.  You did, yes.
23    Q.  And then here is your deposition from April
24 where you say, I'll agree that at the time an
25 orthopedic surgeon testifies with their final

33

1 opinions that they should have done everything in
2 Number 6. I will agree to that.
3        Did I read that correctly?
4     A.  You did.
5     Q.  Are you -- do you agree with your April
6 self?
7     A.  I'm going to disagree with my April self.
8 I don't think depositions are anywhere close to
9 important as the actual medical facts and the medical
10 evidence. I've seen plenty of depositions contradict
11 the medical evidence, which the deposition is taken
12 maybe four years after the event took place. And
13 somehow a person's memory four years later can be
14 better than the contemporaneously-made record -- to
15 me doesn't make any sense. And so I don't know why I
16 didn't pick up on that in April when you took my last
17 deposition, but I'll correct that today and say, I
18 would not rely on depositions. I think they're okay
19 to read, they're good to read, they're helpful. They
20 provide some insight about plaintiffs, defendants,
21 experts, people involved in the case. But to rely on
22 them for a factual opinion is not a safe thing to do.
23 The safest and the most scientific thing to do is to
24 rely on the actual contemporaneously-created
25 documents at the time, not somebody's recollection in

34

1  a legal case two, three, four years, five years
2  later.
3      Q.   Okay.  Did you review any depositions in
4  this case?
5      A.   No.
6      Q.   Did you review any of the discovery
7  responses in this case?
8      A.   No.
9      Q.   Have you reviewed any of the work done by
10  other experts in this case?
11      A.   No.
12      Q.   Did you review any of the photographs or
13  diagrams showing how the accident occurred or the
14  damage from the accident?
15      A.   No.
16      Q.   Does it matter to you at all how the
17  accident occurred?
18      A.   In a very general sense, I'd like to know.
19  Was this a skydiving accident?  Somebody diving into
20  a pool?  A car wreck?  In general, I'd like to know.
21  But no, I've seen minor motor vehicle accidents cause
22  significant injury to people.  And I've seen major
23  accidents, rollovers, total head-on collisions, and
24  people walk away with a scratch.  So what I rely on
25  is the medical facts and the medical evidence.  Not

35

1  the damage to the vehicles.
2      Q.   Sure.  I'm going to mark as Exhibit 1 the
3  notice of the deposition that we filed today.
4           (Whereupon, Exhibit No. 1 was designated
5  for identification)
6  BY MR. LESTER:
7      Q.   Have you seen that?
8      A.   Yes, I have a copy of it here.
9      Q.   I recognize that James has objected to a
10  portion of Exhibit A, but I just want to ask the
11  general question:  Did you help gather the documents
12  listed on Exhibit A or was that just done by someone
13  else?
14      A.   I don't understand what you're asking me.
15  Help gather.
16      Q.   Can you flip to Exhibit A?
17      A.   Okay.  I have it.
18      Q.   Did you gather the documents that were
19  requested herein and provide them to plaintiff's
20  counsel, or did -- was that handled outside of your
21  office?
22      A.   Yes.
23      Q.   I asked a bad question.  Did you handle it?
24      A.   I took care of it.
25      Q.   Okay.  You personally went through and

36

1  identified the responsive documents?
2      A.   That's correct.
3      Q.   Okay.  And we have, I have, a file that was
4  produced to me on Friday that contains seven PDFs.
5  We have the depo notice, the CV, fee schedule,
6  correspondence, Graboff invoices, records reviewed,
7  notes, and report.  Are those the documents that you
8  gathered?
9      A.   Correct.
10      Q.   And is that everything that you have that's
11  responsive to the Exhibit A subject to the
12  objections?
13      A.   I've got to be careful answering that.  I'd
14  like to say yes, but I don't know what happened to
15  the material -- I sent my entire file to the firm.
16  Whether they transmitted the entire file to you, I do
17  not know.
18      Q.   Fair.
19      A.   So I don't know what you have.  I know what
20  I sent, but I don't know what you have.
21      Q.   Yeah.  I'll just short-circuit it.  You
22  provided everything that you believed was responsive
23  to plaintiff's counsel, correct?
24      A.   Yes.
25      Q.   Okay.

37

1           I'm going to mark just for the sake of the
2  record your CV, fee schedule, and testimony history
3  as Exhibit 2.
4           (Whereupon, Exhibit No. 2 was designated
5  for identification)
6  BY MR. LESTER:
7      Q.   Do you have those in front of you?
8      A.   I can get them.
9      Q.   I just want to -- I assume that they're all
10  up-to-date and there's nothing you need to add to any
11  of them or change or modify.
12      A.   I verified they were all current and
13  up-to-date before I sent them, correct.
14      Q.   Okay.  Can you open your testimony history?
15      A.   Sure, one second.  If I accidentally
16  disconnect myself, I'll come back.  I'm in uncharted
17  territory here.  Looking for something with -- okay.
18  I found it.
19      Q.   You got your testimony history open?
20      A.   I'm getting there.  Okay.  Can you still
21  hear me?
22      Q.   I can.
23      A.   Okay.  I can't see you anymore, but I can
24  see my testimony.  I'm ready.
25      Q.   Okay.  I just want you to go through -- can

**38**

1  you identify any of these cases after let's just say
2  from 2017 through the present where it involved a
3  spine injury? And at the same time, I'd also like
4  you to identify anyone where you know you were
5  retained by the defendant in that same time period.
6      A.  Okay. That's really going to be pretty
7  much impossible. Because they're not categorized
8  this way. I'd be more than happy to attempt to
9  answer your question and look and see if I can
10  remember just by the name of the case. But it
11  doesn't say whether it was a plaintiff or defense
12  case, and it certainly doesn't say what it was about.
13      Q.  I'd appreciate it if you could do your
14  best.
15      A.  No, I will. And you said you wanted me to
16  look starting in 2017?
17      Q.  Yes.
18      A.  Okay. The Alyson King -- February 23, 2017
19  Allison King case. I believe that was a spine case,
20  and I was plaintiff expert.
21          August 17, 2017, Vicki Lane, I believe that
22  was also a spine case. I was plaintiff expert.
23          Same thing September 14, 2017, the Teresa
24  Robey, R-o-b-e-y, case. I believe that was also --
25          COURT REPORTER: That was also what? I

**39**

1  think you might have frozen.
2          Mr. Lester? Mr. Thompson? Michael?
3          I think everybody froze.
4          And now I get a notice my internet
5  connection is unstable, and I'm hard-wired here.
6          Mike?
7          MR. LESTER: Let's go off the record. I
8  think we might have lost our court reporter.
9          MR. THOMPSON: I think she's back.
10          COURT REPORTER: I've been here all along.
11  But I lost all of you. Are we off the record?
12          Mike, can you hear me?
13          MR. LESTER: Let's go off the record.
14          MR. MAN: We're now going off the record.
15  The time is 12:11.
16          (Pause in proceedings)
17          VIDEOGRAPHER: We're now going back on the
18  record. The time is 12:13.
19  BY MR. LESTER:
20      Q.  Dr. Graboff, we had some more technical
21  issues. I think you were telling us about the
22  September 14th, 2017 case on your testimony history.
23  If you could pick up from there.
24      A.  Correct. I believe that September 14,
25  2017, Teresa Robey, R-o-b-e-y case, that was a spine

**40**

1  case. I was plaintiff expert.
2          I'm just going to continue on down here.
3          There may be others in here that are
4  plaintiff or defense or spine that are not jumping
5  out at me, but I'm doing the best I can for you.
6      Q.  Appreciate it.
7      A.  That's all I can come up with.
8      Q.  It looked to me like the three that you
9  identified were likely medical malpractice cases
10  rather than personal injury cases; is that fair?
11      A.  That's definitely a fact. They were all
12  med mal cases.
13      Q.  Okay. I'm going to mark as Exhibit 3 the
14  invoice that's in this file.
15          (Whereupon, Exhibit No. 3 was designated
16  for identification)
17  BY MR. LESTER:
18      Q.  I'll share my screen with you so you can
19  see the same thing. Do you see this invoice?
20      A.  Yes, sir.
21      Q.  This is the only -- well, let me ask you:
22  Is this the only invoice you've submitted other than
23  prepayment of the deposition?
24      A.  You broke up a little bit. Please repeat.
25      Q.  Is Exhibit 3 the only invoice that you have

**41**

1  submitted in this case other than prepayment for this
2  deposition?
3      A.  Let me clarify that. Because what you're
4  stating is -- this is not an invoice. Top right
5  corner says Statement. So this is a statement that
6  will summarizes all of the invoices. So if you look
7  in the body under transactions, you'll see invoices.
8  So there was -- looks like there was one, two, three
9  invoices. And that would be the sum total in this
10  case.
11      Q.  What's the total amount that you've billed
12  in this case?
13      A.  I don't know the number. And I'd have to
14  get a calculator out to tell you, add them all up.
15      Q.  Is it fair to say everything that you've
16  billed in this case is on this statement, Exhibit 3?
17      A.  That's correct.
18      Q.  Okay. Is there any amount of unbilled work
19  other than deposition preparation that you need to
20  bill for?
21      A.  Deposition preparation was already paid.
22  So there's nothing else.
23      Q.  All right. So this is it, we're completely
24  up-to-date? This is everything you've billed in the
25  case for all your time?

42

1    A.   Yes, sir.
2    Q.   And do you have any additional work that
3  you are planning or believe that you need to do in
4  order to render final opinions at trial?
5    A.   There's nothing else I need to do to render
6  a final opinion at trial.  I have everything I need
7  for that.  However, usually in preparation for
8  testimony at trial I like to look at any -- defense
9  or plaintiff, depending on what I'm doing -- other
10  expert depositions, other treating physicians in
11  depositions, other additional examination reports or
12  things done.  In this case, for defense, I'd like to
13  look at those things.  Not to change or alter or
14  change my opinion, but rather they are more of just
15  an interest in how things are going in terms of the
16  trial.
17    Q.   So in your opinion at this point in time,
18  all of the statements and opinions in your report are
19  final and shouldn't change between now and trial; is
20  that fair?
21       MR. THOMPSON:  I would object to the extent
22  that if there's additional discovery -- discovery is
23  still ongoing -- obviously we will provide relevant
24  information to the doctor.  And if they in any way,
25  shape, or form change his opinions, we would let you

43

1  know.
2       THE WITNESS:  So at the very end of this
3  report, as you know, there's a statement that says if
4  I have had the opportunity to receive any additional
5  materials or review these materials, I reserve the
6  right to change my opinion.  So no, this is not hard
7  and cast in stone.  It could change.
8       But based on everything that I have
9  reviewed to date, this is what I am prepared to
10  testify to.
11  BY MR. LESTER:
12    Q.   All right.  The next item that's in the
13  file that I have is records reviewed.  There's 691
14  pages of medical records.  Does that sound inclusive
15  of everything that you reviewed in this case?
16    A.   I don't recall that.
17    Q.   Do you have any idea, one way or another?
18    A.   I don't recall that number.
19    Q.   Fair enough.  We'll go through some
20  specifics later.  But I'm going to mark as Exhibit 4
21  some handwritten notes that I have from you.
22       (Whereupon, Exhibit No. 4 was designated
23  for identification)
24  BY MR. LESTER:
25    Q.   Do you have those in front of you?  If not,

44

1  I can share my screen.
2    A.   No, I have those.  They should be on a
3  yellow-lined page.
4    Q.   I think it's going to be close to what you
5  testified earlier, your dictation and your
6  yellow-lined page.  Do you see my screen?
7    A.   Yes.
8    Q.   Is this what you were talking about earlier
9  where you said you dictated some information --
10  sorry.  I'm going to rephrase.
11       Are the first three pages of this, which
12  have been Bates labeled Graboff 734 through 736, the
13  dictation that you referenced earlier as eventually
14  having been incorporated into your full report?
15    A.   Correct.
16    Q.   And then the last page is a yellow notebook
17  lined paper with handwritten notes; is that correct?
18    A.   Correct.
19    Q.   Those are -- and that's your handwriting,
20  your notes?
21    A.   Yes.
22    Q.   Do you know when these notes were taken?
23    A.   Yes, I do.
24    Q.   When is that?
25    A.   Those would have been taken by me as I was

45

1  reviewing the materials in preparation for drafting
2  my report, and so they were probably done right on or
3  about June 14, 2021, which is the date that I started
4  the report.
5    Q.   I'm going to go through just in some of
6  these places where I can't read your handwriting, or
7  where there's an abbreviation, I just want to know
8  what it says.  On the third line with the first word
9  "acute".  Do you see that?
10    A.   Yes.
11    Q.   Can you just read what that line is saying
12  or what your notes mean?
13    A.   So it says, Acute L5/S1 left HNP, which
14  stands for herniated nucleus pulposus.  Underneath it
15  is the word protrusion.  Plus L circle, which means
16  left, S1 compression, with an arrow leading down to
17  radiculopathy, which means it's causing a
18  radiculopathy.
19    Q.   Okay.  And then beneath that parenthesis it
20  says objectively confirmed.  What's the rest of that
21  say?
22    A.   Objectively confirmed at operation
23  February 4, 2019.
24    Q.   Okay.  The seventh line down it starts with
25  Failed Spinal.  Could you read what that line says?

46

1    A.  Yes.  Failed Spinal Surgery Syndrome,
2  hyphen, post-laminectomy syndrome.
3    Q.  Okay.  I assume where you have written
4  FM colon, you're talking about the future medical
5  care.  Is that what that stands for?
6    A.  That's correct.
7    Q.  And then we'll get into it when we get into
8  your report, but it looks like those five are the
9  future medical care that you're thinking Mr. Stoneman
10  may need.
11    A.  Well, on these notes.  But I'm not sure if
12  my actual report lists more of future medical than
13  what I scribbled down here.  I have a line in the
14  report, not these notes.
15    Q.  What does it say on the left-hand margin
16  there, right next to the future medical?
17    A.  Where the bracket is?
18    Q.  Yes.
19    A.  Okay.  So it says, op, which is op, meaning
20  an operation.  This is me notating to myself that
21  there was a surgery performed on February 4, 2019,
22  left L5/S1 herniated nucleus pulposus, decompression.
23    Q.  And then what does it say in the margin
24  right underneath that?
25    A.  In the parenthesis beneath that, it says

47

1  agree with radiology.
2    Q.  Okay.  The bottom is restrictions.  These
3  are all in your report so I'm not going to spend too
4  long with it.  But I want to know, are these
5  restrictions that you came up with or did you pull
6  these from a specific medical record?
7    A.  No, these are all restrictions that came
8  out of my head.
9    Q.  Okay.  So that's not a summary of a medical
10  record or opinion; is that fair?  That's your own
11  opinion?  And we'll get to the actual restrictions
12  here in a little bit.
13    A.  Yes, correct.
14    Q.  We've been going for about 55 minutes on
15  and off.  Let's take a quick, just a five-minute
16  break.  And when we come back, I'll go through your
17  report, if you want to have that ready in front of
18  you.
19    A.  Ready to go.  Thank you.
20    MR. THOMPSON:  And obviously not holding
21  you to anything, but do you have some estimate,
22  Michael, on time?
23    MR. LESTER:  It's not that complicated.  I
24  expect we'll be done in the next hour or so.
25    MR. THOMPSON:  Okay.  Thanks very much.

48

1  All right, we'll take five.
2    VIDEOGRAPHER:  We're now going off the
3  record.  The time is 12:24.
4    (Recess)
5    VIDEOGRAPHER:  We're now going back on the
6  record.  The time is 12:32.
7  BY MR. LESTER:
8    Q.  All right, Dr. Graboff, do you have your
9  report in front of you?
10    A.  I do.
11    Q.  I'm going to mark it as Exhibit 5.
12    (Whereupon, Exhibit No. 5 was designated
13  for identification)
14  BY MR. LESTER:
15    Q.  And just so we're talking about the same
16  thing, it is a 12-page report dated June 14th, 2021?
17    A.  That's correct.
18    Q.  Okay.  Fair to say the first page is mostly
19  just a breakdown of your qualifications that we
20  talked about this morning?
21    A.  Yes.
22    Q.  Second page is a list of the medical
23  records and imaging that you've looked at in this
24  case?
25    A.  Starting at the bottom of the first page

49

1  and continuing through the second page and at the
2  very top of the third page, correct.
3    Q.  On the top of the third page, there's a
4  section called Brief Case Summary.  Do you see where
5  I'm at?
6    A.  I do.
7    Q.  It is my understanding that basically from
8  that, where it says Brief Case Summary to where it
9  says -- through to Page 9 where the bullet points
10  start with your opinions, that what you've tried to
11  do here is basically give a synopsis and overview of
12  the medical records; is that fair?
13    A.  That's fair.
14    Q.  So there's no opinions of yours between
15  Page 3 and Page 9 and-a-half, this is just what you
16  believe was important as you went through the medical
17  records.  Fair?
18    A.  I don't want to say fair.  Let me answer it
19  this way and see if it's fair enough.  What I
20  dictated there and put on in print is a summary of
21  the case for me, for my purposes, not necessarily
22  pulling out the most important things in the case.
23  But you know how these things go, sometimes you get
24  deposed or go to trial two months later, or four
25  years later.  I wanted to write something down so

50

1  that when I picked up my file how many years later I
2  could review the brief summary of the case and have a
3  really good understanding for myself as to what
4  happened.
5        So the issue I'm taking with you is that it
6  doesn't necessarily call out what I thought was the
7  most important parts of the case, even though it does
8  contain a lot of that. It's really there for me so
9  that I don't have to re-review the entire how many
10 hundred thousands of pages of records all over again
11 in five years when I testify. Just review my own
12 summary, and it makes sense for me.
13     Q. All right. Perfect. That is a fair enough
14 answer. So the part of my -- I asked a bad question.
15 The part of my question that I'm really focused on is
16 from Page 3 to Page 9 and-a-half, everything written
17 in there is not really your opinion but it's your
18 synopsis of what was contained in the medical
19 records, fair?
20     A. That's correct.
21     Q. Okay. And to the extent that there's
22 discussions in here about plaintiff's subjective
23 issues and complaints, that is simply you looking for
24 plaintiff's self-reporting in the medical records and
25 then pulling that out. Is that fair?

51

1      A. Correct.
2      Q. You wouldn't -- you wouldn't have been
3  trying to independently verify the subjective
4  complaints, it's just this is what he told his
5  doctors at this time. Is that fair?
6      A. Well, I don't know so much about that.
7  That's more than I would know. All I know is what
8  the medical records --
9      Q. Sure.
10     A. -- have written.
11        So all I'm doing is regurgitating the parts
12 of the medical records as they are written, assuming
13 that they are true and correct as they are written,
14 as part of my summary.
15     Q. Okay. And from Page 3 to Page 9
16 and-a-half, to the extent there's any objective
17 finding or diagnosis in this portion of your report,
18 it's you summarizing what the treating doctors found
19 rather than you commenting on your own finding; is
20 that fair?
21     A. That's correct.
22     Q. Okay. On Page 5 of your report, it starts
23 getting into the diagnosis and the surgery. I just
24 want to know in your own words how would you explain
25 to a lay jury what a large herniated nucleus pulposus

52

1  of the lumbar spine L5/S1, very central left-sided,
2  is?
3      A. How I would explain the findings in this
4  case was that the disk that separates the bones
5  between L5 and S1 is like a fresh jelly doughnut.
6  And that this jelly doughnut was compressed with
7  sufficient force to allow a big blob of that jelly
8  inside the doughnut to explode out through the
9  posterior back end of the wall of the doughnut,
10 through the dough, and compress the nerve going down
11 the left leg. And the medical facts to base that up
12 are well-written in the operative report. And on the
13 radiologic studies you can see it. It was a forceful
14 sort of explosion of the disk material posteriorly
15 outside the back of the disk to the left side that
16 completely compressed the S1 nerve root.
17     Q. Okay.
18     A. And basically made a hole in the -- if you
19 looked at a jelly doughnut and think about making a
20 hole in the skin of the jelly doughnut and then a
21 bunch of the jelly just squirting out.
22     Q. Is this a rare or uncommon injury?
23     A. No.
24     Q. Is it -- was this particular injury
25 different than a normal herniated disk injury?

53

1        MR. THOMPSON: Objection. Lacks
2  foundation. Lacks facts for the doctor to formulate
3  an opinion.
4        THE WITNESS: I agree with the objection,
5  but....
6  BY MR. LESTER:
7      Q. That's fine. That question --
8      A. What was --
9      Q. -- I'll rephrase.
10     A. Yeah, if you can just rephrase it so I
11 understand what you mean by "normal".
12     Q. How many patients in your clinic did you
13 treat with herniated disks?
14     A. Oh, gosh, in my surgical career, I probably
15 did 4- or 500 of these surgeries myself. I probably
16 treated a couple of thousand of these patients. Not
17 every one of them needed an operation.
18 Predictably -- even as Dr. Bailey said, predictably,
19 this one would need surgery, I would agree. But
20 sometimes they don't. So I would say I probably
21 treated over a thousand, 2,000 in total in my career.
22     Q. Is there anything about this injury that
23 would make it abnormal or otherwise unexpectedly
24 different than the thousands that you've looked at
25 previously?

54

1      MR. THOMPSON:  Objection.  Same objection,
2   to the extent it lacks foundation, lacks facts
3   necessary to formulate a response.
4      THE WITNESS:  I'm not quite sure what
5   you're trying to ask me here.  It's definitely
6   abnormal because you should not have disk material
7   extruded outside of the disk squashing the nerve.
8   It's definitely abnormal in that regard, if that's
9   what you mean.
10  BY MR. LESTER:
11     Q.  How many of the 400 to 500 surgeries that
12  you did involved disk material outside squashing the
13  nerve?
14     A.  Probably the majority.  That's why you do
15  the surgery.
16     Q.  Okay.  The -- you said you had done 4- to
17  500 surgeries, correct?  Is that of the -- like
18  the -- at the bottom of Page 5, it lists the actual
19  operation that was performed.  Do you see that?
20     A.  Correct.
21     Q.  Have you performed those surgeries before?
22     A.  I have, yes.
23     Q.  When's the last time you performed a
24  laminectomy decompression?
25     A.  Best estimate would be in December of 2004.

55

1      Q.  When's the last time you performed a
2   partial facetectomy and neural -- I'm not going to
3   get the words right -- but foraminotomy?
4      A.  Same time.
5      Q.  So it's been 16 years since you did either
6   of those?
7      A.  Yes.
8      Q.  Of the thousands of people that you saw
9   with herniated disks, was there a primary cause,
10  something that usually caused it?
11     A.  I'm going to say the majority of them were
12  somehow related to a traumatic event.  But not all.
13  Sometimes a disk can herniate without trauma.  But by
14  far, the vast majority are traumatically related.
15     Q.  How many do you think you treated or have
16  seen -- how many patients have you seen do you
17  believe that had a herniated disk that you attributed
18  to a rear-end motor vehicle accident?
19     A.  I don't know the answer to that.
20     Q.  More or less than 10 percent of your
21  herniated disks?
22     MR. THOMPSON:  Objection.  Lacks
23  foundation, based on the doctor's prior response.
24     THE WITNESS:  I don't know the answer to
25  that.

56

1   BY MR. LESTER:
2      Q.  Can you give any estimate at all?
3      MR. THOMPSON:  Same objection.
4      THE WITNESS:  I don't know the answer.  If
5   I could, I'd give you an estimate.  But I don't even
6   have a basis to give you an estimate.
7   BY MR. LESTER:
8      Q.  Can you recall any patient that you have
9   ever seen that you believed had a herniated disk that
10  you attributed to a rear-end motor vehicle accident?
11     A.  As I sit here today, I don't remember.
12     Q.  Do you agree with me that typically
13  herniated disks can be associated with lifting heavy
14  objects?
15     A.  I would agree.
16     MR. THOMPSON:  Objection to the extent it
17  lacks foundation; incomplete hypothetical.
18  BY MR. LESTER:
19     Q.  Would you agree that lifting heavy objects
20  in general can cause a herniated disk?
21     A.  That's a known mechanism, I would agree.
22     Q.  Is that a type of traumatic event that when
23  you were discussing earlier that most herniated disks
24  are caused by some type of trauma, would heavy
25  lifting flat back blowout be incorporated under that

57

1   trauma umbrella?
2      A.  It would, yes.
3      Q.  Can you give me any estimate of how many of
4   the thousands of herniated -- thousands of patients
5   that you saw with herniated disks that you would
6   attribute to lifting heavy objects?
7      MR. THOMPSON:  Objection.  Incomplete
8   hypothetical; lacks foundation.
9      THE WITNESS:  So, I do -- as I sit here
10  today, and as you aptly pointed out a few times
11  already in today's deposition, it's been a long time
12  since I've done surgery.  I don't remember the
13  etiologies to give you any estimates.  I can give you
14  just the general framework, which I've already done.
15  Trauma or degenerative conditions are the typical
16  reasons.  Trauma is the vast majority.  And that
17  trauma can be anything from what you've already
18  suggested, lifting: it can be motor vehicle
19  accidents; it can be heavy sneezing and coughing:
20  twisting the wrong way; getting up out of a chair the
21  wrong way.  So there's many etiologies, but by far
22  the vast majority of traumatically induced.  Too much
23  force is placed across the disk.  And of course,
24  depending on the disk itself, how fragile it is, it
25  could be more easily damaged or not.  But as for my

58

1  own history of the surgeries I've done back in --
2  from '85 to 2005, I just don't remember, you know,
3  who and what, where they came from.
4      Q.  Sure.  What about when you were a
5  clinician?  Let's just focus on the last five years
6  when you've had a clinic.  Can you give any specific
7  estimate during that time?
8      A.  Specific estimates of...?
9      Q.  How many herniated disks came from -- let's
10  start with motor vehicle accidents, rear-end motor
11  vehicle accidents.
12      A.  I don't recall.
13      Q.  All right.  And then same question, but
14  lifting.
15      A.  I don't recall.  It's just been too long.
16      Q.  Okay.  On Page 6 of your report you discuss
17  the post-surgery meetings with his treating physician
18  and then a new MRI scan.  Are you on Page 6?
19      A.  Yes.
20      Q.  You would agree with me that you originally
21  reported that -- the 70 percent clinically better
22  after the surgery.
23      A.  Yes.
24      Q.  Is that normal?  Is it a good recovery?
25      A.  It would be a good recovery in general

59

1  speak -- in general terms, yes.  Good recovery.
2  Elimination of the radicular symptoms in the leg
3  would be considered a good recovery.
4      Q.  And you agree that in April 2019 his
5  treating physician cleared him to return to work,
6  correct?
7      A.  Correct.
8      Q.  And that subsequent to that his working or
9  not working was based on his own subjective
10  complaints rather than anything his treating
11  physician thought he could find or treat; is that
12  fair?
13      MR. THOMPSON:  Object.  That misstates the
14  records.
15      THE WITNESS:  One second.
16  BY MR. LESTER:
17      Q.  I'll move on to a different question.
18  Around the middle of the page it says, the physician
19  interpretation of a good clinical outcome.  Do you
20  agree with that?
21      A.  I need to find out where you are.
22      Q.  Page 6, around the middle of the page.
23  It's a paragraph that starts with the phrase, In the
24  assessment, it is noted.
25      A.  I found it.

60

1      Q.  And it says, the physician interpretation
2  of a good clinical outcome.  Do you agree with that?
3      A.  Well, I can't -- I'm not in a position to
4  agree or disagree.  I just putting in quotes what he
5  wrote.  That's what he said.
6      Q.  Okay.  As we sit here today, are you not
7  going to offer any opinions about whether this was a
8  good clinical outcome?
9      A.  Well, when you -- if you were to stop the
10  case right here, that would be an interesting point.
11  But there's a lot more to this case that continues to
12  go on, including subsequent MRI scans which show
13  recurrent disk herniations, granulation tissue
14  enhancement around the S1 nerve root with swelling
15  and inflammation.  So plenty of objective pathology
16  after this entry by the physician.  And the physician
17  himself notes that the man needed to have more
18  surgery.  And even recommended more surgery.  So when
19  you take it all into account, I will have a different
20  opinion at the time of trial than if you just leave
21  it at this sentence here.
22      Q.  One, two, three.  Three paragraphs down,
23  starts with, The new MRI scan.  Is that what you were
24  just talking about?
25      A.  Yes.

61

1      Q.  All right.  What is -- can you explain what
2  a recurrent or residual disk fragmentation is, in lay
3  terms?
4      A.  Sure.  So not only did I read the
5  radiologist's report, but I looked at the MRI scan
6  myself, confirming it.  And I've also had this
7  problem occur in my own patient population that I've
8  done surgery on, where they've had either a residual
9  disk fragment that moves around in the disk space
10  causing trouble, or because the disk has been so
11  severely exploded, it's been damaged, it came out in
12  large chunks, it blew out the back side of the
13  intervertebral disk space, that there's still
14  residual disk material in there.  He didn't have a
15  complete diskectomy by the surgeon.  He just had
16  removal of the herniated portions.  It's not uncommon
17  for this now damaged disk to re-herniate.  More
18  material can squirt out towards the back side or move
19  about.  And it's very difficult to tell on an MRI
20  scan whether it's a retained fragment that wasn't
21  completely taken out the first time, which happens,
22  or whether it's a new fragment that developed
23  subsequent to the first surgery.  But in either case,
24  it doesn't matter, the fact is is that there's now a
25  new or persistent piece of irritating disk material

1 that's in the disk space causing the patient to have
2 symptoms. And that's how I would explain it to a
3 jury.
4 Q. Okay. The second sentence in that
5 paragraph says it's not causing any neurologic
6 impingement. What does that mean?
7 A. It means that the disk, the fragment that's
8 there or the recurrent disk herniation, is not
9 compressing a nerve.
10 Q. And the last sentence also says that same,
11 without neurologic compression. Do you see that?
12 A. Yes.
13 Q. Do you agree with that finding?
14 A. Correct. I looked at that MRI scan. I did
15 not see the material impinging on the nerve root.
16 Q. Okay.
17 A. However, be aware that disk space pathology
18 can cause referred pain to the buttocks, the lower
19 back, the upper thigh. It usually doesn't go down
20 all the way to the tips of the toes, but it can go
21 down the leg. So you can have what's called disk
22 space or discogenic radiating pain. And there's
23 certainly significant pathology in this disk space
24 that can do that even in the absence of compressing
25 the neurologic structure.

1 Q. Is there any objective finding that you can
2 point to that would show that?
3 MR. THOMPSON: I would object to the extent
4 he just answered that question.
5 THE WITNESS: I thought I did answer that
6 question. The MRI scan that we're talking about, the
7 follow-up MRI scan that he had, objectively shows
8 that. An MRI is an objective test.
9 BY MR. LESTER:
10 Q. Yeah, sorry. I guess I misunderstood.
11 It's a poor question on my part.
12 What percentage of your patients that you
13 performed these surgeries on have this type of issue?
14 A. Best estimate, no more than 10 percent.
15 And I'm being really generous with that number.
16 Failed spinal surgery syndrome, post-laminectomy
17 syndrome, persistent disk fragments, recurrent disk
18 herniations. That whole genre of problems post
19 spinal surgery, I would say no more than about 10
20 percent.
21 Q. And are there any known comorbidities or
22 causes for why those 10 percent might have the
23 surgery fail or have these subsequent issues?
24 A. In general?
25 Q. Yeah.

1 A. Okay. Not specific to --
2 Q. Not specific to this. Just when we're
3 talking about that 10 percent of the -- less than 10
4 percent of the population where this doesn't work,
5 are there any known issues that routinely crop up in
6 those kind of cases?
7 A. There's a known issue in patients that have
8 a significantly degenerative disk that herniates, or
9 extrudes out, or protrudes out. Those typically have
10 a higher problematic issue with persistent
11 fragmentation or recurrent herniations than someone
12 that has a healthy disk. So the example that I would
13 give to a jury, a person with a healthy disk has a
14 freshly baked, warm jelly doughnut that's plump and
15 you can stretch the dough and you can mush it around
16 and it's nice and pliable. The risk doesn't exist so
17 much in that case. Take the same jelly doughnut,
18 leave it out in the hot sun for two or three weeks so
19 it kind of flattens out, dries up, the jelly gets
20 kind of thick and dry on the inside. That kind of
21 jelly doughnut, that patient, if that's what his disk
22 looks like, they have a higher chance of having
23 recurrent herniations, persistent fragmentation, and
24 poor results from trying to take out the disk.
25 Q. Did you find anything in your review of the

1 records in this case that might explain why
2 Mr. Stoneman's particular back surgery allegedly
3 failed?
4 A. No.
5 Q. Do you have any explanation at all, not
6 from the records, but just from your experience as an
7 orthopedic surgeon who's done this surgery?
8 A. I do. It happens. It's something that you
9 have to consent the patient for. In consenting a
10 patient to doing the exact operation that's listed by
11 Dr. Bailey, the conversation between the surgeon and
12 the patient has to include: You can have a recurrent
13 disk herniation. This surgery can fail. You can
14 have persistent symptoms in your back and your leg.
15 You may have a persistent fragment in there that we
16 can't get out or we didn't get out.
17 These are all parts of the informed
18 consent. It happens. It's a well-known fact that it
19 happens. And then there are even people that have
20 had a successful surgery where the complete
21 decompression took place with no recurrence of
22 herniation, no recurrence of a fragment, no
23 persistent fragment, no recurrence of a herniation,
24 those people, some people, can develop -- you look
25 frozen.

66

1    Q.  No.
2    A.  Your eyes are blinking.  Good.
3        Those patients can develop post-laminectomy
4  syndrome.  I don't have an explanation for that.  I'm
5  not aware of anything in the literature that explains
6  why they can develop that.  But they can actually
7  come out of a surgery worse than they went in.  And
8  that has to be part of the consent.
9    Q.  Do you have an estimate based on your
10  experience of how many people have these issues
11  without any comorbidities or degenerative changes in
12  their back beforehand?
13    A.  No.
14    Q.  I assume it's a subset of the 10 percent?
15    A.  More likely than not it's going to be
16  within that 10 percent, I would agree.
17    Q.  On Page 8 of your report you started having
18  some bullet points that include some work activities.
19  Do you see that?
20    A.  Yes.
21    Q.  Where is that pulled from?
22    A.  So you're looking at the top of Page 8; is
23  that correct?
24    Q.  Top of Page 8 in the work ability summary
25  it indicates that he could perform the following

67

1  activities, colon, and then there's four bullet
2  points.
3    A.  Right.  I pulled that from the
4  September 12th, 2019 functional capacity evaluation
5  done at SERC Physical and Hand Therapy.
6    Q.  Do you disagree with or are you critiquing
7  any of those findings?
8    A.  No.  I'm just regurgitating what they
9  found.
10    Q.  And just generally in this case, are you
11  going to critique any part of that functional
12  capacity evaluation or what they found he could do?
13    A.  I'm not going to critique that, no.
14    Q.  Okay.
15    A.  I have my own opinions, but I'm not going
16  to critique that.
17    Q.  You would agree with the limitations and
18  abilities as listed on Page 8?
19    A.  Well, I'm not so sure I know, even, what
20  they mean.  So where it says in the heavy category,
21  pushing and pulling, I don't know what that means.
22  In the median category where it says low lift, I
23  don't know what that means.  In the light category,
24  high lift, mid lift, full lift, carrying and overall
25  strength, I don't know what that means.  So I can't

68

1  agree or disagree with any of that.  Not that I
2  would, I'm just regurgitating it anyway.
3        And then the last bullet, able to perform
4  activities on a constant basis, sitting, reaching in
5  front, to the left, to the right, manual handling,
6  frequent basis, standing, walking, kneeling, reaching
7  overhead, front right, reaching overhead, front
8  left -- I think I agree with most of that.  But I
9  think I phrased it differently in my own limitations,
10  which I would agree with more than what they've
11  written.
12    Q.  Okay.  And what did you -- what type of
13  tests did you perform on Mr. Stoneman to measure the
14  limitations that you believe should be placed on him?
15    A.  I didn't examine him.
16    Q.  Okay.  Did you use any of the tests
17  performed by SERC where they actually had him lift
18  boxes and move and sit and stand?
19    A.  I did incorporate that into my opinions,
20  yes.
21    Q.  But you think your restrictions are better
22  than the ones done by SERC?
23        MR. THOMPSON:  Object.  Misstates his
24  testimony.  He didn't say better or worse.  He said
25  his are different.

69

1        THE WITNESS:  Right.  I was going to
2  disagree with your phrase better.  I think mine, as
3  an orthopedic surgeon -- I'm not a physical
4  therapist.  I'm an M.D., a surgeon.  I was a
5  qualified medical examiner for the State of
6  California examining injured workers just like him
7  with the same exact injuries to determine if they
8  were capable of returning to work, and if so, what
9  kind of permanent impairment, limits, and
10  restrictions they had.  And I was doing that for the
11  State of California since 1989.
12        I believe that my opinions, based on the
13  surgical findings, the radiologic findings, the
14  clinical findings, the subjective complaints, the
15  overall case in whole, how he responded, exceeds the
16  functional capacity evaluation based on a single
17  functional capacity exam.  And my opinion takes all
18  of that into account.  And I think mine is -- my
19  opinion is what it is based on that of a medical
20  doctor, a surgeon, a qualified medical examiner,
21  looking at the entire case.  Not just a single
22  functional capacity exam.
23    Q.  When's the last time you did a qualified
24  medical examination for the State of California?
25    A.  2017.

70

1 Q. How many did you do from 2013 to 2017?
2 A. Hundreds.
3 Q. How many that were back/spinal issues?
4 A. The majority were back, yes.
5 Q. Do you have records of those anywhere?
6 A. Not anymore.
7 Q. Dr. Bailey found that Mr. Stoneman had
8 reached maximum medical improvement. Do you agree
9 with that?
10 MR. THOMPSON: I'm going to object to the
11 question to the extent it used words and terminology
12 that are unique to workmen's compensation claims, and
13 are inconsistent with either the standard of care or
14 the basis for an expert opinion in a civil case.
15 THE WITNESS: Mr. Thompson's reading my
16 mind. So maximal medical improvement means that
17 Dr. Bailey's done everything he can do for -- that he
18 could do for the man at the time and from a workers'
19 compensation standpoint, has to consider him
20 maximally improved. He's got no other treatment
21 options at that point.
22 BY MR. LESTER:
23 Q. I guess my question for you is: Was there
24 other treatment options at that point that should
25 have been considered or done?

71

1 MR. THOMPSON: Well, and to the extent you
2 have now asked a new question, I would object because
3 it misstates the record that Dr. Bailey did make
4 specific recommendations and options available to
5 this patient.
6 THE WITNESS: The answer is yes.
7 BY MR. LESTER:
8 Q. What should Dr. Bailey have done?
9 MR. THOMPSON: Objection. Misstates the
10 record. He's not saying what Dr. Bailey should have
11 done.
12 BY MR. LESTER:
13 Q. What treatment options -- well, I'll just
14 move on.
15 On Page 8, a paragraph starting with,
16 Furthermore, Dr. Poppa indicates that Mr. Stoneman
17 was evaluated by a surgeon and placed on work
18 restrictions of light work. Do you see that?
19 A. Yes.
20 Q. It's my understanding that your opinion --
21 that your restrictions go further than that. Would
22 you agree?
23 A. I think so.
24 Q. So you disagree with the work restrictions
25 placed by Mr. Stoneman's treating physician?

72

1 A. Well, I agree with the restriction of 20
2 pound -- yeah, I think mine was 10 pounds, if I
3 remember right. So yes, I would disagree.
4 Q. Okay. And you disagree about light work,
5 correct?
6 A. I'm pretty sure mine was -- let me just
7 verify it. I think mine was sedentary.
8 Yes, I do disagree.
9 Q. All right. The surgeon who placed those
10 work restrictions are the ones -- is the one who
11 performed the surgery and met with Mr. Stoneman
12 multiple times, correct?
13 A. Can you rephrase, please?
14 Q. Sure. The surgeon who actually placed
15 Mr. Stoneman on work restriction of light work, 20
16 pounds lifting or carrying, etc., as listed here, is
17 the surgeon who actually performed the surgery on
18 Mr. Stoneman and would have met with him multiple
19 times; is that correct?
20 A. Correct.
21 Q. Is there any medical records that you think
22 you have that that surgeon would not have had?
23 MR. THOMPSON: I would object. Misstates
24 the record. Asks this witness to guess and speculate
25 what Dr. Bailey did or did not have at his disposal

73

1 in making the opinions that he did regarding this
2 patient's care.
3 BY MR. LESTER:
4 Q. I'm trying to ask if you know the reason
5 for why you think the restrictions are more than what
6 the treating surgeon believes.
7 A. Well, when Dr. Bailey gave him those
8 restrictions, that wasn't the end of this saga of
9 Mr. Stoneman. His medical condition continued on.
10 There's other things that are found and have to be
11 taken into account when the overall permanent
12 restrictions are assigned. Maybe at the time I'm --
13 I don't know the answer, because I don't know what
14 Dr. Bailey was thinking. But there's more to the
15 case that exists subsequent to the time when he
16 release him to return to work.
17 Q. What was found between September 19th, 2019
18 and June 14th, 2021 --
19 A. He had -- I'm sorry.
20 Q. I didn't mean to cut you off. You can
21 answer.
22 A. Yeah, I thought I cut you off.
23 That his condition -- I'm not sure I can
24 give you a specific piece of information that I can
25 recall as I'm sitting here, off the top of my head.

74

1    Q.  You said that the case didn't stop when
2  Mr. Bailey -- when Dr. Bailey wrote his report on
3  September 19th, 2019 and that's why all of your
4  restrictions are essentially more limiting and more
5  restricted, so I'm trying to figure out what changed
6  between September 19th, 2019 and today that would
7  require more significant restrictions to be placed on
8  Mr. Stoneman.
9        MR. THOMPSON:  I object.  That misstates
10  the doctor's testimony here today.  He didn't --
11  you're assuming what he's basing his increased or
12  more significant restrictions on.
13  BY MR. LESTER:
14    Q.  Well, then do you disagree with the
15  restrictions that Dr. Bailey placed in September of
16  2019?  Do you think they were inappropriate?
17    A.  I -- yes, I think they were inappropriate
18  for the condition at the time.  There was a known
19  persistent disk fragment.  There was a known
20  persistent or recurrent disk herniation.  The man was
21  highly symptomatic.  There was radiologic evidence of
22  swelling of the S1 nerve root.  Mr. Stoneman at the
23  time did not want to go through another operation, so
24  Dr. Bailey had no chance to do anything else.  So he
25  declared him maximally medically improved and

75

1  released him to return to work with restrictions.  I
2  don't agree with those restrictions, given the
3  objective findings at the time as well as the
4  subjective complaints of the patient at the time.
5    Q.  I think that is different than what you
6  said earlier, because my understanding earlier was
7  that you agreed with the restrictions at the time,
8  but then testified that things had changed.  But --
9        MR. THOMPSON:  I object.  It's your
10  interpretation.  It's not what he testified to.
11  BY MR. LESTER:
12    Q.  Okay.  So it's your testimony that the
13  restrictions placed by Dr. Bailey in September of
14  2019 were wrong at that time?
15        MR. THOMPSON:  I object.  He didn't say
16  wrong.
17  BY MR. LESTER:
18    Q.  Were not restricted enough.  They were
19  improper and he should have been more restricted?
20        MR. THOMPSON:  I object.  That misstates
21  the record.  This is one doctor's opinion versus
22  another doctor's opinion based on their unique
23  experiences professionally.  You keep trying to put
24  words in his mouth, Michael, and testify for him.
25  Let him testify.

76

1        THE WITNESS:  I don't -- my personal
2  opinion is based on the totality of this case.
3  You're asking me to disown what I know about the
4  entire case and look at a --
5  BY MR. LESTER:
6    Q.  Well, that's what I tried to get you --
7  that's what I've tried to --
8        MR. HOU:  Hold, hold, hold.  Don't
9  interrupt him.
10        THE WITNESS:  You're asking me to look at a
11  small portion of this case where Dr. Bailey was in a
12  position in a workers' compensation environment where
13  he could do nothing more for his patient.  Because
14  the patient didn't want to have another operation,
15  for whatever reasons.  And it's the patient's choice,
16  of course.  And Dr. Bailey at that point said, Okay,
17  you're maximally medically improved, and he released
18  him.  I don't agree, based on the totality of this
19  case and the facts that I know, that that was an
20  appropriate release with appropriate restrictions and
21  limitations, given the objective pathology and what
22  the man had just gone through surgically.
23  BY MR. LESTER:
24    Q.  Okay.  I feel like we're saying the same
25  thing.  But you're prefacing your sentences with no,

77

1  you don't agree with me.  So you do not believe that
2  the limitations outlined on Paragraph 8 with work
3  restrictions of light duty work were correct and
4  proper for that time?
5        MR. THOMPSON:  I object.  That's not his
6  testimony.  He hasn't given a correct and proper.
7  Use the wording he has used and you won't draw an
8  objection.
9        THE WITNESS:  So I disagree with the
10  release to return to work with the restrictions that
11  were given to the man at the time.
12  BY MR. LESTER:
13    Q.  Okay.  And then you said it's very
14  difficult, and I understand this, to separate what
15  you know of the entire case from what may have been
16  available then.  But what I was trying to suss out
17  earlier is, what has changed between September of
18  2019 and today?  Have any of the pathologies changed?
19        MR. THOMPSON:  Objection, as a compound
20  question.  You've asked two questions in that.  Are
21  you asking did his medical care cease?  He was seen
22  by other doctors after that.
23  BY MR. LESTER:
24    Q.  Are there any scans that show a change?
25    A.  One second.

**78**

1  I'm not aware of any subsequent MRI or CT
2  scans that were done after the last one that showed
3  the persistent disk herniation or fragment.  And by
4  the way, that subsequent postoperative MRI measures
5  the remaining pathological disk at 1.1 centimeter.
6  The surgery was done for a disk that was half that
7  size, .5 centimeter.  So he has twice as big of a
8  fragment or recurring disk herniation sitting at
9  L5/S1.  And has something changed since the surgery?
10  Yes.  Has something changed since Dr. Bailey released
11  him?  Yes.  The presence of this 1.1 centimeter
12  herniated disk sitting in the L5/S1 disk space has
13  caused a man to suffer from persistent low back pain,
14  dysfunction, discogenic referred pain down in the
15  left lower extremity, inability to move and lift
16  correctly, and to do all of the things which I
17  discussed in my report.
18      So all of those things existed after
19  Dr. Bailey attempted to release him back to work The
20  man's pain continued to get work, and objectively
21  there's a reason to explain that.  It's on that MRI
22  scan after the surgery.  He underwent additional
23  injection treatments to try and deal with that.  He
24  underwent -- and he was stuck in the work comp
25  system, so his treatments were not occurring very

**79**

1  expeditiously, and with Dr. -- I'm not sure if it's
2  "Pope-a" or "Pop-a" -- but nevertheless he was on
3  narcotics and neurogenic pain medications and chronic
4  pain medication to try and deal with this condition.
5  And it wasn't a condition that is unsupported by a --
6  without objective findings.  It's a condition that's
7  completely explainable by this large 1.1 centimeter
8  either recurrent disk herniation or disk fragment
9  that was left in there at L5/S1.  That, without
10  exception, will explain why the man is not doing
11  well, continues to do poorly, continues to have pain,
12  needed further care, has significant restrictions.
13  And those are all conditions that existed after
14  Dr. Bailey tried to release him to return to work
15  with some restrictions that really were not
16  sufficient for the condition at hand.
17      And so there's a lot of things going on in
18  this case after Dr. Bailey released him that explain
19  what's going on and why he shouldn't have been
20  released back to work at the time.
21  Q.  On Page 9 of your report, I believe it's
22  your opinions that start -- would you agree with me
23  that Pages 9 through 11 of your report contain all of
24  the opinions that you have in this case as of right
25  now, understanding discovery is still ongoing?

**80**

1  A.  Yes.
2  Q.  There's no opinion that you currently hold
3  that's not listed somewhere in this report, is that
4  fair?
5  A.  Correct.
6  Q.  You are not going to be giving any opinions
7  about the cost of any future medical treatment,
8  correct?
9  A.  Correct.
10  Q.  Do you agree with me that that's best left
11  for a lifecare planner?
12  A.  Correct.
13  Q.  And you would agree with me that you're not
14  a qualified lifecare planner, you have no training or
15  experience in that field?
16      MR. THOMPSON:  I would object.  That
17  misstates the record, misstates his background, and
18  assumes that he couldn't offer opinions regarding the
19  cost of these procedures.  There is another expert in
20  this case who is specifically a lifecare planner and
21  offering those opinions.  That doesn't mean that this
22  doctor can't do it as well.  He's just not doing it.
23  If you want to head down that road, then you're going
24  to open up the door to his testimony on this as well.
25  If you're going to elicit those opinions from him,

**81**

1  Michael, then do it at your own peril.
2  BY MR. LESTER:
3  Q.  You testified in the Straw case that any
4  future medical care estimates that you gave would
5  just be estimates and that a lifecare planner would
6  be better qualified and suited to actually provide
7  the costs.  Do you remember that testimony?
8      MR. THOMPSON:  Objection, improper
9  impeachment.  If you're attempting to impeach this
10  witness, then show him the testimony.  Certainly
11  seems like a waste of time since he's not being
12  offered at this time for those opinions in this case.
13      MR. LESTER:  Sure.  This will be quick.
14  BY MR. LESTER:
15  Q.  This is your testimony you would rely on a
16  lifecare planner -- you say, I would rely on a
17  lifecare planner to do that, in response to my
18  question about costs in Miss Straw's lawsuit.  Same
19  in this lawsuit, fair?
20  A.  Correct.
21  Q.  Do you have any reason to disagree with
22  your April self that you would rely on a lifecare
23  planner when discussing future costs?
24  A.  No.  My testimony there was pretty accurate
25  that I could give estimates, but a lifecare planner

82

1  would be more accurate.
2      Q.  Okay.  We've already discussed a lot of
3  these opinions so I'm not going to touch on all of
4  them.
5          The bullet point second from the bottom,
6  Mr. Stoneman ultimately had recurrence of a disk
7  herniation or retained fragment of disk at the L5/S1
8  level.  Do you see that?
9      A.  Yes.
10     Q.  As we sit here today, is it fair to say
11 that you don't know what caused or why he potentially
12 had that recurrence or retained fragment?  Is it just
13 we can't -- we don't know?
14         MR. THOMPSON:  I object.  That is
15 inconsistent with his testimony as to why that
16 fragment exists.
17         THE WITNESS:  So I don't agree with what
18 you're saying.
19 BY MR. LESTER:
20     Q.  Okay.
21     A.  We don't have a basis to know what's going
22 on here.  First of all, the L5/S1 disk suffered a
23 severe -- I'm going to use the word explosive type of
24 pressure that caused the posterior aspect of the disk
25 to blow out.  Dr. Bailey specifically wrote in his

83

1  operative report he didn't have to use a scalpel to
2  get the disk out.  And I've been there.  I know what
3  he means.  I know what that is.  There was already a
4  big hole there.  It blew itself out of the back end
5  of the disk space leaving a big hole.  So that
6  Dr. Bailey, all he had to do was reach in with his
7  instruments to remove the fragments of the disk that
8  had blown out there.
9          So when you have that kind of an injury,
10 you can have more fragments of the disk that are
11 buried deeper in the disk space that don't get pulled
12 out by the surgeon because you can't see in the disk
13 space.  You're basically going in and feeling your
14 way around.  And some of those can be left in there.
15 That would be one reasonable explanation for a
16 retained fragment.
17     Q.  Wait --
18     A.  The second reason --
19     Q.  Wait.  Why?
20     A.  The second reason is that the disk was
21 severely injured.  And once it was severely injured
22 and it lost its structural integrity, it could also
23 re-herniate again because all of the disk material
24 was not removed by the surgeon.
25     Q.  Yeah.

84

1      A.  And there was disk material left behind.
2  So those are substantial reasons that could lead to a
3  retained fragment or return herniation.
4      Q.  I understood.  So those are possibilities,
5  but you couldn't tell me which one of those two
6  happened, or if something else happened.  Is that
7  fair?
8      A.  I don't know what you mean by something
9  else.
10         MR. THOMPSON:  Doctor, let me object.  I'm
11 sorry.  I was on mute.
12         I object because it misstates the
13 testimony.  The doctor's opinion is that to a
14 reasonable degree of medical certainty, the
15 recurrence is directly related to the original injury
16 and the physiological changes.  That's pretty damn
17 clear in his report and in his testimony today.
18         MR. LESTER:  I'm just trying to suss out
19 whether or not -- the objection is noted.  The doctor
20 doing a good job of speaking for himself.  I'm sure
21 he'll say the same thing that you are.
22 BY MR. LESTER:
23     Q.  You can't tell me that Dr. Bailey left --
24 you were just talking about where he might have left
25 a piece of fragment because he was unable to find it.

85

1  We don't know.  Is that fair?
2      A.  Yeah, I just want to be careful.  I'm not
3  trying to imply that it's negligent on the part of
4  Dr. Bailey to not take out all the fragments.  This
5  is a common problem.
6      Q.  Uh-huh.
7      A.  It's not a medical negligence issue.  It
8  happens.
9      Q.  Right.
10     A.  So that's -- but I can't say whether or not
11 he left a fragment in or not.
12     Q.  And you can't say for sure whether or not
13 the disk re-herniated at a later date.  It's a
14 possibility it's not.  You can't point to anything
15 that says he absolutely re-herniated it at this
16 stage.
17     A.  Well, by the time of the subsequent MRI
18 scan, it was either re-herniated or there was a disk
19 fragment left in.  But I can't say which of the two.
20     Q.  You can't say which of the two, you can't
21 say how it happened, you can just say that
22 something's there.  Is that fair?
23         MR. THOMPSON:  Objection.  That misstates
24 his testimony.  He is testifying as to how it
25 eventually happens.

86

1          THE WITNESS:  Yeah, I can -- I've already
2     explained that.
3     BY MR. LESTER:
4          Q.  You've explained it -- you have explained
5     possibilities for how it may have happened.  And I'm
6     with you and I understand that you're saying it's to
7     a reasonable -- James, I understand -- to a
8     reasonable degree of medical certainty.  But you
9     can't -- you've offered two options and they are
10     exclusive of each other, aren't they?
11          MR. THOMPSON:  I would object.  It
12     misstates the testimony based on how you've asked the
13     question.  The doctor's opinion is to a reasonable
14     degree of medical certainty.  The subsequently he
15     used --
16          MR. LESTER:  James --
17          MR. THOMPSON:  -- trail back to the
18     original --
19          MR. LESTER:  -- he can speak for himself.
20          MR. THOMPSON:  You know what?  When you
21     keep misstating him, when you keep changing words
22     he's used and use what apparently you think, you
23     know, are synonyms, and they're not.  In this
24     situation, he is saying, has said in his report, that
25     the need and what physiological changes resulted from

87

1     the original incident are all linked to the
2     subsequent issues and problems.  Regardless of
3     whether it's one or the other.
4     BY MR. LESTER:
5          Q.  And you cannot, Dr. Graboff, you cannot
6     pinpoint whether it is one or the other?
7          A.  Correct.
8          Q.  Could any -- could an incident have caused
9     a re-herniation?
10          A.  Sure.
11          Q.  If Mr. Stoneman goes out and falls down or
12     is in another motor vehicle accident, tries to lift
13     something, could that have been the cause of the
14     subsequent re-herniation?
15          MR. THOMPSON:  Objection.  Incomplete
16     hypothetical.  Lacks sufficient facts to formulate
17     opinion.  Asks for speculation.
18          THE WITNESS:  Subsequent trauma can lead to
19     additional herniations, I would agree.
20     BY MR. LESTER:
21          Q.  Okay.  Would you agree with me that
22     Dr. Bailey said that he did not believe that there
23     needed to be another decompression of the L5/S1?
24          MR. THOMPSON:  Objection.  Misstates the
25     record.

88

1          THE WITNESS:  I would disagree.  I believe
2     Dr. Bailey recommended an anterior decompression and
3     fusion at that level.
4     BY MR. LESTER:
5          Q.  Could you find where you think he
6     recommended that?
7          A.  Sure.  Again, I only have the summary here.
8     But in my report -- let me just look at it real
9     quick.
10          Q.  It's my understanding -- and please feel
11     free to correct me if you have something wrong -- if
12     he did talk with Mr. Stoneman about doing a fusion,
13     that it was his opinion that a decompression would
14     not be helpful.  If you have a reason to dispute that
15     understanding, I'm happy to look at the record.
16          A.  I don't have the records in front of me to
17     show it to you.  But let me just see if my notes
18     here -- my report, I'm sorry -- helps me remember.
19          So we're talking about Dr. Bailey's visit
20     with Mr. Stoneman on July 25, 2019, because that's
21     where the discussion took place about having
22     additional surgery, which would be an
23     anterior/posterior lumbar spinal fusion.  Now, as a
24     surgeon, an anterior/posterior lumbar spinal fusion
25     includes decompression of the disk.  By nature of the

89

1     actual surgery, you're removing the entire disk and
2     you're fusing it together, so you're completely
3     decompressing it.  I do not recall any statement --
4     and if it's there, then it's there.  But I don't
5     recall a statement that says further decompression
6     would be of any benefit.  By nature of the
7     procedure -- spinal fusion anterior/posterior lumbar
8     spinal fusion, by nature of that operation, you have
9     no choice but to do a full decompression.  So I will
10     accept the fact that if there's a statement in the
11     record, that's what he said.  But it wouldn't make
12     any sense because he would be decompressing it.
13          Q.  Sure.  You, for instance, you -- and we get
14     into your future medical care.  You have, I believe,
15     suggested two different surgeries.  First, a
16     decompression.  And then if needed a fusion.  Is that
17     correct?
18          A.  Correct.
19          Q.  And so if Dr. Bailey, if the records show
20     that Dr. Bailey said just the decompression -- if you
21     go in and do a decompression without a fusion, I
22     don't think it would be of any help and there's no
23     use, you would disagree with that?
24          A.  I would disagree with that, yes.
25          Q.  Is that a thing that reasonable surgeons

1 can disagree on? Or do you have information that you
2 think he wouldn't have had? Do you know why that
3 disagreement exists?
4     MR. THOMPSON: Objection. Compound.
5     THE WITNESS: Well, I don't know why the
6 disagreement exists. I don't know if Dr. Bailey has
7 looked at the same material as I've looked at. But
8 let me put it to you -- let me put it to you the way
9 I would put it to the jury. If you have a rock in
10 your shoe by your heel and every time you step on it,
11 it hurts your heel, would you fuse your shoe to your
12 heel so the shoe doesn't move anymore? Or would you
13 open up the shoe and dump out the rock and get on
14 with your life? So I don't know why Dr. Bailey
15 wouldn't take the easy way, which would be to just
16 decompress it and get rid of that remaining
17 herniation or fragment and see how well Mr. Stoneman
18 does, because you can always come back and do a
19 fusion. But once you do the fusion, that's
20 permanent, and that leads to additional problems
21 later on. So I'd have no clue as to why Dr. Bailey
22 would not offer that option, which is easily done,
23 can even be done microscopically, and wouldn't do any
24 harm to the patient.
25     Q. Okay. I'm looking at your future medical

1 care on Page 10 of 12. Do you see where you start
2 the bullet points there?
3     A. Yes.
4     Q. Do you have any specific training or
5 education in chronic pain management that you've had
6 in the last 25 years?
7     A. I have.
8     Q. What is that?
9     A. Well, it was part of my general training as
10 an orthopedic surgeon. I don't know if you've ever
11 broken a bone before, but they're really painful.
12 People that have chronic spinal conditions have
13 chronic pain, and orthopedic surgeons like myself
14 treat them. People have chronic neck pain. Joint
15 pain from arthritis, that's chronic. So it's just
16 part and parcel with learning to be an orthopedic
17 surgeon, how to treat people with chronic pain.
18 Would I consider myself a chronic pain specialist?
19 The answer is no. I'm not a chronic pain specialist.
20 But I do have the training. I have done it for my
21 entire career as an orthopedic surgeon. I've treated
22 patients chronically for pain. So the answer is yes.
23     Q. Bullet point Number 3, can you explain -- I
24 guess let me ask this: If he does the decompression
25 listed in Number 2, in bullet point Number 2, is it

1 possible that that would relieve or largely relieve
2 all of the symptoms that he is complaining of in
3 these medical records?
4     A. It's possible there could be a significant
5 reduction, but it would be only temporary. The
6 problem we have now with this case as it has evolved
7 is that there was -- and it's -- I have really
8 detailed it in the report, but I'll just paraphrase
9 it. There was no evidence of L3-4 -- I'm sorry, L4-5
10 disk pathology initially, in 2018. But there was
11 subsequently -- after the surgery, there's evidence
12 on the subsequent MRI that the L4-5 disk is now
13 abnormal. There was no degeneration of the disk at
14 L5/S1 at the time of the initial injury. But because
15 of the nature of the blowout that occurred at L5/S1,
16 that disk space is now degenerated.
17     So it's really not medically probable that
18 just going in now and doing a full decompression is
19 going to cure him forever. I think it will help, and
20 there's nothing like giving somebody more time to
21 have an enjoyable life. But I think because of the
22 pathology that's developed at L5/S1 due to the injury
23 and the subsequent pathology that's developed at L4-5
24 due to the original injury and surgery that he's
25 going to need to have those areas eventually fused.

1     Q. Based on your history and the surgeries
2 that you've performed, could you assign any percent
3 chance or estimate chance about whether or not the
4 decompression would lead to a -- helping the
5 plaintiff's symptoms?
6     A. All I can say is it's medically possible
7 that it will help his symptoms temporarily.
8     Q. When you say temporarily, can you provide
9 any time range for how long it would help?
10     A. I'm going to give a best estimate of about
11 five years. Maybe a little longer. If it works at
12 all. But because of the degeneration at L5/S1 and
13 the disk pathology at L4-5 now, I'm not very
14 confident, I don't have high hopes that it will help
15 him. But as I said a minute ago when I testified
16 about it, it's such a simple operation to do. It's
17 not going to do him any harm to take out this piece
18 that's still in there. And let's see if it helps him
19 for awhile so he can get off the narcotics, so he can
20 get out of the pain injection treatments. And see if
21 it helps him for awhile. I think it would benefit
22 his lifestyle and his life, quality of life. It's a
23 simple thing to do. But it's not going to be
24 curative and he's still going to wind up going down
25 the rabbit hole of needing further surgeries.

94

1    Q.  All right.  Bullet point three you talk
2  about the fusions.  When do you believe he'll need
3  those?
4    A.  That's going to be within 10 years.  And
5  I'm saying that with the assumption that he undergoes
6  the removal of the remaining fragment or recurrent
7  herniation relatively quickly.  If he doesn't do
8  that, it may occur sooner, the fusion.  Maybe within,
9  you know, seven years, eight years.  But for sure by
10  10 years out, I don't think that that disk is going
11  to -- disk space at L5/S1 is going to survive.  It's
12  going to need to be fused.
13    Q.  Fourth bullet point, you talk about spinal
14  implants.  What is that?
15    A.  So actually the last two bullet points go
16  together.  There's two kinds of spinal implants.
17  There's a spinal cord stimulator, which is an
18  electrical device.  And in layman's terms, it's a
19  minor surgical procedure where electrodes are placed
20  into the spinal cord area.  In his case, it would be
21  around the L5/S1 area.  And what the electrical
22  device does is it causes interference with the
23  transmission of nerve impulses in the spinal cord.
24  And that will reduce his failed spine surgery pain
25  syndrome, his failed laminectomy syndrome.  It'll

95

1  hopefully block or interfere with the transmission of
2  pain signals from L5/S1 up to his brain.  That's what
3  a spinal stimulator will do.
4        If that fails and doesn't work for him,
5  then the last bullet point is the other spinal
6  implant option, which is a basically a pain pump
7  which is implanted in the body.  And it's filled up
8  with various solutions and narcotics, or sometimes
9  nonnarcotic pain medications, and that's delivered by
10  catheter directly to the area where the pain is
11  coming from.  In his case, L4-5 L5/S1 level.  That
12  would be the last -- the last resort.  You wouldn't
13  want to start giving somebody a permanent implantable
14  narcotic device for the rest of their life if you can
15  avoid it.
16    Q.  How many of your patients did you ever put
17  a spinal implant into, the electrical one?
18    A.  I personally never put any in.  I always
19  referred -- I always referred these patients out to a
20  neurosurgeon or to a pain management specialist to
21  have it done.
22    Q.  How many of your patients did you refer out
23  to others to have a spinal cord stimulator put in?
24    A.  So, you know, keeping along with what I
25  answered earlier, it's a long time ago and it's hard

96

1  to remember.  Best estimate, somewhere at least in
2  the range of 50.  Five-zero.
3    Q.  Five-zero.  What about the spinal cord pain
4  pump?
5    A.  I don't really know.  The reason I don't
6  know is because once I referred them out, then I
7  would leave it up to the physician I referred to, the
8  neurosurgeon or the pain management specialist, to
9  either go with the pain pump or the nerve stimulator.
10  So I really don't know the answer to the second part
11  of your question.
12    Q.  What about when you were a clinician?  So
13  after you were done with surgery but you're just
14  seeing patients, how many of your -- can you give me
15  a percent of spine patients that end up getting a
16  spinal implant of any kind?
17    A.  Best estimate would be about 10 percent.
18    Q.  And (unintelligible) -- is the only time
19  you'd use a spinal implant?
20    A.  I'm sorry, maybe you cut out?  I don't
21  know.
22    Q.  I think we need to go off the record real
23  fast.
24        MR. THOMPSON:  We've been going about an
25  hour.  I don't know how much -- or a little over an

97

1  hour.
2        MR. LESTER:  I was trying to push through
3  because I think we've only got....
4        VIDEOGRAPHER:  We're now going off the
5  record.  The time is 1:43.
6        (Recess)
7        VIDEOGRAPHER:  We're now going back on the
8  record.  The time is 1:50.
9  BY MR. LESTER:
10    Q.  Dr. Graboff, if we switch back to Page 9
11  quickly, I just want to go to the very first bullet
12  point that you have there.
13    A.  Okay.
14    Q.  If you had heard or seen testimony that
15  Mr. Stoneman potentially spent an hour after the
16  accident trying to lift an object that was too heavy
17  for him to carry, would that change any of your
18  opinions about how the herniated disk may have
19  occurred?
20        MR. THOMPSON:  I object.  That misstates
21  the record in this case.
22        THE WITNESS:  Can you just go ahead and
23  rephrase that one more time?  I'm trying to follow
24  along.
25  //

98

1  BY MR. LESTER:
2      Q.  Sure.  I want you to assume for the
3  purposes of this question that Mr. Stoneman spent
4  between 30 minutes and an hour following the accident
5  attempting to lift something up that was too heavy
6  for him to carry.
7          MR. THOMPSON:  I object.  It misstates the
8  record and it fails to provide this witness
9  additional information to formulate an opinion.
10  Based on the misstatement of the facts you've made,
11  apparently assumes that he weren't just rear-ended by
12  a semi.
13  BY MR. LESTER:
14      Q.  With the assumptions that I just put in
15  place, would that change any of your opinions about
16  what may or may not have caused the herniated disk?
17          MR. THOMPSON:  Same objection.
18          THE WITNESS:  In order for me to say it
19  might change my opinion, or affect my opinion, or
20  need to be considered in my opinion, I would need to
21  know whether there was any effect to Mr. Stoneman
22  when he was trying to lift whatever object you're
23  referring to.  Did it -- did it cause a sudden change
24  in his symptoms?  Did it cause new symptoms?  Did it
25  not cause any symptoms?  Just in general, because

99

1  we've already talked about it, lifting heavy things
2  can cause disk herniations.  In general, the answer
3  would be, sure, it would be something to take into
4  account.  But the medical facts from your question
5  are completely missing so I have no way of using it
6  as a -- in my analysis unless I had the medical facts
7  associated with the event.
8  BY MR. LESTER:
9      Q.  Sure.  Well, you would agree with me that
10  Mr. Stoneman did not seek treatment of any kind on
11  the day of his accident, right?
12      A.  Correct.
13      Q.  And in fact, I believe he reported that he
14  didn't feel any pain at all the day of the accident,
15  correct?
16      A.  I don't recall that.
17      Q.  Do you recall one way or another whether he
18  testified about having pain that he associates from
19  the motor vehicle collision on the day of the
20  accident?
21      A.  I didn't read his testimony.
22      Q.  Or from the medical records that you
23  reviewed?
24      A.  Okay.  So rephrase, please.
25      Q.  Do you recall seeing anything about whether

100

1  Mr. Stoneman did or did not have pain that he
2  attributes to the motor vehicle accident on the day
3  of the accident?
4      A.  Yes, I do.
5      Q.  Where is that?
6      A.  Well, I just started looking at my report
7  under the Brief Case Summary, and again I don't have
8  the records in front of me, but when he was seen at
9  Corporate Care Occupational Medicine Clinic, in their
10  history of illness -- I have it in quotes, which
11  means I took it verbatim from their record --
12  moderate to -- in regards to his pain -- moderate to
13  intense; it has been eight days since the onset of
14  the pain.  That would make it from the day of the
15  accident.
16      Q.  And if you go down further, do you see the
17  paragraph that starts with on August 28th, 2018?
18      A.  Yes.
19      Q.  And again you have in quotes, He began
20  experiencing pain one to two days after the accident.
21  Do you see that?
22      A.  I do.
23      Q.  So inconsistent statements, or inconsistent
24  records, at least?
25      A.  Those would be, correct.

101

1      Q.  Okay.  If there are other records --
2  well --
3      A.  I thought there was another entry
4  somewhere, and that's what I was looking at.  Looking
5  for, I mean.  Let me just finish looking for one
6  second, please.
7          The Mid-America Orthopedics records, they
8  indicate that the -- and I have it in quotes -- that
9  the work injury, which would be the motor vehicle
10  accident, is the likely prevailing cause of the
11  current symptoms, which....
12      Q.  If Mr. Stoneman didn't tell any of his
13  doctors about him lifting a heavy object, then none
14  of them would have any way to know about it, right?
15          MR. THOMPSON:  Objection.  Misstates the
16  record.  Let the witness finish his response instead
17  of interrupting him.
18          THE WITNESS:  And I missed the first part
19  of that.
20  BY MR. LESTER:
21      Q.  Well, nowhere in the records did you see
22  anything where Mr. Stoneman told or informed any of
23  his treating physicians about the fact that he
24  allegedly was lifting a heavy object or attempting to
25  lift a heavy object following the accident, correct?

1     A.  I did not see that, correct.
2     Q.  So none of these doctors would have any way
3  of associating anything about with that unless
4  Mr. Stoneman had told them.  Fair?
5     A.  Correct.
6        Let me just finish looking at that -- for
7  that other question you asked.
8        So when he first saw Dr. Bailey on
9  October 22nd, 2018, Dr. Bailey described the work
10  accident -- work-related accident, being hit by the
11  semi, and he indicated that Mr. Stoneman did not
12  think he was significantly hurt but reported the
13  accident.  And the next day, it was worse.  So again,
14  there's another entry here which is indicating that
15  the symptoms began the day of the accident.
16        Almost done.
17        That's it.  That's all I could find.
18     Q.  Nothing in the records that you saw that
19  would indicate whether any of his symptoms started
20  one minute after the accident versus one hour after
21  the accident versus five hours after the accident; is
22  that fair?
23     A.  That's fair.
24     Q.  So knowing that, is it possible that
25  lifting and movement after the accident could have

1  potentially caused a herniated disk?
2        MR. THOMPSON:  Objection.  Incomplete
3  hypothetical.  Fails to provide sufficient facts or
4  information for this witness to formulate a response.
5        THE WITNESS:  So anything's possible.
6  Meaning he could have been hit by a meteor for all I
7  know.  The records tell me what they tell me.
8  They're all very consistent.  They all make sense.
9  There's nothing unusual here.  I didn't see any
10  entries about lifting.  He saw multiple
11  practitioners.  If it had come up, I would have made
12  mention of it.  It would have been part of my
13  assessment, my forensic assessment.  It's not here.
14        But from an orthopedic biomechanical
15  standpoint, the accident could have reasonably led to
16  the injuries sustained.  The injuries sustained is
17  well-documented and found to be present.  It's not
18  unusual for patients to have acute herniated disks,
19  to have the delayed onset of symptoms, especially
20  radicular symptoms.  It usually takes a day or so,
21  maybe a little less than a day, for the nerve root to
22  be compressed enough to be irritated and cause
23  radicular symptoms down in the lower extremity.  And
24  many patients think they just have a sore back when
25  in reality they've blown out a disk.  And within 24

1  hours they become highly symptomatic, or 36 hours
2  they become highly symptomatic.  I've seen that
3  hundreds of times in my practice.  So everything
4  makes sense here.  And your hypothetical that he
5  lifted something heavy that caused all this shows up
6  nowhere.  So I can't put any value to that.
7  BY MR. LESTER:
8     Q.  Sure.  Because you didn't read any of the
9  depositions.  Fair?
10     A.  Not fair.  Because as I said at the
11  beginning, I wouldn't rely on the deposition of
12  someone who is in a legal battle years later.  I rely
13  on the contemporaneously-created medical records
14  before there is a legal battle.  And they're not
15  being deposed.
16     Q.  This is a work comp case and a work comp
17  treatment, right?
18     A.  I'm sorry?
19     Q.  This is a -- all of his treatment is work
20  comp in this one, correct?
21     A.  The records I reviewed were all workers'
22  comp.
23     Q.  So on Page 11, the second bullet point from
24  the top, you recommend psychologic/psychiatric
25  support.  Do you see that?

1     A.  Yes.
2     Q.  Did you see that recommendation from any
3  one of his treating providers?
4     A.  No.
5     Q.  Your -- the next section of your report is
6  injuries and restrictions.  One, two, three, four.
7  Your fifth bullet point talks about, His overall
8  condition is not consistent with him being able to
9  continue his usual and customary occupation as a
10  truck driver.  Do you see that?
11     A.  Yes.
12     Q.  Are you -- do you have any experience as a
13  vocational rehab expert?
14     A.  Not as a vocational rehab expert, no.
15     Q.  Any training in vocational rehabilitation
16  or vocational placement?
17     A.  No.
18     Q.  Are you going to be offering any opinions
19  about Mr. Stoneman's vocational abilities and
20  employment opportunities beyond the restrictions that
21  you've identified?
22     A.  No.
23     Q.  Are you familiar with the FMCSR?
24     A.  Not those letters, no.
25     Q.  Okay.  Have you ever -- do you know what

106

1 the medical requirements to operate a commercial
2 motor vehicle are?
3        MR. THOMPSON:  I would object to the
4 extent -- are you asking him what the requirements
5 are under the Federal Motor Carrier Safety
6 Administration's Regulations?
7 BY MR. LESTER:
8     Q.  Sorry.  I will rephrase and ask a better
9 question because there's a lot of requirements that
10 would be outside your field.
11        Do you know what the medical requirements
12 to operate a commercial motor vehicle are?
13        MR. THOMPSON:  Again, same objection,
14 without reference to any specific source.  If you're
15 talking about under the Federal Motor Carrier Safety
16 Administrations Regulations, are you talking about
17 custom and practice in the industry?  Are you
18 talking --
19 BY MR. LESTER:
20     Q.  I'd like to know any.  Dr. Graboff, do you
21 know any medical requirements for the operation of
22 commercial motor vehicles?
23     A.  I know just the opposite.  I know what
24 would preclude somebody from doing that kind of work,
25 but I do not know what the list of requirements are.

107

1     Q.  Okay.  What do you think would preclude him
2 from doing that work?
3     A.  Climbing, Number 1.  Getting up into the
4 cab.  Number 2, impact to the spine, sitting in the
5 seat.  Any lifting requirements over 10 pounds, which
6 just common sense tells me if he's a truck driver,
7 there's going to be more than 10 pounds of lifting,
8 pushing, pulling, or comparable physical effort
9 required with his upper extremities.
10     Q.  That's just common sense, though, but you
11 have no basis -- I mean, have you ever talked to a
12 truck driver about whether or not it's mandatory for
13 them to push, pull or do 10 pounds of lifting?
14        MR. THOMPSON:  I would object.  Here again,
15 Michael, you've interrupted him while he is still
16 providing a response.  Just hold your horses and let
17 him finish.  And then you can certainly follow up
18 with another question.
19        THE WITNESS:  So from 1989 to 2017, I was
20 assigned by the State of California when I was
21 practicing in California to determine whether truck
22 drivers could go back to work driving trucks after
23 they had spinal injuries and spinal decompression
24 procedures, laminectomies, diskectomies, fusions.  I
25 did the same thing to the police department,

108

1 helicopter pilots, aircraft industry.  So I have
2 plenty of experience in dealing with truck drivers
3 and what their requirements are on paper to drive a
4 truck and what they do in reality to drive your
5 truck.  Which may not be on paper, necessarily.  But
6 from a medical standpoint, you don't necessarily have
7 to take into account the fact that there are listed
8 federal or state requirements for driving a truck.
9 You need to take into account the kinetics and the
10 effect on the injury and the treatment that was
11 provided and the future of the patient's injury and
12 where it will lead to if it's not prophylactically
13 protected.
14        And so from a medical standpoint, I have in
15 the past for many years in California when I was
16 doing QME work for the state, determined, and most
17 other orthopedic surgeons have done the same, that an
18 individual that's had this kind of a disk blowout and
19 injury with now two levels of disk pathology that's
20 progressive is not suitable for bouncing around in
21 the cab of a truck.  Is not suitable for doing any
22 kind of long-term sitting, long-term driving.  And
23 not being able to get up and move around every half
24 hour or 20 minutes as needed for relief and comfort.
25 And most patients with this kind of condition would

109

1 be prophylactically precluded from truck driving,
2 regardless of what the standards say they may or may
3 not be able to do in their job or they have to do.
4 But from a medical standpoint, it's not good for
5 their condition.  It's only going to make it worse.
6        Now, if you told me that the federal or
7 state guidelines for driving a truck means that he's
8 going to sit behind a desk and not bounce around and
9 he can get up and move around every 10, 15, 20
10 minutes as needed for comfort, yeah, he could drive a
11 truck.
12 BY MR. LESTER:
13     Q.  Would it matter to you that a medical
14 examiner who's qualified under the FMCSR saw him
15 after the surgery in 2019 and said that he was
16 qualified to drive a truck?
17        MR. THOMPSON:  Objection.
18 BY MR. LESTER:
19     Q.  Medically qualified to drive a truck?
20        MR. THOMPSON:  Under the Federal Motor
21 Carrier Safety Regulations.  If you include that, I
22 won't object to the question.
23        MR. LESTER:  I'll include it.
24        (Telephonic interruption)
25 //

BY MR. LESTER:

Q. Does that matter to you?

A. It would not matter to me, no.

Q. We talked about -- okay, so then we get into the restrictions that you've identified. That's the next one, two, three, four bullet points there. Do you see where I'm talking about?

A. I do.

Q. Do you agree with me that -- I guess let me ask a better question. Did these restrictions come from anywhere or are they all from your experience and expectations? As in -- and I'll ask one more better question just to clarify.

Did you see these specific restrictions placed on him at any point by any of his treating providers?

A. No. And you're talking about the specific restrictions that I opined on, correct?

Q. That's the specific restrictions in bullet points seven, eight -- six, seven, eight, and nine on Page 11 of your report.

A. What about 10?

Q. We can add 10, sure.

A. Yes, I didn't see anybody else give that degree of restriction.

Q. Okay. You would agree with me that these are far more restrictive than any restrictions placed on him by his treating providers, correct?

A. Correct.

Q. And you would agree with me that you did not actually go out and perform any tests to measure his capabilities or abilities to create these restrictions, correct?

A. Correct.

Q. You didn't speak with him to understand what he believes his own limitations are or read his deposition or anything like that, correct?

A. That wouldn't matter to me. He's not a medical doctor. He doesn't know what the future holds. He can't predict what's going to happen to him in the future. Doesn't have that kind of knowledge, training or experience. So it wouldn't matter. But the answer to your question, no, I did not speak to him. But it's irrelevant.

Q. And was the functional capacity exam also irrelevant?

MR. THOMPSON: Objection. Argumentative.

THE WITNESS: Functional capacity evaluation was interesting to read. It did show that he was impaired. But -- and it was not irrelevant.

And I took it into account as part of my opinions.

BY MR. LESTER:

Q. Okay. Can you give me an explanation for why your restrictions are more narrow and allow him to do less than the restrictions placed on him by SERC and by his treating physician?

MR. THOMPSON: Objection to the extent it's been asked and answered. He's explained this about an hour ago.

BY MR. LESTER:

Q. Uh-huh.

A. Well, first of all, let me ask a rhetorical question to start my answer by saying, Would you want a man with this severe damage to his spine, this amount of pain, and this amount of dysfunction driving a heavy truck heading towards you in the middle of the night? My answer would be no. Never. I wouldn't want this man on the road driving a commercial vehicle, period.

What drives me to these opinions are, Number 1, I've seen patients, from start to finish in my career, starting off with his injury, and I've seen what happens to them over the course of 15, 20 years as their spine has been damaged and it gets worse and degenerates. And the whole intent of the

restrictions is to minimize the rapidity of which all this is going to take place.

So there's two prongs to the restrictions. One is from a safety standpoint. Number 2 is a prophylactic standpoint, to try and prolong the inevitable as long as possible. Also from a safety standpoint. We don't want him to have a sudden numb leg, a sudden severe spasm of back pain while he's driving 65 miles an hour in his truck. It's a dangerous situation. So --

BY MR. LESTER:

Q. You --

A. Let me just wrap it up by saying, it's a multifaceted reason from a medical standpoint with prophylaxis for the future because he can't see what's down the road. He's not a medical professional. He may say, Sure, I can drive my truck, I've got to feed my family. But he doesn't understand that if he does that, and he feels like he can do it now, he's only going to accelerate the damage and cause him to require more surgery, more treatment, a lot sooner than may be necessary.

Q. Okay. You would agree with me that Dr. Bailey placed restrictions on him that would allow him to work in capacities that are not a

114

1 commercial motor vehicle driver, correct?
2    A. I'm not sure I know....
3    Q. You were very focused in that response on
4 whether or not he should be a commercial motor
5 vehicle driver. There are other jobs in the world
6 other than commercial motor vehicle driver, correct?
7    A. Yes.
8    Q. And with the restrictions placed on him by
9 Dr. Bailey, he could work more jobs than with the
10 restrictions placed by you, fair?
11    A. Hang on. I need to go back and see what
12 Dr. Bailey's restriction was.
13    Q. It was on Page 8 of your report. The
14 paragraph starting, Furthermore, Dr. Poppa indicates
15 that Mr. Stoneman....
16    A. I thought you were talking about Bailey.
17    Q. Yeah. Dr. Poppa -- I believe you have
18 Dr. Poppa summarizing Dr. Bailey's opinions in your
19 report. Mr. Stoneman was evaluated by the surgeon
20 and placed on work restrictions.
21    A. ,So evaluated by the surgeon. Work
22 restrictions of light work, 20-pound lifting or
23 carrying on an occasional basis, and to change
24 positions, meaning sitting, standing, or walking,
25 every two hours.

115

1       Yes, there are other jobs than driving a
2 truck that he could do that.
3    Q. Yeah. And those restrictions are less
4 restrictive on his work and employment future than
5 what yours are. Fair enough?
6    A. Yeah. Not that much. 10 more pounds
7 difference in lifting. I have him mainly sedentary.
8 He has him at light look work. Light work is the
9 next level above sedentary. So we're not that far
10 apart.
11    Q. Do you agree with Dr. Bailey that plaintiff
12 could perform light work?
13    A. No, I believe in my opinions, the ones that
14 I've given you.
15    Q. Okay. So you would disagree with -- you
16 believe that those restrictions aren't restrictive
17 enough, fair?
18    A. That's correct.
19    Q. Same with if you look above on Page 8,
20 you've got the restrictions from the SERC functional
21 capacity exam. You would also say that those
22 restrictions are not restrictive enough?
23    A. I think we went through this before. And I
24 told you I didn't understand exactly what they meant
25 by those. But just the last bullet, I do understand.

116

1 And I don't agree that those are restrictive enough
2 to prevent this man from all the things I was talking
3 about before.
4    Q. If Mr. Stoneman were to do the care and
5 treatment that you have called for in your future
6 medical care section, could any of these restrictions
7 be lifted or changed or modified?
8    A. No.
9    Q. It's your position that no matter what he
10 does, he will have these restrictions for the rest of
11 his life?
12    A. Correct.
13    Q. I think I asked you earlier, but this
14 report contains a complete list of all opinions you
15 expect to offer at trial subject to if discovery
16 reveals any facts?
17    A. Correct.
18    Q. How many cases have you been retained by
19 Edelman & Thompson to give opinions on?
20    A. Estimate, 15.
21    Q. How many of those have been within the last
22 five years?
23    A. You've got that list there. I'm sure
24 they're all on there.
25    Q. Would you say every case that you've been

117

1 retained by Edelman & Thompson is on the testimony
2 list that you've provided?
3    A. No. Only the ones I've testified to.
4    Q. Okay. Do you have any idea how much -- in
5 the last five years, do you know how much money
6 Edelman & Thompson has paid you for opinions?
7       MR. THOMPSON: Objection. Objection. He's
8 not paid for his opinion. He's paid for his time.
9 BY MR. LESTER:
10    Q. Sure. Do you have any idea just how much
11 you've billed Edelman & Thompson for medical legal
12 work on their cases?
13    A. From a cumulative standpoint, no.
14    Q. Have you ever turned down a case from
15 Edelman & Thompson?
16    A. I don't believe I have.
17    Q. Have you ever had your testimony or
18 opinions excluded or limited by a court before?
19    A. Not that I'm aware of.
20    Q. Have you ever provided a final report or
21 given sworn testimony in a case you later learned
22 would be -- was incorrect or wrong or needed to be
23 changed?
24    A. Not that I'm aware of, no.
25    Q. Do you recall at the last deposition we

118

1  discussed a report you offered on behalf of
2  plaintiff, Derrick Houston, who was represented by
3  Edelman & Thompson?
4      A.  I do.
5      Q.  Did you do anything to look up or find that
6  report or remind yourself of that case following our
7  discussion in April?
8      A.  I did.
9      Q.  Do you recall -- after you looked it up, do
10  you recall Derrick Houston at all and the facts of
11  that case?
12      A.  Only what I could find on the internet.
13  But yes, a little bit.
14      Q.  What did you find on the internet?
15      A.  That he was injured in prison -- I don't
16  have any file on him anymore, it's all gone.  But
17  that he was injured in prison, he had a severe spinal
18  burst fracture.  He had paraplegia.  And that at some
19  point ultimately after he settled his case out, he
20  was captured on a video cam somewhere or a body
21  camera walking.
22      Q.  Do you recall authoring a report in March
23  of 2017 that testified that his paralysis was
24  irreversible and permanent?
25      MR. THOMPSON:  I would object.  First of

119

1  all, he didn't testify to anything.  He issued --
2      MR. LESTER:  It was a bad question.  I'll
3  rephrase, James.  You're right.
4      MR. THOMPSON:  He issued a report.
5  BY MR. LESTER:
6      Q.  Do you recall drafting a final report in
7  that case that was used for settlement that stated
8  that Mr. Houston's paralysis was irreversible and
9  permanent?
10      MR. THOMPSON:  And I would object.  That
11  again misstates the record in this case.  And in the
12  Houston case.
13      THE WITNESS:  I do recall that I did a
14  report in that case.  I do recall identifying, after
15  a comprehensive forensic analysis of that material
16  provided to me, that patient with that kind of injury
17  was consistent with being paraplegic.
18  BY MR. LESTER:
19      Q.  Okay.  This is the report and
20  recommendation filed in the court, stamped and
21  everything.  It says, Dr. Graboff reviewed
22  Mr. Houston's medical records and opined that the
23  jail staff's delayed treatment of plaintiff's T2
24  vertebrae caused his paralysis to become irreversible
25  and permanent.

120

1      My first question is:  That's you,
2  Dr. Graboff, correct?
3      A.  Correct.
4      Q.  And do you have any reason to dispute the
5  characterization that the court gave your report?
6      A.  No.
7      Q.  Is it your understanding that approximately
8  a month after that report was drafted, Mr. Houston
9  was in fact caught on camera walking?
10      MR. THOMPSON:  Well, I would object.  That
11  completely misstates the record in this case.  And it
12  misstates the record in the Houston case.  And it
13  misstates the record of when the report was issued.
14  And it misstates the timeframes with respect to
15  Derrick Houston.  And it misstates or fails to
16  include that Derrick Houston in the report was found
17  to have been dishonest to his lawyers and dishonest
18  to the medical providers and doctors who evaluated
19  him.  And it also -- it also misstates --
20      MR. LESTER:  I'll ask a different question.
21      MR. THOMPSON:  -- misstates the record in
22  the context of the totality of this case.  I happen
23  to know this case fairly well, and I know the facts
24  in the case.
25      MR. LESTER:  All right.

121

1  BY MR. LESTER:
2      Q.  Let me just look at the report and
3  recommendation, Dr. Graboff.  It says, Defendant
4  also had a March 2017 report authored by Steven R.
5  Graboff, M.D.  Do you have any reason to dispute that
6  that was the March 2017 report?
7      A.  No.
8      Q.  On April 25th, 2017, officers of
9  Columbia -- this is the summary of him being caught
10  on camera, which occurred on April 25th, 2017.  Do
11  you have any reason to dispute that that's the date
12  where Mr. Houston was caught on camera walking?
13      A.  No.
14      Q.  So we have, I said a month, I guess I'm not
15  sure, maybe it was up to 60 days, but some time
16  between March 2017 when your report was authored and
17  April 25th, 2017 your opinion that his paralysis was,
18  quote, irreversible and permanent, was -- became
19  incorrect, correct?
20      A.  That's a really --
21      MR. THOMPSON:  I would object to the extent
22  that Derrick Houston still has paralysis, as all of
23  his -- as all his medical records indicate.  His
24  ability to ambulate is a different question.
25      THE WITNESS:  That's a complex question you

122

1  just asked me.  So here's my best answer to your
2  question, because I want to answer it for you.  The
3  medical records and the radiology that was provided
4  to me to review in that case is 100 percent
5  consistent and medically probable of an individual
6  with an irreversible spinal cord injury due to a
7  burst fracture leading to paraplegia.  I could review
8  those records 100 times and I would come to the same
9  forensic conclusion every single time I looked at
10  those records and radiology, that that patient had an
11  irreversible burst fracture with retropulsion of a
12  big chunk of bone into his spinal cord impaling his
13  spinal cord, leading to paraplegia.  I think if you
14  showed that -- those medical records to 10 other
15  orthopedic surgeons, they'd all arrive at the same
16  conclusion.  So regardless of whether this man
17  somehow is shown walking 60 days later would never
18  change my opinion based on the materials that I
19  forensically reviewed because they all are consistent
20  with and show an individual with a severe spinal cord
21  injury leading to paraplegia.
22  BY MR. LESTER:
23      Q.  Do you believe that the records, that every
24  single forensic orthopedic surgeon looking at the
25  records would also come to the conclusion that the

123

1  paralysis was irreversible and permanent?
2      A.  I'm not going to answer every single.  I
3  would say the majority would.
4          MR. THOMPSON:  How about every single
5  treating physician of Derrick Houston who agreed with
6  it?
7          THE WITNESS:  I agree with that.  Every
8  single treating physician did find that.
9  BY MR. LESTER:
10      Q.  He then, of course, was able to ambulate at
11  a later date, correct?
12      A.  Well, I don't know that for a fact.  All I
13  know is what you're showing me and what I saw on the
14  internet on -- in some internet postings.  I don't
15  know that medically, what he did.
16      Q.  Fair enough.  You would agree with me then
17  that it's possible that medical records that 100
18  percent pointed to one forensic outcome can be wrong
19  if a patient or plaintiff lies?  Is that fair?
20          MR. THOMPSON:  Objection.  Incomplete
21  hypothetical.  Fails to provide proper foundation for
22  this witness to formulate a response.  If my
23  grandmother had wheels, she'd be a trolley car, you
24  know.  And meteors hit the earth.  It's a ridiculous
25  question.

124

1          THE WITNESS:  So the answer to your
2  question is, I don't agree with what you just said,
3  no.  Even if I did not see a single medical record
4  that had any statements from Mr. Houston
5  whatsoever -- lying, truthful, irrelevant, if you
6  just showed me the MRI scan, CT-scan and x-ray of
7  Mr. Houston, and said to me, What would his medical
8  condition be, I would tell you that he would be a
9  high-level thoracic paraplegic based on the severe
10  burst fracture that he had.  Without him saying a
11  word.  So answer is no.
12  BY MR. LESTER:
13      Q.  If the word that he said was, But I can
14  ambulate, would that then affect your opinion?
15          MR. THOMPSON:  Objection.  Incomplete
16  hypothetical.
17  BY MR. LESTER:
18      Q.  If he walked up to you and told you, Oh,
19  no, that I can ambulate, would you still give the
20  same opinion?
21      A.  If he -- if I actually saw him walk up to
22  me?  And I saw -- then I would have to say that the
23  radiology that I was looking at did not belong to
24  Mr. Houston and that there's some funny business
25  going on here.

125

1      Q.  So all I'm asking is -- I don't -- this is
2  not really trying to be a tricky questioning.  It's
3  possible and you have had a case with Mr. Thompson
4  before where all of the medical records pointed to
5  one thing, and that one thing may not have been
6  correct; is that fair?
7          MR. THOMPSON:  Incomplete hypothetical.
8  That one thing was correct.  You don't understand the
9  medical in the Houston case, Michael.  You simply
10  don't.
11          THE WITNESS:  So I don't agree with you.
12  The medical opinion about Derrick Houston in my
13  opinion is 100 percent correct.  It'll never change.
14  The only thing that would change is if somebody said,
15  you know what, we accidentally gave you the wrong
16  medical records.  These don't belong to Mr. Houston.
17  They belong to somebody else.
18          MR. LESTER:  Okay.
19          James, do you have any redirect?
20          MR. THOMPSON:  Yeah, I have two questions.
21  Are you done?
22          MR. LESTER:  Why don't you go?  I'll look
23  at my notes, but I think I'm done.
24
25  //

126

1          EXAMINATION
2 BY MR. THOMPSON:
3     Q.  Doctor, I just have a -- really, one or two
4 questions.  Just clarify a couple things.
5     A.  You're showing me your notes.
6     MR. LESTER:  Oh, I'm sorry.  Didn't realize
7 I was still sharing.
8     THE WITNESS:  It's okay.  I copied them
9 all.
10 BY MR. THOMPSON:
11    Q.  Doctor, I have just a few questions.  You
12 recall, both in terms of the records you reviewed and
13 also your opinions that you've given today, that
14 subsequent to Dr. Bailey's surgery, additional
15 radiographic findings were obtained, right?
16    A.  Correct.
17    Q.  And those additional findings indicated a
18 fragment, as you've explained, correct?
19    A.  Correct.
20    Q.  And defense counsel wanted to make a big
21 point about could that fragment have been just a
22 fragment that had been left there in the original
23 surgery and existed at all times, or could it have
24 been an additional -- an additional herniation that
25 created that fragment.  Do you recall that line of

127

1 questioning?
2     A.  Yes.
3     Q.  And you've indicated it could be either
4 scenario, correct?
5     A.  Correct.
6     Q.  But in either case, Doctor, is it your
7 opinion, to a reasonable degree of medical certainty,
8 that either scenario would have been caused by the
9 original accident and injury in this case?  In other
10 words, if the fragment was simply left, was that
11 caused or contributed to cause -- be caused by the
12 accident?  Do you have an opinion?
13    A.  I do.  It was.
14    Q.  And let's say it was the result of an
15 additional herniation.  Would the pathophysiology
16 that was created in the original injury at that disk
17 level have led to that type of additional herniation?
18    A.  Yes, it would.
19    Q.  And can you explain in that setting why the
20 original injury would have, more likely than not,
21 been the causative agent for an additional
22 herniation?
23    A.  Sure.  So when you have a massive blowout
24 of the disk at L5/S1 that occurred in this case, and
25 then you have a surgeon go in and remove the

128

1 fragments of this very large disk, which Dr. -- I
2 just blanked on his name -- the surgeon removed at
3 the time of the surgery -- Dr. Bailey -- he
4 documented how large this was and how it was tenting
5 or underneath the S1 nerve.  So he removed all that.
6 But what's left behind in the disk space is now
7 damaged, softened, potentially fragmented,
8 potentially torn, remaining disk material.  Which is
9 known to re-herniate.  Is known -- there's nothing
10 holding it together.  So it can easily pop a piece
11 out and re-herniate.  And this is well-known since
12 the disk is no longer fully contained by the
13 surrounding membrane.  There's nothing to really hold
14 it together.  It would be like, if we go back to the
15 jelly doughnut scenario, if I removed one third of
16 the jelly doughnut's skin, would it take much for
17 more of the jelly to ooze out of the center onto the
18 table top?  No.  Because there's nothing to hold it
19 together.  That's the same situation after the
20 surgery.
21    Q.  Thank you, Doctor.  I have no further
22 questions.
23    MR. LESTER:  I have no further questions, I
24 think.
25    But just for the record, I didn't mark

129

1 everything in the file.  I'm just going to mark the
2 entire file as a whole as Exhibit 6.  Unless you
3 object, James.
4     MR. THOMPSON:  That's fine.
5     (Whereupon, Exhibit No. 6 was designated
6 for identification.)
7     MR. THOMPSON:  All right.  Thanks
8 everybody.
9     VIDEOGRAPHER:  We're now going off the
10 record.  The time is 2:35.
11    (Adjourned at 2:35 p.m.;
       signature waived by deponent)
12
13         oOo
14
15
16
17
18
19
20
21
22
23
24
25

130

REPORTER'S CERTIFICATION

      I, CONNIE McCARTHY, a Certified Court Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

      That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

      I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the events of this cause, and that I am not related to any of the parties hereto.

DATED: November 6, 2021

_____

Connie McCarthy, RMR, CRR
MO CCR 1435

**A**

**A.6** 32:1,14
**a.m** 3:15 5:1
**AAOS** 29:16 30:1,7
 31:1,4,23
**AAOS's** 30:10,15
**abbreviation** 45:7
**abilities** 67:18 105:19
 111:7
**ability** 66:24 121:24
**able** 68:3 105:8
 108:23 109:3
 123:10
**abnormal** 53:23 54:6
 54:8 92:13
**absence** 62:24
**absolutely** 85:15
**accelerate** 113:20
**accept** 89:10
**acceptance** 21:25
**accepted** 13:22
**access** 24:17 27:9
**accident** 10:5 34:13
 34:14,17,19 55:18
 56:10 87:12 97:16
 98:4 99:11,14,20
 100:2,3,15,20
 101:10,25 102:10
 102:10,13,15,20,21
 102:21,25 103:15
 127:9,12
**accidentally** 37:15
 125:15
**accidents** 34:21,23
 57:19 58:10,11
**account** 60:19 69:18
 73:11 99:4 108:7,9
 112:1
**accurate** 28:14,15
 81:24 82:1
**acknowledge** 5:20,23
**activities** 66:18 67:1
 68:4
**actual** 33:9,24 46:12
 47:11 54:18 89:1
**acute** 45:9,13 103:18
**add** 37:10 41:14
 110:23
**additional** 22:22

28:10 29:9,10,14
 42:2,11,22 43:4
 78:22 87:19 88:22
 90:20 98:9 126:14
 126:17,24,24
 127:15,17,21
**address** 7:7,10 22:24
**Adjourned** 129:11
**administer** 5:24
**administered** 5:24
**Administration's**
 106:6
**Administrations**
 106:16
**administrative** 31:3
**advise** 21:25
**affect** 98:19 124:14
**agent** 127:21
**ago** 10:24 24:24
 93:15 95:25 112:9
**agree** 6:7,9 26:14,18
 27:7 28:18 31:7,13
 31:14,16 32:24 33:2
 33:5 47:1 53:4,19
 56:12,15,19,21
 58:20 59:4,20 60:2
 60:4 62:13 66:16
 67:17 68:1,8,10
 70:8 71:22 72:1
 75:2 76:18 77:1
 79:22 80:10,13
 82:17 87:19,21 99:9
 110:9 111:1,5
 113:23 115:11
 116:1 123:7,16
 124:2 125:11
**agreed** 31:6 75:7
 123:5
**agreement** 6:4,5
**ahead** 97:22
**aircraft** 108:1
**AJELLO** 1:7 3:7
**al** 5:8
**allegation** 25:25 26:8
 27:8
**allegations** 26:12
**allegedly** 65:2 101:24
**Allison** 38:19
**allow** 52:7 112:4

113:25
**allowed** 24:2
**alter** 42:13
**Alyson** 38:18
**ambulate** 121:24
 123:10 124:14,19
**amended** 32:7
**American** 12:17 13:2
 13:5,19,25 17:18,19
 17:23,24 18:10 20:2
 20:3,17 22:12 24:3
 24:3 25:22
**amount** 41:11,18
 112:15,15
**analysis** 20:23 21:2
 24:15 99:6 119:15
**and-a-half** 49:15
 50:16 51:16
**ankle** 15:3
**answer** 15:7 19:3,4
 19:23,24 21:23 26:6
 28:13 29:5 38:9
 49:18 50:14 55:19
 55:24 56:4 63:5
 71:6 73:13,21 91:19
 91:22 96:10 99:2
 111:18 112:13,17
 122:1,2 123:2 124:1
 124:11
**answered** 27:13 29:1
 63:4 95:25 112:8
**answering** 36:13
**anterior** 88:2
**anterior/posterior**
 88:23,24 89:7
**anybody** 7:12 21:13
 22:5 110:24
**anymore** 37:23 70:6
 90:12 118:16
**anyplace** 16:16
**anything's** 103:5
**anyway** 68:2
**apart** 115:10
**apparently** 21:21
 86:22 98:11
**appealed** 30:5
**appearance** 5:11
**applicable** 31:11
 32:17

**applied** 13:21
**appreciate** 38:13
 40:6
**appropriate** 76:20,20
**approximately** 11:12
 11:22 120:7
**April** 10:11,15 32:23
 33:5,7,16 59:4
 81:22 118:7 121:8
 121:10,17
**aptly** 57:10
**area** 13:11 14:20
 94:20,21 95:10
**areas** 24:14 92:25
**Argumentative**
 111:22
**arised** 26:21
**arose** 26:15,21 27:8
**arrangement** 6:2
**arrive** 122:15
**arrow** 45:16
**arthritis** 91:15
**article** 23:17
**articles** 11:6 23:6,11
 23:22 24:1
**aside** 19:20
**asked** 8:6 28:14 29:1
 35:23 50:14 71:2
 77:20 86:12 102:7
 112:8 116:13 122:1
**asking** 18:14,16,22
 35:14 76:3,10 77:21
 106:4 125:1
**Asks** 72:24 87:17
**aspect** 15:4 82:24
**assassination** 20:14
**assessment** 21:3,3
 24:15 27:2 59:24
 103:13,13
**assign** 93:2
**assigned** 73:12
 107:20
**associated** 56:13 99:7
**associates** 99:18
**associating** 102:3
**Association** 25:22
**assume** 21:11 37:9
 46:3 66:14 98:2
**assumes** 29:2 80:18

98:11
**assuming** 51:12
74:11
**assumption** 94:5
**assumptions** 21:9
98:14
**attached** 2:20
**attempt** 16:2 38:8
**attempted** 15:12
78:19
**attempting** 21:21
81:9 98:5 101:24
**attempts** 16:1
**attorney** 130:15
**attorneys** 5:19
**attribute** 57:6
**attributed** 55:17
56:10
**attributes** 100:2
**August** 38:21 100:17
**authored** 121:4,16
**authoring** 118:22
**Autonoma** 12:12
13:14
**available** 24:22 71:4
77:16
**avoid** 95:15
**aware** 62:17 66:5
78:1 117:19,24
**awhile** 22:1 93:19,21

**B**

**B** 4:10
**back** 12:24 17:6,10
24:21,23 32:3 37:16
39:9,17 47:16 48:5
52:9,15 56:25 58:1
61:12,18 62:19 65:2
65:14 66:12 70:4
78:13,19 79:20 83:4
86:17 90:18 97:7,10
103:24 107:22
113:8 114:11
128:14
**back/spinal** 70:3
**background** 10:19
18:6,17 80:17
**backup** 14:18
**bad** 8:6 35:23 50:14

119:2
**Bailey** 53:18 65:11
70:7 71:3,8,10
72:25 73:7,14 74:2
74:2,15,24 75:13
76:11,16 78:10,19
79:14,18 82:25 83:6
84:23 85:4 87:22
88:2 89:19,20 90:6
90:14,21 102:8,9
113:24 114:9,16
115:11 128:3
**Bailey's** 70:17 88:19
114:12,18 126:14
**baked** 64:14
**base** 52:11
**based** 25:9 31:18
43:8 55:23 59:9
66:9 69:12,16,19
75:22 76:2,18 86:12
93:1 98:10 122:18
124:9
**basically** 49:7,11
52:18 83:13 95:6
**basing** 74:11
**basis** 56:6 68:4,6
70:14 82:21 107:11
114:23
**Bates** 44:12
**battle** 104:12,14
**beat** 32:9
**began** 100:19 102:15
**beginning** 7:24
104:11
**behalf** 1:14 5:13,15
6:6,8 8:12 118:1
**believe** 8:19 18:3
19:5,6 20:21 22:14
26:8 38:19,21,24
39:24 42:3 49:16
55:17 68:14 69:12
77:1 79:21 87:22
88:1 89:14 94:2
99:13 114:17
115:13,16 117:16
122:23
**believed** 36:22 56:9
**believes** 73:6 111:11
**belong** 124:23 125:16

125:17
**belonged** 22:13
**beneath** 45:19 46:25
**benefit** 89:6 93:21
**best** 23:4 38:14 40:5
54:25 63:14 80:10
93:10 96:1,17 122:1
**better** 33:14 58:21
68:21,24 69:2 81:6
106:8 110:10,13
**beyond** 105:20
**big** 52:7 78:7 83:4,5
122:12 126:20
**bill** 41:20
**billed** 41:11,16,24
117:11
**billing** 2:12
**biomechanical**
103:14
**bit** 14:11 40:24 47:12
118:13
**blanked** 128:2
**blew** 61:12 83:4
**blinking** 66:2
**blob** 52:7
**block** 95:1
**blow** 82:25
**blown** 83:8 103:25
**blowout** 56:25 92:15
108:18 127:23
**board** 15:11 16:10,14
16:19 17:2,19 20:2
20:3,25 21:10,11
22:12 24:3
**board-certified** 14:5
14:9 15:5,8 20:18
**boards** 20:7,8 23:13
23:23 24:10
**body** 41:7 95:7
118:20
**bone** 91:11 122:12
**bones** 52:4
**bottom** 47:2 48:25
54:18 82:5
**Boulevard** 4:11
**bounce** 109:8
**bouncing** 108:20
**boxes** 68:18
**bracket** 46:17

**brain** 95:2
**break** 17:13,17 47:16
**breakdown** 48:19
**breaking** 13:8
**brief** 49:4,8 50:2
100:7
**Broadway** 4:5
**broke** 40:24
**broken** 91:11
**Brown** 4:10
**bullet** 49:9 66:18
67:1 68:3 82:5 91:2
91:23,25 94:1,13,15
95:5 97:11 104:23
105:7 110:6,19
115:25
**bunch** 52:21
**buried** 83:11
**burst** 118:18 122:7
122:11 124:10
**business** 124:24
**buttocks** 62:18

**C**

**C** 4:1
**cab** 107:4 108:21
**calculator** 41:14
**California** 14:7,21
69:6,11,24 107:20
107:21 108:15
**call** 14:19 50:6
**called** 6:12 21:16,17
21:24 49:4 62:21
116:5
**calling** 23:8
**cam** 118:20
**camera** 118:21 120:9
121:10,12
**capabilities** 111:7
**capable** 69:8
**capacities** 113:25
**capacity** 67:4,12
69:16,17,22 111:20
111:23 115:21
**captured** 118:20
**car** 34:20 123:23
**care** 15:2 35:24 46:5
46:9 70:13 73:2
77:21 79:12 81:4

89:14 91:1 100:9
116:4,6
**career** 12:5,8 53:14
53:21 91:21 112:22
**careful** 36:13 85:2
**Carrier** 106:5,15
109:21
**carry** 97:17 98:6
**carrying** 67:24 72:16
114:23
**case** 1:5 3:5 5:7,8
8:17 9:10,16 10:18
21:5 26:24 28:7
29:3,12 31:9 33:21
34:1,4,7,10 38:10
38:12,19,19,22,24
39:22,25 40:1 41:1
41:10,12,16,25
42:12 43:15 48:24
49:4,8,21,22 50:2,7
52:4 60:10,11 61:23
64:17 65:1 67:10
69:15,21 70:14
73:15 74:1 76:2,4
76:11,19 77:15
79:18,24 80:20 81:3
81:12 92:6 94:20
95:11 97:21 100:7
104:16 116:25
117:14,21 118:6,11
118:19 119:7,11,12
119:14 120:11,12
120:22,23,24 122:4
125:3,9 127:6,9,24
**cases** 20:21,23 25:10
25:18 38:1 40:9,10
40:12 64:6 116:18
117:12
**cast** 43:7
**cat** 24:2
**categorized** 38:7
**category** 67:20,22,23
**catheter** 95:10
**caught** 120:9 121:9
121:12
**causative** 127:21
**cause** 34:21 55:9
56:20 62:18 87:13
98:23,24,25 99:2

101:10 103:22
113:21 127:11
130:7,17
**caused** 55:10 56:24
78:13 82:11,24 87:8
98:16 103:1 104:5
119:24 127:8,11,11
**causes** 63:22 94:22
**causing** 45:17 61:10
62:1,5
**CCR** 3:16 4:25
130:24
**CDs** 8:22
**cease** 77:21
**center** 128:17
**centimeter** 78:5,7,11
79:7
**central** 5:5 52:1
**certain** 22:5
**certainly** 38:12 62:23
81:10 107:17
**certainty** 84:14 86:8
86:14 127:7
**certification** 16:15,19
17:3 18:11,13 20:5
23:13,24 130:1
**certifications** 15:12
17:16 22:10
**certified** 16:9 17:18
20:1,7,17 21:5 24:2
130:3
**certify** 20:5 130:4,14
**chair** 57:20
**chance** 64:22 74:24
93:3,3
**change** 37:11 42:13
42:14,19,25 43:6,7
77:24 97:17 98:15
98:19,23 114:23
122:18 125:13,14
**changed** 22:23 27:23
28:11 29:10,11
30:18 74:5 75:8
77:17,18 78:9,10
116:7 117:23
**changes** 66:11 84:16
86:25
**changing** 86:21
**characterization**

120:5
**charge** 21:10
**charged** 22:13,14
**chart** 2:14
**choice** 76:15 89:9
**Christopher** 1:3 3:3
5:7,14 8:12
**chronic** 79:3 91:5,12
91:13,14,15,17,18
91:19
**chronically** 91:22
**chunk** 122:12
**chunks** 61:12
**circle** 45:15
**City** 1:2 3:2 4:6,12
**civil** 30:13 70:14
**claimed** 29:22
**claims** 70:12
**clarify** 41:3 110:13
126:4
**clear** 32:11 84:17
**cleared** 59:5
**clientele** 14:13
**Climbing** 107:3
**clinic** 11:19 12:2
53:12 58:6 100:9
**clinical** 22:24 59:19
60:2,8 69:14
**clinically** 14:14 58:21
**clinician** 58:5 96:12
**close** 33:8 44:4
**clue** 90:21
**CME** 24:14
**college** 17:18,23,24
18:10 20:9,17 22:1
**collision** 99:19
**collisions** 34:23
**colon** 46:4 67:1
**Columbia** 121:9
**come** 37:16 40:7
47:16 66:7 90:18
103:11 110:10
122:8,25
**comfort** 108:24
109:10
**coming** 95:11
**comment** 18:24
**commenting** 51:19
**commercial** 106:1,12

106:22 112:19
114:1,4,6
**committed** 30:16
**common** 85:5 107:6
107:10
**communication** 8:4
**comorbidities** 63:21
66:11
**comp** 78:24 104:16
104:16,20,22
**companies** 17:22
**comparable** 107:8
**compensation** 70:12
70:19 76:12
**complaining** 92:2
**complaints** 50:23
51:4 59:10 69:14
75:4
**complete** 2:17 24:25
26:23 29:9 61:15
65:20 116:14
**completely** 19:18,20
41:23 52:16 61:21
79:7 89:2 99:5
120:11
**complex** 121:25
**complicated** 47:23
**compound** 21:20,22
77:19 90:4
**comprehensive**
119:15
**compress** 52:10
**compressed** 52:6,16
103:22
**compressing** 62:9,24
**compression** 45:16
62:11
**computer** 130:12
**conclusion** 122:9,16
122:25
**condition** 73:9,23
74:18 79:4,5,6,16
105:8 108:25 109:5
124:8
**conditions** 57:15
79:13 91:12
**confident** 93:14
**confirmed** 45:20,22
**confirming** 61:6

connection 39:5
Connie 3:16 4:24
  12:23 130:3,23
consent 6:1 65:9,18
  66:8
consenting 65:9
consider 70:19 91:18
considered 59:3
  70:25 98:20
consisted 14:17
consistent 103:8
  105:8 119:17 122:5
  122:19
constant 68:4
contain 50:8 79:23
contained 50:18
  128:12
contains 9:11 36:4
  116:14
contemporaneousl...
  33:24 104:13
contemporaneousl...
  33:14
context 120:22
continue 16:14 19:17
  40:2 105:9
continued 73:9 78:20
continues 60:11
  79:11,11
continuing 22:19
  49:1
contradict 33:10
contributed 127:11
conversation 19:8
  65:11
copied 126:8
copies 2:21
copy 35:8
cord 94:17,20,23
  95:23 96:3 122:6,12
  122:13,20
corner 41:5
Corporate 100:9
correct 8:12,13 11:8
  11:15,21,24 12:3,4
  12:10,18 16:4 17:21
  17:25 18:1,7,8
  25:14,15,23 26:2
  27:16,17,19,25 28:8

28:9,12 29:18 30:4
  30:5,6,7,8,11,14,23
  30:24 31:1 33:17
  36:2,9,23 37:13
  39:24 41:17 44:15
  44:17,18 46:6 47:13
  48:17 49:2 50:20
  51:1,13,21 54:17,20
  59:6,7 62:14 66:23
  72:5,12,19,20 77:3
  77:6 80:5,8,9,12
  81:20 87:7 88:11
  89:17,18 99:12,15
  100:25 101:25
  102:1,5 104:20
  110:18 111:3,4,8,9
  111:12 114:1,6
  115:18 116:12,17
  120:2,3 121:19
  123:11 125:6,8,13
  126:16,18,19 127:4
  127:5
correctly 32:21 33:3
  78:16
correspondence 9:14
  36:6
cost 80:7,19
costs 81:7,18,23
coughing 57:19
counsel 5:11 6:1
  35:20 36:23 126:20
  130:14
couple 10:24 53:16
  126:4
course 18:12 22:20
  57:23 76:16 112:23
  123:10
courses 18:13 24:13
  24:18,19,20
court 1:1 3:1 5:9,17
  5:19 7:18 12:14
  16:25 25:14 30:13
  38:25 39:8,10
  117:18 119:20
  120:5 130:3
crap 19:16
create 11:7
created 126:25
  127:16

credits 22:19 24:14
criminal 18:7
critique 67:11,13,16
critiquing 67:6
crop 64:5
CRR 3:17 4:24
  130:23
CT 78:1
CT-scan 124:6
cumulative 117:13
curative 93:24
cure 92:19
current 37:12 101:11
currently 7:13 16:9
  19:6 80:2
custom 106:17
customary 105:9
cut 73:20,22 96:20
CV 2:11 36:5 37:2
Cyril 20:11

# D

damage 34:14 35:1
  112:14 113:21
damaged 57:25 61:11
  61:17 112:24 128:7
damn 84:16
dangerous 113:10
data 24:16
date 5:4 11:20 43:9
  45:3 85:13 121:11
  123:11
dated 48:16 130:20
day 3:16 99:11,14,19
  100:2,14 102:13,15
  103:20,21
days 100:13,20
  121:15 122:17
de 12:12 13:14
dead 19:6 32:9
deal 78:23 79:4
dealing 108:2
death 19:10
Debra 10:11,18
December 11:11,17
  54:25
decided 13:23
declared 74:25
decompress 90:16

decompressing 89:3
  89:12
decompression 46:22
  54:24 65:21 87:23
  88:2,13,25 89:5,9
  89:16,20,21 91:24
  92:18 93:4 107:23
deeper 83:11
defend 21:18
defendant 38:5 121:3
defendants 1:8,14
  3:8 4:9 5:16 6:9,12
  33:20
defense 38:11 40:4
  42:8,12 126:20
definitely 40:11 54:5
  54:8
degenerated 92:16
degenerates 112:25
degeneration 92:13
  93:12
degenerative 57:15
  64:8 66:11
degree 84:14 86:8,14
  110:25 127:7
delayed 103:19
  119:23
delivered 95:9
DENNIS 4:15
department 107:25
depending 42:9
  57:24
depo 20:24,24 36:5
deponent 129:11
deposed 49:24
  104:15
deposition 1:13 2:9
  3:13 5:6,20,21,22
  6:25 8:3,15 10:11
  10:13 11:25 25:10
  31:7,19 32:23 33:11
  33:17 35:3 40:23
  41:2,19,21 57:11
  104:11 111:12
  117:25 130:5,8,16
depositions 7:15
  10:14 31:12,15,17
  32:18 33:8,10,18
  34:3 42:10,11 104:9

**Derrick** 118:2,10
120:15,16 121:22
123:5 125:12
**described** 102:9
**designated** 35:4 37:4
40:15 43:22 48:12
129:5
**desk** 109:8
**destination** 13:24
**detailed** 92:8
**determine** 69:7
107:21
**determined** 108:16
**develop** 65:24 66:3,6
**developed** 61:22
92:22,23
**device** 94:18,22
95:14
**diagnosis** 51:17,23
**diagrams** 34:13
**dictated** 9:17 44:9
49:20
**dictation** 44:5,13
**died** 19:9
**difference** 115:7
**different** 29:15 52:25
53:24 59:17 60:19
68:25 75:5 89:15
120:20 121:24
**differently** 68:9
**difficult** 61:19 77:14
**direction** 130:12
**directly** 84:15 95:10
**director** 20:9,15
**disagree** 27:4 33:7
60:4 67:6 68:1 69:2
71:24 72:3,4,8
74:14 77:9 81:21
88:1 89:23,24 90:1
115:15
**disagreement** 90:3,6
78:14
**discogenic** 62:22
78:14
**disconnect** 37:16
**discovery** 34:6 42:22
42:22 79:25 116:15
**discuss** 21:16 58:16
**discussed** 18:3 19:5
78:17 82:2 118:1

**discussing** 17:16
23:23 24:1 56:23
81:23
**discussion** 88:21
118:7
**discussions** 50:22
**dishonest** 120:17,17
**disinterested** 130:9
**disk** 52:4,14,15,25
54:6,7,12 55:13,17
56:9,20 57:23,24
60:13 61:2,9,9,10
61:13,14,17,25 62:1
62:7,8,17,21,23
63:17,17 64:8,12,13
64:21,24 65:13
74:19,20 78:3,5,6,8
78:12,12 79:8,8
82:6,7,22,24 83:2,5
83:7,10,11,12,20,23
84:1 85:13,18 88:25
89:1 92:10,12,13,16
93:13 94:10,11
97:18 98:16 99:2
103:1,25 108:18,19
127:16,24 128:1,6,8
128:12
**diskectomies** 107:24
**diskectomy** 61:15
**disks** 53:13 55:9,21
56:13,23 57:5 58:9
103:18
**disown** 76:3
**disposal** 72:25
**dispute** 18:5,9,17,25
19:12 88:14 120:4
121:5,11
**disputed** 29:22
**disputing** 30:13
**District** 1:1,1 3:1,1
5:9,9
**diving** 34:19
**doctor** 6:17 13:22,24
19:3,23 42:24 53:2
69:20 80:22 84:10
84:19 111:14 126:3
126:11 127:6
128:21
**doctor's** 55:23 74:10

75:21,22 84:13
86:13
**doctors** 10:1 51:5,18
77:22 101:13 102:2
120:18
**document** 8:24 9:1
22:18 26:22,25
**documented** 128:4
**documents** 8:19,21
8:23 9:18 31:12
32:17 33:25 35:11
35:18 36:1,7
**doing** 14:16 22:24
40:5 42:9 51:11
65:10 69:10 79:10
80:22 84:20 88:12
92:18 106:24 107:2
108:16,21
**door** 80:24
**dough** 52:10 64:15
**doughnut** 52:5,6,8,9
52:19,20 64:14,17
64:21 128:15
**doughnut's** 128:16
**Dr** 2:11,12,15,17 5:6
6:19,25 7:4 17:13
20:11 39:20 48:8
53:18 65:11 70:7,17
71:3,8,10,16 72:25
73:7,14 74:2,15,24
75:13 76:11,16
78:10,19 79:1,14,18
82:25 83:6 84:23
85:4 87:5,22 88:2
88:19 89:19,20 90:6
90:14,21 97:10
102:8,9 106:20
113:24 114:9,12,14
114:17,18,18
115:11 119:21
120:2 121:3 126:14
128:1,3
**draft** 27:1,16,18 28:8
28:20,21 29:6,8,8
**drafted** 28:20 29:6
120:8
**drafting** 45:1 119:6
**draw** 77:7
**dries** 64:19

**drive** 108:3,4 109:10
109:16,19 113:17
**driver** 105:10 107:6
107:12 114:1,5,6
**drivers** 107:22 108:2
**drives** 112:20
**driving** 107:22 108:8
108:22 109:1,7
112:16,18 113:9
115:1
**dry** 64:20
**Duces** 2:9
**due** 92:22,24 122:6
**duly** 6:13 130:5
**dump** 90:13
**duty** 77:3
**dwell** 10:25
**dysfunction** 78:14
112:15

## E

**E** 4:1,1
**earlier** 27:3,5 44:5,8
44:13 56:23 75:6,6
77:17 95:25 116:13
**earth** 123:24
**easily** 57:25 90:22
128:10
**easy** 90:15
**Edelman** 4:4 116:19
117:1,6,11,15 118:3
**education** 22:19 91:5
**effect** 32:11 98:21
108:10
**effort** 107:8
**eight** 94:9 100:13
110:20,20
**either** 11:6 24:10
25:16 55:5 61:8,23
70:13 79:8 85:18
96:9 127:3,6,8
130:15
**electrical** 94:18,21
95:17
**electrodes** 94:19
**elicit** 80:25
**Elimination** 59:2
**emergency** 14:18,20
**emperor** 23:8

**employment** 105:20 115:4
**enhancement** 60:14
**enjoyable** 92:21
**entail** 24:12
**entire** 12:8 36:15,16 50:9 69:21 76:4 77:15 89:1 91:21 129:2
**entities** 18:2
**entries** 103:10
**entry** 10:10 60:16 101:3 102:14
**environment** 76:12
**especially** 103:19
**ESQ** 4:4,10
**essentially** 11:18 74:4
**estimate** 47:21 54:25 56:2,5,6 57:3 58:7 63:14 66:9 93:3,10 96:1,17 116:20
**estimates** 23:4 57:13 58:8 81:4,5,25
**et** 5:8
**ethical** 29:17 30:2,17 31:4
**etiologies** 57:13,21
**evaluated** 22:6 71:17 114:19,21 120:18
**evaluation** 67:4,12 69:16 111:24
**event** 33:12 55:12 56:22 99:7
**events** 130:17
**eventually** 15:7,8 44:13 85:25 92:25
**everybody** 12:19 39:3 129:8
**everything's** 9:2
**evidence** 31:19 33:10 33:11 34:25 74:21 92:9,11
**evolved** 92:6
**exact** 65:10 69:7
**exactly** 115:24
**exam** 16:1 69:17,22 111:20 115:21
**examination** 2:1,3,4 6:15 9:24 20:19

42:11 69:24 126:1
**examine** 68:15
**examined** 3:14
**examiner** 69:5,20 109:14
**Examiners** 17:19,25 18:10 20:3,18
**examining** 69:6
**example** 64:12
**exceeds** 69:15
**exception** 79:10
**excluded** 117:18
**exclusive** 86:10
**Exhibit** 35:2,4,10,12 35:16 36:11 37:3,4 40:13,15,25 41:16 43:20,22 48:11,12 129:2,5
**exhibits** 2:7,8,20
**exist** 64:16
**existed** 78:18 79:13 126:23
**exists** 73:15 82:16 90:3,6
**expect** 47:24 116:15
**expectations** 110:12
**expeditiously** 79:1
**experience** 10:19 65:6 66:10 80:15 105:12 108:2 110:11 111:17
**experiences** 75:23
**experiencing** 100:20
**expert** 8:11 12:7 29:18 32:15 38:20 38:22 40:1 42:10 70:14 80:19 105:13 105:14
**experts** 33:21 34:10
**expired** 16:20
**explain** 51:24 52:3 61:1 62:2 65:1 78:21 79:10,18 91:23 127:19
**explainable** 79:7
**explained** 27:13 86:2 86:4,4 112:8 126:18
**explains** 66:5
**explanation** 65:5

66:4 83:15 112:3
**explode** 52:8
**exploded** 61:11
**explosion** 52:14
**explosive** 82:23
**extent** 21:19 42:21 50:21 51:16 54:2 56:16 63:3 70:11 71:1 106:4 112:7 121:21
**extremities** 107:9
**extremity** 78:15 103:23
**extruded** 54:7
**extrudes** 64:9
**eyes** 66:2

### F

**facetectomy** 55:2
**fact** 18:23 21:6 24:2 26:24 40:11 61:24 65:18 89:10 99:13 101:23 108:7 120:9 123:12
**facts** 19:10 21:4 24:7 26:2,17 29:2 31:18 33:9 34:25 52:11 53:2 54:2 76:19 87:16 98:10 99:4,6 103:3 116:16 118:10 120:23
**factual** 33:22
**fail** 15:14 63:23 65:13
**failed** 45:25 46:1 63:16 65:3 94:24,25
**fails** 95:4 98:8 103:3 120:15 123:21
**failure** 8:7
**fair** 9:7 10:17 11:4 13:25 16:6 22:7,8 27:10 30:3,10,13 36:18 40:10 41:15 42:20 43:19 47:10 48:18 49:12,13,17 49:18,19 50:13,19 50:25 51:5,20 59:12 80:4 81:19 82:10 84:7 85:1,22 102:4

102:22,23 104:9,10 114:10 115:5,17 123:16,19 125:6
**fairly** 120:23
**falls** 87:11
**false** 30:20
**familiar** 20:12 105:23
**family** 113:18
**far** 55:14 57:21 111:2 115:9
**fast** 96:23
**February** 38:18 45:23 46:21
**federal** 106:5,15 108:8 109:6,20
**fee** 2:11 22:11 23:1,2 36:5 37:2
**feed** 113:18
**feel** 16:13 18:20 76:24 88:10 99:14
**feeling** 83:13
**feels** 113:19
**fellowships** 25:1
**felt** 21:1
**field** 14:5,12 15:6 80:15 106:10
**fifth** 105:7
**figure** 28:16 74:5
**file** 2:17 8:17,20,23 9:8,11,13,14,16,19 20:23 36:3,15,16 40:14 43:13 50:1 118:16 129:1,2
**filed** 6:24 25:11,21 30:12 35:3 119:20
**filled** 95:7
**final** 31:8,9 32:25 42:4,6,19 117:20 119:6
**find** 29:13 59:11,21 64:25 84:25 88:5 102:17 118:5,12,14 123:8
**finding** 30:5,9,16 51:17,19 62:13 63:1
**findings** 52:3 67:7 69:13,13,14 75:3 79:6 126:15,17

**fine** 23:21 53:7 129:4
**finish** 101:5,16 102:6
  107:17 112:21
**firm** 36:15
**first** 12:11 13:12,14
  13:17 15:16,17,23
  16:1 18:21 20:1
  44:11 45:8 48:18,25
  61:21,23 82:22
  89:15 97:11 101:18
  102:8 112:12
  118:25 120:1
**five** 14:19 26:11 34:1
  46:8 48:1 50:11
  58:5 93:11 102:21
  116:22 117:5
**five-minute** 47:15
**Five-zero** 96:2,3
**flat** 56:25
**flattens** 64:19
**flip** 35:16
**FM** 46:4
**FMCSR** 105:23
  109:14
**focus** 58:5
**focused** 50:15 114:3
**follow** 97:23 107:17
**follow-up** 63:7
**following** 66:25 98:4
  101:25 118:6
**follows** 6:13
**foot** 15:3
**foraminotomy** 55:3
**force** 52:7 57:23
**forceful** 52:13
**foregoing** 130:5
**forensic** 15:8 17:18
  17:20,23,25 18:10
  20:2,3,10,17,19
  21:2 24:4,15 103:13
  119:15 122:9,24
  123:18
**forensically** 122:19
**forever** 92:19
**forgot** 15:17
**form** 42:25
**format** 6:7
**formulate** 53:2 54:3
  87:16 98:9 103:4

123:22
**forth** 6:25 11:5
**forwarded** 23:7,12
  23:22
**found** 29:16 30:2
  37:18 51:18 59:25
  67:9,12 70:7 73:10
  73:17 103:17
  120:16
**foundation** 18:15,25
  19:19,21 23:15,15
  23:18 24:7 53:2
  54:2 55:23 56:17
  57:8 123:21
**founded** 18:2,11
**four** 11:23 33:12,13
  34:1 49:24 67:1
  105:6 110:6
**Fourth** 94:13
**fracture** 15:2 118:18
  122:7,11 124:10
**fragile** 57:24
**fragment** 61:9,20,22
  62:7 65:15,22,23
  74:19 78:3,8 79:8
  82:7,12,16 83:16
  84:3,25 85:11,19
  90:17 94:6 126:18
  126:21,22,25
  127:10
**fragmentation** 61:2
  64:11,23
**fragmented** 128:7
**fragments** 63:17 83:7
  83:10 85:4 128:1
**framework** 57:14
**fraudulent** 30:20
**free** 18:20 88:11
**frequent** 68:6
**fresh** 52:5
**freshly** 64:14
**Friday** 36:4
**front** 23:16 37:7
  43:25 47:17 48:9
  68:5,7,7 88:16
  100:8
**froze** 7:19,24 17:4
  39:3
**frozen** 12:14 16:25

39:1 65:25
**full** 20:21,23 44:14
  67:24 89:9 92:18
**fully** 128:12
**functional** 67:4,11
  69:16,17,22 111:20
  111:23 115:20
**funny** 8:1 124:24
**further** 5:23 16:18
  71:21 79:12 89:5
  93:25 100:16
  128:21,23 130:14
**Furthermore** 71:16
  114:14
**fuse** 90:11
**fused** 92:25 94:12
**fusing** 89:2
**fusion** 88:3,12,23,24
  89:7,8,16,21 90:19
  90:19 94:8
**fusions** 94:2 107:24
**future** 46:4,9,12,16
  80:7 81:4,23 89:14
  90:25 108:11
  111:14,16 113:15
  115:4 116:5

---

## G

**game** 19:16
**Gardnerville** 7:6,8
**gather** 35:11,15,18
**gathered** 36:8
**general** 14:13,17,22
  34:18,20 35:11
  56:20 57:14 58:25
  59:1 63:24 91:9
  98:25 99:2
**generally** 67:10
**generous** 63:15
**genre** 63:18
**getting** 37:20 51:23
  57:20 96:15 107:3
**girlfriend** 19:13
**give** 49:11 56:2,5,6
  57:3,13,13 58:6
  64:13 73:24 81:25
  93:10 96:14 110:24
  112:3 116:19
  124:19

**given** 10:14 75:2
  76:21 77:6,11
  115:14 117:21
  126:13
**giving** 80:6 92:20
  95:13
**go** 8:5 12:11,17 13:2
  13:4,19 24:21 31:5
  37:25 39:7,13 43:19
  45:5 47:16,19 49:23
  49:24 60:12 62:19
  62:20 71:21 74:23
  89:21 94:15 96:9,22
  97:11,22 100:16
  107:22 111:6
  114:11 125:22
  127:25 128:14
**goes** 87:11
**going** 5:3 7:16,16,20
  8:4 10:20,22,24
  17:5,7,10 19:17
  31:5,22 32:1 33:7
  35:2 37:1 38:6
  39:14,17 40:2,13
  42:15 43:20 44:4,10
  45:5 47:3,14 48:2,5
  48:11 52:10 55:2,11
  60:7 66:15 67:11,13
  67:15 69:1 70:10
  79:17,19 80:6,23,25
  82:3,21,23 83:13
  92:18,19,25 93:10
  93:17,23,24,24 94:4
  94:10,11,12 96:24
  97:4,7 105:18 107:7
  109:5,8 111:15
  113:2,20 123:2
  124:25 129:1,9
**good** 6:17 13:10
  33:19 50:3 58:24,25
  59:1,3,19 60:2,8
  66:2 84:20 109:4
**gosh** 53:14
**Graboff** 1:13 2:2
  3:14 5:6 6:11,19 7:4
  17:13 36:6 39:20
  44:12 48:8 87:5
  97:10 106:20
  119:21 120:2 121:3

121:5
**Graboff's** 2:11,12,15
  2:17 6:25
**graduated** 14:4,6
**Grand** 4:11
**grandmother** 123:23
**granulation** 60:13
**grievance** 25:21,25
  26:15,20,21 27:8
  32:12
**gross** 12:6
**group** 11:7
**Guadalajara** 12:12
  13:15
**guess** 13:10 18:15
  26:12 31:21 63:10
  70:23 72:24 91:24
  110:9 121:14
**guidelines** 109:7

**H**

**half** 78:6 108:23
**hand** 15:3 67:5 79:16
**handle** 35:23
**handled** 35:20
**handling** 68:5
**handwriting** 18:11
  18:13 44:19 45:6
**handwritten** 2:14
  9:15 43:21 44:17
**Hang** 114:11
**happen** 111:15
  120:22
**happened** 36:14 50:4
  84:6,6 85:21 86:5
**happens** 61:21 65:8
  65:18,19 85:8,25
  112:23
**happy** 7:22 8:8 38:8
  88:15
**hard** 43:6 95:25
**hard-wired** 39:5
**harm** 90:24 93:17
**he'll** 84:21 94:2
**head** 47:8 73:25
  80:23
**head-on** 34:23
**heading** 112:16
**healthy** 64:12,13

**hear** 7:25 12:19
  37:21 39:12
**heard** 97:14
**hearing** 21:17 31:3
**heavy** 56:13,19,24
  57:6,19 67:20 97:16
  98:5 99:1 101:13,24
  101:25 104:5
  112:16
**heel** 90:10,11,12
**helicopter** 108:1
**help** 35:11,15 89:22
  92:19 93:7,9,14
**helpful** 33:19 88:14
**helping** 93:4
**helps** 17:6 88:18
  93:18,21
**hereto** 130:18
**herniate** 55:13
**herniated** 45:14
  46:22 51:25 52:25
  53:13 55:9,17,21
  56:9,13,20,23 57:4
  57:5 58:9 61:16
  78:12 97:18 98:16
  103:1,18
**herniates** 64:8
**herniation** 62:8
  65:13,22,23 74:20
  78:3,8 79:8 82:7
  84:3 90:17 94:7
  126:24 127:15,17
  127:22
**herniations** 60:13
  63:18 64:11,23
  87:19 99:2
**high** 67:24 93:14
**high-level** 124:9
**higher** 64:10,22
**highly** 74:21 104:1,2
**history** 2:11 10:10,19
  18:6 37:2,14,19
  39:22 58:1 93:1
  100:10
**hit** 102:10 103:6
  123:24
**HNP** 45:13
**hold** 25:3 76:8,8,8
  80:2 107:16 128:13

128:18
**holding** 47:20 128:10
**holds** 111:15
**hole** 52:18,20 83:4,5
  93:25
**home** 7:10
**hopefully** 31:22 95:1
**hopes** 93:14
**horse** 32:9
**horses** 107:16
**hospital** 14:19 16:15
**hot** 64:18
**HOU** 76:8
**hour** 47:24 96:25
  97:1,15 98:4 102:20
  108:24 112:9 113:9
**hours** 3:15 102:21
  104:1,1 114:25
**Houston** 118:2,10
  119:12 120:8,12,15
  120:16 121:12,22
  123:5 124:4,7,24
  125:9,12,16
**Houston's** 119:8,22
**hundred** 50:10
**hundreds** 70:2 104:3
**hurt** 102:12
**hurts** 90:11
**hyphen** 46:2
**hypothetical** 56:17
  57:8 87:16 103:3
  104:4 123:21
  124:16 125:7

**I**

**idea** 43:17 117:4,10
**identification** 35:5
  37:5 40:16 43:23
  48:13 129:6
**identified** 8:11 36:1
  40:9 105:21 110:5
**identify** 38:1,4
**identifying** 119:14
**illness** 100:10
**imaging** 48:23
**impact** 107:4
**impaired** 111:25
**impairment** 69:9
**impaling** 122:12

**impeach** 81:9
**impeachment** 81:9
**impingement** 62:6
**impinging** 62:15
**implant** 95:6,17
  96:16,19
**implantable** 95:13
**implanted** 95:7
**implants** 94:14,16
**imply** 85:3
**important** 33:9 49:16
  49:22 50:7
**impossible** 38:7
**improper** 23:19
  75:19 81:8
**improved** 70:20
  74:25 76:17
**improvement** 70:8
  70:16
**impulses** 94:23
**inability** 78:15
**inappropriate** 18:22
  19:21 74:16,17
**incident** 87:1,8
**include** 65:12 66:18
  109:21,23 120:16
**includes** 88:25
**including** 31:12
  32:17 60:12
**inclusive** 43:14
**incomplete** 56:17
  57:7 87:15 103:2
  123:20 124:15
  125:7
**inconsistent** 70:13
  82:15 100:23,23
**incorporate** 6:23,24
  29:25 68:19
**incorporated** 9:17
  44:14 56:25
**incorrect** 26:7 28:4
  117:22 121:19
**increased** 74:11
**independently** 51:3
**INDEX** 2:1,7
**indicate** 6:4 101:8
  102:19 121:23
**indicated** 102:11
  126:17 127:3

**indicates** 66:25 71:16 114:14
**indicating** 23:22 102:14
**individual** 108:18 122:5,20
**individually** 11:7
**induced** 57:22
**industry** 23:8 106:17 108:1
**inevitable** 113:6
**inflammation** 60:15
**information** 18:25 20:22 22:23 23:7,12 23:22 42:24 44:9 73:24 90:1 98:9 103:4
**informed** 65:17 101:22
**initial** 92:14
**initially** 8:17 92:10
**injection** 78:23 93:20
**injured** 69:6 83:21 83:21 118:15,17
**injuries** 69:7 103:16 103:16 105:6 107:23
**injury** 34:22 38:3 40:10 52:22,24,25 53:22 83:9 84:15 92:14,22,24 101:9 108:10,11,19 112:22 119:16 122:6,21 127:9,16 127:20
**inside** 52:8 64:20
**insight** 33:20
**instance** 89:13
**institute** 17:3,19
**instruments** 83:7
**integrity** 83:22
**intense** 100:13
**intent** 112:25
**interest** 42:15
**interested** 130:16
**interesting** 60:10 111:24
**interfere** 95:1
**interference** 94:22

**internal** 30:10
**internally** 30:7
**internet** 17:14 39:4 118:12,14 123:14 123:14
**internet's** 13:9
**interpretation** 59:19 60:1 75:10
**interrupt** 6:21 32:3 76:9
**interrupted** 107:15
**interrupting** 101:17
**interruption** 109:24
**intervertebral** 61:13
**invoice** 40:14,19,22 40:25 41:4
**invoices** 36:6 41:6,7,9
**involve** 25:16,19
**involved** 20:13,14,22 33:21 38:2 54:12
**Iron** 5:7
**irrelevant** 111:19,21 111:25 124:5
**irreversible** 118:24 119:8,24 121:18 122:6,11 123:1
**irritated** 103:22
**irritating** 61:25
**Irvine** 14:7
**issue** 15:22 19:7 25:16,19 26:16 50:5 63:13 64:7,10 85:7
**issued** 119:1,4 120:13
**issues** 8:4 15:14 18:23 39:21 50:23 63:23 64:5 66:10 70:3 87:2
**It'll** 94:25 125:13
**item** 43:12
**itemized** 9:2

**J**

**J** 1:7 3:7
**jail** 119:23
**James** 1:7 3:7 4:4,10 5:13 6:6 35:9 86:7 86:16 119:3 125:19 129:3
**January** 11:20

**jelly** 52:5,6,7,19,20 52:21 64:14,17,19 64:21 128:15,16,17
**JFK** 20:14
**job** 84:20 109:3
**jobs** 114:5,9 115:1
**joined** 20:8,9
**joint** 15:1 91:14
**jthompson@etkcla...** 4:7
**July** 88:20
**jumping** 40:4
**June** 8:25 45:3 48:16 73:18
**junk** 23:9
**jury** 51:25 62:3 64:13 90:9
**justice** 18:7

**K**

**Kansas** 1:2 3:2 4:6,12
**keep** 13:8 75:23 86:21,21
**keeping** 95:24
**kind** 64:6,19,20,20 69:9 83:9 96:16 99:10 106:24 108:18,22,25 111:16 119:16
**kinds** 14:23 94:16
**kinetics** 108:9
**King** 38:18,19
**kneeling** 68:6
**know** 8:8 11:1 13:9 14:11 19:4,9,10,15 19:24 21:7,23,24 24:21 31:20 33:15 34:18,20 36:14,17 36:19,19,20 38:4 41:13 43:1,3 44:22 45:7 47:4 49:23 51:6,7,7,24 55:19 55:24 56:4 58:2 67:19,21,23,25 73:4 73:13,13 76:3,19 77:15 82:11,13,21 83:2,3 84:8 85:1 86:20,23 90:2,5,6 90:14 91:10 94:9

95:24 96:5,6,10,21 96:25 98:21 101:14 103:7 105:25 106:11,20,21,23,23 106:25 111:14 114:2 117:5 120:23 120:23 123:12,13 123:15,24 125:15
**knowing** 102:24
**knowledge** 18:19 20:4 21:13 111:17
**known** 56:21 63:21 64:5,7 74:18,19 128:9,9

**L**

**L** 45:15
**L3-4** 92:9
**L4-5** 92:9,12,23 93:13 95:11
**L5** 52:5
**L5/S1** 45:13 46:22 52:1 78:9,12 79:9 82:7,22 87:23 92:14 92:15,22 93:12 94:11,21 95:2,11 127:24
**labeled** 44:12
**lacks** 18:15,25 19:19 19:21 23:15,18 24:6 53:1,2 54:2,2 55:22 56:17 57:8 87:16
**laminectomies** 107:24
**laminectomy** 54:24 94:25
**Lane** 7:8 38:21
**lapse** 16:21
**large** 51:25 61:12 79:7 128:1,4
**largely** 92:1
**lawsuit** 10:12 29:23 30:1,12 81:18,19
**lawyer** 26:22
**lawyers** 120:17
**lay** 51:25 61:2
**layman's** 94:18
**lead** 8:4 84:2 87:18 93:4 108:12

**leading** 45:16 122:7
122:13,21
**leads** 90:20
**learned** 117:21
**learning** 91:16
**leave** 60:20 64:18
96:7
**leaving** 83:5
**led** 103:15 127:17
**left** 45:13,16 46:22
52:11,15 68:5,8
78:15 79:9 80:10
83:14 84:1,23,24
85:11,19 126:22
127:10 128:6
**left-hand** 46:15
**left-sided** 52:1
**leg** 52:11 59:2 62:21
65:14 113:8
**legal** 2:15 12:3,7
29:18 31:11 32:17
34:1 104:12,14
117:11
**lengthy** 6:23
**Lester** 2:3 4:10 5:15
5:15 6:8,8,16 7:2,3
7:18,21 12:15,18,22
13:1 17:1,12 18:16
18:18 19:2,22 22:3
23:20 24:8 26:5
27:15,22 28:5,23
29:4,24 35:6 37:6
39:2,7,13,19 40:17
43:11,24 47:23 48:7
48:14 53:6 54:10
56:1,7,18 59:16
63:9 70:22 71:7,12
73:3 74:13 75:11,17
76:5,23 77:12,23
81:2,13,14 82:19
84:18,22 86:3,16,19
87:4,20 88:4 97:2,9
98:1,13 99:8 101:20
104:7 106:7,19
109:12,18,23 110:1
112:2,10 113:11
117:9 119:2,5,18
120:20,25 121:1
122:22 123:9

124:12,17 125:18
125:22 126:6
128:23
**let's** 9:4 15:16 27:14
38:1 39:7,13 47:15
58:5,9 93:18 127:14
**letters** 105:24
**level** 82:8 88:3 95:11
115:9 127:17
**levels** 108:19
**license** 25:3
**lies** 123:19
**lieu** 5:23
**life** 90:14 92:21 93:22
93:22 95:14 116:11
**lifecare** 80:11,14,20
81:5,16,17,22,25
**lifestyle** 93:22
**lifetime** 22:25 23:1
**lift** 67:22,24,24,24
68:17 78:15 87:12
97:16 98:5,22
101:25
**lifted** 104:5 116:7
**lifting** 56:13,19,25
57:6,18 58:14 72:16
99:1 101:13,24
102:25 103:10
107:5,7,13 114:22
115:7
**light** 67:23 71:18
72:4,15 77:3 114:22
115:8,8,12
**limitations** 67:17
68:9,14 76:21 77:2
111:11
**limited** 117:18
**limiting** 74:4
**limits** 69:9
**line** 19:20 45:8,11,24
45:25 46:13 126:25
**line-up** 10:7
**lined** 44:17
**linked** 87:1
**list** 48:22 106:25
116:14,23 117:2
**listed** 8:25 9:3,4,5,6
21:20 35:12 65:10
67:18 72:16 80:3

91:25 108:7
**lists** 46:12 54:18
**literature** 66:5
**little** 14:11 40:24
47:12 93:11 96:25
103:21 118:13
**living** 14:21
**LLC** 1:6 3:6
**located** 7:5,6
**long** 10:25 16:19 23:4
47:4 57:11 58:15
93:9 95:25 113:6
**long-term** 108:22,22
**longer** 93:11 128:12
**look** 10:4 24:22 38:9
38:16 41:6 42:8,13
65:24 76:4,10 88:8
88:15 115:8,19
118:5 121:2 125:22
**looked** 21:7,11,14
22:5 32:1 40:8
48:23 52:19 53:24
61:5 62:14 90:7,7
118:9 122:9
**looking** 20:14 37:17
50:23 66:22 69:21
90:25 100:6 101:4,4
101:5 102:6 122:24
124:23
**looks** 41:8 46:8 64:22
**lost** 29:23 39:8,11
83:22
**lot** 50:8 60:11 79:17
82:2 106:9 113:22
**low** 67:22 78:13
**lower** 62:18 78:15
103:23
**lumbar** 52:1 88:23
88:24 89:7
**lying** 124:5

_____

**M**

**M.D** 1:13 2:2 3:14
6:11 69:4 121:5
**major** 34:22
**majority** 54:14 55:11
55:14 57:16,22 70:4
123:3
**making** 52:19 73:1

**mal** 40:12
**malpractice** 25:11,18
26:24 40:9
**man** 39:14 60:17
70:18 74:20 76:22
77:11 78:13 79:10
112:14,18 116:2
122:16
**man's** 78:20
**management** 32:20
91:5 95:20 96:8
**mandatory** 107:12
**manner** 6:3
**manual** 68:5
**March** 118:22 121:4
121:6,16
**margin** 46:15,23
**mark** 35:2 37:1 40:13
43:20 48:11 128:25
129:1
**marked** 2:20 31:23
**massive** 127:23
**material** 21:12 36:15
52:14 54:6,12 61:14
61:18,25 62:15
83:23 84:1 90:7
119:15 128:8
**materials** 8:16 21:14
29:9,10,14 43:5,5
45:1 122:18
**matter** 34:16 61:24
109:13 110:2,3
111:13,18 116:9
**maximal** 70:16
**maximally** 70:20
74:25 76:17
**maximum** 70:8
**McCarthy** 3:16 4:24
130:3,23
**mean** 6:21 27:23
28:24 45:12 53:11
54:9 62:6 67:20
73:20 80:21 84:8
101:5 107:11
**meaning** 46:19 103:6
114:24
**means** 45:15,17 62:7
67:21,23,25 70:16
83:3 100:11 109:7

meant 31:16 115:24
measure 68:13 111:6
measures 78:4
mechanism 56:21
med 40:12
median 67:22
medical 2:14,15,17
  9:8,23 11:6 12:3,7
  12:11,17 13:2,5,13
  13:20,22,25 14:4
  16:10 20:9,15,25
  22:19 25:1,3,10,18
  26:24 27:10,19,24
  28:10,19 29:17
  31:11,18,19 32:15
  32:15,16,19 33:9,9
  33:11 34:25,25 40:9
  43:14 46:4,9,12,16
  47:6,9 48:22 49:12
  49:16 50:18,24 51:8
  51:12 52:11 69:5,19
  69:20,24 70:8,16
  72:21 73:9 77:21
  80:7 81:4 84:14
  85:7 86:8,14 89:14
  90:25 92:3 99:4,6
  99:22 104:13 106:1
  106:11,21 108:6,14
  109:4,13 111:14
  113:14,16 116:6
  117:11 119:22
  120:18 121:23
  122:3,14 123:17
  124:3,7 125:4,9,12
  125:16 127:7
medically 74:25
  76:17 92:17 93:6
  109:19 122:5
  123:15
medication 79:4
medications 79:3
  95:9
medicine 14:7 17:20
  17:23 20:2,19 24:4
  25:6 100:9
meetings 58:17
member 22:25 24:3
membrane 128:13
memory 33:13

mention 103:12
met 21:2 72:11,18
Metal 5:8
meteor 103:6
meteors 123:24
Mexico 12:12 13:15
  14:2
Michael 4:10,15 5:15
  6:8 12:21 19:17
  39:2 47:22 75:24
  81:1 107:15 125:9
microscopically
  90:23
mid 67:24
Mid-America 101:7
middle 59:18,22
  112:17
Mike 28:25 39:6,12
miles 113:9
million 12:6
mills 23:13,24
mind 70:16
mine 69:2,18 72:2,6,7
minimize 113:1
minor 34:21 94:19
minute 93:15 102:20
minutes 47:14 98:4
  108:24 109:10
misrepresenting
  26:22
missed 101:18
missing 99:5
Missouri 1:1 3:1 4:6
  4:12 5:10 25:4,7
misstatement 98:10
misstates 24:7 26:3
  27:11,12,20 28:1
  29:2,19 59:13 68:23
  71:3,9 72:23 74:9
  75:20 80:17,17
  84:12 85:23 86:12
  87:24 97:20 98:7
  101:15 119:11
  120:11,12,13,14,15
  120:19,21
misstating 86:21
misunderstood 63:10
mlester@bjpc.com
  4:13

MO 4:25 130:24
moderate 100:12,12
modified 30:18 116:7
modify 37:11
money 16:16 117:5
month 120:8 121:14
months 10:24 13:18
  49:24
morning 6:17 48:20
motor 34:21 55:18
  56:10 57:18 58:10
  58:10 87:12 99:19
  100:2 101:9 106:2,5
  106:12,15,22
  109:20 114:1,4,6
Mottsville 7:8
mouth 75:24
move 17:15 27:6,14
  59:17 61:18 68:18
  71:14 78:15 90:12
  108:23 109:9
movement 102:25
moves 61:9
MRI 58:18 60:12,23
  61:5,19 62:14 63:6
  63:7,8 78:1,4,21
  85:17 92:12 124:6
multifaceted 113:14
multiple 72:12,18
  103:10
murder/suicide
  19:13
mush 64:15
mute 84:11

N

N 4:1
name 6:5,18 20:11,12
  38:10 128:2
named 20:10
narcotic 95:14
narcotics 79:3 93:19
  95:8
narrow 112:4
nature 88:25 89:6,8
  92:15
necessarily 49:21
  50:6 108:5,6
necessary 26:1 54:3

113:22
neck 91:14
need 16:14,16 37:10
  41:19 42:3,5,6
  46:10 53:19 59:21
  86:25 92:25 94:2,12
  96:22 98:20,20
  108:9 114:11
needed 13:23 25:13
  29:8,9 53:17 60:17
  79:12 87:23 89:16
  108:24 109:10
  117:22
needing 93:25
negligence 85:7
negligent 85:3
nerve 15:2 52:10,16
  54:7,13 60:14 62:9
  62:15 74:22 94:23
  96:9 103:21 128:5
neural 55:2
neurogenic 79:3
neurologic 62:5,11
  62:25
neurosurgeon 95:20
  96:8
Nevada 7:6,8
never 95:18 112:17
  122:17 125:13
nevertheless 9:18
  79:2
new 58:18 60:23
  61:22,25 71:2 98:24
nice 64:16
night 112:17
NIM 1:6 3:6
nine 110:20
non-medical 9:12
nonnarcotic 95:9
Nope 7:14
Norfolk 5:7
normal 52:25 53:11
  58:24
notating 46:20
notebook 44:16
noted 59:24 84:19
notes 2:14,14 9:15,17
  36:7 43:21 44:17,20
  44:22 45:12 46:11

46:14 60:17 88:17
125:23 126:5
**notice** 2:9 6:24 35:3
36:5 39:4
**November** 130:20
**nucleus** 45:14 46:22
51:25
**numb** 113:7
**number** 26:11 33:2
41:13 43:18 63:15
91:23,25,25 107:3,4
112:21 113:4

**O**

**O'Block** 18:3,12 19:6
23:8
**O'Block's** 18:6
**O.J** 20:13
**oath** 5:24,25
**object** 21:19 23:14
42:21 59:13 63:3
68:23 70:10 71:2
72:23 74:9 75:9,15
75:20 77:5 80:16
82:14 84:10,12
86:11 97:16,20 98:7
98:22 101:13,24,25
106:3 107:14
109:22 118:25
119:10 120:10
121:21 129:3
**objected** 35:9
**objection** 6:23 18:14
19:15 24:6 26:3
27:11,20 28:1,22,24
29:1,19 53:1,4 54:1
54:1 55:22 56:3,16
57:7 71:9 77:8,19
81:8 84:19 85:23
87:15,24 90:4 98:17
101:15 103:2
106:13 109:17
111:22 112:7 117:7
117:7 123:20
124:15
**objectionable** 19:1
21:22
**objections** 6:2,24
36:12

**objective** 21:3 51:16
60:15 63:1,8 75:3
76:21 79:6
**objectively** 45:20,22
63:7 78:20
**objects** 56:14,19 57:6
**obligations** 29:17
30:3,17
**obtained** 126:15
**obviously** 11:1 42:23
47:20
**occasional** 114:23
**occupation** 105:9
**Occupational** 100:9
**occur** 61:7 94:8
**occurred** 34:13,17
92:15 97:19 121:10
127:24
**occurring** 78:25
**October** 1:15 3:15
5:1,4 102:9
**offer** 60:7 80:18
90:22 116:15
**offered** 81:11 81:12
86:9 118:1
**offering** 80:21 105:18
**offers** 31:8
**office** 35:21
**office-based** 14:24
**officers** 121:8
**Oh** 53:14 124:18
126:6
**okay** 7:2 8:8 9:7,12
9:20 11:2 14:10
16:9 19:3,23 24:25
26:8,14,19 28:15
29:16 33:18 34:3
35:17,25 36:3,25
37:14,17,20,23,25
38:6,18 40:13 41:18
45:19,24 46:3,19
47:2,9,25 48:18
50:21 51:15,22
52:17 54:16 58:16
60:6 62:4,16 64:1
67:14 68:12,16 72:4
75:12 76:16,24
77:13 82:2,20 87:21
90:25 97:13 99:24

101:1 105:25 107:1
110:4 111:1 112:3
113:23 115:15
117:4 119:19
125:18 126:8
**once** 83:21 90:19
96:6
**ones** 68:22 72:10
115:13 117:3
**ongoing** 42:23 79:25
**online** 24:13
**onset** 100:13 103:19
**oOo** 2:6,19,22 129:13
**ooze** 128:17
**op** 46:19,19
**open** 37:14,19 80:24
90:13
**operate** 106:1,12
**operates** 17:23
**operation** 45:22
46:20 53:17 54:19
65:10 74:23 76:14
89:8 93:16 106:21
**operative** 52:12 83:1
**opined** 110:18 119:22
**opinion** 29:11,11,15
32:19 33:22 42:6,14
42:17 43:6 47:10,11
50:17 53:3 60:20
69:17,19 70:14
71:20 75:21,22 76:2
80:2 84:13 86:13
87:17 88:13 98:9,19
98:19,20 117:8
121:17 122:18
124:14,20 125:12
125:13 127:7,12
**opinions** 20:23 21:18
28:11 31:18 32:16
33:1 42:4,18,25
49:10,14 60:7 67:15
68:19 69:12 73:1
79:22,24 80:6,18,21
80:25 81:12 82:3
97:18 98:15 105:18
112:1,20 114:18
115:13 116:14,19
117:6,18 126:13
**opportunities** 105:20

**opportunity** 43:4
**opposite** 106:23
**opted** 22:25
**option** 90:22 95:6
**options** 70:21,24 71:4
71:13 86:9
**oral** 32:15
**order** 42:4 98:18
**organizations** 22:13
**original** 2:20 84:15
86:18 87:1 92:24
126:22 127:9,16,20
**originally** 13:3,5
18:11 30:1 58:20
**orthopedic** 14:8,9,14
14:17,19,23 15:4,6
15:11 22:12 25:22
31:8 32:14,25 65:7
69:3 91:10,13,16,21
103:14 108:17
122:15,24
**orthopedics** 14:22
15:2 101:7
**outcome** 59:19 60:2,8
123:18
**outlined** 8:24 77:2
**outside** 35:20 52:15
54:7,12 106:10
**overall** 67:24 69:15
73:11 105:7
**overhead** 68:7,7
**overturned** 30:18,21
**overview** 49:11

**P**

**P** 4:1,1
**P.C** 4:10
**p.m** 3:16 129:11
**page** 2:2,8 32:4 44:3
44:6,16 48:18,22,25
49:1,2,3,9,15,15
50:16,16 51:15,15
51:22 54:18 58:16
58:18 59:18,22,22
66:17,22,24 67:18
71:15 79:21 91:1
97:10 104:23
110:21 114:13
115:19

**pages** 43:14 44:11
50:10 79:23
**paid** 22:25 41:21
117:6,8,8
**pain** 62:18,22 78:13
78:14,20 79:3,4,11
91:5,13,14,15,17,18
91:19,22 93:20
94:24 95:2,6,9,10
95:20 96:3,8,9
99:14,18 100:1,12
100:14,20 112:15
113:8
**painful** 91:11
**paper** 44:17 108:3,5
**paragraph** 59:23
62:5 71:15 77:2
100:17 114:14
**paragraphs** 60:22
**paralysis** 118:23
119:8,24 121:17,22
123:1
**paraphrase** 92:8
**paraplegia** 118:18
122:7,13,21
**paraplegic** 119:17
124:9
**parcel** 91:16
**parenthesis** 45:19
46:25
**part** 11:7 15:19 21:9
24:14 25:1 50:14,15
51:14 63:11 66:8
67:11 85:3 91:9,16
96:10 101:18
103:12 112:1
**partial** 55:2
**participating** 5:20
**particular** 52:24 65:2
**parties** 6:1 130:15,18
**parts** 50:7 51:11
65:17
**pass** 15:25 16:2
**path** 13:23
**pathological** 78:5
**pathologies** 77:18
**pathologist** 20:10
**pathology** 60:15
62:17,23 76:21

92:10,22,23 93:13
108:19
**pathophysiology**
127:15
**patient** 11:16,23
32:20 56:8 61:7
62:1 64:21 65:9,10
65:12 71:5 75:4
76:13,14 90:24
119:16 122:10
123:19
**patient's** 73:2 76:15
108:11
**patients** 14:18,25
25:7 53:12,16 55:16
57:4 63:12 64:7
66:3 91:22 95:16,19
95:22 96:14,15
103:18,24 108:25
112:21
**Pause** 39:16
**pay** 22:9
**PDFs** 36:4
**pediatric** 15:2
**peer-reviewed** 11:6
**people** 20:5,12 23:7
33:21 34:22,24 55:8
65:19,24,24 66:10
91:12,14,17
**percent** 12:2 55:20
58:21 63:14,20,22
64:3,4 66:14,16
93:2 96:15,17 122:4
123:18 125:13
**percentage** 63:12
**Perfect** 50:13
**perform** 66:25 68:3
68:13 111:6 115:12
**performed** 9:23 11:5
11:9,13 46:21 54:19
54:21,23 55:1 63:13
68:17 72:11,17 93:2
**performing** 16:6
**peril** 81:1
**period** 38:5 112:19
**permanent** 69:9
73:11 90:20 95:13
118:24 119:9,25
121:18 123:1

**persistent** 61:25
63:17 64:10,23
65:14,15,23 74:19
74:20 78:3,13
**person** 5:24 20:22
64:13 130:9
**person's** 33:13
**personal** 18:6,19
20:22 21:13 40:10
76:1
**personally** 20:6 21:7
35:25 95:18
**pertinent** 31:11
32:16
**Philadelphia** 26:22
**photographs** 10:4
34:12
**phrase** 59:23 69:2
**phrased** 68:9
**physical** 67:5 69:3
107:8
**physically** 5:21 7:5
**physician** 15:9 58:17
59:5,11,18 60:1,16
60:16 71:25 96:7
112:6 123:5,8
**physicians** 20:16
42:10 101:23
**physiological** 84:16
86:25
**pick** 10:8 33:16 39:23
**picked** 50:1
**piece** 61:25 73:24
84:25 93:17 128:10
**pilots** 108:1
**pinpoint** 87:6
**place** 33:12 65:21
88:21 98:15 113:2
130:10
**placed** 57:23 68:14
71:17,25 72:9,14
74:7,15 75:13 94:19
110:15 111:2 112:5
113:24 114:8,10,20
**placement** 105:16
**places** 45:6
**plaintiff** 1:4 3:4 4:3
5:14 38:11,20,22
40:1,4 42:9 115:11

118:2 123:19
**plaintiff's** 35:19
36:23 50:22,24 93:5
119:23
**plaintiffs** 6:7,22
33:20
**planner** 80:11,14,20
81:5,16,17,23,25
**planning** 42:3
**pleading** 7:1
**please** 5:11,18 6:4,17
7:4 8:7 11:1 18:20
32:4 40:24 72:13
88:10 99:24 101:6
**plenty** 33:10 60:15
108:2
**pliable** 64:16
**plump** 64:14
**Plus** 45:15
**point** 10:25 15:20
22:20 30:15 42:17
60:10 63:2 70:21,24
76:16 82:5 85:14
91:23,25 94:1,13
95:5 97:12 104:23
105:7 110:15
118:19 126:21
**pointed** 57:10 123:18
125:4
**points** 49:9 66:18
67:2 91:2 94:15
110:6,20
**police** 107:25
**pool** 34:20
**poor** 63:11 64:24
**poorly** 79:11
**pop** 128:10
**Pop-a** 79:2
**Pope-a** 79:2
**Poppa** 71:16 114:14
114:17,18
**population** 61:7 64:4
**portion** 31:15 35:10
51:17 76:11
**portions** 61:16
**position** 60:3 76:12
116:9
**positions** 114:24
**possibilities** 84:4

86:5
**possibility** 85:14
**possible** 92:1,4 93:6
102:24 103:5 113:6
123:17 125:3
**post** 63:18
**post-laminectomy**
46:2 63:16 66:3
**post-surgery** 58:17
**posterior** 52:9 82:24
**posteriorly** 52:14
**postings** 123:14
**postoperative** 78:4
**potentially** 82:11
97:15 103:1 128:7,8
**pound** 72:2
**pounds** 72:2,16 107:5
107:7,13 115:6
**practice** 14:12,17,21
14:24 22:24 104:3
106:17
**practiced** 14:14 25:6
**practicing** 107:21
**practitioners** 103:11
**preclude** 106:24
107:1
**precluded** 109:1
**predict** 111:15
**predictably** 53:18,18
**prefacing** 76:25
**preliminary** 27:1
29:6
**preparation** 41:19,21
42:7 45:1
**prepare** 8:14
**prepared** 26:1,15,17
27:9,16 28:8 43:9
**prepayment** 40:23
41:1
**presence** 78:11
**present** 5:21 21:5
29:3 38:2 103:17
**pressure** 82:24
**pretty** 15:3 22:11,15
38:6 72:6 81:24
84:16
**prevailing** 101:10
**prevent** 116:2
**previously** 53:25

**primary** 55:9
**print** 49:20
**prior** 31:12,15,17
32:18 55:23
**prison** 118:15,17
**probable** 92:17 122:5
**probably** 45:2 53:14
53:15,20 54:14
**problem** 12:22 15:24
61:7 85:5 92:6
**problematic** 64:10
**problems** 14:24
63:18 87:2 90:20
**procedure** 89:7 94:19
**procedures** 30:10
80:19 107:24
**proceedings** 39:16
**process** 20:6 21:15
**produced** 3:14 36:4
**professional** 113:17
**Professionalism**
31:24
**professionally** 75:23
**progressive** 108:20
**prolong** 113:5
**prongs** 113:3
**proper** 77:4,6 123:21
**prophylactic** 113:5
**prophylactically**
108:12 109:1
**prophylaxis** 113:15
**protected** 108:13
**protrudes** 64:9
**protrusion** 45:15
**provide** 33:20 35:19
42:23 81:6 93:8
98:8 103:3 123:21
**provided** 36:22
108:11 117:2,20
119:16 122:3
**providers** 10:2 105:3
110:16 111:3
120:18
**provides** 32:14
**providing** 107:16
**psychologic/psychi...**
104:24
**published** 30:20
**pull** 47:5 107:13

**pulled** 66:21 67:3
83:11
**pulling** 49:22 50:25
67:21 107:8
**pulposus** 45:14 46:22
51:25
**pump** 95:6 96:4,9
**purpose** 16:18
**purposes** 49:21 98:3
**push** 97:2 107:13
**pushing** 67:21 107:8
**put** 11:5 23:16 49:20
75:23 90:8,8,9
95:16,18,23 98:14
104:6
**putting** 60:4

**Q**

**QME** 108:16
**qualifications** 10:19
48:19
**qualified** 21:4 69:5
69:20,23 80:14 81:6
109:14,16,19
**quality** 93:22
**question** 7:23 8:6,7
12:16,21 13:4 15:17
15:17,19 18:22 19:4
21:20 23:15,19
28:13 30:1 31:20
35:11,23 38:9 50:14
50:15 53:7 58:13
59:17 63:4,6,11
70:11,23 71:2 77:20
81:18 86:13 96:11
98:3 99:4 102:7
106:9 107:18
109:22 110:10,13
111:18 112:13
119:2 120:1,20
121:24,25 122:2
123:25 124:2
**questioning** 19:20
125:2 127:1
**questions** 15:16
21:21,24 77:20
125:20 126:4,11
128:22,23
**quick** 47:15 81:13

88:9
**quickly** 10:23 94:7
97:11
**quit** 17:5
**quite** 54:4
**quote** 121:18
**quotes** 60:4 100:10
100:19 101:8

**R**

**R** 1:13 2:2 3:13 4:1
5:6 6:11 121:4
**R-o-b-e-y** 38:24
39:25
**rabbit** 93:25
**radiating** 62:22
**radicular** 59:2
103:20,23
**radiculopathy** 45:17
45:18
**radiographic** 126:15
**radiologic** 9:1,3
52:13 69:13 74:21
**radiologist's** 61:5
**radiology** 9:9 47:1
122:3,10 124:23
**ran** 21:10
**range** 93:9 96:2
**rapidity** 113:1
**rare** 52:22
**re-herniate** 61:17
83:23 128:9,11
**re-herniated** 85:13
85:15,18
**re-herniation** 87:9,14
**re-pay** 22:16
**re-review** 50:9
**re-up** 22:21
**reach** 83:6
**reached** 70:8
**reaching** 68:4,6,7
**read** 32:1,21 33:3,19
33:19 45:6,11,25
61:4 99:21 104:8
111:11,24
**reading** 70:15
**ready** 37:24 47:17,19
**real** 88:8 96:22
**reality** 103:25 108:4

realize 126:6
really 31:18 38:6
  50:3,8,15,17 63:15
  79:15 91:11 92:7,17
  96:5,10 121:20
  125:2 126:3 128:13
rear-end 55:18 56:10
  58:10
rear-ended 98:11
reason 18:5,9,17 19:1
  19:12 73:4 78:21
  81:21 83:18,20
  88:14 96:5 113:14
  120:4 121:5,11
reasonable 83:15
  84:14 86:7,8,13
  89:25 127:7
reasonably 103:15
reasons 6:25 57:16
  76:15 84:2
recall 10:12 19:7
  26:10 43:16,18 56:8
  58:12,15 73:25 89:3
  89:5 99:16,17,25
  117:25 118:9,10,22
  119:6,13,14 126:12
  126:25
receive 43:4
received 9:4 24:9,20
recertification 16:2
  16:17
recertified 15:23
recertify 15:12,15,18
  22:17,21
recertifying 15:20,25
Recess 17:9 48:4 97:6
recognize 35:9
recollection 33:25
recommend 104:24
recommendation
  105:2 119:20 121:3
recommendations
  71:4
recommended 60:18
  88:2,6
reconstructive 15:1
record 5:4,12 6:5,18
  6:22 17:8,11 26:4
  27:12,21 28:2 29:2

29:20 33:14 37:2
  39:7,11,13,14,18
  47:6,10 48:3,6 71:3
  71:10 72:24 75:21
  80:17 87:25 88:15
  89:11 96:22 97:5,8
  97:21 98:8 100:11
  101:16 119:11
  120:11,12,13,21
  124:3 128:25
  129:10
record's 32:10
records 2:14 9:9,12
  27:10,19,24 28:11
  28:19 29:7 31:11
  32:17 36:6 43:13,14
  48:23 49:12,17
  50:10,19,24 51:8,12
  59:14 65:1,6 70:5
  72:21 88:16 89:19
  92:3 99:22 100:8,24
  101:1,7,21 102:18
  103:7 104:13,21
  119:22 121:23
  122:3,8,10,14,23,25
  123:17 125:4,16
  126:12
recovery 58:24,25
  59:1,3
recurrence 65:21,22
  65:23 82:6,12 84:15
recurrent 60:13 61:2
  62:8 63:17 64:11,23
  65:12 74:20 79:8
  94:6
recurring 78:8
redacted 20:21
redirect 125:19
reduce 94:24
reduced 130:11
reduction 92:5
refer 95:22
reference 106:14
referenced 44:13
referred 62:18 78:14
  95:19,19 96:6,7
referring 23:18 98:23
regard 54:8
regarding 73:1 80:18

regardless 87:2 109:2
  122:16
regards 100:12
Regulations 106:6,16
  109:21
regurgitating 51:11
  67:8 68:2
rehab 105:13,14
rehabilitation 105:15
rejected 14:1 18:12
rejoin 17:5
related 55:12,14
  84:15 130:17
relatively 94:7
release 73:16 76:20
  77:10 78:19 79:14
released 75:1 76:17
  78:10 79:18,20
relevant 27:10,19
  28:19 29:7 32:18
  42:23
relief 108:24
relieve 92:1,1
rely 33:18,21,24
  34:24 81:15,16,22
  104:11,12
remaining 78:5 90:16
  94:6 128:8
remember 22:1
  31:15 38:10 56:11
  57:12 58:2 72:3
  81:7 88:18 96:1
remind 118:6
REMOTE 1:13 3:13
remotely 5:22,25
removal 61:16 94:6
remove 83:7 127:25
removed 83:24 128:2
  128:5,15
removing 89:1
render 42:4,5
rendering 32:18
renew 16:22
renewal 16:22
repairs 15:3
repeat 7:22 12:20
  13:12 40:24
rephrase 7:22 8:8
  13:6 27:12 44:10

53:9,10 72:13 97:23
  99:24 106:8 119:3
replacement 15:1
report 2:15 8:18,25
  9:6,18 20:1 26:1,15
  26:17,23 27:1,9,16
  27:18 28:8,12,20,21
  29:7,8,9 31:9 36:7
  42:18 43:3 44:14
  45:2,4 46:8,12,14
  47:3,17 48:9,16
  51:17,22 52:12
  58:16 61:5 66:17
  74:2 78:17 79:21,23
  80:3 83:1 84:17
  86:24 88:8,18 92:8
  100:6 105:5 110:21
  114:13,19 116:14
  117:20 118:1,6,22
  119:4,6,14,19 120:5
  120:8,13,16 121:2,4
  121:6,16
report-writing 24:15
reported 4:24 58:21
  99:13 102:12
reporter 5:17,19 7:18
  12:14 16:25 38:25
  39:8,10 130:4
REPORTER'S 130:1
reporting 5:22 6:3
reports 42:11
represented 118:2
requested 35:19
require 22:22 74:7
  113:21
required 20:20 107:9
requirements 21:2
  106:1,4,9,11,21,25
  107:5 108:3,8
research 11:5,6
reserve 43:5
residency 14:8
residual 61:2,8,14
resort 95:12
respect 15:11 120:14
respond 19:19 23:19
responded 69:15
response 54:3 55:23
  81:17 101:16 103:4

107:16 114:3 123:22
**responses** 34:7
**responsive** 36:1,11 36:22
**rest** 45:20 95:14 116:10
**restate** 8:8
**restricted** 74:5 75:18 75:19
**restriction** 72:1,15 110:25 114:12
**restrictions** 47:2,5,7 47:11 68:21 69:10 71:18,21,24 72:10 73:5,8,12 74:4,7,12 74:15 75:1,2,7,13 76:20 77:3,10 79:12 79:15 105:6,20 110:5,10,14,18,19 111:2,8 112:4,5 113:1,3,24 114:8,10 114:20,22 115:3,16 115:20,22 116:6,10
**restrictive** 111:2 115:4,16,22 116:1
**result** 127:14
**resulted** 86:25
**results** 64:24
**retained** 8:11 38:5 61:20 82:7,12 83:16 84:3 116:18 117:1
**retired** 11:18 16:13 16:22
**retirement** 11:20 12:2
**retropulsion** 122:11
**return** 59:5 73:16 75:1 77:10 79:14 84:3
**returning** 69:8
**reveals** 116:16
**revenue** 12:6
**review** 8:17 28:10 32:16 34:3,6,12 43:5 50:2,11 64:25 122:4,7
**reviewed** 8:16,17 9:9 21:1,15 22:6 31:10

34:9 36:6 43:9,13 43:15 99:23 104:21 119:21 122:19 126:12
**reviewing** 9:16 45:1
**rhetorical** 112:12
**rid** 90:16
**ridiculous** 123:24
**right** 7:5 10:22 17:6 17:16 19:25 22:1 27:23 28:6 41:4,23 43:6,12 45:2 46:16 46:24 48:1,8 50:13 55:3 58:13 60:10 61:1 67:3 68:5,7 69:1 72:3,9 79:24 85:9 94:1 99:11 101:14 104:17 119:3 120:25 126:15 129:7
**risk** 64:16
**RMR** 3:17 4:24 130:23
**road** 80:23 112:18 113:16
**Robert** 18:3 23:8
**Robey** 38:24 39:25
**rock** 90:9,13
**roll** 21:21
**rollovers** 34:23
**room** 5:21 7:12
**rooms** 14:20
**root** 52:16 60:14 62:15 74:22 103:21
**roughly** 16:3
**routinely** 64:5
**run** 10:22

─────────
**S**

**S** 4:1
**S1** 45:16 52:5,16 60:14 74:22 128:5
**safe** 33:22
**safest** 33:23
**safety** 106:5,15 109:21 113:4,6
**saga** 73:8
**sake** 37:1
**salacious** 19:16

**saw** 11:16,23 14:22 14:24 55:8 57:5 102:8,18 103:10 109:14 123:13 124:21,22
**saying** 28:25 45:11 71:10 76:24 82:18 86:6,24 94:5 112:13 113:13 124:10
**says** 23:12 41:5 43:3 45:8,13,20,25 46:19 46:25 49:8,9 59:18 60:1 62:5,10 67:20 67:22 85:15 89:5 119:21 121:3
**scalpel** 83:1
**scan** 58:18 60:23 61:5,20 62:14 63:6 63:7 78:22 85:18 124:6
**scans** 9:9 60:12 77:24 78:2
**scenario** 127:4,8 128:15
**scene** 10:5
**schedule** 2:11 36:5 37:2
**school** 12:11,17 13:3 13:5,13,20 14:1,5,7
**schools** 14:1
**science** 23:9
**scientific** 21:3 33:23
**scratch** 34:24
**screen** 31:22 40:18 44:1,6
**scribbled** 46:13
**seat** 107:5
**second** 15:10,19,25 37:15 48:22 49:1 59:15 62:4 77:25 82:5 83:18,20 96:10 101:6 104:23
**section** 49:4 105:5 116:6
**sedentary** 72:7 115:7 115:9
**see** 9:5 15:16 17:5,13 24:22 31:23,25 37:23,24 38:9 40:19

40:19 41:7 44:6 45:9 49:4,19 52:13 54:19 62:11,15 66:19 71:18 82:8 83:12 88:17 90:17 91:1 93:18,20 100:16,21 101:21 102:1 103:9 104:25 105:2,10 110:7,14 110:24 113:15 114:11 124:3
**seeing** 14:17 96:14 99:25
**seek** 32:16 99:10
**seen** 23:6,11,21 24:1 25:6 33:10 34:21,22 35:7 55:16,16 56:9 77:21 97:14 100:8 104:2 112:21,23
**self** 33:6,7 81:22
**self-reporting** 50:24
**semi** 98:12 102:13
**sense** 18:24 33:15 34:18 50:12 89:12 103:8 104:4 107:6 107:10
**sent** 8:16 26:23,25 36:15,20 37:13
**sentence** 20:1 60:21 62:4,10
**sentences** 76:25
**separate** 9:18 77:14
**separates** 52:4
**September** 38:23 39:22,24 67:4 73:17 74:3,6,15 75:13 77:17
**SERC** 67:5 68:17,22 112:6 115:20
**set** 6:25 20:16
**setting** 127:19
**settle** 25:13 26:24
**settled** 118:19
**settlement** 119:7
**seven** 26:12 36:4 94:9 110:20,20
**seventh** 45:24
**severe** 82:23 112:14 113:8 118:17

122:20 124:9
**severely** 61:11 83:21 83:21
**shape** 42:25
**share** 31:22 40:18 44:1
**sharing** 126:7
**she'd** 123:23
**shoe** 90:10,11,12,13
**short-circuit** 36:21
**shorthand** 130:9
**show** 31:21 32:11 60:12 63:2 77:24 81:10 88:17 89:19 111:24 122:20
**showed** 78:2 122:14 124:6
**showing** 32:6 34:13 123:13 126:5
**shown** 30:19 122:17
**shows** 63:7 104:5
**side** 52:15 61:12,18
**signals** 95:2
**signature** 129:11
**significant** 34:22 62:23 74:7,12 79:12 92:4
**significantly** 64:8 102:12
**simple** 93:16,23
**simply** 23:23 50:23 125:9 127:10
**Simpson** 20:13
**single** 8:24 69:16,21 122:9,24 123:2,4,8 124:3
**sir** 40:20 42:1
**sister** 17:22
**sit** 22:4 56:11 57:9 60:6 68:18 82:10 109:8
**sitting** 68:4 73:25 78:8,12 107:4 108:22 114:24
**situation** 86:24 113:10 128:19
**six** 26:12 110:20
**size** 78:7
**skin** 52:20 128:16

**skydiving** 34:19
**small** 76:11
**sneezing** 57:19
**softened** 128:7
**solutions** 95:8
**somebody** 34:19 92:20 95:13 106:24 125:14,17
**somebody's** 33:25
**something's** 85:22
**sooner** 94:8 113:22
**sore** 103:24
**sorry** 13:6 17:4 24:19 32:3 44:10 63:10 73:19 84:11 88:18 92:9 96:20 104:18 106:8 126:6
**sort** 17:23 52:14
**sorted** 17:14
**sought** 31:10
**sound** 43:14
**source** 106:14
**Southern** 14:21
**space** 61:9,13 62:1,17 62:22,23 78:12 83:5 83:11,13 92:16 94:11 128:6
**spasm** 113:8
**speak** 59:1 86:19 111:10,19
**speaking** 84:20
**specialist** 91:18,19 95:20 96:8
**specific** 47:6 58:6,8 64:1,2 71:4 73:24 91:4 106:14 110:14 110:17,19
**specifically** 26:10 80:20 82:25
**specifics** 43:20
**speculate** 18:15 72:24
**speculation** 87:17
**speed** 10:24
**spelled** 20:11
**spend** 16:16 47:3
**spent** 12:7 97:15 98:3
**spinal** 25:19 45:25 46:1 63:16,19 88:23

88:24 89:7,8 91:12 94:13,16,17,20,23 95:3,5,17,23 96:3 96:16,19 107:23,23 118:17 122:6,12,13 122:20
**spine** 14:25 25:16 38:3,19,22 39:25 40:4 52:1 94:24 96:15 107:4 112:14 112:24
**spoken** 9:20
**squashing** 54:7,12
**squirt** 61:18
**squirting** 52:21
**staff** 16:16
**staff's** 119:23
**stage** 85:16
**stamped** 119:20
**stand** 68:18
**standard** 5:5 22:11 22:15 70:13
**standards** 20:16 30:17 31:5,24 109:2
**standing** 68:6 114:24
**standpoint** 70:19 103:15 108:6,14 109:4 113:4,5,7,14 117:13
**stands** 45:14 46:5
**start** 13:6 49:10 58:10 79:22 91:1 95:13 112:13,21
**started** 45:3 66:17 100:6 102:19
**starting** 8:24 38:16 48:25 71:15 112:22 114:14
**starts** 45:24 51:22 59:23 60:23 100:17
**state** 5:11 6:18 7:4 18:23 69:5,11,24 107:20 108:8,16 109:7
**stated** 19:25 119:7 130:10
**statement** 2:12 7:25 8:2 23:17 28:4 32:19 41:5,5,16

43:3 89:3,5,10
**statements** 42:18 100:23 124:4
**States** 1:1 3:1 5:9 13:21
**stating** 6:4 41:4
**step** 28:25 90:10
**Steven** 1:13 2:2 3:13 5:6 6:11,19 121:4
**stimulator** 94:17 95:3,23 96:9
**stipulation** 5:18
**stone** 43:7
**Stoneman** 1:3 3:3 5:7 5:14 8:12 9:21,24 10:7 46:9 68:13 70:7 71:16 72:11,15 72:18 73:9 74:8,22 82:6 87:11 88:12,20 90:17 97:15 98:3,21 99:10 100:1 101:12 101:22 102:4,11 114:15,19 116:4
**Stoneman's** 65:2 71:25 105:19
**stop** 60:9 74:1
**stopped** 14:16 16:6,7
**storms** 13:10
**Straw** 32:9 81:3
**Straw's** 31:6 81:18
**Straws** 10:11,18
**strength** 67:25
**stretch** 64:15
**structural** 83:22
**structure** 62:25
**stuck** 78:24
**studies** 9:3 52:13
**study** 9:1
**subject** 36:11 116:15
**subjective** 50:22 51:3 59:9 69:14 75:4
**submission** 21:12,14
**submissions** 21:1,8 22:6
**submit** 20:20
**submitted** 40:22 41:1
**subsequent** 59:8 60:12 61:23 63:23 73:15 78:1,4 85:17

87:2,14,18 92:12,23
126:14
**subsequently** 30:12
86:14 92:11
**subset** 66:14
**substantial** 84:2
**successful** 65:20
**sudden** 98:23 113:7,8
**suffer** 78:13
**suffered** 82:22
**sufficient** 52:7 79:16
87:16 103:3
**suggested** 57:18
89:15
**suitable** 108:20,21
**Suite** 4:5,11
**suited** 81:6
**sum** 41:9
**summarizes** 41:6
**summarizing** 51:18
114:18
**summary** 47:9 49:4,8
49:20 50:2,12 51:14
66:24 88:7 100:7
121:9
**sun** 64:18
**supervision** 130:13
**support** 104:25
**sure** 8:9,22 10:12
12:23,23 22:8 31:21
32:10 35:2 37:15
46:11 51:9 54:4
58:4 61:4 67:19
72:6,14 73:23 79:1
81:13 84:20 85:12
87:10 88:7 89:13
94:9 98:2 99:3,9
104:8 110:23
113:17 114:2
116:23 117:10
121:15 127:23
**surgeon** 14:9,19 31:8
32:14,25 61:15 65:7
65:11 69:3,4,20
71:17 72:9,14,17,22
73:6 83:12,24 88:24
91:10,17,21 114:19
114:21 122:24
127:25 128:2

**surgeons** 25:22 89:25
91:13 108:17
122:15
**surgeries** 16:6 53:15
54:11,17,21 58:1
63:13 89:15 93:1,25
**surgery** 11:10,14
14:8,14,16,25 15:1
15:2,4,6,11 22:12
46:1,21 51:23 53:19
54:15 57:12 58:22
60:18,18 61:8,23
63:16,19,23 65:2,7
65:13,20 66:7 72:11
72:17 78:6,9,22
88:22 89:1 92:11,24
94:24 96:13 109:15
113:21 126:14,23
128:3,20
**surgical** 14:18,23
32:19 53:14 69:13
94:19
**surgically** 76:22
**surrounding** 19:7
128:13
**survive** 94:11
**suspended** 30:22
**suss** 77:16 84:18
**sustained** 103:16,16
**swear** 5:18
**swelling** 60:14 74:22
**switch** 97:10
**sworn** 3:14 6:13 31:9
117:21 130:5
**symptomatic** 74:21
104:1,2
**symptoms** 59:2 62:2
65:14 92:2 93:5,7
98:24,24,25 101:11
102:15,19 103:19
103:20,23
**syndrome** 46:1,2
63:16,17 66:4 94:25
94:25
**synonyms** 86:23
**synopsis** 49:11 50:18
**system** 78:25

——————————
**T**
——————————

**T2** 119:23
**table** 128:18
**take** 13:23 47:15 48:1
60:19 64:17,24 85:4
90:15 93:17 99:3
108:7,9 113:2
128:16
**taken** 1:14 33:11
44:22,25 61:21
73:11 130:8
**takes** 69:17 103:20
**talk** 10:1 15:10 88:12
94:1,13
**talked** 16:24 17:2
48:20 99:1 107:11
110:4
**talking** 9:8 44:8 46:4
48:15 60:24 63:6
64:3 84:24 88:19
106:15,16,18 110:7
110:17 114:16
116:2
**talks** 105:7
**tangential** 19:18
**technical** 39:20
**technology** 8:7
**Tecum** 2:9
**Telephonic** 109:24
**tell** 18:20 28:17 41:14
61:19 84:5,23
101:12 103:7,7
124:8 130:5
**telling** 39:21
**tells** 107:6
**temporarily** 93:7,8
**temporary** 92:5
**Ten** 24:23
**tendon** 15:3
**tenting** 128:4
**Teresa** 38:23 39:25
**terminology** 70:11
**terms** 42:15 59:1
61:3 94:18 126:12
**territory** 37:17
**test** 63:8
**testified** 6:13 44:5
75:8,10 81:3 93:15
99:18 117:3 118:23
**testifies** 32:25

**testify** 22:5 43:10
50:11 75:24,25
119:1
**testifying** 85:24
**testimonial** 2:11
10:10
**testimony** 10:17 19:8
20:24 27:12,24 28:6
31:8,9,9,16,19
32:15 37:2,14,19,24
39:22 42:8 68:24
74:10 75:12 77:6
80:24 81:7,10,15,24
82:15 84:13,17
85:24 86:12 97:14
99:21 117:1,17,21
130:10
**tests** 24:19 68:13,16
111:6
**Thank** 47:19 128:21
**Thanks** 47:25 129:7
**therapist** 69:4
**Therapy** 67:5
**they'd** 122:15
**thick** 64:20
**thigh** 62:19
**thing** 9:2 33:22,23
38:23 40:19 48:16
76:25 84:21 89:25
93:23 107:25 125:5
125:5,8,14
**things** 20:15 42:12,13
42:15 49:22,23
73:10 75:8 78:16,18
79:17 99:1 116:2
126:4
**think** 7:15,18 12:16
13:25 18:8 19:9
23:3,5 26:11 33:8
33:18 39:1,3,8,9,21
44:4 52:19 55:15
68:8,9,21 69:2,18
71:23 72:2,7,21
73:5 74:16,17 75:5
86:22 88:5 89:22
90:2 92:19,21 93:21
94:10 96:22 97:3
102:12 103:24
107:1 115:23

116:13 122:13 125:23 128:24
**thinking** 46:9 73:14
**third** 16:1 45:8 49:2 49:3 128:15
**Thompson** 2:4 4:4,4 5:13,13 6:6,6,21 8:22 12:20 18:14,21 19:15 21:19 23:14 24:6 26:3 27:11,20 28:1,22,24 29:19 39:2,9 42:21 47:20 47:25 53:1 54:1 55:22 56:3,16 57:7 59:13 63:3 68:23 70:10 71:1,9 72:23 74:9 75:9,15,20 77:5,19 80:16 81:8 82:14 84:10 85:23 86:11,17,20 87:15 87:24 90:4 96:24 97:20 98:7,17 101:15 103:2 106:3 106:13 107:14 109:17,20 111:22 112:7 116:19 117:1 117:6,7,11,15 118:3 118:25 119:4,10 120:10,21 121:21 123:4,20 124:15 125:3,7,20 126:2,10 129:4,7
**Thompson's** 70:15
**thoracic** 124:9
**thought** 50:6 59:11 63:5 73:22 101:3 114:16
**thousand** 53:16,21
**thousands** 50:10 53:24 55:8 57:4,4
**three** 13:18 16:5 21:20 34:1 40:8 41:8 44:11 60:22,22 64:18 94:1 105:6 110:6
**throw** 19:17
**time** 5:5,5 7:16 8:5 10:25 11:9,13,16,23 12:6 14:20 15:25

16:15 17:8,11 18:3 19:5 20:9,16 21:1 21:25 22:14,23 23:1 23:4 26:17 27:18 28:19 29:6,7 30:15 30:25 31:2 32:12,24 33:25 38:3,5 39:15 39:18 41:25 42:17 47:22 48:3,6 51:5 54:23 55:1,4 57:11 58:7 60:20 61:21 69:23 70:18 73:12 73:15 74:18,23 75:3 75:4,7,14 77:4,11 79:20 81:11,12 85:17 90:10 92:14 92:20 93:9 95:25 96:18 97:5,8,23 117:8 121:15 122:9 128:3 129:10 130:9
**timeframes** 120:14
**times** 57:10 72:12,19 104:3 122:8 126:23
**tips** 62:20
**tissue** 60:13
**today** 8:10 11:12,22 22:4 33:17 35:3 56:11 57:10 60:6 74:6,10 77:18 82:10 84:17 126:13
**today's** 5:4 57:11
**toes** 62:20
**told** 27:13 51:4 101:22 102:4 109:6 115:24 124:18
**top** 28:25 41:4 49:2,3 66:22,24 73:25 104:24 128:18
**torn** 128:8
**total** 12:5 34:23 41:9 41:11 53:21
**totality** 76:2,18 120:22
**touch** 82:3
**trail** 86:17
**training** 24:9,20 25:1 80:14 91:4,9,20 105:15 111:17
**transactions** 41:7

**transcript** 2:21
**transmission** 94:23 95:1
**transmitted** 36:16
**TRANSPORTATI...** 1:6 3:6
**trauma** 14:22 15:1 55:13 56:24 57:1,15 57:16,17 87:18
**traumatic** 55:12 56:22
**traumatically** 55:14 57:22
**treat** 53:13 59:11 91:14,17
**treated** 14:23 53:16 53:21 55:15 91:21
**treating** 42:10 51:18 58:17 59:5,10 71:25 73:6 101:23 105:3 110:15 111:3 112:6 123:5,8
**treatment** 70:20,24 71:13 80:7 99:10 104:17,19 108:10 113:22 116:5 119:23
**treatments** 78:23,25 93:20
**trial** 20:13,24,25 42:4 42:6,8,16,19 49:24 60:20 116:15
**tricky** 125:2
**tried** 24:21 49:10 76:6,7 79:14
**trier** 21:5
**tries** 87:12
**trolley** 123:23
**trouble** 15:20 61:10
**truck** 105:10 107:6 107:12,21 108:2,4,5 108:8,21 109:1,7,11 109:16,19 112:16 113:9,18 115:2
**trucks** 107:22
**true** 10:20 17:20 51:13
**truth** 130:6,6,6
**truthful** 124:5

**try** 10:24 78:23 79:4 113:5
**trying** 20:4 32:9 51:3 54:5 64:24 73:4 74:5 75:23 77:16 84:18 85:3 97:2,16 97:23 98:22 125:2
**turned** 117:14
**twice** 78:7
**twisting** 57:20
**two** 15:16 16:1,8 17:22 20:7 23:12,23 24:10 25:13 30:22 34:1 41:8 49:24 60:22 64:18 77:20 84:5 85:19,20 86:9 89:15 94:15,16 100:20 105:6 108:19 110:6 113:3 114:25 125:20 126:3
**type** 9:23 11:5,13 56:22,24 63:13 68:12 82:23 127:17
**typewriting** 130:12
**typical** 57:15
**typically** 56:12 64:9

**U**

**Uh-huh** 85:6 112:11
**ultimately** 14:4 29:13 29:16 30:9,22 82:6 118:19
**umbrella** 17:24 57:1
**unable** 84:25
**unbilled** 41:18
**uncharted** 37:16
**uncommon** 52:22 61:16
**undergoes** 94:5
**underneath** 45:14 46:24 128:5
**understand** 8:6,10 20:4 28:20 32:8,13 35:14 53:11 77:14 86:6,7 111:10 113:19 115:24,25 125:8
**understanding** 11:25

17:17 25:9 49:7
50:3 71:20 75:6
79:25 88:10,15
120:7
**understood** 84:4
**underwent** 78:22,24
**unexpectedly** 53:23
**unintelligible** 7:17
12:13 16:24 96:18
**unique** 70:12 75:22
**United** 1:1 3:1 5:9
**University** 12:12
13:14 14:6
**unrelated** 18:23
**unstable** 39:5
**unsupported** 79:5
**unusual** 103:9,18
**up-to-date** 10:20
37:10,13 41:24
**update** 22:22
**upheld** 30:9
**upper** 62:19 107:9
**use** 68:16 77:7 82:23
83:1 86:22 89:23
96:19
**usual** 105:9
**usually** 13:10 42:7
55:10 62:19 103:20

**V**

**v** 1:5 3:5
**value** 104:6
**various** 24:14 95:8
**vast** 55:14 57:16,22
**vehicle** 34:21 55:18
56:10 57:18 58:10
58:11 87:12 99:19
100:2 101:9 106:2
106:12 112:19
114:1,5,6
**vehicles** 35:1 106:22
**verbatim** 100:11
**verified** 37:12
**verify** 51:3 72:7
**versus** 5:7 75:21
102:20,21
**vertebrae** 119:24
**Vicki** 38:21
**video** 1:13 3:13

118:20
**Videographer** 4:15
5:3,17 7:20 17:7,10
39:17 48:2,5 97:4,7
129:9
**videotaped** 5:6
**violated** 29:17 30:2
30:16
**visit** 88:19
**vocational** 105:13,14
105:15,16,19

**W**

**W-e-c-h-t** 20:11
**Wait** 83:17,19
**waive** 6:2
**waived** 129:11
**walk** 14:10,11 34:24
124:21
**walked** 124:18
**walking** 68:6 114:24
118:21 120:9
121:12 122:17
**wall** 52:9
**want** 23:16 32:10
35:10 37:9,25 45:7
47:4,17 49:18 51:24
74:23 76:14 80:23
85:2 95:13 97:11
98:2 112:13,18
113:7 122:2
**wanted** 12:23,23
13:22 17:15 38:15
49:25 126:20
**warm** 64:14
**wasn't** 16:15 61:20
73:8 79:5
**waste** 7:16 81:11
**way** 28:13 38:8 42:24
43:17 49:19 57:20
57:21 62:20 78:4
83:14 90:8,15 99:5
99:17 101:14 102:2
130:16
**we'll** 15:10 43:19
46:7 47:11,24 48:1
**we're** 5:3 7:20 8:3
17:7,10 39:14,17
41:23 48:2,5,15

63:6 64:2 76:24
88:19 97:4,7 115:9
129:9
**we've** 21:20 23:23
47:14 82:2 96:24
97:3 99:1
**Wecht** 20:11
**Wednesday** 1:15 5:1
**week** 14:25
**weeks** 64:18
**well-documented**
103:17
**well-known** 20:10
65:18 128:11
**well-written** 52:12
**went** 13:13 14:1
21:14 31:4 32:8
35:25 49:16 66:7
115:23
**weren't** 98:11
**Western** 1:1 3:1 5:9
**whatsoever** 124:5
**wheels** 123:23
**When's** 54:23 55:1
69:23
**whited** 26:25
**wind** 93:24
**withdrew** 30:25 31:3
**within-entitled** 130:7
**witness** 5:18 6:12
12:16 18:15 19:19
21:23 23:16,19 28:3
29:21 43:2 53:4
54:4 55:24 56:4
57:9 59:15 63:5
69:1 70:15 71:6
72:24 76:1,10 77:9
81:10 82:17 86:1
87:18 88:1 90:5
97:22 98:8,18
101:16,18 103:4,5
107:19 111:23
119:13 121:25
123:7,22 124:1
125:11 126:8 130:4
130:11
**word** 28:6 45:8,15
82:23 124:11,13
**wording** 77:7

**words** 26:19 27:1
51:24 55:3 70:11
75:24 86:21 127:10
**work** 10:19 12:3,3
34:9 41:18 42:2
59:5 64:4 66:18,24
69:8 71:17,18,24
72:4,10,15,15 73:16
75:1 77:2,3,10
78:19,20,24 79:14
79:20 95:4 101:9
102:9 104:16,16,19
106:24 107:2,22
108:16 113:25
114:9,20,21,22
115:4,8,8,12 117:12
**work-related** 102:10
**workers** 69:6
**workers'** 70:18 76:12
104:21
**working** 12:1 59:8,9
**workmen's** 70:12
**works** 93:11
**world** 114:5
**worse** 66:7 68:24
102:13 109:5
112:25
**wouldn't** 51:2,2
89:11 90:2,15,23
95:12 104:11
111:13,17 112:18
**wrap** 113:13
**wreck** 34:20
**write** 49:25
**written** 32:15 46:3
50:16 51:10,12,13
68:11
**wrong** 11:1 27:3
57:20,21 75:14,16
88:11 117:22
123:18 125:15
**wrote** 60:5 74:2
82:25

**X**

**x-ray** 124:6

**Y**

**yeah** 7:24 9:5 11:21

12:9,22 13:9 22:2
  24:19 32:13 36:21
  53:10 63:10,25 72:2
  73:22 83:25 85:2
  86:1 109:10 114:17
  115:3,6 125:20
**years** 11:4,13,23 12:1
  13:16 14:16 15:23
  15:24 16:5 19:14
  22:20 24:24 30:23
  33:12,13 34:1,1
  49:25 50:1,11 55:5
  58:5 91:6 93:11
  94:4,9,9,10 104:12
  108:15 112:24
  116:22 117:5
**yellow** 44:16
**yellow-lined** 44:3,6
**Yep** 32:5
**younger** 19:14

**Z**

**Zoom** 8:3

**0**

**1**

**1** 2:9 35:2,4 107:3
  112:21
**1.1** 78:5,11 79:7
**1:43** 97:5
**1:50** 97:8
**10** 12:6 13:25 15:23
  20:21 21:1,8 25:10
  25:18 55:20 63:14
  63:19,22 64:3,3
  66:14,16 72:2 91:1
  94:4,10 96:17 107:5
  107:7,13 109:9
  110:22,23 115:6
  122:14
**10/15/21** 2:10
**10/19/21** 2:13
**100** 122:4,8 123:17
  125:13
**11** 79:23 104:23
  110:21
**11:27** 3:15 5:1,5
**11:42** 17:8
**11:43** 17:11

**12** 91:1
**12-page** 48:16
**12:11** 39:15
**12:13** 39:18
**12:24** 48:3
**12:32** 48:6
**126** 2:4
**129** 2:17
**12th** 67:4
**14** 8:25 38:23 39:24
  45:3
**1400** 4:5
**1435** 4:25 130:24
**14th** 39:22 48:16
  73:18
**15** 109:9 112:23
  116:20
**1500** 23:5
**16** 11:12 55:5
**17** 38:21
**1974** 13:17
**1978** 13:18
**1985** 14:15
**1989** 69:11 107:19
**19th** 73:17 74:3,6

**2**

**2** 2:11 37:3,4 91:25
  91:25 107:4 113:4
**2,000** 53:21
**2:35** 3:16 129:10,11
**20** 11:4 14:16 15:24
  28:7 72:1,15 108:24
  109:9 112:23
**20-pound** 114:22
**2004** 11:11 54:25
**2005** 14:16 16:7 58:2
**2007** 16:3,7 25:21
  28:7,20
**2010** 32:7
**2011** 24:23
**2013** 70:1
**2017** 11:17 14:15,15
  38:2,16,18,21,23
  39:22,25 69:25 70:1
  107:19 118:23
  121:4,6,8,10,16,17
**2018** 11:20 16:13,21
  16:22 92:10 100:17

102:9
**2019** 45:23 46:21
  59:4 67:4 73:17
  74:3,6,16 75:14
  77:18 88:20 109:15
**2021** 1:15 3:15 5:1,4
  8:25 10:11 45:3
  48:16 73:18 130:20
**2100** 4:11
**22nd** 102:9
**23** 38:18
**2345** 4:11
**24** 103:25
**25** 88:20 91:6
**25th** 121:8,10,17
**27** 1:15 3:15 5:1
**27th** 5:4
**28th** 100:17

**3**

**3** 2:12 40:13,15,25
  41:16 49:15 50:16
  51:15 91:23
**30** 98:4
**3100** 4:5
**35** 2:10
**36** 104:1
**37** 2:11

**4**

**4** 2:14 43:20,22 45:23
  46:21
**4-** 53:15 54:16
**4:21-CV-00061-SRB**
  1:5 3:5 5:8
**40** 2:13 12:2 19:13
**400** 54:11
**43** 2:14
**472-0800** 4:12
**48** 2:16

**5**

**5** 2:15 48:11,12 51:22
  54:18 78:7
**50** 96:2
**500** 53:15 54:11,17
**521** 7:8
**55** 47:14
**561-3400** 4:6

**6**

**6** 2:3,17 33:2 58:16
  58:18 59:22 129:2,5
  130:20
**6/10** 2:14
**6/11/21** 2:14
**6/14/21** 2:16
**60** 121:15 122:17
**64108** 4:12
**64111** 4:6
**65** 113:9
**691** 43:13

**7**

**70** 58:21
**734** 44:12
**736** 44:12

**8**

**8** 66:17,22,24 67:18
  71:15 77:2 114:13
  115:19
**816** 4:6,12
**85** 58:2
**89460** 7:9

**9**

**9** 49:9,15 50:16 51:15
  79:21,23 97:10
**950** 22:14
**9th** 10:11