S
L
T

# Truck Accident & Incident Experts, LLC
## dba/ Scott L Turner Consulting
P.O. Box 1007 • Naples, FL 34106
844-974-1870

# Expert Report of Scott L. Turner

### September 20th, 2021

### United States District Court, Western District of Missouri at Kansas City

### Docket Number: No. 4:21-CV-00061-SRB

**Christopher W. Stoneman**
Plaintiff

V.

**Ajello, NIM Transportation, LLC**
Defendant

*"The Finest in Transportation Consulting to the Legal Community"*



# Truck Accident & Incident Experts, LLC

## dba/ Scott L Turner Consulting

P.O. Box 1007 • Naples, FL 34106

844-974-1870

**Date:** September 20, 2021

**Report by** Scott L. Turner

**Prepared for:** James T. Thompson, Esq.
Edelman & Thompson
3100 Broadway – Suite 1400
Kansas City, MO 64111

**Case Caption:** Stoneman v. Ajello, NIM Transportation, LLC

**Jurisdiction:** United States District Court, Western District of Missouri at Kansas City

**Cause/Case/Docket Number:** 4:21-CV-00061-SRB


**General Information:**

**Date & Time of Crash/Loss:** July 16, 2018 / Approximately 12:00PM

**Location of Crash/Loss:** IS-670, West Direction of Travel
Kansas City, Missouri (Jackson County)

**Equipment Involved: Pltf:** 2018 Kenworth Truck-Tractor (VIN #2NKHHJ7X4JM191851)
Straight-Truck w/ Roll-Off

**Def:** 2017 International Truck-Tractor (VIN #3AKJGED10HSJA1798)
Coupled to a Soft-Side Semi-Trailer

**Motor Carrier USDOT Number(s): Pltf:** #773896 (U-Load It)

**Def:** #1188659 (Norfolk Iron & Metal)

**USDOT Number Status:** U-Load It (Satisfactory, 3/30/2010)

Norfolk Iron & Metal (None)

**Weather Conditions:** Clear/Cloudy

1

**Road Surface Conditions:** Dry

**Posted Speed Limit:** 45-MPH

**Natural Lighting Conditions:** Hours of Daylight

**Artificial Lighting Conditions:** N/A


## 1.0 Persons and Organizations:

- Christopher W. Stoneman (hereinafter "Stoneman"): Professional CMV driver Stoneman, the Plaintiff was operating his roll-off straight-truck CMV in the left-lane of travel when his CMV was square-on rear-ended by the CMV of the Defendant.

- James J. Ajello (hereinafter "Ajello"): Professional CMV driver Ajello, the Defendant was operating his CMV in the left-lane of travel behind the Plaintiff wherein his combination truck-tractor and coupled semi-trailer CMV square-on rear-ended the CMV of the Plaintiff.

- Officer Kenton Stone (hereinafter "Officer Stone"): Officer Stone was the Kansas City, Missouri enforcement officer that investigated the subject CMV crash and assigned fault to Defendant, professional CMV driver, Ajello.

- Norfolk Iron & Metal (hereinafter "NIM"): Norfolk Iron & Metal and/or NIM is an authorized Motor Carrier operating under the authority of the FMCSA under USDOT #1188659.

- U-Load It (hereinafter "ULI"): U-Load It and/or ULI is an authorized Motor Carrier operating under the authority of the FMCSA under USDOT #773896.


## 2.0 Abbreviations and Acronyms:

- USDOT – United States Department of Transportation
- 49 CFR – USDOT, Code of Federal Regulations
- FMCSA – Federal Motor Carrier Safety Administration
- FMCSR – Federal Motor Carrier Safety Regulations
- NHTSA – National Highway Traffic Safety Administration
- ATRI – American Transportation Research Institute
- CMV – Commercial Motor Vehicle
- CDL – Commercial Driver's License
- LTCCS – Large Truck Crash Causation Study
- MPH – Mile Per Hour

## 3.0 General Description:

Although there are differing opinions as to how the pre-crash events and the actual crash occurred, the subject crash factually occurred as a result of the Ajello CMV having rear-end crashed into the forward CMV of Stoneman of whom was factually established in the lane of travel wherein the crash occurred.

Accordingly, Ajello testified as such: *Q: "And I bet you've come through that very location before and had vehicles jump in front of you?" A: "Pretty much every day. I'm prepared for it all." Q: "How long after he got <u>fully in your lane</u> did the impact occur?" A: "<u>Maybe two seconds at the most.</u>"* (JA: 70/6). This testimony demonstrates that Stoneman was by fact established in his lane of travel, although there is Stoneman's testimony that establishes Stoneman in the left-lane significantly longer than two-seconds.

Albeit nearly all evidence (other than Ajello's statement and deposition testimony) points to the crash being preventable in terms of Ajello's actions and/or inactions, evidence such as, but not limited to: 1.) *Missouri Uniform Crash Report*; 2.) NIM *Preliminary Report of Driver Accident*; 3.) Stoneman statement and deposition testimony; and 4.) The frontal squared pushback on the nose of the NIM truck-tractor, as opposed to being angular, and the Plaintiff CMV being struck squared to the rear as evidence indicates strongly supports the Investigating Officer's findings established in the Crash Report. Further, in addition to Ajello's testimony demonstrating that the Stoneman CMV was established in the lane of travel before the subject crash:

LEFT BLANK INTENTIONALLY



Image #1                                                                 Source: Discovery

As the four primary evidentiary factors as aforestated are substantial including NIM, Ajello's own employer, the undersigned recognizes there are conflicting perspectives as to pre-crash causation regarding testimony of Ajello and Stoneman. Therefore, the undersigned reserves the ultimate determination and province to the trier of the facts, the Jury.

### 3.1 Province of the Jury:

As stated, the undersigned recognizes there are significant conflicting sworn testimonies of the two-crash participants as to how the actual crash occurred, and the pre-crash dynamics. Therefore, the undersigned offers the following report and opinions with the assumption of the crash occurring predominantly in the manner as descriptive by Plaintiff Stoneman, Officer Stone and the author of the NIM Preliminary Report of Driver Accident as opposed to the differing and conflicting opinions that are ultimately the province of the Jury.

When credible and reliable  ACTAR Accident Reconstructionist opinion(s) and/or other affirmative Discovery becomes available and given the opportunity as to having been reviewed by the undersigned, the following report and/or opinions may become subjected to revision, amendment and/or change.

It is not the province of the liability expert to determine the veracity or truthfulness in conflicting testimony; therefore, ultimately the final determination as to the crash sequences and/or the veracity of testimony of the two crash participants will be limited hereunder. Again, it is the province of the trier of the facts will make the final determination, the Jury.

## 4.0 Assignment:

The undersigned has been requested to examine all of the documents listed in the Document's Reviewed section of this report. Apply the knowledge, experience and education along with standards of care and the FMCSR.

With aforestated examination regarding Ajello and Stoneman's testimony, determine if and how the Motor Carriers, NIM and/or ULI (respectively) , and/or professional CMV drivers Ajello and/or Stoneman pre-crash actions were causative in anyway, and in what manner from a regulatory and standards of care standpoint including the FMCSR, applicable CDL Manuals among other standards of care.

Again, the following conclusions and/or opinions are based on the following testimony of Stoneman being factual, thereby dismissing for discussion purposes the testimony and/or statements of Ajello where they may conflict with the testimony of Stoneman. The undersigned does not represent any testimony being outweighed by opposing testimony and is not to be considered the arbiter of such testimonies.

## 5.0 Introduction and History:

A two-vehicle crash is caused when the two vehicles attempt to occupy the same space at the same time. It is then that a determination, based on physical evidence, witness statements and testimony must be made as to which of the two vehicles was the offending vehicle(s), thereby the vehicle(s) that caused the subject crash; or, better yet, which of the two CMVs had the final and last best opportunity and/or chance to prevent the crash.

However, as aforestated there are two opposing opinions as to the unfolding of the crash and its sequences; therefore, only one version, Stoneman will be considered for discussion purposes in so that the undersigned does not appear to be the arbiter of the facts, picking and choosing what the undersigned decides is factual v. non-factual regarding the two involved CMV drivers subject to the crash. Once again, this is reserved for the Jury.

---

The subject crash occurred on the IS-670, west direction of travel, Kansas City, Missouri (Jackson County), the area is a heavily populated area with significant traffic throughout the day, often with congestion as was the condition at the time of the subject crash.

The stretch of roadway in the area of the crash is straight and level. There are three-lanes of travel with the far right, #3 lane of travel exiting onto RP 13th Street, the #1 and #2 through lanes of travel continue in a westerly direction of travel. Accordingly, evidence strongly suggests both of the CMV's involved in the subject crash were established in the left-lane (#1 lane) in the westbound direction when subject crash occurred:



**Image #2**                                                                 **Source: Discovery**

The above Google Earth Pro Image #1 depicts the general area of the crash, a complex area often of significant traffic whereby professional CMV drivers must use adequate precaution, absolute attention and comply with the rules of the road while traversing this area, in addition to the industry standards of care and the FMCSRs.

---

The genesis of the subject crash that forms the basis of this lawsuit occurred as a result of the CMV of Ajello crashing into the rear of the CMV of Stoneman that was fully established in the left lane (#1 lane) of travel, as evidence strongly demonstrates.

Ajello failed to maintain and/or create the proper space cushion; Ajello operated at a speed of too fast for conditions; Ajello failed to comply with or know the rules of the road concerning proper following distance for CMVs; and, Ajello failed in the assured clear distance rule. All of which were proximate causers of the subject crash as will be addressed hereunder.

## 6.0 Document Examination:

There were various documents examined as listed below in "Documents Reviewed" section of this report. Throughout the review process the specific points, testimony and issues of examination are included in this section of the report while they are often applied to industry standards of care and the FMCSR, in combination with the undersigned's years of experience, training and knowledge.

## 6.1 Federal Motor Carrier Safety Regulation-

The Federal Motor Carrier Safety Regulations (FMCSRs) were established by the USDOT in an effort to reduce the number of CMV crashes resulting in injury and/or death involving Commercial Motor Vehicles. Originally, the Motor Carrier safety and enforcement in terms of regulations were governed by the ICC established in 1935. In 1966 the responsibility of Interstate Commerce Motor Carrier safety and enforcement was transferred to the USDOT, of which was then newly formed. Currently the obligatory regulations remain under the executive branch, the USDOT, but are in direct oversight, application and enforcement by the FMCSA.

As a result, the Interstate Commerce Motor Carrier industry is one of the most regulated industries governed by the United States Federal Government, the United States Department of Transportation, or USDOT. In fact, the rules that apply to both Motor Carriers and their CMV drivers are governed by a set of the Code of Federal Regulations, title 49, also known as 49-CFR.

The FMCSA established the regulations to cause for Interstate Motor Carriers and/or their professional CMV drivers to comply with a set of obligatory regulations that would apply to FMCSA registered Motor Carriers when traversing in Interstate Commerce as aforestated. Such regulations are intended to cause such CMV drivers to comply through not only the FMCSA regulations, but they must also comply with safety policies and procedures of their Motor Carrier employer.

Over the years, the FMCSR's have grown substantially as the FMCSA, industry and academia learned more as to the causative and preventative effects of crashes and incidents involving Motor Carriers, this in addition to new technologies. As such, the regulations currently cover a plethora of areas, all geared towards the safety of the general motoring public, the professional CMV driver(s), and the protection of property.

To be clear, the FMCSR's are fully applicable to all Interstate Motor Carriers in Interstate Commerce and Intrastate Commerce according to the adoption by the specific State and/or Commonwealth, as such, the State of Missouri.

### 6.1.1 FMCSR General Applicability-

It is a Motor Carrier's responsibility to cause for their employee CMV driver(s) to be knowledgeable in the FMCSRs. This can be accomplished through road tests, by way of training programs, handouts, disciplinary measures, and safety meetings. Without question, the driver must be hired with adequate knowledge as a foundation of safety, and the Motor Carrier must have a means of proving such *Required Knowledge* exists before hiring then giving care, custody and control of a CMV. The Motor Carrier must ensure professional CMV driver's knowledge, often and most prudently by way of instruction.

When an *employee* professional CMV driver is found as to having violated the FMCSR and/or Motor Carrier safety policies, the driver must be disciplined. Otherwise, the employee driver may very well only observe the same as corporate bravado that may well cause an attitude of implied consent as to the CMV driver's CMV operating mannerisms and/or habits.

The CMV driver must also be monitored to ensure compliance with the FMCSR. Compliance with the FMCSR is not achieved by simply handing a CMV driver a set of policies or a pocket FMCSR, then considering the driver as to being so *instructed*, as stated in *FMCSR § 390.3*:

> ➤ *§ 390.3 General Applicability (e) Knowledge of and compliance with the regulations.*
>
> *(1) Every employer shall be knowledgeable of and comply with all regulations contained in this subchapter which are applicable to that motor carrier's operations.*
>
> *(2) Every driver and employee <u>shall be instructed</u> regarding, and shall comply with, all applicable regulations contained in this subchapter.*

The issue of the FMCSR regarding the CMV driver's duty as to being required to be knowledgeable and so *instructed* as required under *FMCSR § 390.3* is supported by *FMCSR § 383.111* in terms of defined *Required Knowledge* section of the FMCSR and will be addressed herein in detail. In other words, *FMCSR § 383.111* is essentially a road map to complying with the requirement of *FMCSR § 390.3*.

Then, the State of Missouri CDL Manual simplifies the regulation of *FMCSR § 383.111* to easy to use, reader friendly plain language. In the CDL Manual, it teaches as to safe following distance as a rudimentary principle of safe CMV driving.

If a professional CMV driver complies with the FMCSR, in particular *FMCSR § 383.111*, and makes certain as to safety details such as space cushion, other road user activities and presence, speed, following distance, etc., the CMV driver will lead a career of crash free history insofar as his/her preventable role in any crash.

These immutable and non-delegable duties of compliance are not only promulgated in the FMCSR, but as aforestated they are reduced to user friendly CDL Manuals that are excellent study guides, also known as the AAMVA CDL Manual. Such CDL Manuals provide critical

information concerning *FMCSR § 383.111* in an easier to understand version. If a professional CMV driver complies with the State specific CDL Manual, he/she is then fully compliant with the intent of *FMCSR § 383.111.*

## 6.1.2 FMCSR Required Knowledge-

In the examination, and during the road test phase of the CDL test, the driver must both demonstrate knowledge of various aspects of the FMCSR and a road test. Specifically, the candidate must demonstrate the *Required Knowledge*, but not limited to that of *FMCSR § 383.111* although *§ 383.111* is critical knowledge in the undersigned's opinion.

In this specific regulation, it is required by the professional CMV driver to understand twenty general areas of the "*Required Knowledge*" regulation. They are as follows:

> ➢ *§ 383.111 Required knowledge. (a) All CMV operators must have knowledge of the following 20 general areas:*
>
>> *1. Safe Operations Regulations;*
>> *2. Safe Vehicle Control Systems;*
>> *3. CMV Safety Control Systems;8*
>> *4. Basic Control;*
>> *5. Shifting;*
>> *6. Backing;*
>> *7. Visual Search;*
>> *8. Communication;*
>> *9. Speed Management;*
>> *10. Space Management;*
>> *11. Night Operations;*
>> *12. Extreme Driving Conditions;*
>> *13. Hazard Perceptions;*
>> *14. Emergency Maneuvers;*
>> *15. Skid Control and Recovery;*
>> *16. Relationship of Cargo to Vehicle Control;*
>> *17. Vehicle Inspections;*
>> *18. Hazardous Materials;*
>> *19. Mountain Driving;*
>> *20. Fatigue and Awareness*

It should be noted that even though professional CMV driver Ajello has had his CDL for many years and worked for a number of Motor Carriers, it is still required of him to not only know this *Required Knowledge*, but more importantly, he must incorporate it into his constant driving habits and skillsets; further, as stated regarding *FMCSR § 390.3*, professional CMV driver, Ajello must be so

instructed in the FMCSR. The seemingly ambiguous regulation of *FMCSR § 383.111* is broken down into specifics in subject matter in the State of Kansas CDL Manual.

As will be demonstrated, Ajello's complete disregard and/or non-knowledge regarding proper following distance is a strong indicator that Ajello has not been effectively instructed in terms of the FMCSR by his Motor Carrier employer, NIM. Improper following distance of which is a seminal issue and proximate cause to the subject crash will be addressed hereunder.

Ajello's Motor Carrier employer, NIM has a duty to so instruct Ajello in the same in accordance with *FMCSR § 390.3*, and NIM cannot rely solely upon actual or perceived knowledge obtained or acquired by an employee CMV driver over time or believed to having been acquired by former Motor Carrier employers. As aforestated, the *Required Knowledge* is most easily instructed by way of instructing the State specific CDL Manual on regular intervals of mandatory instruction.

In general, as to this specific *Required Knowledge* section, the following coincide with the parts of the *Required Knowledge* that were either ignored and/or were not exercised when Ajello was operating his CMV at the time of the subject crash:

> ### § 383.111 Required Knowledge
>
> **(a) All CMV operators must have knowledge of the following 20 general areas:**
>
> **(1) Safe operations regulations.** *Driver-related elements of the regulations contained in parts 391, 392, 393, 395, 396, and 397 of this subchapter, such as:*
>
> > **(ii)** *Procedures for safe vehicle operations;*
>
> **(2) Safe vehicle control systems.** *The purpose and function of the controls and instruments commonly found on CMVs.*
>
> **(3) CMV safety control systems.**
>
> > **(ii)** *CMV drivers must have knowledge of the correct procedures needed to use these safety systems in an emergency situation, e.g., skids and loss of brakes.*
>
> **(4) Basic control.** *The proper procedures for performing various basic maneuvers, including:*
>
> > **(ii)** *Putting the vehicle in motion and stopping;*
>
> **(5) Shifting.** *The basic shifting rules and terms for common transmissions, including:*
>
> > **(iii)** *Consequences of improper shifting.*
>
> **(7) Visual search.** *The importance of proper visual search, and proper visual search methods, including:*
>
> > **(i)** *Seeing ahead and to the sides;*

**(9) Speed management.** *The importance of understanding the effects of speed, including:*

    *(i) Speed and stopping distance;*

    *(ii) Speed and surface conditions;*

    *(iii) Speed and the shape of the road;*

    *(iv) Speed and visibility; and*

    *(v) Speed and traffic flow.*

**(10) Space management.** *The procedures and techniques for controlling the space around the vehicle, including:*

    *(i) The importance of space management;*

    *(ii) Space cushions, e.g., controlling space ahead/to the rear;*

    *(iv) Space for traffic gaps.*

**(13) Hazard perceptions.** *The basic information on hazard perception and clues for recognition of hazards, including:*

    *(i) Road characteristics; and*

    *(ii) Road user activities.*

**(14) Emergency maneuvers.** *The basic information concerning when and how to make emergency maneuvers, including:*

    *(i) Evasive steering;*

    *(ii)Emergency stop;*

**(b) Air brakes.** *All CMV drivers operating vehicles equipped with air brakes must have knowledge of the following 7 areas:*

    *(7) General operating practices and procedures, including:*

    *(i) Proper braking techniques;*

    *(iii)Emergency stops*

**(c) Combination vehicles.** *All CMV drivers operating combination vehicles must have knowledge of the following 3 areas:*

**(3) General operating practices and procedures, including:**

    *(i) Safely operating combination vehicles;*

The non-application of 10 out of 20 points (50% fail rate) of *FMCSR § 383.111(a) Required Knowledge* demonstrated by a "professional" CMV driver is a failure of Ajello's performance as a professional CMV driver and is a proximate cause to the subject crash. This is in addition to the genesis of such failures and said proximate cause in the fact that by demonstration, NIM

failed to so instruct Ajello as required by the FMCSR and industry standards of care, most notably, proper and safe following distance and driving too fast for conditions. This is all in addition to Ajello's failure in *§ 383.111(b)(c) Required Knowledge (b) Air Brakes,* and, *(c) Combination vehicles* as listed above.

Had Ajello been given an adequate degree of instruction as to proper and safe CMV operations with respect to driving a CMV in an attentive and defensive manner, and had he applied such instruction, the subject crash would not have occurred.

## 6.3 Smith-System Defensive Driving-

Specifically, the Smith-System – arguably the premier defensive driver training course (DDC) in the North America, if not the world – has a program that would have trained professional CMV driver Ajello on tactics to more safely negotiate motor vehicle operations in general.

Basing the following on driving skillset alone, if Ajello were trained in the Smith-System, or thereabouts equivalent, and incorporated the teachings into his daily driving habits of which were clear contributing factors, the subject crash would not have occurred. It is the sole and non-delegable duty of his Motor Carrier employer, NIM to ensure such necessary training to cause for the prevention of crashes, such as the subject rear-end crash.

The Smith-System trains as to the following methodology. There are five primary key elements in the driver training program. In these five primary key elements, there are sub-elements; they are collectively as follows, note the highly probable and/or affirmatively applicable bolded items:

*Key #1: Aim High in Steering*

- **Eyes lead the vehicle properly.**
- **Sees and evaluates relevant objects from among distant objects.**
- **Adjusts eye lead distance to speed.**
- **Keeps vehicle rolling by adjusting for conditions.**
- *Eyes properly elevated around turns and corners.*

*Key #2: Get The Big Picture*

- **Following distance consistently appropriate for conditions.**
- **Makes and executes decisions early.**
- **Avoids being unnecessarily boxed in.**
- **Speed is neither too fast nor too slow for conditions.**
- *Uses knowledge to make driving smoother and more economical.*

*Key #3: Keep Your Eyes Moving*

- *Scans mirrors frequently.*
- *Scans major and minor intersections before entry.*

- *Moves eyes at least every two seconds.*
- *Checks mirrors prior to slowing or stopping the vehicle.*
- *Avoids staring while evaluating relevant objects.*

### *Key #4: Leave Yourself an Out*

- *Maintains proper space around the vehicle.*
- *Adjusts space to avoid unsafe intrusion by other drivers.*
- *When stopped, leaves appropriate space in front of vehicle.*
- *Consistently selects lanes to minimize danger and maximize space & visibility.*
- *Keeps up to date with current size and shape of space cushion.*

### *Key #5: Make Sure They See You*

- *Seeks eye contact and communicates when conditions suggest the need.*
- *Effectively times use of turn indicators.*
- *Appropriate speed and communications when changing lanes*
- *Brakes early to activate brake lights.*
- *Vehicle positioning promotes seeing and being seen.*

Note on Keys #1-#5: All of the **bolded** above primary key elements and sub-elements are bolded as they are in all probability either directly or indirectly associated to necessary driving behaviors of Ajello as preventative actions to the subject crash.

According to ATRI's, *Predicting Truck Crash Involvement* from October 2005, it states the following as to defensive driver type training programs: *"Most directors require that new drivers go through both National Safety Council's Defensive Driving Program and/or Smith System Training".* The undersigned noted no Discovery demonstrating Ajello ever having received any such training by his Motor Carrier employer, NIM. In fact, Ajello in fact testifies as to having no knowledge of the Smith-System training whatsoever: *Q: Have you ever – have you ever had Smith training?" A: "Smith training?" Q: "The Smith system?" A: "I'm not sure what that is."* (JA: 17/24).

Compounded, Ajello essentially does not even recall any specifics as to the ineffective training that was nothing less than bravado: *Q: "Can you think of any other information you received while at NIM in terms of training for -- from a safety standpoint as a commercial motor vehicle operator?" A: "I imagine we just go -- a quick overview on the basic rules of the law and -- and the dos and don'ts as far as what the type of material we were hauling. And, of course, I trained on proper way to tie equipment -- or the proper use of equipment and tying down the material –"* (AJ 19/23)

Specifically, defective of the deficient training is Ajello's belief in safe and effective following distances, of which his rendition is not only very wrong, it is both the proximate cause and quite frankly dangerous: *Q: "Okay. What is a reasonable safe distance? How do you calculate that?" A: "What I've always learned from day one from driver's training in high school, they try to maintain 10 feet for every 10 miles per hour." Q: "So if you're going 60 miles an hour, you*

13

*would maintain 60 feet in front of you?" A: "Try to, yes, or more. Hopefully more."* (AJ: 22/16)

The old saying of "you don't know what you don't know" is demonstrably evident by the testimony of Ajello. Proper following distance in a CMV of which is part of defensive driving techniques and skillsets will be addressed hereunder.

Such a failure is evidence of a Motor Carrier negligence by that of Ajello's employer, NIM. If Ajello had the benefit of such DDC training, and if he applied the same to his driving skillsets, the subject crash would not have occurred.

Had investment in proper defensive driver training and other substantive and meaningful driver safety training been undertaken by NIM wherein Ajello could affirmatively recall, and subsequently been applied by professional CMV driver Ajello in his driving habits and/or skillsets, they would have without question been preventative functions that would have averted the subject crash.

## 6.4 State of Kansas CDL Manual-

Although all CDL Manuals are essentially the same through all 50-states (with exception to Section 1), as they model from the AAMVA CDL Manual for Motor Carrier's in Interstate Commerce, the State of Kansas CDL Manual is referenced herein as professional CMV driver Ajello is a Kansas domiciled CDL-A licensed driver.

Ajello is required to follow the instruction within the State of Kansas CDL Manual; however, there are several applicable sections in particular within the State of Kansas CDL manual that Ajello has a duty to follow that are relative to the subject crash and are contributing factors and/or proximate causers. The sections that are applicable to the subject crash are, but not limited to the following:

> ### State of Kansas CDL Manual:

> ➤ *2.4 – Seeing*

> *To be a safe driver you need to know what's going on all around your vehicle. <u>Not looking properly is a major cause of accidents.</u>*

> ➤ *2.4.1 – Seeing Ahead*

> *All drivers look ahead; but many don't look far enough ahead. <u>Importance of Looking Far Enough Ahead</u>. Because stopping or changing lanes can take a lot of distance, knowing what the traffic is doing on all sides of you is very important.*

<u>*You need to look well ahead to make sure you have room to make these moves safely.*</u>

**How Far Ahead to Look.** *Most good drivers look at least 12 to 15 seconds ahead. That means looking ahead the distance you will travel in 12 to 15 seconds. At lower speeds, that's about one block. At highway speeds it's about a quarter of a mile. If you're not looking that far ahead, you may have to stop too quickly or make quick lane changes. Looking 12 to 15 seconds ahead doesn't mean not paying attention to things that are closer. Good drivers shift their attention back and forth, near and far. Figure 2.6 illustrates how far to look ahead.*

**Look for Traffic.** *Look for vehicles coming onto the highway, into your lane, or turning. <u>Watch for brake lights from slowing vehicles.</u> By seeing these things far enough ahead, you can change your speed, or change lanes if necessary, to avoid a problem. If a traffic light has been green for a long time it will probably change before you get there. Start slowing down and be ready to stop.*

---

➢ **2.6 – Controlling Speed**

*Driving too fast is a major cause of fatal crashes. You must <u>adjust your speed depending on driving conditions</u>. These include traction, curves, visibility, traffic and hills.*

➢ **2.6.4 – Speed and Distance Ahead**

*<u>You should always be able to stop within the distance you can see ahead</u>. Fog, rain, or other conditions may require that you slow down to be able to stop in the distance you can see. At night, you cannot see as far with low beams as you can with high beams. When you must use low beams, slow down.*

➢ **2.6.5 – Speed and Traffic Flow**

*When you are driving in heavy traffic, the safest speed is the speed of other vehicles. vehicles going the same direction at the same speed are not likely to run into one another. In many states, speed limits are lower for trucks and buses than for cars. It can vary as much as 15 mph. use extra caution when you change lanes or pass on these roadways. Drive at the speed of the traffic, if you can without going at an illegal or unsafe speed. Keep a safe following distance.*

*The main reason drivers exceed speed limits is to save time. But anyone trying to drive faster than the speed of traffic will not be able to save much time. The risks involved are not worth it. If you go faster than the speed of other traffic, you'll have to keep passing other vehicles. This increases the chance of a crash, and it is more tiring. Fatigue increases the chance of a crash. Going with the flow of traffic is safer and easier.*

15

> ➤ *2.7 – Managing Space*

> *To be a safe driver, you need space all around your vehicle. When things go wrong, space gives you time to think and to take action. To have space available when something goes wrong, you need to manage space. While this is true for all drivers, it is very important for large vehicles. They take up more space and they require more space for stopping and turning.*

> ➤ *2.7.1 – Space Ahead*

> <u>*Of all the space around your vehicle, it is the area ahead of the vehicle--the space you're driving into that is most important.*</u>

> **The Need for Space Ahead.** <u>*You need space ahead in case you must suddenly stop.*</u> *According to accident reports, the vehicle that trucks and buses most often run into is the one in front of them.* <u>*The most frequent cause is following too closely.*</u> *Remember, if the vehicle ahead of you is smaller than yours, it can probably stop faster than you can.* <u>*You may crash if you are following too closely.*</u>

Had professional CMV driver Ajello complied with the instruction of the State of Kansas CDL Manual as aforestated and had NIM so instructed Ajello in the content and *Required Knowledge* of the FMCSR and the State of Kansas CDL Manual, the subject crash would not have occurred.

**6.4.1 Kansas CDL Manual, Stopping Distance-**

The first step in understanding as to proper following distance is to know the proper stopping distance formulas that are in all CDL manuals, in Section 2. If a professional CMV driver such as Ajello does not know the formulas for following and/or stopping, it is simply impossible to apply them in accordance with the FMCSR and industry standards of care. Again, "you don't know what you don't know". Again, Ajello's belief is *"10 feet for every 10 miles per hour"*, this is an incredibly dangerous mindset for any professional CMV driver, especially when traversing on any high-speed Interstate Highways with 80,000# combination CMVs, or even worse, double semi-trailers like NIM often assigns Ajello.

Assuming for a moment that distracted or inattentive driving were not the contributing factors of the subject crash, Ajello either knew or should have known of the approximate required stopping distance of his CMV irrespective of whether there was cargo on board or not, and whether the road surface was wet, damp or dry. This is the non-delegable duty of a professional CMV driver, and the Motor Carrier must ensure this knowledge.

The proper and capable stopping distance is in direct correlation of the proper following distance, and the reason thereof. The faster an 80,000# GVWR, Class 8 CMV operates the further distance it takes to stop and/or slow, and the destructive crushing impact is far more

pernicious at 60-MPH as opposed to 45-MPH as opposed to 15-MPH, and for Ajello to apply one generic following distance formula he learned in high school of *"10 feet for every 10 miles per hour"* is extremely reckless and required immediate remedial action from the Motor Carrier, NIM, before allowing Ajello to operate his CMV in such a constant reckless and dangerous manner. The subject crash or its alike was a foregone conclusion, it is remarkable such a rear-end crash did not occur well before July 16, 2018, the day of the subject crash.

A professional CMV driver must be able to stop his/her CMV without colliding and/or crashing into any obstacles within the stopping distance, essentially assuring of the *assured clear distance rule* is effectively being applied. This ability to stop is inextricably tied to having full knowledge of the CMV that Ajello was operating, no exception.

Ajello testified as to having been operating the subject International truck-tractor since purchased by NIM. In other words, if Ajello of whom was clearly experienced with the CMV could only see 350 linear feet of forward direction clearance he must not travel at speeds that would require greater than 350 linear feet to stop. If he cannot, his proximate cause contributing factors are, but not limited to: following too closely; too fast for conditions; failure in the assured clear distance rule; failure to keep proper lookout and in all probability, driving in an inattentive manner.

---

Proper stopping distance is a factor of time, distance and mechanical functionality as air pressure essentially converts to mechanical energy within the brake chambers. The CMV driver must allow himself/herself the proper time to perceive the hazard followed by reaction to the hazard.

In an 18-wheel CMV, at 55-MPH this distance can be much greater than a football field in length that would be required to fully stop once the reaction has been fully affected, especially with an 80,000# GVWR Class 8 CMV.

To create the optimal amount of distance to fully stop such a CMV, the emphasis must always be on the CMV driver's attention to detail, especially in urban area driving with substantial traffic as found on major highways as such in Kansas City, Missouri as depicted above in Image #2. Simply stated, the CMV driver must be on full alert, proceeding with due care and caution, often at a reduced speed than that of which is posted, and be prepared for slowed and/or stopped traffic; a common situation.

The CMV driver must be fully cognizant of other motorists, especially of those that may be traveling ahead of the CMV, thus *"Aim High in Steering"* must be applied as the Smith-System instructs and required of general good and safe driving principles demanded of the professional CMV driver. Proper use of *Aim High in Steering* creates necessary time and distance, critical components to being able to slow and/or stop safely.

It is therefore the responsibility of the CMV driver to ensure not only proper following distance, but he/she must keep a sharp observation on what is not only going on around their CMV, but must also keep a keen watchful eye on what is going on in front of his/her CMV, the most

vulnerable area to a pernicious crash. In other words, as previously stated the CMV driver must always *Aim High in Steering* (Key #1 in the Smith-System for a good reason); the reason is, what is going on in front of the CMV is considered the most critical of areas around a CMV, not to diminish the importance of the other areas around the CMV.

---

It is the following formula that Ajello is apparently completely ignorant too, this coupled with the ignorance as to following distance provides a clear understanding as to how Ajello caused the subject crash.

Again, at the risk of necessary redundancy, Ajello testified in the following manner concerning his understanding as to following distance, something he learned back in the years he obtained his Class D driver's license in high school: *Q: "Okay. What is a reasonable safe distance? How do you calculate that?" A: "What I've always learned from day one from driver's training in high school, they try to maintain <u>10 feet for every 10 miles per hour.</u>" Q: "So if you're going 60 miles an hour, you would maintain 60 feet in front of you?" A: "Try to, yes, or more. Hopefully more."* (AJ: 22/16). Proper following distance in an 80,000# GVWR CMV is very different than a hypothetical 3,500# commuter car, and the stopping distance differential is substantial. Had NIM trained Ajello accordingly, the subject crash would not have occurred.

The State of Kansas CDL Manual and/or the AAMVA CDL Manual states the following as to perception/reaction to hard braking to coming to a full and complete safe and controlled stop:

### *2.6.1 – Stopping Distance*

*Perception Distance + Reaction Distance + Braking Distance = Total Stopping Distance*

**Perception distance** *– The distance your vehicle travels, in ideal conditions; from the time your eyes see a hazard until your brain recognizes it. Keep in mind certain mental and physical conditions can affect your perception distance. It can be affected greatly depending on visibility and the hazard itself. The average perception time for an alert driver is 1¾ seconds. At 55 mph this accounts for 142 feet traveled.*

**Reaction distance** *– The distance you will continue to travel, in ideal conditions; before you physically hit the brakes, in response to a hazard seen ahead. The average driver has a reaction time of ¾ second to 1 second. At 55 mph this accounts for 61 feet traveled.*

**Braking distance** *– The distance your vehicle will travel, in ideal conditions; while you are braking. At 55 mph on dry pavement with good brakes, it can take about 216 feet.*

**Total stopping distance** *– The total minimum distance your vehicle has traveled, in ideal conditions; with everything considered, including perception distance, reaction distance*

*and braking distance, until you can bring your vehicle to a complete stop. At 55 mph,*
*your vehicle will travel a minimum of 419 feet. (See Figure 2.11.)*



**Figure 2.11**

**The Effect of Speed on Stopping Distance** — *The faster you drive, the greater the impact or striking power of your vehicle. When you double your speed from 20 to 40 mph the impact is four times greater. The braking distance is also four times longer. Triple the speed from 20 to 60 mph and the impact and braking distance is nine times greater. At 60 mph, your stopping distance is greater than the length of a football field. Increase the speed to 80 mph, and the impact and braking distance are 16 times greater than at 20 mph. High speeds greatly increase the severity of crashes and stopping distances. By slowing down, you can reduce braking distance.*

**The Effect of Vehicle Weight on Stopping Distance** — *The heavier the vehicle, the more work the brakes must do to stop it and the more heat they absorb. The brakes, tires, springs and shock absorbers on heavy vehicles are designed to work best when the vehicle is fully loaded. Empty trucks require greater stopping distances because an empty vehicle has less traction.*

It has been determined in a plethora of studies that perception and reaction time – also known as response time – is between one to four seconds (inattention aside), even six seconds in extreme cases. According to the *University of Idaho's Geometric Design, Theory and Concepts* studies they state the following as to braking reaction time: *"Extensive research has shown that 90% of the driving population can react in 2.5 seconds or less."*

There are variables in consideration as to perception and reaction time, such as, but not limited to: age, fatigue, distractions and physical health. Questionable or poor physical health, fatigue and elderly age are likely to lead to diminished mental acuity and diminished cognitive skills therefore longer periods of perception and reaction. However, the greatest unpredictable delay in reaction time may often be the distraction that take the driver's eyes off the road for an undetermined period of time, typically known only by the driver or in-cab camera if available of which none were in Ajello's cab at the time of the subject crash.

Once a perception and reaction time estimates have been established one must consider the CMV's mechanical state, speed, weight of the vehicle and lading, in addition the road surface conditions to determine the ability to stop as to distance once actual hard brake application has been made.

The standard perception and reaction time used in accident reconstruction is 1.5 seconds (arguably 1.6 seconds), although the actual perception/reaction time can vary greatly and there are many schools of thought, as aforestated.

Further, with a foundation airbrake system there exists what is known as a "lag time" that will exist from the point at which the driver applies the hard brake application until such time that the airbrakes actually become fully applied and/or engaged. This lag time is approximately .5 seconds, or a half-second.

Lag time exists in a foundation airbrake system whereas when the driver applies the service brake pedal, it takes a brief literal split of a second to send the air from the air tank reservoirs to the brake chambers. Once the brake chamber converts the compressed air to mechanical energy thereby pushing out the pushrod causing all other applicable mechanical aspects (S-cam) to become engaged, an approximate of a half of a second has expired before the necessary friction forces on the inner brake drum are created.

It is the immutable duty of Ajello to fully understand the critically important information in terms of being capable of stopping his CMV in a safe and controlled manner. It is further his Motor Carrier's duty to so-instruct Ajello in the same. Failure to do so is a contributory cause to the subject crash.

### 6.5 State of Kansas CDL Manual, Distracted Driving-

Professional CMV driver Ajello was to a high degree of probability distracted as indicated in testimony when it was necessary for him to make an abrupt hard-brake application. Had Ajello been making observation 12-15 seconds ahead of the roadway he was intending to travel, in an

*assured clear distance*, reacted safely with the information taken in from such observation; established the proper and safe following distance, the subject crash would not have occurred.

Had professional CMV driver Ajello been driving attentively, the hard brake application would not have been necessary:

> ➢ *2.9 – **Distracted Driving.** A driver distraction is anything that takes your attention away from driving. Whenever you are driving a vehicle and your full attention is not on the driving task, you are putting yourself, your passengers, other vehicles, and pedestrians in danger. Distracted driving can cause collisions, resulting in injury, death or property damage. Activities inside of the vehicle that can distract your attention include: talking to passengers; adjusting the radio, CD player or climate controls; eating, drinking or smoking; reading maps or other literature; picking up something that fell; talking on a cell phone or CB radio; reading or sending text messages; using any type of telematic or electronic devices (such as navigation systems, pagers, personal digital assistant, computers, etc.); daydreaming or being occupied with other mental distractions; and many others.*

Unwittingly, in deposition testimony, Ajello actually inadvertently admits as to operating his CMV in an inattentive manner. First, Ajello testifies as to not knowing if traffic was stopped in front of Stoneman's CMV, yet he states that Stoneman was in his lane of travel for an approximate of two-seconds before rear-end crashing into Stoneman: *Q: "And I asked you this before, but your view was blinded. You don't know if traffic was stopped in front of him or not; right?" A: "That's correct."* (AJ: 77/5); then, in terms of the two seconds, Ajello states: *Q: "How long after he got fully in your lane did the impact occur?" A: "Maybe two seconds at the most."* (AJ: 70/11).

Interpreting the aforestated testimony, this would mean that Ajello did not have a line of sight beyond that of Stoneman's CMV for only two-seconds prior. How Ajello could have been following at a safe distance and driving attentively when conflating the two lines of testimony, then looking at his written statement read into the record: *"Vehicle 2 comes around me and dives in front of me and blocks my vision as traffic is slowing."* (AJ: 73/21). If Ajello knew traffic was slowing he should have been slowing, and if he maintained the required and necessary following distance between his CMV and the forward traffic before Stoneman's migrating into the left-lane, the crash would never have occurred.

If the speed were 45-MPH then Ajello should have been following at an approximate minimum of seven seconds or 472 linear feet, over 1.5 football fields. Additional following distance issues will be addressed hereunder.

If distracted driving was in fact applicable as a pre-crash condition, whatever it was that took Ajello's attention from his required task of undivided attention of driving attentively regarding his CMV; if he were not driving inattentively, the subject crash would never have occurred.

Ajello had an immutable and non-delegable duty to operate his CMV in a proper and safe manner with proper and safe following distance and with an *assured clear distance* and *aiming high in steering*. Evidence of the crash alone establishes that he was not operating in such a manner.

Failure to make *assured clear distance* observation is a manner of driving while distracted and/or in a state of inattention. Concentration of the *assured clear distance* is interrupted when a CMV driver gives his attention to things other than his/her duty of safe motor vehicle operation.

If the Motor Carrier, NIM suggests as to not being aware of Ajello's contributing and/or proximate causative actions and/or inactions at moments prior to the subject crash, it remains the duty of the Motor Carrier (NIM) regarding a CMV driver's compliance while operating a CMV, no exceptions:

> ➢ *§ 390.11 Motor carrier to require observance of driver regulations.*
>
> *Whenever in part 325 of subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition. If the motor carrier is a driver, the driver shall likewise be bound.*

In other words, a Motor Carrier cannot defend itself by stating that they are not in the CMV during the crash that occurs; therefore, it is clearly not solely the duty of the CMV driver regarding the FMCSR compliance, it is likewise the Motor Carrier's.


**6.6 Proper Following Distance-**

Based on the fact of the square-on rear-end crash, indicating that Stoneman was clearly established in his lane of travel where the subject crash occurred, and the acknowledgement by Ajello as to the same, in addition to Ajello's completely incorrect assessment and memory of what proper following distance is (*"What I've always learned from day one from driver's training in high school, they try to maintain 10 feet for every 10 miles per hour."*) in a CMV as opposed to a car, making no differential. Ajello failed to create the proper following distance, of which is a proximate cause to the subject crash:


> ➢ *2.7.1 – Space Ahead*
>
> <u>*Of all the space around your vehicle, it is the area ahead of the vehicle--the space you're driving into that is most important.*</u>
>
> **The Need for Space Ahead.** <u>*You need space ahead in case you must suddenly stop.*</u>
> *According to accident reports, the vehicle that trucks and buses most often run into is the one*

*in front of them. The most frequent cause is following too closely. Remember, if the vehicle ahead of you is smaller than yours, it can probably stop faster than you can. You may crash if you are following too closely.*

***How Much Space?*** *How much space should you keep in front of you? One good rule says you need at least one second for each 10 feet of vehicle length at speeds below 40 mph. At greater speeds, you must add 1 second for safety. For example, if you are driving a 40-foot vehicle, you should leave 4 seconds between you and the vehicle ahead. In a 60-foot rig, you'll need 6 seconds. Over 40 mph, you'd need 5 seconds for a 40-foot vehicle and 7 seconds for a 60-foot vehicle. See Figure 2.12. To know how much space you have, wait until the vehicle ahead passes a shadow on the road, a pavement marking, or some other clear landmark. Then count off the seconds like this: "one thousand-and-one, one thousand-and-two" and so on, until you reach the same spot. Compare your count with the rule of one second for every ten feet of length.*

*If you are driving a 40-foot truck and only counted up to 2 seconds, you're too close. Drop back a little and count again until you have 4 seconds of following distance (or 5 seconds, if you're going over 40 mph). After a little practice, you will know how far back you should be. Remember to add 1 second for speeds above 40 mph. Also remember that when the road is slippery, you need much more space to stop.*

LEFT BLANK INTENTIONALLY



**HEAVY VEHICLE FORMULA**
**For timed interval following distance**

- 1 second required for each 10 feet of vehicle length at speeds under 40 MPH
- Above 40 MPH use same formula, then add 1 second for the additional speed

40 foot truck (under 40 MPH) = 4 seconds

50 foot truck (above 40 MPH) = 6 seconds

60 foot truck (under 40 MPH) = 6 seconds

Figure 2.12

In applying the above formula at Ajello's referenced 60-MPH in his testimony as cited above, professional CMV driver Ajello testifies that if a CMV is traveling at 60-MPH, the following distance should be 60 linear feet, that's less than the length of his CMV of which certainly exceeds 60 linear feet, more likely 70 linear feet. To put it in plain lay terms, at 60-MPH, the perception time alone (before the attempted brake application) at 1.5 seconds would be 130 plus feet alone, over twice that of Ajello's calculation of 60-feet, and that's only perception time.

The actual following distance required for a CMV that is 60 linear feet over 40-MPH as established above is seven seconds of which translates to 88 FPS, multiplied by 7 seconds causes a required minimum following distance of 616 linear feet, over two football fields. This 616 linear feet required is 10X greater than Ajello's understanding of what he learned in high school while driving a car and applying to his current profession of driving of 80,000# CMVs, at times with double 50 linear foot semi-trailers, plus the converter dolly.

It is not exactly clear as to Ajello's actual speed, therefore the undersigned will not speculate. However, it can be safe to conclude that Ajello's improper understanding, and quite frankly dangerous understanding of proper following distance with an 80,000# GVWR CMV would be the proximate cause to the subject crash.

## 6.8 Preventability-

With respect to preventability, the FMCSA has specific language in the determination process when considering preventability. Definitions of preventability largely point to what the CMV driver did or did not do to prevent himself/herself from becoming a party to a crash.

The FMCSR states the following as to *FMCSR § 385, Appendix A*:

> ➢ *"If a driver, who exercises normal judgment and foresight, could have foreseen the possibility of the accident that in fact occurred, and avoided it by taking steps within his/her control which would not have risked causing another kind of mishap, the accident was preventable.*

Furthermore, in the definition section of *FMCSR § 385.3*, a preventable accident is defined as such:

*FMCSR § 385.3. Definitions - Preventable accident on the part of a motor carrier means an accident (1) that involved a commercial motor vehicle, and (2) that could have been averted but for an act, or failure to act, by the motor carrier or the driver.*

---

The NSC states the following as to preventability in their Fourth Edition of the Motor Fleet Safety Manual:

> ➢ *"If the driver did everything that reasonably could have been done to prevent the accident and it still happened, then it is graded non-preventable. If the driver did not do everything reasonable, the accident is considered preventable."*

And, NATMI defines the preventability of an accident as such:

> ➢ *"One in which the driver failed to do everything that could be reasonably expected to be done to prevent it."*

Based on the foregoing and aforestated testimony of Ajello, it is clear that professional CMV driver Ajello did not operate the NIM CMV in a reasonable and safe manner in accordance with

the FMCSR, or the State of Kansas CDL Manual and/or AAMVA CDL Manual, and industry standards of care relative to the specifics in terms of the subject crash.

## 7.0 Opinions:

Based upon the foregoing analysis, as a Commercial Motor Vehicle expert possessing approximately 30 years-experience in the CMV Transportation Industry and based upon what is good and safe practices in the Transportation Industry, I have come to form the following opinions as to the crash that caused injury to Plaintiff which occurred in the left-lane of travel on IS-670, west direction of travel in Kansas City, Missouri (Jackson County).

I express these opinions with a reasonable degree of professional certainty and probability:

1. It is the undersigned's opinion that Ajello failed in operating his CMV within the required assured clear distance rule. A clear contributing factor to the subject crash.

2. It is the undersigned's opinion that Ajello failed to control his CMV and operated the same in a negligent and reckless manner that was a clear contributing factor to the subject crash.

3. It is the undersigned's opinion that had Ajello operated his assigned CMV in a professional manner as required in the Kansas CDL Manual and the FMCSR, the subject crash would not have occurred.

4. It is the undersigned's opinion that based solely on the crash evidence, had Ajello retained and applied the *FMCSR § 383.111, Required Knowledge* part at the time of and moments prior to the subject crash; the basis and foundation of a driver's CDL license, the subject crash would not have occurred.

5. It is the undersigned's opinion that the non-application of 10 out of 20 points (50%) of the *Required Knowledge (FMCSR § 383.111)* by a professional CMV driver is an extraordinary failure of Ajello's performance and is a proximate cause to the subject crash.

6. It is the undersigned's opinion that if NIM had trained Ajello in the Smith-System defensive driver training program, or thereabouts equivalent, and incorporated the teachings into his daily driving habits, the subject crash would not have occurred, if such instruction were applied by Ajello.

7. It is the undersigned's opinion that Ajello was operating his CMV at the time of and moments before the subject crash at a speed that was too fast for conditions, irrespective of the posted speed limit. Speed too fast for conditions was a proximate cause of the subject crash.

8. It is the undersigned's opinion that Ajello failed to maintain proper lookout and failed to make proper observation, of which was a proximate cause to the subject crash.

26

9. It is the undersigned's opinion that Ajello failed in the most rudimentary basics of CDL instruction as to following too closely to lead traffic ahead of his CMV. Further, Ajello's complete lack of knowledge of proper following distance was a negligence caused by his Motor Carrier employer, NIM.

10. It is the undersigned's opinion that both Ajello had substantially below the required level of understanding and knowledge of the FMCSR, or the FMCSA as a whole; the very federal agency that governs his industry.

11. It is the undersigned's opinion that the Motor Carrier employer of Ajello, NIM failed to ensure that Ajello was adequately trained in terms of *FMCSR § 383.111 Required Knowledge.*

12. It is the undersigned's opinion that the Motor Carrier employer of Ajello, NIM failed to train Ajello in the most basic and rudimentary level of instruction concerning adequate and safe following distances when operating a CMV, the proximate cause of the subject crash.

13. It is the undersigned's opinion that had Ajello been adequately instructed by his Motor Carrier employer, NIM in the proper following distances, and had he applied the same as to his driving behaviors, the subject crash would not have occurred.

14. It is the undersigned's opinion that Ajello had the last best opportunity to prevent the subject crash from having occurred.

15. It is the undersigned's opinion that with the assumption that the Stoneman deposition transcript is accurate and Stoneman was in effect established in the left-lane of travel at the time of the subject crash, and moments prior, there was nothing that Stoneman did and/or did not due to cause the subject crash from occurring.

16. It is the undersigned's opinion that with the assumption that the Stoneman deposition transcript is accurate, the crash was non-preventable concerning the actions and/or inactions of Stoneman.

17. It is the undersigned's opinion that in terms of the preventability standard in the FMCSR, the subject crash was preventable based on the actions and/or inactions of Ajello.

18. It is the undersigned's opinion that NIM management finding a contributing factor to the subject crash being Ajello's "*failure to follow prescribed policies and procedures*", and if Ajello were "*following policy* [that] *is in place for NIM Transportation and if followed would have prevented this incident*" is substantial evidence as to preventability in terms of Ajello's actions and/or inactions.

19. It is the undersigned's opinion that investigating officer, Officer Stone opining at the crash scene and reflected the same in his Crash Report that Ajello was in fact driving "*too*

*fast for conditions*" and "*following too close*" of which are both proximate causes of the subject crash.

**Note:** The aforestated opinions are in addition to the main body of the preceding report, of which are likewise to be considered additional to the undersigned's opinions.

<u>**Documents Reviewed:**</u>

- ➢ Deposition Transcript of James Ajello, w/ Exhibits
- ➢ Deposition Transcript of Christopher Stoneman, w/ Exhibits
- ➢ Complaint, 1st Amended
- ➢ Defendant's Document Production
- ➢ U-Load It Document Production
- ➢ Scene Photos
- ➢ Ajello, DQ and Personnel Files
- ➢ Ajello, Answers to Plaintiff

<u>**References:**</u>

- Federal Motor Carrier Safety Regulation
- State of Kansas CDL Manual
- AAMVA CDL Manual
- ATRI-TRF; Predicting Truck Crash Involvement: Developing a Commercial Driver Behavior Model and Requisite Enforcement Countermeasures
- Predicting Truck Crash Involvement: A 2011 Update
- NSC – A Guide to Determine Motor Vehicle Accident Preventability
- FHWA, Commercial Vehicle Preventable Accident Manual
- Smith-System, Instructor Training Manual
- University of Idaho's Geometric Design, Theory and Concepts

**As the author of this report, I reserve the right to change or amend my conclusions and opinions based on information that was not available to me at the time of this report writing. Should the need for such changes or amendments be necessary I will submit the same to the retaining counsel of this report.**

**Reported by:**

**Scott L. Turner**
**Chief Consultant**

# Truck Accident & Incident Experts, LLC
## dba/ Scott L. Turner Consulting

*"The Finest in Transportation Consulting to the Legal Community"*

## Nationwide Services

SLTurner@SLTurnerConsulting.com
www.SLTurnerConsulting.com

### 844-974-1870

### Scott L. Turner, Chief Consultant

**Profile:**   Highly qualified and well-rounded expert opinions are supported by nearly 30-years experience in the highly specialized field of commercial motor vehicle (CMV, meaning "truck") crashes and incidents, including 16 years at the helm of a national incident response company. Specializing in CMV crash investigation, CMV loading/offloading incidents, scene investigation and post crash/incident CMV inspection/investigations. Scott's career of service includes response and investigation to well in excess of 1,000 CMV tractor-trailer crashes, 1,000 CMV loading/off-loading incidents, over 200 CMV cargo-tank truck crashes/incidents and a multitude of industrial setting incidents such as loading rack fires and/or explosions.

Trained in Level 1 FMCSA CMV roadside enforcement inspections and CMV post crash inspections. Scott's in-depth knowledge of the Federal Motor Carrier Safety Regulations, detailed and well written reports, in-depth knowledge of applicable standards of care and professionally delivered testimony can be a focal point of any civil or criminal litigation or arbitration where CMV crashes, with or without hazardous material involvement and/or transport related matters are at issue.

In addition to Scott's years of experience responding to and/or investigating truck crashes, Scott spent several years behind the wheel as an 18-wheeler CMV tractor-trailer driver. In his overall driving experience, he was a driver of low-boys (flatbeds), dry-van trailers and cargo-tanks. During Scott's experience as a CMV operator, he became extensively experienced as to both driving, loading and offloading of van trailers, load securement on drop-decks (flatbeds) and cargo-tanks. The approximate total mileage driven as a CMV operator was 250K.

During part of the years as detailed above, from 1996-2009 Scott was an instructor for the New Jersey State Police. In this specific discipline, Scott was a CMV crash specialist instructor for cargo-tank truck incidents and as an Instructor with a focus on CMV tractor-trailer crashes, incidents and recovery with or without HM.

Scott has inspected many Commercial Motor Vehicles for road worthiness as required by the FMCSA. Not only was he responsible for inspecting his own trucks in the late 1980's as pre- and post-trip inspections, then overseeing a

fleet

of CMV inspections through the 1990's and 2000's, he eventually came to inspecting CMVs side-by-side with the New Jersey State Police at various CMV roadside inspections/weight stations. In addition, as aforementioned, Scott has responded to and/or inspected in excess of 1,000 CMV crashes.

On a multitude of responses and cases Scott has managed incidents involving cargo related loading and/or offloading incidents including loading dock; forklift related; loading rack incidents; and, flatbed cargo securement failures.

Scott's CMV expert consulting career started in January 2010. It has provided him a rich experience whereas he has continued inspecting CMVs post crash, crash scene/site investigations and inspections, litigation support and examining discovery documents and evidence, then pulling a seemingly impossible universe of documents together,

1

then proffered into a well constructed report in the most difficult and complex of cases. Having served as a CMV expert in numerous cases for both Defense and Plaintiff throughout the United States, spanning from Hawaii to New York and from Texas to Michigan, Scott has earned an outstanding reputation as clearly indicated on the website testimonial section.

**Professional**
**History:**

2010 – Present; Truck Accident & Incident Experts, LLC; dba/ Scott L. Turner Consulting
1993 – 2009; President/CEO HMHTTC Response, Incorporated (owned and
    operated a fleet of tractor trailers within HMHTTC Response, Inc.)
1996 – 2009; New Jersey State Police, Cargo Tank Truck Specialist Instructor
1996 – 2009; New Jersey State Police, HM Instructor for CMV Incidents
1991 – 1993; EPS, CMV Crash Response Manager / HM Management
1988 – 1991; Heavy Highway Construction Management
    (Hardroads/Della-Pello Highway Construction)
1985 – 1988; Professional CMV Tractor Trailer Driver/Owner-Operator hauling van-trailers and
    flatbed type semi-trailers

**Descriptive**
**Certifications/**
**Training:**

Institute of Police Technology & Management, Commercial Vehicle Crash Investigation
New Jersey State Police/USDOT Commercial Vehicle Inspections, Enforcement; Level I – FMCSA
New Jersey State Police/USDOT Commercial Motor Vehicle Inspections, Enforcement; Level III – FMCSA
New Jersey State Police/USDOT Roadside HazMat Inspections, Enforcement; PHMSA
New Jersey State Police/USDOT Passenger Vehicle Inspection (Bus and Motorcoach)
New Jersey State Police Weights and Measures; Commercial Motor Vehicle
New Jersey State Police, HM Highway Transportation Emergency Response Instructor
New Jersey State Police, Cargo-Tank Specialist, Highway Transportation Specialist Instructor
Essex County College, Police Academy; Commercial Motor Vehicle Crash Investigation
Tennessee MTA, North American Transportation Management Institute; Safety Supervisor Training
Tennessee MTA, North American Transportation Management Institute; Director of Safety Training
New Jersey MTA, Air Brake Foundation, 10/2017
New Jersey MTA, Air Brake Foundation, 10/ 2014
New Jersey MTA, Air Brake Foundation, 5/2011
New Jersey MTA, Federal Motor Carrier Regulations
NTTC, Cargo-Tank Test, Inspection and Repair
Bendix, Air Brake Systems – Operation and Maintenance
University of Findlay, Advanced Emergency Response – Cargo-Tank Truck
University of Medicine & Dentistry of New Jersey, Site Investigation Certification
University of Medicine & Dentistry of New Jersey, Site Investigation Supervisor Certification
AAR/Bureau of Explosives, Rail-Tank Car Specialist
New Jersey State Police, Confined Space Operations-Trainer
Rutgers University, Traffic Control Coordinator Certified - MUTCD
Smith System, Multi-Company Driver Trainer-Instructor Certified
Smith System, Principles of Space Cushion – No Accident Driving
National Safety Council; Defensive Driver Certified

*Additional relative certifications available upon request

**Professional**
**Experience:**

In excess of 1,000 CMV Tractor-Trailer Crashes
In excess of 1,000 CMV Loading/Offloading Incidents
In excess of 200 CMV Cargo-Tank Crashes
In excess of 1,000 CMV Post-Crash; and, FMCSA Compliance and Pre-Trip Inspections
Motorcoach and Bus Crash Inspection/Investigation

Load Securement Failures CMV Flatbeds
Driver Qualifications; Hours-of-Service; Motor Carrier Fitness; CDL
Highway construction Zone Crashes - CMV
Loading/Offloading Incidents (Loading Docks/Loading Racks)
Forklift Operations/Loading Dock
CMV Post Crash Inspections
FMCSA & PHMSA Regulatory
Hazardous Materials Regulations (HMR)
Maritime Shipping Container/Chassis Incidents

**Professional**
**Associations:**   Commercial Vehicle Safety Alliance
National Tank Truck Carriers (NTTC)
American Trucking Association (ATA)
North American Transportation Institute (NATMI)
Tire Industry Association (TIA)
Accident Reconstruction Communications Network (ARC)
National Academy of Sciences; Transportation Research Board (NAS;TRB)

- Speaking engagements: American Law Firm Association (ALFA); Transportation Lawyers Association (TLA); National Tank Truck Carriers (NTTC) annual conferences (Annual Safety Managers Conference, Annual Board of Directors meeting); NJ State Safety Council Annual Conferences; Middlesex County Fire Academy; Hazardous Materials Advisory Council's, Transportation Regulatory Compliance Enforcement Program; Marine Fire Fighting Task Force; Association of American Railroads (BOE); American Towmen's Association; Vessel Operators HM Association; Pennsylvania Association Annual Conference (HACC); California Regional HM Response Organizations (CRHMRO); etc.

**Geographic**
**Area:**   Continental US, Hawaii, Puerto Rico, Alaska, US Virgin Islands, Canada and Brazil

**Fees:**   Expert and consulting rates schedule available upon request

**Litigation**
**Case History:**  Available upon request